1  SHAWNA PARKS (CA BAR NO. 208301)  (sparks@dralegal.org)
   MARY-LEE K. SMITH (CA BAR NO. 239086)  (msmith@dralegal.org)
2  REBECCA WILLIFORD (CA BAR NO. 269977 )  (rwilliford@dralegal.org)
   KARA JANSSEN (CA BAR NO. 274762)  (kjanssen@dralegal.org)
3  DISABILITY RIGHTS ADVOCATES
   2001 Center Street, Fourth Floor
4  Berkeley, CA  94704-1204
   Telephone:     (510) 665-8644
5  Facsimile:     (510) 665-8511

6  HERNAN VERA (CA BAR NO. 175149)  (hvera@publiccounsel.org)
   LAURA FAER (CA BAR NO. 223846)  (lfaer@publiccounsel.org)
7  PUBLIC COUNSEL
   2001 Center Street, Fourth Floor
8  Berkeley, CA  94704-1204
   Telephone:     (510) 529-3419
9  Facsimile:     (213) 385-9089

10  GRACE A. CARTER (CA BAR NO. 101610)  (gracecarter@paulhastings.com)
    GINA COOK (CA BAR NO. 245611 )  (ginacook@paulhastings.com)
11  PAUL HASTINGS LLP
    55 Second Street, Twenty-Fourth Floor
12  San Francisco, CA  94105-3441
    Telephone:     (415) 856-7000
13  Facsimile:     (415) 856-7100
    *Attorneys for Plaintiffs*

14

15                  **UNITED STATES DISTRICT COURT**

16                **NORTHERN DISTRICT OF CALIFORNIA**

17  G.F., by and through her guardian ad litem,        **Case No.  C13-3667**
    Gail F.; W.B., by and through his guardian ad
18  litem, CiCi C.; Q.G., by and through his          **CLASS ACTION**
    guardian ad litem, Barbara C.; and on behalf of
19  themselves and a class of those similarly         **COMPLAINT FOR INJUNCTIVE AND**
    situated,                                         **DECLARATORY RELIEF**

20                  Plaintiffs,

21  v.

22  CONTRA COSTA COUNTY; CONTRA
    COSTA COUNTY DEPARTMENT OF
23  PROBATION; PHILIP KADER, in his official
    capacity, Chief County Probation Officer;
24  BRUCE PELLE, in his official capacity,
    Superintendent of Juvenile Hall; CONTRA
25  COSTA COUNTY OFFICE OF
    EDUCATION; JOSEPH A. OVICK, in his
26  official capacity as Superintendent, Contra
    Costa County Office of Education; LYNN
27  MACKEY, in her official capacity, Director of
    Contra Costa County Court Schools.
28
                    Defendants.

1    Plaintiffs G.F., W.B., and Q.G.[1] (collectively, "Plaintiffs"), by and through their counsel,

2    Disability Rights Advocates, Public Counsel and Paul Hastings LLP, bring this Complaint

3    against Defendants Contra Costa County; Contra Costa County Department of Probation; Philip

4    Kader, in his official capacity as Chief County Probation Officer; Bruce Pelle, in his official

5    capacity as Superintendent of Contra Costa County Juvenile Hall; Contra Costa County Office of

6    Education; Joseph Ovick, in his official capacity as Superintendent, Contra Costa County Office

7    of Education; and Lynn Mackey, in her official capacity as Director of Contra Costa County

8    Court Schools (collectively, the "Defendants").[2]

9                                    **INTRODUCTION**

10        1.        Contra Costa County Juvenile Hall, like all juvenile halls in the State, exists

11   "solely for the purpose of rehabilitation and not punishment"[3] for young people who have gotten

12   off track.  Indeed, juvenile hall "shall not be deemed to be, nor be treated as, a penal institution.

13   It shall be a safe and supportive homelike environment."  Cal. Welf. & Inst. Code § 851.  Instead

14   of following these statutory mandates, Defendants (1) are subjecting youth with disabilities to

15   unconscionable conditions of solitary confinement based on their disability-related behavior –

16   sometimes for weeks or months at a time – while watching them deteriorate mentally; (2) are

17   denying youth with disabilities education and special education and related services when they

18   are in solitary confinement, and (3) are failing to provide youth with disabilities the required

19   special education and related services even when they are not in solitary confinement, all in

20   violation of federal and state anti-discrimination laws.

21        2.        Young people with disabilities become trapped in a cruel cycle of discrimination:

22   Defendants fail to provide them with critical special educational and related services to which

---

[1] Plaintiffs are redacting plaintiffs' names pursuant to Federal Rules of Civil Procedure 5.2(a) ("in an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor, . . . a party or nonparty making the filing may include only: (3) the minor's initials[.]")  Plaintiffs are concurrently filing under a separate cover a motion to proceed under fictitious names and motion to seal for the guardians ad litem for named plaintiffs.

[2] Defendants sued in their official capacity are sued for prospective relief to enjoin them from continuing to deny Plaintiffs, and others similarly situated, the rights guaranteed to them under various federal and state laws.

[3] *People v. Olivas*, 17 Cal. 3d 236, 254 (1976).

---

1 they are entitled under federal and state laws and, lacking such supports, the youth are punished

2 for a variety of infractions and are locked away in solitary confinement where their conditions

3 only deteriorate and they fall further behind in their education because they are denied schooling,

4 making it more likely that they will commit further infractions upon their release from solitary

5 confinement.

6   3. Specifically, Defendants fail to provide the legally-required special education and

7 related services, including mental health services, to youth with disabilities such that they cannot

8 meaningfully access education while in Juvenile Hall.  Defendants also deny youth with

9 disabilities the opportunity to equally, effectively and meaningfully participate in and benefit

10 from the educational and rehabilitative services and programs offered by Defendants in Juvenile

11 Hall.

12   4. When youth with disabilities commit infractions in Juvenile Hall that result in

13 their being locked in solitary confinement, Defendants fail to inquire into whether the youth has

14 a disability and fail to make the legally mandated determination of whether the infraction was

15 disability-related.

16   5. Indeed, regardless of whether their behavior was on account of their disability,

17 youth are thrown into solitary confinement and spend up to 23 hours a day in their cells.

18 Defendants fail to make reasonable modifications to the policies, procedures and practices of

19 Juvenile Hall to avoid this discrimination against youth with disabilities.

20   6. While locked in the two higher levels of solitary confinement, students with

21 disabilities are denied all education and special education, which are legally mandated.  In the

22 lowest level of solitary confinement, they have only limited access to general education and are

23 denied all special education.

24   7. Accordingly, when youth with disabilities are released from solitary confinement,

25 they have fallen further behind in their education and their mental health has deteriorated,

26 perpetuating the cycle of discrimination.

27   8. In Contra Costa County Juvenile Hall, youth are frequently placed on "Program,"

28 "Risk" or "Max" – three levels of solitary confinement.  On Program, youth are generally kept in

1    their cells 22-1/2 hours a day, and on Risk and Max, youth are in their cells for 23 hours a day.

2       9.      While education should be the "foundation for programming in most juvenile

3    institutions,"[4] in Contra Costa County Juvenile Hall, youth in solitary confinement cannot attend

4    school. While on "Risk" and "Max," youth with disabilities are outright denied both general and

5    special education entirely.

6       10.      Even while on "Program," the County's policies illegally permit Probation to

7    withhold education as a punishment or for no reason at all. If "educational services" are

8    provided, generally it is a tutor that visits only sporadically (not every day) and for

9    approximately five to 30 minutes each time.

10       11.      California law provides that the County Board of Education shall provide for the

11    administration and operation of juvenile court schools in conjunction with the county's chief

12    probation officer, or a designee. Defendants Contra Costa County Office of Education ("Office

13    of Education"), and Ovick and Mackey, as officers of the Office of Education, are therefore

14    responsible, together with Defendants County of Contra Costa and the County's Department of

15    Probation (collectively "Probation Department") and Kader and Pelle, as officers of the

16    Probation Department, for ensuring detained youth in Contra Costa County receive an education

17    that complies with the applicable federal and state laws.

18       12.      Detained youth with disabilities are legally entitled under the Individuals with

19    Disabilities Education Act, Title II of the Americans with Disabilities Act, Section 504 of the

20    Rehabilitation Act and the California Education and Government Codes to receive a free

21    appropriate public education, which includes special education and related services, and shall not

22    be discriminated against or otherwise denied meaningful access to education.

23       13.      Youth with disabilities are also legally entitled under Title II of the Americans

24    with Disabilities Act, Section 504 of the Rehabilitation Act, and Government Code Section

25    11135 to equal, effective and meaningful participation in and benefit from Defendants'

26    educational and rehabilitative services and programs. To satisfy this legal mandate, Defendants

27

28    [4] U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention, Conditions of Confinement: Juvenile Detention and Corrections Facilities 129 (1994),

1 | must make reasonable modifications to policies, practices and procedures in order to meet the
2 | specific needs of youth with disabilities.

3 |       14.     Nonetheless, Defendants have abdicated their core responsibility of providing
4 | education and rehabilitation, not punishment, to youth with disabilities who are detained at the
5 | Contra Costa County Juvenile Hall.  The violations of detained youth's rights and illegal
6 | deprivations of educational and rehabilitative services at Juvenile Hall are rampant and
7 | widespread, yet Defendants have allowed them to persist.

8 |       15.     Specifically, Defendants have violated the rights of detained young people with
9 | disabilities as follows:

10 |      a)   Defendants fail to provide meaningful access to the education they offer, because:

11 |           1)   Defendants fail to provide the full continuum of educational placements,
12 |      such as special day classes, non-public schools and residential treatment
13 |      options, instead offering the general education setting (i.e., a regular
14 |      classroom) as the only placement option to youth with disabilities;

15 |           2)   Defendants develop wholly inappropriate "cookie-cutter" Individualized
16 |      Education Programs (IEPs) for youth with disabilities that are virtually the
17 |      same for every youth and, thus, do not meet their unique disability-related
18 |      educational needs;

19 |           3)   Defendants routinely deny the special education and related services
20 |      (specifically specialized academic instruction) that they are obligated to
21 |      provide, often denying the services required by the deficient IEPs that
22 |      Defendants themselves develop;

23 |           4)   Before they develop a child's new IEP, Defendants fail to provide students
24 |      who enter Juvenile Hall with comparable services to their prior IEPs;

25 |           5)   Defendants also fail to affirmatively identify, locate, and evaluate students
26 |      who enter Juvenile Hall and need special education but have not
27 |      previously been identified as needing special education;

28 |

b) When youth with disabilities commit infractions resulting in their being removed from school and locked in solitary confinement, Defendants fail to hold legally required manifestation determinations to evaluate whether the infraction was a result of their disability;

c) Just as they do not conduct manifestation determinations, Defendants do not complete functional behavior or analysis assessments (prior to July 2013), do not put in place systems of Positive Behavioral Interventions and Supports to assist youth with disabilities, and do not develop legally required Behavioral Intervention Plans;

d) Regardless of whether an infraction was due to disability, Defendants remove the student from school and place him or her in solitary confinement for days, weeks or even months  and fail to make reasonable modifications to policies, procedures and practices in Juvenile Hall to avoid such placement;

e) Defendants knowingly place youth with disabilities, such as mental illness, cognitive impairments and ADHD, in solitary confinement, which leads to the deterioration of these disabilities;

f) Defendants outright deny education, including special education and related services, to youth with disabilities who are placed on the Risk or Max levels of solitary confinement;

g) Defendants' policies illegally permit Probation supervisors to withhold education for punishment.  When "educational services" are provided on the Program level, it is generally a tutor who visits only sporadically (not every day) and for approximately five to 30 minutes each time.

16.     In sum, Defendants have systematically discriminated against youth with disabilities and deprived them of the most basic access to education in violation of federal and state laws.  Defendants' conduct, acts and omissions are ongoing.

17.     Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of similarly situated youth ("Plaintiff Class") in the form of an order finding Defendants

1   out of compliance with relevant laws and directing Defendants to comply with all relevant laws

2   by, *inter alia*, providing: (1) meaningful access to education for all students with disabilities and

3   compliance with all special education laws that protect such students; (2) general education and

4   special education and related services to all youth with disabilities in solitary confinement in any

5   of its forms for any amount of time; (3) compensatory education to youth with disabilities who

6   have served and are currently serving time in Juvenile Hall; (4) reasonable modifications to

7   policies, practices and procedures to ensure that youth with disabilities do not suffer

8   discrimination based on their disability, including through placement in solitary confinement; (5)

9   an award of reasonable attorneys' fees and costs under applicable law; and (6) any other relief

10   the Court deems appropriate.

11        18.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of

12   Defendants' ongoing refusal to meet the needs of youth with disabilities in the Contra Costa

13   County Juvenile Hall, and all will continue to suffer further irreparable harm unless and until the

14   Court grants declaratory and injunctive relief against Defendants to remedy the ongoing illegal

15   treatment of and discrimination against youth with disabilities at the Juvenile Hall, and to ensure

16   that the rights of youth with disabilities are not violated.

17                  **JURISDICTION**

18        19.    This court has jurisdiction over Plaintiffs' federal claims that arise under the

19   Individuals with Disabilities Education Improvement Act ("IDEA"), Title II of the Americans

20   with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Section 504") and

21   the regulations promulgated thereunder.  The jurisdiction of this Court is invoked (1) pursuant to

22   28 U.S.C. § 1331, because those claims arise under 28 U.S.C. § 1343(a)(3), because those claims

23   seek to redress deprivations, under color of state authority, of rights, privileges and immunities

24   secured by the United States Constitution and any Act of Congress providing for equal rights of

25   citizens or of all persons, and (2) under 28 U.S.C. § 1343(a)(4), because those claims seek to

26   secure equitable relief under an Act of Congress providing for the protection of civil rights.

27        20.    Through the same acts and omissions that form the basis for Plaintiffs' federal

28   claims, Defendants have also violated Plaintiffs' rights under state law, over which this Court has

---

1    supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2         21.     Pursuant to the Court's jurisdiction over this matter, Plaintiffs G.F., by and

3    through her guardian ad litem, Gail F.; W.B., by and through his guardian ad litem, CiCi C.; and

4    Q.G., by and through his guardian ad litem, Barbara C., bring this action on behalf of themselves

5    and on behalf of all other persons similarly situated.

6         22.     This Court has jurisdiction over Plaintiffs' claims for declaratory and injunctive

7    relief pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure 57(d) and 65.  This

8    Court also has authority pursuant to 42 U.S.C. § 1415(i)(3) under IDEA, 42 U.S.C. § 12205

9    under the ADA, and 29 U.S.C. § 794a(b) under Section 504 to award Plaintiffs' reasonable

10   attorneys' fees and costs.

11                                      **VENUE**

12        23.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)

13   because Defendants are located in this District and all of the acts and/or omissions complained of

14   herein have occurred, are occurring, or will occur in the District.

15                                     **PARTIES**

16                                     ***Plaintiffs***

17        24.     Plaintiff G.F. is a 14-year-old citizen of the United States and a resident of Contra

18   Costa County, California.  G.F. has been detained at Juvenile Hall in Martinez since the summer

19   of 2012, when she was 13.  She is a part of the Girls in Motion Program which is housed at

20   Juvenile Hall.  G.F.'s guardian is contemporaneously filing a petition under seal with this Court

21   to act as her guardian ad litem.

22        25.     Plaintiff W.B. is a 17-year-old citizen of the United States and resident of Contra

23   Costa County, California.  W.B. has been detained in Juvenile Hall since May 2012.  W.B. has

24   been declared incompetent by the Juvenile Court.  W.B.'s parent is contemporaneously filing a

25   petition under seal with this Court to act as his guardian ad litem.

26        26.     Plaintiff Q.G. is a 17-year-old citizen of the United States and resident of Contra

27   Costa County, California.  Q.G. has been detained in Juvenile Hall since November of 2010.  He

28   is currently a part of the Youthful Offender Treatment Program which is housed at Juvenile Hall.

Q.G.'s parent is contemporaneously filing a petition under seal with this Court to act as his guardian ad litem.

### Defendants Contra Costa County, Contra Costa County Probation Department, Kader and Pelle

27.     Defendant Contra Costa County is responsible for providing and maintaining the juvenile facilities in Contra Costa County and for meeting minimum standards promulgated by the California Board of Corrections for these facilities. 15 Cal. Code Regs. § 1310. The County is also responsible for providing oversight to the Probation Department and Chief County Probation Officer Kader.

28.     Contra Costa County Probation Department is responsible for the care of youth detained in the Juvenile Hall. California law provides that each county probation department shall manage and control that county's juvenile hall. Cal. Welf. & Inst. Code § 852. However, California law is clear: "the juvenile hall shall not be in, or connected with, any jail or prison, and shall not be deemed to be, nor be treated as, a penal institution. It shall be a safe and supportive homelike environment." Cal. Welf. & Inst. Code § 851.

29.     The Chief Probation Officer, in conjunction with the Contra Costa Office of Education, is legally required to provide for the administration and operation of juvenile court schools. 15 Cal. Code Regs. § 1370(a). Together, the County Office of Education and the Probation Department must "develop written policy and procedures to ensure communication and coordination between educators and probation staff." *Id.*

30.     Among other things, the Juvenile Hall school programs must provide a quality educational program that includes instructional strategies designed to respond to the different learning styles and abilities of students. 15 Cal. Code Regs. § 1370(b). This means that "education instruction shall be provided to minors restricted to high security or other special units" and that "state and federal laws shall be observed for individuals with special education needs." 15 Cal. Code Regs. § 1370(d). Moreover, "expulsion/suspension from school shall follow the appropriate due process safeguards...including the rights of students with special needs." 15 Cal. Code Regs. § 1370(c)(3). Disciplinary actions taken at juvenile detention

1  facilities <u>must not</u> deprive a youth of education. 15 Cal. Code Regs. § 1390(j).  Indeed, any

2  disciplinary actions must follow clear due process procedures including right to a hearing and to

3  present evidence.  15 Cal. Code Regs. § 1391.

4         31.    In short, the Probation Department must ensure that youth detained at the Juvenile

5  Hall have access to legally adequate and appropriate educational services (which the Contra

6  Costa County Office of Education is obligated to provide) during the youth's term of

7  commitment and must ensure that detained youth receive reasonable modifications to policies,

8  practices and procedures to ensure that youth with disabilities are not discriminated against based

9  on their disability.

10         32.    In addition, the Probation Department is also responsible for the violations of the

11  Contra Costa County Office of Education in that by allowing its discrimination to continue

12  unchecked, the Probation Department both aids and perpetuates discrimination against youth

13  with disabilities at Juvenile Hall.

14         33.    As a "political subdivision[] of the State that [is] responsible for providing

15  education to children with disabilities," the County is a public agency for purposes of IDEA.  34

16  C.F.R. § 300.33.  The County's Probation Department is also a public agency as it is considered

17  a subdivision of the State that is "involved in the education of children with disabilities."  34

18  C.F.R. § 300.2.  "Having administrative control and direction" over the juvenile court schools,

19  the Probation Department also qualifies as an educational services agency under IDEA.  20

20  U.S.C. § 1401(5)(b); 34 C.F.R. § 300.12(b)

21         34.    As a local government, the County, and its Probation Department, is a "public

22  entity" as defined by Title II of the ADA.  42 U.S.C § 12131(1)(B).

23         35.    As a public entity receiving federal funds, the County, and its Probation

24  Department, may not discriminate against people with disabilities in violation of Section 504.

25         36.    Philip Kader is the Chief Probation Officer for the County.  He is sued in his

26  official capacity.  Defendant Kader's official duties as Chief Probation Officer include direct

27  responsibility for working with the County Office of Education to provide for the administration

28  and operation of juvenile court schools and to ensure communication and coordination between

1   educators and probation staff.  He is also charged with creating and implementing Juvenile Hall

2   policies.

3       37.     Bruce Pelle is the Superintendent of Juvenile Hall for the County.  He is sued in

4   his official capacity.  Defendant Pelle's official duties as Superintendent of Juvenile Hall include

5   overseeing the implementation of all policies at Juvenile Hall.  He is also charged with making

6   final determinations as to any grievances coming from the youth detained in Juvenile Hall.

7               ***Defendants Contra Costa County Office of Education, Ovick and Mackey***

8       38.     Contra Costa County Office of Education ("Office of Education") is one of the

9   State of California's County Offices of Education.  County Offices of Education are charged

10   with providing for the administration and operation of juvenile court schools.  Cal. Educ. Code §

11   48645.2.  The Office of Education operates the court school at Juvenile Hall, Mt. McKinley

12   School.

13       39.     The Office of Education receives federal financial assistance under IDEA.  It is

14   therefore responsible for providing all school-eligible persons with disabilities who reside in the

15   County with special education programs administered in compliance with federal and state laws

16   and regulations. 20 U.S.C. § 1413(a).

17       40.     The Office of Education must ensure that youth detained at the Juvenile Hall have

18   access to legally adequate and appropriate educational services as well as receive reasonable

19   modifications to policies, practices and procedures to ensure that youth with disabilities are not

20   discriminated against based on their disability.

21       41.     In addition, the Office of Education is also responsible for the violations of the

22   Contra Costa County Probation Department in that by allowing its discrimination to continue

23   unchecked, the Office of Education both aids and perpetuates discrimination against youth with

24   disabilities at Juvenile Hall.

25       42.     As a "political subdivision[] of the State that [is] responsible for providing

26   education to children with disabilities," the County Office of Education is a public agency for

27   purposes of IDEA.  34 C.F.R. § 300.33.  As a "public authority legally constituted within a State

28   for either administrative control or direction of, or to perform a service function for, public

---

*G.F., et al. v. Contra Costa County, et al.*, Case No.
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                    10

1    elementary schools or secondary schools in a city, county, township, school district, or other

2    political subdivision of a State," Defendant Office of Education is a local education agency

3    ("LEA") as defined by IDEA.  20 U.S.C. § 1401(19); 34 C.F.R. 300.328(a).

4         43.    As a department or agency of a local government, the Office of Education is a

5    "public entity" as defined by Title II of the ADA.  42 U.S.C § 12131(1)(B).

6         44.    As a public entity receiving federal funds, the Office of Education may not violate

7    Section 504 by discriminating against people with disabilities.

8         45.    Defendant Joseph A. Ovick is the Superintendent of the Office of Education.  He

9    is sued in his official capacity.  Defendant Ovick's official duties as the Office of Education

10   Superintendent include direct supervisory responsibilities over the juvenile court schools run by

11   the Office of Education.

12        46.    Defendant Ovick is required to, *inter alia*, "[v]isit and examine each school in his

13   or her county at reasonable intervals to observe its operation and to learn of its problems" and

14   "[e]nforce the course of study."  Cal. Educ. Code §§ 1240, (c)(1) and (h), respectively.

15        47.    Defendant Lynn Mackey is the Director for Contra Costa County Court Schools,

16   and her duties include the operation and supervision of such schools.  She is sued in her official

17   capacity.

18                                   **CLASS ALLEGATIONS**

19        48.    Plaintiffs bring this action on behalf of themselves and all other persons similarly

20   situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

21        49.    The class consists of all youth with disabilities, as defined by the Americans with

22   Disabilities Act and Section 504 of the Rehabilitation Act, who are currently detained or who

23   will be detained at the Contra Costa County Juvenile Hall.

24        50.    The compensatory education class consists of all youth who are or were detained

25   at the Contra Costa County Juvenile Hall and are or were eligible for special education during

26   the two years prior to filing of this Complaint.

27        51.    Class action status for this litigation is proper because:

28

(a) The class of students is so numerous that joinder of all members is impractical. Plaintiffs maintain that the class of persons consists of hundreds if not thousands of youth. For instance, from January 2013 to April 2013, approximately 32.7% of the student population at Mt. McKinley School had disabilities. Given that approximately 1,300 students pass through Mt. McKinley each year, in a single year, approximately 425 students who have a disability that requires either an IEP or 504 Plan pass through Mt. McKinley. Moreover, the juvenile population within Juvenile Hall changes constantly and not all class members can be specifically identified. In addition, many detained youth who have a disability are not identified as such, because of Defendants' failure to fulfill their obligations under federal and state laws to locate, identify and assess youth suspected of having a disability.

(b) There are questions of law and fact common to the class.

(c) The claims of Plaintiffs are typical of the claims of the class. Plaintiffs are being and were denied their legal entitlement to special education, related services, and reasonable modifications to Defendants' policies and practices.

(d) Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Plaintiffs and the other class members and Plaintiffs have retained counsel experienced in class action litigation relating to education, special education, and the civil rights of persons with disabilities.

(e) Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## FACTUAL ALLEGATIONS

### Contra Costa County Juvenile Hall

52. Defendant Probation Department operates the Contra Costa County Juvenile Hall in Martinez, California. Juvenile Hall is a 290-bed, maximum-security detention facility, for youth up to age 18.

53.     Juvenile Hall is generally not the final sentencing disposition for youth, except for those young people in the Youthful Offender Treatment Program and for the Girls in Motion Program.  Generally, Juvenile Hall provides temporary detention for pre-adjudicated youth awaiting hearings or sentencing, and adjudicated youth who are sentenced to a treatment or rehabilitation program that has a waiting list.  No treatment or rehabilitative programs are offered at the Juvenile Hall for those awaiting hearings, sentencing, or placement.

54.     In addition, those youth found to be incompetent under the law also remain at Juvenile Hall and receive competency training until they either become competent or are released.  Such detentions can last for years.

55.     The Youthful Offender Treatment Program ("YOTP") is a 30-bed boys' program located inside Juvenile Hall.  YOTP is designed for youth generally between 16 and 19 years of age.  There are four phases to YOTP plus an orientation, and the length of the placement in YOTP is determined by the successful completion of each phase.  On average, YOTP can be completed in approximately fourteen months.

56.     Juvenile Hall has one girls' housing unit.  Within that unit, in 2010, Juvenile Hall staff developed the Girls in Motion Program.  The Court has the option of ordering female offenders into Girls in Motion.  There are four phases to Girls in Motion, and the length of placement in Girls in Motion is determined by the successful completion of each phase.  On average, Girls in Motion can be completed in approximately four months.

### Solitary Confinement in the Juvenile Hall

57.     Cells in Contra Costa County Juvenile Hall are prison-like.  They are extremely small without even enough room to exercise.  There is a toilet, sink and bed.  The bed is a cement block with a pad on it.  The cell does not have bars but rather a solid door with a small window in it.  The window is about as wide as a hand and long as an arm.  Youth who look out their window while in their cell are subject to discipline by the probation staff.

58.     Much like the cells, the solitary confinement policies of Contra Costa County Juvenile Hall are like that from an adult detention facility.  There are various levels of solitary confinement known as "Security Programs."  According to the Probation Department, these are

1   used as "a disciplinary measure for those residents who have violated Major Rules, demonstrate

2   a pattern of repetitious Minor Rule violations, or who present an immediate physical threat to

3   another person." There are three basic levels: maximum security, security risk and special

4   program.

5        59.    Maximum security or "Max" is the most restrictive program at Juvenile Hall. On

6   Max, a youth is confined to his/her cell, and is prohibited from participating in any unit activity

7   with the group. Youth on Max are allowed out of their cell for only one hour per 24-hour period,

8   i.e., 30 minutes on the morning shift and 30 minutes on the afternoon/evening shift. During

9   these times, they cannot leave their unit. Visits with the Juvenile Hall chaplain, mental health

10   therapists or Probation Officers are permitted only with supervisory approval. Such visits are

11   conducted in the youth's cell or in the unit's interview room. If the visit takes place in the

12   youth's cell, the door to the cell must remain open with three probation counselors present on the

13   unit. Whenever the cell door is opened for a youth on Max, or when the youth is out of his or her

14   cell, a minimum of three Probation Counselors must be on the housing unit.

15        60.    Juvenile Hall's policy lacks any mention of the provision of educational services

16   for young people on Max and, indeed, youth are outright denied general education or special

17   education services while on Max.

18        61.    "Security risk" or "Risk" is only slightly less restrictive than Max. Youth on Risk

19   are confined to their cells and are prohibited from participating in any unit activity with the

20   group. Young people on Risk are allowed out of their cell for one hour during a 24-hour period,

21   30 minutes on the morning shift and 30 minutes on the afternoon/evening shift. The visitation

22   policy for the Juvenile Hall chaplain, mental health therapists or Probation Officers when on

23   Risk is the same as when on Max except that only two probation counselors are needed. A

24   minimum of two Probation Counselors must be on the housing unit whenever the youth's cell

25   door is opened, or when he or she is out of the cell.

26        62.    Juvenile Hall's policy lacks any mention of the provision of educational services

27   for young people on Risk and, indeed, youth are outright denied general education or special

28   education services while on Risk.

63.     Special Program or "Program" is generally assigned as a reduction from Risk status but is also "used when a resident is habitually violating minor rule infractions." On Program, the supervisor can determine "the amount of exercise time the resident will be allotted, number of meal trays, . . . contact with the group, and other limitations." However, generally, while on Program, youth are allowed out of their cells for 45 minutes in the morning shift and 45 minutes in the afternoon/evening shift during a 24-hour period.

64.     Furthermore, even though the law mandates that youth be provided with education, the Probation Department's written policy gives supervisors the authority to impose "restrictions on school attendance" as punishment.

65.     While students are on Program, a "tutor" _may_ visit youth for anywhere from five to 30 minutes to provide school work on some days but only if the Probation Department authorizes it. Tutors rarely provide actual instruction; rather, they bring worksheets to complete.

66.     There are other security restrictions such as "Security Suspect," or "Suspect." Youth may be placed on Suspect when it is believed that they could be a serious threat to the community, or exhibit bizarre or suspicious behaviors which would lead one to believe that they may be a danger to themselves or others. On Suspect, a youth is not allowed to attend any off-unit activity in the assessment center, overflow classroom, or other location where the youth may come into contact with youth from other housing units. Whenever the unit is engaged in one of these off-unit activities in which the Suspect youth is prohibited from participating, the youth may be confined to his/her cell.

67.     There is also a disciplinary measure that may be employed by the County's Office of Education teachers, known euphemistically as "room time." If a teacher believes that a student has not completed sufficient work while in the classroom or has committed some other infraction, the teacher may request that the student be placed on "room time." At the teacher's discretion, the discipline may occur during school, in which case the student is sent to his/her cell instead of attending school. It may also occur when a student might normally be allowed of out of his/her cell (e.g., after dinner). Instead, the student must stay confined in his/her cell.

1    Regardless of when this punishment occurs, the student is not given any school work to

2    complete.

3         68.    Youth are never given any guidance, written or verbal, as to what infractions will

4    result in their being locked in solitary confinement.  Indeed, under the County's practice,

5    placement in solitary confinement is highly subjective. Youth can be locked in solitary

6    confinement for anything, including disability-related behavior.

7         69.    When a youth is locked in solitary confinement there should be an "incident

8    report."  However, the youth do not get to see it.  Rather, they are given a "due process" form

9    which says that they are being put on Program, Risk or Max but, does not explain why.  The

10   youth is given no choice but to sign it.  While there is a place to write down the youth's side of

11   the story and a staff member is supposed to meet with the youth to discuss, this rarely occurs,

12   and the process never results in any outcome other than solitary confinement.  Moreover, the due

13   process form is not always provided to the youth and, thus, they never have an opportunity to tell

14   their side of the story.

15        70.    When youth are locked in solitary confinement, there is no inquiry into whether

16   the behavior leading to solitary confinement was related to the youth's disability or even as to

17   whether the youth has a disability at all.

18                              ***School in Juvenile Hall***

19        71.    Defendant Office of Education operates, in conjunction with Defendant Probation

20   Department, a public school onsite that provides educational services to the youth held at the

21   Juvenile Hall.  The school is called Mt. McKinley.

22        72.    Mt. McKinley School was built in 2005.  The school has eight classrooms, a

23   library, computer lab, athletic gym and field.

24        73.    While on all school sites, students are under direct supervision from probation

25   personnel.

26        74.    Each classroom consists of all the students on that unit of varying ages and grade

27   levels.  Everyone in the classroom, regardless of level, is taught the same lessons regardless of

28   whether they learned the material already or not.  For instance, the 18-year-olds are taught the

---

*G.F., et al. v. Contra Costa County, et al.*, Case No.
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                    16

1   same subjects as the 15-year-olds.

2       75.     Each classroom has the same teacher for all subjects: Math, Science, English,

3   History and P.E. There is one teacher for the entire class. There is also a teacher's aide who is

4   in the classroom at various points during the day.

5       ***Special Education Required for Youth with Disabilities Detained at Juvenile Hall***

6       76.     Together, IDEA, Section 504[5], the ADA, California Education Code section

7   56000 *et seq.*, and California Government Code section 11135 *et seq.* prescribe very specific

8   requirements for the provision of special education and related services for students with

9   disabilities and students suspected of having a disability. All students with disabilities are

10  entitled to receive a free appropriate public education appropriate to meet their individual needs,

11  also known as "FAPE." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.101; Cal. Educ. Code §

12  56040(a); 45 C.F.R. § 84.33. FAPE is intended to enable students with disabilities to receive

13  educational benefit and to have meaningful access to public education.[6]

14      77.     Title II of the ADA, Section 504, and Government Code Section 11135[7] prohibit

15  a public entity from excluding persons with disabilities from participation in the programs of that

16  public entity or denying such persons the benefits of those programs. This prohibition is

17  intended to ensure that persons with disabilities have "meaningful access" to all the benefits a

18

19  _____

20  [5] The regulations promulgated under Section 504 generally conform to the standards established by the IDEA. They use substantially the same language regarding a school district's obligation

21  to evaluate each disabled child, create an IEP with parental input, and provide each disabled child with an appropriate education. *See* 34 C.F.R. §§ 104.33, 104.35, 104.36. Moreover, Title II

22  of the ADA adopts the substantive standards of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *See* 28 C.F.R. § 35.103(a) ("Except as otherwise provided in this part, this part

23  shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 ... or the regulations issued by Federal agencies pursuant to that

24  title."). Thus, courts analyze ADA claims addressing education by reference to Section 504's standards. In addition, a violation of the ADA is also considered a violation of Government
    Code Section 11135. Cal. Gov't Code § 11135(b).

25  [6] *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley*, 458 U.S.

26  176 (1982).

27  [7] California Government Code section 11135 frames this slightly differently as requiring "full and equal access" to the benefits of a public entity's programs or activities. Cal. Gov't Code §
    11135(a). However, a violation of the ADA is also considered a violation of both the

28  Rehabilitation Act and Government Code section 11135. *See* 42 U.S.C. § 12117(b) and Cal. Gov't Code § 11135(b).

_____

*G.F., et al. v. Contra Costa County, et al.*, Case No.
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**          17

1   public entity offers.[8]

2       78.    To ensure the provision of FAPE, a local education agency ("LEA") has what are

3   called "Child Find" obligations which means it must have procedures to identify, locate and

4   evaluate "[a]ll children with disabilities...who are in need of special education and related

5   services[.]" 20 U.S.C. § 1412(a)(1)(A); Cal. Educ. Code § 56301(a); see also 45 C.F.R. §

6   84.32(a). When a LEA identifies a student suspected of having a disability, an initial assessment

7   must be conducted by qualified persons in all areas of suspected disability. Cal. Educ. Code §

8   56320.

9       79.    The initial assessment determines whether a student is eligible for special

10  education and related services. Eligibility is based on having been diagnosed with one of the

11  following conditions: "mental retardation, hearing impairments (including deafness), speech or

12  language impairments, visual impairments (including blindness), serious emotional disturbance .

13  . ., orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific

14  learning disabilities" which, by reason thereof, requires special education and related services. 20

15  U.S.C. § 1401(3).

16      80.    Students receive an individual education program ("IEP") if they are considered

17  "eligible." An IEP is a document developed by an IEP team which includes the parents, a

18  general education teacher, a special education teacher, a representative from the LEA and

19  someone to interpret the results of the assessment. 20 U.S.C. § 1414(d)(1)(B); Cal. Educ. Code §

20  56341(c). This team must meet at least once annually, and a new assessment of the student must

21  be conducted every three years. 20 U.S.C § 1414(d)(4)(A)(i); 20 U.S.C.§ 1414(a)(2)(B)(ii); Cal.

22  Educ. Code § 56043(j), (k).

23      81.    Providing FAPE also requires providing "related services" that a child with a

24  disability may need in order to benefit from his or her education. The term "related services"

25  means "transportation, and such developmental, corrective, and other supportive services

26  (including speech-language pathology and audiology services, interpreting services,

27

28  _____

[8] *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

1   psychological services, physical and occupational therapy, recreation, including therapeutic

2   recreation, social work services, school nurse services designed to enable a child with a disability

3   to receive a free appropriate public education as described in the individualized education

4   program of the child, counseling services, including rehabilitation counseling, orientation and

5   mobility services, and medical services, except that such medical services shall be for diagnostic

6   and evaluation purposes only)[.]" 20 U.S.C. § 1401(26)(A).

7        82.    Once a student is deemed eligible for special education under the IDEA,

8   Defendants are charged with assembling an IEP team to determine what combination of

9   instruction, services, and placement are needed to meet that child's unique needs.

10       83.    Each public agency must ensure that a continuum of alternative placements is

11  available to meet the needs of children with disabilities for special education and related

12  services.  The continuum must include options ranging from instruction in regular classes,

13  special classes, special schools, home instruction, and instruction in hospitals and institutions. 34

14  C.F.R. 300.115; Cal. Educ. Code § 56360.

15       84.    Individualized Education Programs (IEPs) are supposed to be, as the name

16  suggests, specifically tailored to meet the unique needs of each disabled student.  20 U.S.C. §

17  1414(d)(1)(A).  IEPs must be "designed to meet individual educational needs of handicapped

18  persons as adequately as the needs of non-handicapped persons are met." 34 C.F.R. § 104.33(b).

19       85.    Once an IEP has been developed, it must be implemented fully.  20 U.S.C. §

20  1414(d)(2)(A); Cal. Educ. Code § 56345(c).

21       86.    In addition, when students with IEPs enter a new school district they must be

22  provided with "comparable" services to their previous IEPs for the next 30 days, at which point,

23  the new school district must either adopt the prior IEP or develop, adopt and implement a new

24  IEP. 20 U.S.C. § 1414(d)(2)(c); 34 C.F.R. § 300.323(e); Cal. Educ. Code § 56043(m)(1).

25       87.    Federal and state laws require that if behavior leads to removal from school for

26  more than 10 days, or if the child is removed for less than 10 days but the removal is based on

27  behavior that constitutes a pattern, it is a change of placement.  When there is a change in

28  placement, a child must "continue to receive educational services…so as to enable the child to

continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 34 C.F.R. § 300.530(d)(1)(i).

88.     In addition, if behavior leads to removal from school for more than 10 days or to removal for less than 10 days based on behavior that constitutes a pattern, an immediate IEP meeting is required.  During this meeting (also known as a "manifestation determination"), the IEP team must determine if the behavior is a manifestation of the student's disability.  34 C.F.R. § 300.530(e); 34 C.F.R. § 300.536(a)(2); 20 USC § 1415(k); Cal. Educ. Code § 48915.5.

89.     If the behavior was a manifestation of disability, the school must (1) conduct a functional behavior/analysis assessment (the latter before July 2013) and implement a behavioral intervention plan; or (2) review and modify the existing behavioral intervention plan; and (3) return student to the placement from which he or she was removed, unless it involved weapons, drug possession, or serious bodily injury (at which time the student would be placed in an interim alternative educational setting for not more than 45 school days). 20 USC § 1415(k); 34 C.F.R. § 300.530(f)&(g).

90.     If, on the other hand, the behavior was not a manifestation of disability, the student is subject to the regular disciplinary process but is entitled to receive FAPE and services no later than the 11th cumulative day of removal.  20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(c); Cal. Educ. Code § 48915.5.

91.     Separate from the manifestation determination and the requirements it triggers, when behavior impedes learning, public agencies must consider implementing positive behavioral interventions and supports to counter behavior that impedes learning. 20 U.S.C. § 1401(c)(5)(F).  They must also, pursuant to the ADA, Section 504 and Government Code section 11135, make "reasonable modifications" to their policies and practices to ensure that disability-related behavior is not punished. 28 C.F.R. § 35.130(b)(7).

92.     Defendants must meet all of the above special education requirements for students with disabilities, even when students are locked in solitary confinement. *See* 15 Cal. Code Regs. § 1370(d).

1    93.    Nonetheless, Defendants consistently fail to meet these requirements for youth

2    with disabilities held at Juvenile Hall.

3    94.    According to Defendant Office of Education, from July 2011 to June 2012,

4    approximately 23% of the student population at Mt. McKinley had a disability that required

5    either an IEP or 504 Plan.   From January 2013 to April 2013, approximately 32.7% of the

6    student population at Mt. McKinley School had a disability that required either an IEP or 504

7    Plan.

8    95.    These figures are actually quite low, given that estimates of the percentage of

9    youth in juvenile detention facilities who require either an IEP or 504 Plan can be as high as

10    70%.[9]  Indeed, the figures are low because Defendants fail to identify students with disabilities

11    who enter Mt. McKinley School but may not yet have been identified as having a disability, as is

12    required by federal and state law.  In fact, Defendants have no actual policies specific to Juvenile

13    Hall to identify students who may have a disability (i.e. "Child Find" policies).  Rather

14    Defendants' policy is to offer special education only to those students *already identified*.

15    96.    When a student is identified for the first time as having a possible disability, the

16    school must conduct an assessment.  However, from September 2012 to April 2013, Defendants

17    conducted only one initial IEP assessment.  This again indicates that Defendants do not identify

18    students with disabilities who have not previously been identified as having disabilities.

19    97.    Defendants also fail to provide the continuum of placements at Juvenile Hall.  In

20    fact, there is only one placement option for students with disabilities in Juvenile Hall: general

21    education classroom setting (i.e. the regular classroom).  There is, for instance, no special day

22    class that would provide full-time (or even part-time) special education instruction.  Rather,

23    Defendants have adopted an across-the-board policy to justify their illegal practice, which

24    provides that special day classes and resource specialist programs are to be considered "services"

25    and not "placements."  Under this policy, Defendants unlawfully replace special day classes and

26

27

28

[9] Leone, Peter E., Zaremba, Barbara A., Chapin, Michelle S., Understanding the
Overrepresentation of Youths with Disabilities in Juvenile Detention, The District of Columbia
Law Review Vol. 3, No. 389 (1995).

resource specialize programs, where 100% of the time (roughly 240 minutes per day) is spent

receiving instruction from a special education teacher in a class with other disabled peers, with

"specialized academic instruction" for 45 to 90 minutes in the general education classroom

setting.  Specialized academic instruction, however, is a delivery method for special education

and not a program, such as a special day class or resource specialist, so it cannot replace such

programs.  Moreover, consistent with the failure to provide a continuum of placements,

Defendants have also admitted to a practice of never providing or authorizing non-public school

or residential treatment center placements as required by 34 C.F.R. § 300.115(b)(1), regardless of

need or Court Order.

98.     While IEPs are required to be individualized, Defendants have an established

policy of simply disregarding those requirements.  The IEPs that Defendants develop are

strikingly similar regardless of the student's varying disabilities, needs, and previous IEPs.

These "cookie-cutter" IEPs are not individualized to meet an individual student's unique needs.

Indeed, all IEPs place students in a general education setting, and most offer the same

instructional services, namely 45 to 90 minutes of "specialized academic instruction" three to

five times a week.

99.     The specialized academic instruction provided by Defendants is not designed to

meet the unique needs of the students. Students with disabilities who come from special day

classes or non-public schools that provide full-time special education instruction and related

services usually receive approximately 300 minutes of specialized academic instruction.

However, when they arrive at Juvenile Hall, Defendants offer anywhere between 45 to 90

minutes per day.

100.    Once Defendants have assigned a disabled student the standard "cookie-cutter"

IEP, Defendants then compound the violation by failing to provide the "specialized academic

instruction" required by the "cookie-cutter" IEP.  Specialized academic instruction is a term of

art that describes a form of instruction that adapts the content, methodology, or delivery of

instruction to address the unique needs of an individual student's disability. 34

C.F.R.300.39(b)(3).  However, Defendants (1) are not providing specialized academic instruction

1   for the required amount of time and (2) are not providing specialized academic instruction by

2   qualified individuals.

3         101.   Plaintiffs have not received the amount of specialized academic instruction called

4   for in their IEPs. Staff members at Mt. McKinley often are not in the classroom for sufficient

5   time to provide individualized instruction to each child with a disability and routinely do not

6   assist disabled students. At most, the staff will assist with a specific question or issue a student

7   with a disability may have. In fact, Defendants have no records to establish that they are

8   complying with their legal obligations. Defendants do not track whether the required minutes

9   are provided to each student who is entitled to specialized academic instruction.

10        102.   Defendants' logs also do not record who provided the specialized academic

11   instruction. Indeed, Defendants admit that most of the staff members providing specialized

12   academic instruction are aides and not qualified special education teachers. Aides cannot

13   provide specialized academic instruction unless they are "paraprofessionals".

14        103.   Even if these aides are "paraprofessionals," [10] there are legal requirements for

15   allowing paraprofessionals to provide such instruction. If a paraprofessional provides such

16   instruction he or she must be under *direct* supervision of a special education teacher. 20 U.S.C.

17   § 6319(g)(3)(a). Moreover, a paraprofessional may only provide one-on-one tutoring if the

18   tutoring is scheduled at a time when a student would not otherwise receive instruction from a

19   qualified teacher. 20 U.S.C. § 6319(g)(2)(a). At Mt. McKinley aides usually are in the

20   classrooms alone, without special education teachers to directly supervise them. Moreover, Mt.

21   McKinley uses a "push-in model," meaning specialized academic instruction is provided in the

22   general education classroom (not in a separate class). As such, only special education teachers

23   would be allowed to provide instruction simultaneously when a general education teacher is

24   teaching the entire class. However, Mt. McKinley admits that special education teachers do not

25   always provide the specialized academic instruction required by the cookie-cutter IEPs.

26        104.   The IEPs developed by Defendants also do little to consider disability-related

27

28   [10] To be a paraprofessional requires a high school diploma and two years of college or an A.A. degree or passing an assessment of knowledge and skills in assisting in instruction.

1  behaviors that may impact education.  Indeed, Defendants seldom include mental health services

2  in a student's IEP, even though mental health services are considered a related service to which

3  students may be entitled if it would assist in their education.  Even when mental health

4  counseling is provided in an IEP, it is usually for an amount of time which is insufficient for the

5  serious nature of the psychological and/or psychiatric disabilities that some youth have (e.g.,

6  bipolar, schizophrenia).  This may be in part due to the fact that mental health services in

7  Juvenile Hall are generally inadequate.  Indeed, the Contra Costa County Juvenile Justice

8  Commission, pursuant to Welfare and Institutions Code section 229, found that, "[m]ental Health

9  services continue to be inadequate again …. Many minors in custody have a history of physical,

10  sexual or mental abuse, alcohol and drug abuse, gang involvement, prostitution, truancy and

11  neglect."  In addition, Defendants rarely rely on positive behavioral interventions and supports to

12  counter behavior that impedes learning.

13      105.    Defendants also fail to provide comparable services before the cookie cutter IEP

14  is developed and implemented.  Because of the lack of placements at Juvenile Hall,  no student

15  coming from a non-general education setting can possibly receive comparable services because

16  putting a student in a general education setting after they were previously placed in a non-public

17  school with full-time special education instruction is not "comparable."

18      106.    In addition, Defendants wholly fail to conduct manifestation determinations when

19  behavior leads to removal from school and placement in solitary confinement for more than 10

20  days or for behavior that constitutes a pattern.  Indeed, Defendants admit that there were no

21  manifestation determinations held at Mt. McKinley School from July 2012 to June 2013.  Thus,

22  Defendants never inquire into whether the behavior that led to the removal from school was

23  disability-related.  As a result, students whose behavior was disability-related and who should be

24  allowed to return to school are denied that opportunity.  Instead students, regardless of whether

25  the behavior was disability-related, are instead locked in solitary confinement consistent with

26  Defendants' policies which either deny all education or allow the Probation Department to

27  determine whether education will be provided at all.

28      107.    Defendants also fail to develop behavioral intervention plans as they are required

---

1   to do for students with behavior that impedes learning and, in particular, after a manifestation

2   determination finds that behavior leading to removal from school was disability-related.

3   Defendants explicitly admit that there were no Behavior Intervention Plans developed at Mt.

4   McKinley School from July 2012 to June 2013.

5                   ***General Education for Youth Detained at Juvenile Hall***

6       108.    The California Legislature has set forth basic minimum requirements for

7   education for all students, regardless of disability or circumstances.  These requirements include:

8   240 minutes of instruction minimum for each school day (Cal. Educ. Code § 48645.3); 400

9   minutes of physical education each 10 school days for an average of 40 minutes of physical

10   education per day (Cal Educ. Code §§ 51220(d) and 51222); and provision of state approved

11   textbooks and instructional materials so that each student has a textbook or instructional material

12   to use in class and to take home (Cal. Educ. Code § 35186(f)(1)).  Moreover, any removal from

13   school (e.g., suspension or expulsion) requires due process including providing notice to parents,

14   ensuring the student is informed of the reason for the disciplinary action and the evidence against

15   him or her, and providing the opportunity for the student to present his or her version and

16   evidence in his or her defense.  Cal. Educ. Code § 48911(b), (d).

17       109.    Defendants must meet these basic minimum requirements for education for all

18   students, regardless of disability, even when students are in Juvenile Hall or locked in solitary

19   confinement.  15 Cal. Code Regs. § 1370(d).

20       110.    Nonetheless, Defendants fail to meet these basic minimum requirements for

21   education.

22       111.    Youth in Juvenile Hall do not get physical education every day.  Physical

23   education is treated as a privilege that can be taken away as punishment.

24       112.    Youth in Juvenile Hall cannot take textbooks or instructional materials to their

25   cells.

26       113.    Use of the library, computer lab, and courtyard are privileges which can be taken

27   away by the Probation Department for no explicitly defined reason.

28

1    114.    When youth are in solitary confinement, Defendants do not provide the legally

2    required 240 minutes of instruction.

3    115.    In solitary confinement, a student may not attend school and does not receive

4    tutoring, homework, or school work, unless the Probation Department permits it when a student

5    is on "Program."

6    116.    Similarly, in solitary confinement, there is no physical education.  Rather, youth

7    are restricted to 30 to 45 minutes outside their small cells twice a day.

8    117.    Instructional materials, including textbooks, similarly are denied to youth in

9    solitary confinement.

10   118.    The computer lab, library and gym are "off unit," so students on Suspect,

11   Program, Risk or Max cannot access these facilities.

12   119.    Indeed, administrators at the Office of Education admit that they have "difficulty

13   providing appropriate educational access to students on special program."

14   120.    Moreover, Defendants remove students from school and instruction without any

15   due process, separate from the special education requirements for a manifestation determination.

16   For instance, Juvenile Hall does not contact the parents or guardians of students who are

17   removed from class.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### G.F.

20   121.    Plaintiff G.F. is 14 years old and first arrived in Juvenile Hall when she was just

21   13.  She has been in Juvenile Hall for over a year now.  She is in the Girls in Motion program

22   that requires making progress through four motions before being released.  G.F. has been

23   diagnosed with ADHD and bipolar affective disorder.  As a result of her bipolar affective

24   disorder, G.F. has experienced suicidal ideation and has been involuntarily committed to a

25   hospital to receive psychiatric care on at least three occasions.  G.F. is on medication for her

26   psychiatric disability.

27   122.    G.F. came to Juvenile Hall with an IEP that made her eligible for special

28   education and related services under the category of "emotional disturbance."  G.F.'s IEP (1)

1    provided for full-time special education instruction and placed her in a non-public school so she

2    could receive intensive behavioral and mental health interventions and support, and (2) had a

3    Behavioral Support Plan, because it was determined that her behavior impeded her learning.

4         123.   When G.F. entered Juvenile Hall, however, Defendants changed her eligibility to

5    the category of "other health impairment," decreased her special education instruction from 314

6    minutes per day (100% of the time) to 45 minutes a day, placed her in a general education setting

7    (because they provide no other placement option), eliminated all mental health-related services,

8    and also eliminated her Behavioral Support Plan. In short, Defendants made G.F.'s IEP look

9    almost the same as every other IEP at Mt. McKinley School.

10        124.   Even the implementation of G.F.'s wholly deficient IEP is problematic. Though

11   she is supposed to receive specialized instruction for 45 minutes a day, G.F. does not receive it.

12   Generally there is an aide, or sometimes a special education teacher, in the room, but he or she

13   does not seek out G.F. to provide instruction as required by her IEP. Instead he or she remains in

14   the room only to answer specific questions that any student, regardless of disability, may have.

15   No one proactively seeks out G.F. to provide instruction.

16        125.   Given the lack of any behavioral supports and mental health services, G.F. has

17   been frequently locked in solitary confinement. Since coming to Juvenile Hall, G.F. has been in

18   solitary confinement for over 100 days.

19        126.   Defendants have never inquired into whether the behavior leading to her

20   placement in solitary confinement was disability-related, though they are required to do so

21   through a manifestation determination and as a reasonable modification to their policies and

22   procedures.

23        127.   Also, Defendants have not considered whether they should modify their policies,

24   practices and procedures to ensure that G.F. is not discriminated against based on her disability.

25   In addition, Defendants have failed to consider other punishment options to avoid the known

26   psychiatric effects of solitary confinement on G.F.'s mental health.

27        128.   While locked in solitary confinement, G.F. is not allowed to attend school. As

28   such, the school counts each of the days G.F. is locked away as an unexcused absence. As a

1   result, G.F. receives partial credit for the classes she is taking and will not progress from grade to

2   grade on schedule.

3         129.    While locked in solitary confinement, G.F. has received no education at all,

4   except when she was on special program.  Even then, she did not even receive the minimal levels

5   of special education required by the inadequate IEP that Defendants developed for her; all she

6   received was a tutor showing up some days but not others for about 10 to 15 minutes to give her

7   some worksheets (sometimes ones she had already completed).

8         130.    While locked in solitary, G.F.'s progress in the Girls in Motion program is "on

9   pause," meaning the time served does not count toward her sentence.  Because of these "pauses,"

10  it took G.F. five months to get through orientation when it is supposed to take two weeks,

11  lengthening her amount of detention time.

12                                       **W.B.**

13        131.    Plaintiff W. B. is 17 years old.  W.B. has been in Juvenile Hall for over a year

14  now.  The Juvenile Court found him incompetent to participate in his own defense because of his

15  severe mental health disability.  W.B. was recently diagnosed with psychosis and possible

16  schizophrenia (notably, after Defendants had locked W.B. in solitary confinement for

17  approximately 60 days from February to May).  At the time that Defendants locked him away,

18  W.B. was spitting, hearing voices, and talking to himself, and he believed his medications and

19  food were being used to poison him.  Finally, after W.B. had a complete psychotic break,

20  Defendants involuntarily committed him to an inpatient psychiatric hospital where he remained

21  for three weeks.

22        132.    W.B. did not have an IEP before coming to Juvenile Hall.  Even though W.B. had

23  a 504 Plan before coming to Juvenile Hall, the Juvenile Court had found W.B. incompetent,

24  W.B.'s mental health assessment recommended a highly structured environment, the Probation

25  Department itself suggested a non-public school placement and W.B. was routinely and

26  frequently placed in solitary confinement, Defendants never inquired into whether he might need

27  special education and related services.  Only after W.B. had been in Juvenile Hall for six months

28  and only because W.B.'s mother formally requested that he be assessed for special education did

1    Defendants take any action.

2        133.    Defendants found W.B. eligible for special education under the category of

3    "emotional disturbance." In accordance with their standard practice, Defendants offered W.B.

4    only a minimal amount of "specialized academic instruction" per day (90 minutes) in the general

5    education classroom (again their only placement) and 30 minutes of mental health counseling

6    once a week. Defendants did not provide a Behavioral Intervention Plan. In sum, W.B. received

7    an IEP similar to other young people with disabilities at Mt. McKinley.[11]

8        134.    The implementation of W.B.'s wholly deficient IEP is also problematic. For

9    instance, although he is supposed to receive specialized instruction for 90 minutes a day, W.B.

10   does not receive it. The special education teachers in the room do not seek out W.B. to provide

11   instruction as required by his IEP but instead only occasionally help him with logistical things

12   like finding the right place on the page.

13       135.    Defendants admit in W.B.'s IEP that he has deteriorated since coming to Juvenile

14   Hall, but they offered only minimal services and a general education placement. Not

15   surprisingly, as a result of Defendants' failure to provide the requisite supports and services,

16   W.B. has frequently been placed in solitary confinement. Since coming to Juvenile Hall, W.B.

17   has spent approximately 90 days in solitary confinement.

18       136.    Defendants have never inquired into whether the behavior leading to W.B.'s

19   placement in solitary confinement was disability-related, though they are required to do so

20   through a manifestation determination and as a reasonable modification to their policies and

21   procedures.

22       137.    Also, Defendants have not considered whether they should modify their policies,

23   practices and procedures to ensure that W.B. is not discriminated against based on his disability.

24   In addition, Defendants have failed to consider other punishment options to avoid the known

25   psychiatric effects of solitary confinement on W.B.'s mental health.

26

27   [11] At the request of W.B.'s mother, W.B.'s IEP was recently revisited by Defendants. However,
     even after the psychiatric hospitalization, Defendants amended his IEP by providing 30
28   additional minutes of mental health counseling per week and by adding a behavior support plan
     that itself admits that W.B. does not do well in the general education setting.

138. While locked in solitary confinement, W.B. is not allowed to attend school. As such, the school counts each of the days W.B. is locked away as an unexcused absence. As a result, W.B. receives partial credit for the classes he is taking and will not progress from grade to grade on schedule.

139. While locked in solitary confinement, W.B. has received no education at all (except when he was on special program) and, even then, he did not even receive the minimal levels of special education required by the inadequate IEP that Defendants developed for him; all he received was a tutor showing up some days but not others.

**Q.G.**

140. Plaintiff Q.G. is 17 years old. Q.G. was first detained at Juvenile Hall on November 23, 2010. He has since been in and out of Juvenile Hall at several group home placements. He is now in the YOTP program which requires completion of four phases to YOTP plus an orientation before he can be released.

141. Q.G. has been eligible for special education since he was in the third grade and has been diagnosed with oppositional defiance disorder and ADHD.

142. Q.G. came to Juvenile Hall with an IEP that placed him outside the general education classroom for 37% of the school day. Q.G. additionally received 150 minutes per day of specialized academic instruction, 60 minutes per week of psychological services, 20 minutes per month of individual counseling, 10 minutes per day of behavior intervention services, and a behavioral support plan. Upon arriving at Mt. McKinley, Defendants placed Q.G. into the general education classroom 100% of the school day, reduced his specialized academic instruction to 90 minutes per week, and eliminated his mental health services and behavioral support plan. Defendants made these changes without re-assessment and without explanation in the IEP.

143. During the last year in Juvenile Hall, Q.G. had more than 30 unexcused absences resulting from being placed in solitary confinement; for the prior year, Q.G. had many, many more and believes he has been placed in solitary for as much as 200 days since his arrival in Juvenile Hall. Defendants have never inquired into whether the behavior leading to his

1  placement in solitary confinement was disability-related, though they are required to do so

2  through a manifestation determination and as a reasonable modification to their policies and

3  procedures, and have not considered whether they should modify their policies, practices and

4  procedures to ensure that Q.G. is not discriminated against based on his disability.  In addition,

5  Defendants have failed to consider other punishment options to avoid the known psychiatric

6  effects of solitary confinement on Q.G.'s mental health.  While in solitary confinement, Q.G. is

7  denied the opportunity to go to school and receives zero credits for the time he has missed.  Q.G.

8  has only earned an average of 9 credits per quarter and is on track to graduate after three more

9  years, meaning it will take a total of seven years for him to complete high school.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Violation of Individuals with Disabilities Education Improvement Act**

**Against All Defendants**

***(20 U.S.C. § 1400 et. seq.)***

15       144.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as

16  though fully set forth herein.

17       145.    Under the federal Individuals with Disabilities Education Act (IDEA), students

18  with disabilities are entitled to receive a free appropriate public education also known as

19  "FAPE." 20 U.S.C. § 1400(d)(1)(a).

20       146.    IDEA defines a child with a disability as a child "with mental retardation, hearing

21  impairments (including deafness), speech or language impairments, visual impairments

22  (including blindness), serious emotional disturbance . . ., orthopedic impairments, autism,

23  traumatic brain injury, other health impairments, or specific learning disabilities" "who, by

24  reason thereof, needs special education and related services." 20 U.S.C. § 1401(3).

25       147.    As a local educational agency, Contra Costa County Office of Education has the

26  duty to provide a FAPE to all students with disabilities, including those who have been

27  suspended or expelled from school.  20 U.S.C. §§ 1412(a)(1), 1413(a).  This duty extends to

28

1   school-eligible persons with disabilities who are incarcerated in juvenile and adult correctional

2   facilities. 34 C.F.R. § 300.2(b)(iv).

3       148.   Similarly, as a public agency and an educational services agency with

4   administrative control and direction over a school, the Probation Department has the same duties

5   as the Office of Education. 34 C.F.R. § 300.2(b)

6       149.   IDEA requires Defendants to meet certain obligations including, but not limited

7   to:

8       a)  Identifying, locating and evaluating "[a]ll children with disabilities residing in

9          the State...who are in need of special education and related services" (20

10         U.S.C. § 1412(a)(1)(A)) and having in effect policies and procedures to ensure

11         this happens (34 C.F.R. § 300.111(a));

12      b)  Upon identification, conducting a full and individual initial evaluation before

13         the initial provision of special education and related services to a child with a

14         disability in all areas of suspected disability and thereafter a re-evaluation

15         every three years (20 U.S.C. § 1414(a)(1)(A), (2)(B)) or whenever educational

16         or related services needs, including improved academic achievement and

17         functional performance, if the child warrants a reevaluation (34 C.F.R. §

18         300.303(a));

19      c)  Developing and implementing an appropriate Individualized Education

20         Program (IEP) for each child with a disability, defined as a written statement

21         that is developed, reviewed, and revised in accordance with 210 U.S.C. §

22         1414(d), which must include, but is not limited to including:

23           i.  a statement of the child's present levels of academic

24             achievement and functional performance (20 U.S.C. §

25             1414(d)(1)(A)(i)),

26          ii.  a statement of measurable annual goals, including academic

27             and functional goals (20 U.S.C. § 1414(d)(1)(A)(ii)),

28

iii. a description of the measurement of the annual goals and the reporting of these goals (20 U.S.C. § 1414(d)(1)(A)(III)),

iv. for children over 16 years of age, annually updated appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills (20 U.S.C. § 1414(d)(1)(A)(VIII)(aa)); and

v. in the case of a child whose behavior impedes the child's learning or that of others, consideration of the use of positive behavioral interventions and supports, and other strategies, to address that behavior (20 USC § 1414(d)(3)(B)(i)).

d) Holding an IEP team meeting at least annually (20 U.S.C. § 1414(d)(4)(A)(i));

e) When students with an IEP enter a new school district, providing "comparable" services to their previous IEP for the next 30 days at which point, either adopting the prior IEP or developing, adopting and implementing a new IEP (20 U.S.C. § 1414(d)(2)(C); 34 C.F.R. § 300.323(e));

f) If behavior leads to removal from school for more than 10 days or to removal for less than 10 days but that is based on behavior that constitutes a pattern, continuing to provide educational services so as to enable the child to continue to participate in the general education curriculum (34 C.F.R. § 300.530(d));

g) If behavior leads to removal from school for more than ten days or to removal for less than 10 days but that is based on behavior that constitutes a pattern, convening an immediate IEP meeting to determine if the behavior is a manifestation of the student's disability (20 USC § 1415(k); 34 C.F.R. § 300.530(e); 34 C.F.R. § 300.536(a)(2); Cal. Educ. Code § 48915.5);

h) If the behavior is a manifestation of disability, (1) conducting a functional behavior/analysis assessment (the latter prior to July 2013) and implement a behavioral intervention plan; or (2) reviewing and modify existing behavioral

1    intervention plan; and (3) returning student to placement from which he or she

2    was removed, unless it involved weapons, drug possession, or serious bodily

3    injury (at which time student would be placed in an interim alternative

4    educational setting for not more than 45 school days) (20 USC § 1415(k);  34

5    C.F.R. § 300.530(f)&(g));

6        i)  If, on the other hand, the behavior was not a manifestation of disability,

7    providing FAPE and services to the student no later than the 11th cumulative

8    day of removal (20 U.S.C. § 1415(k)(1)(C); 34 C.F.R. § 300.530(c)); and

9        j)  Implementing procedural safeguards for children with disabilities, consisting,

10   at a minimum, of notice to parents or guardians of their procedural rights

11   regarding the identification, evaluation, or education placement of their child

12   or the provision of a FAPE to their child, and the right to present complaints

13   and to an impartial due process hearing on such complaints (20 U.S.C. §§

14   1412(a)(6), 1415).

15   150.   By failing to identify, evaluate, recommend, and then provide a FAPE (including

16   appropriate IEPs, special education, and related services to eligible students in Juvenile Hall),

17   and by failing to provide procedural safeguards specified in the statute implementing the IDEA

18   (including manifestation determinations), Defendants have impeded students' rights to a free

19   appropriate public education, have significantly impeded the parents' opportunity to participate

20   in the decision-making process regarding the provision of a free appropriate public education to

21   their students, and/or have deprived students of educational benefits.  In so doing, Defendants

22   have violated and continue to violate rights secured by 20 U.S.C. §§ 1400 *et seq*., and its

23   implementing regulations at 34 C.F.R. §§ 300 *et seq.*

24   151.   Because Defendants' discriminatory and wrongful conduct is ongoing,

25   declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of

26   Defendants' actions, Plaintiffs and members of the Class are suffering irreparable harm and lost

27   education opportunities and therefore speedy and immediate relief is appropriate.

28   152.   Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable

*G.F., et al. v. Contra Costa County, et al.*, Case No.
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                      34

1    attorneys' fees and costs incurred in bringing this action under 20 U.S.C. § 1415(i)(3).

## SECOND CAUSE OF ACTION

### Violation of Americans with Disabilities Act

### Against All Defendants Except Office of Education

### *(42 U.S.C. § 12101, et. seq.)*

153.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

154.    Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity. 42 U.S.C. § 12132.

155.    In providing any aid, benefit, or service, a public entity "may not ... [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity ... as that provided to others," or "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others[.]" 28 C.F.R. § 35.130(b)(1)(i), (ii), (iii), and (vii).

156.    A public entity "*shall* make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7) (emphasis added).

157.    Nor may a public entity (1) "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary[,]" 28 C.F.R.§ 35.130(b)(8); or (2) "utilize criteria or methods of administration ... that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability ... or the purpose or effect of defeating or substantially impairing

1  accomplishment of the objectives of the public entity's program with respect to individuals with

2  disabilities[.]"  28 C.F.R. § 35.130(b)(3)(i)(ii).

3      158.   A public entity is also prohibited from aiding and perpetuating discrimination

4  against persons with disabilities in the programs, services or activities it provides. 28 C.F.R. §

5  35.130(b)(1)(v).

6      159.   Defendants were, at all times relevant to this action, and are currently "public

7  entities" within the meaning of Title II of the ADA and provided and provide a "program,

8  service or activity" including educational and rehabilitative[12] programs, services and activities in

9  the Juvenile Hall.

10     160.   Defendants have violated the rights of Plaintiffs and members of the Plaintiff

11 Class secured by Title II of the ADA and its implementing regulations.

12     161.   Defendants exclude from participation in and deny the benefits of Defendants'

13 educational and rehabilitative programs, services and activities for Plaintiffs and members of the

14 Plaintiff Class due to their disabilities by, *inter alia*, failing to provide Plaintiffs and members of

15 the Plaintiff Class with the special education and related services that they require due to their

16 disabilities thereby denying them the benefits of Defendants' educational and rehabilitative

17 programs, services and activities and locking Plaintiffs and members of the Plaintiff class in

18 solitary confinement due to their disabilities thereby excluding them from Defendants'

19 educational and rehabilitative programs, services and activities.

20     162.   Defendants also deny Plaintiffs and members of the Plaintiff Class the

21 opportunity to equally, effectively and meaningfully participate in and benefit from Defendants'

22 educational and rehabilitative programs, services and activities by, *inter alia*, failing to provide

23 Plaintiffs and members of the Plaintiff Class with the special education and related services that

24 they require due to their disabilities, thereby denying them the benefits of Defendants'

25 educational programs, services and activities and locking Plaintiffs and members of the Plaintiff

26

27

28

---

[12] Rehabilitative programs, services and activities involve, among other things, counseling, vocational training and individual mental health treatment and anything else which is geared towards helping juveniles correct their conduct.

1  class in solitary confinement due to their disabilities thereby, excluding them from Defendants'

2  educational and rehabilitative programs, services and activities.

3       163. Furthermore, Defendants fail to make reasonable modifications to their policies,

4  practices, and procedures when such modifications are necessary to avoid discriminating against

5  Plaintiffs and members of the Plaintiff Class by, *inter alia*, not providing additional educational

6  and rehabilitative programs, services or activities when youth with disabilities are in solitary

7  confinement, not inquiring into whether a young person has a disability and/or whether his or her

8  conduct is disability-related before placing him or her in solitary confinement and not prohibiting

9  the use of solitary confinement for youth with disabilities.

10       164. Defendants additionally impose and apply eligibility criteria that screen out or

11  tend to screen out Plaintiffs and members of the Plaintiff Class from fully and equally enjoying

12  any of Defendants' educational and rehabilitative programs, services or activities by, *inter alia*,

13  adopting and implementing policies and practices with regard to solitary confinement that have a

14  disparate impact on youth with disabilities.

15       165. Defendants further utilize methods of administration that have the effect of

16  subjecting Plaintiffs and members of the Plaintiff Class to discrimination on the basis of

17  disability and the purpose and effect of defeating or substantially impairing accomplishments of

18  the objectives of Defendants' educational and rehabilitative programs, services, and activities

19  with respect to Plaintiffs and members of the Plaintiff Class by, *inter alia*, denying educational

20  and rehabilitative programs, services and activities while youth with disabilities are locked in

21  solitary confinement, failing to inquire into whether a young person has a disability and/or

22  whether his or her conduct is disability-related before placing him or her in solitary confinement

23  and using solitary confinement for youth with disabilities.

24       166. Defendants are also aiding and perpetuating discrimination against persons with

25  disabilities in Defendants' programs, services or activities by, *inter alia*, maintaining policies and

26  practices that allow for discrimination and allowing for the discrimination of each co-defendant

27  to continue unchecked.

28       167. Defendants are otherwise subjecting youth with disabilities detained in Juvenile

1 | Hall to discrimination.

2 |     168.    Because Defendants' discriminatory and wrongful conduct is ongoing,

3 | declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of

4 | Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm

5 | and lost education opportunity and therefore speedy and immediate relief is appropriate.

6 |     169.    Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive

7 | relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 42

8 | U.S.C. § 12205.

9 | **THIRD CAUSE OF ACTION**

10 | **Violation of Section 504 of the Rehabilitation Act**

11 | **Against All Defendants**

12 | ***(29 U.S.C. § 794, et. seq.)***

13 |     170.    Plaintiffs incorporate by reference each and every allegation contained in the

14 | foregoing paragraphs as if specifically alleged herein.

15 |     171.    Section 504 provides, in pertinent part:

16 |         No otherwise qualified individual with a disability in the United
17 |         States . . . shall, solely by reason of his or her disability, be
         excluded from the participation in, be denied the benefits of, or be
18 |         subjected to discrimination under any program or activity receiving
         federal financial assistance[.]  29 U.S.C. § 794(a).

19 |     172.    In providing any aid, benefit, or service, a recipient of federal financial assistance

20 | "may not ... [d]eny a qualified handicapped person the opportunity to participate in or benefit

21 | from the aid, benefit or service," "[a]fford a qualified handicapped person an opportunity to

22 | participate in or benefit from the aid, benefit, or service that is not equal to that afforded others,"

23 | "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective

24 | in affording equal opportunity ... as that provided to others," or "[o]therwise limit a qualified

25 | handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed

26 | by others[.]"  45 C.F.R. § 84.4(b)(i), (ii), (iii), and (vii).

27 |     173.    A recipient of federal financial assistance *shall* make reasonable modifications in

28 | policies, practices, or procedures when the modifications are necessary to avoid discrimination

---

1    on the basis of disability.

2      174. Nor may a recipient of federal financial assistance "utilize criteria or methods of

3    administration (i) that have the effect of subjecting qualified handicapped persons to

4    discrimination on the basis of handicap and/or (ii) that have the purpose or effect of defeating or

5    substantially impairing accomplishment of the objectives of the recipient's program or activity

6    with respect to handicapped persons..." 45 C.F.R. § 84.4(b)(4)(i), (ii);

7      175. A recipient of federal financial assistance is also prohibited from aiding and

8    perpetuating discrimination against a qualified handicapped person by providing significant

9    assistance to an agency, organization, or person that discriminates on the basis of handicap. 45

10   C.F.R. § 84.4(b)(v).

11     176. Each Defendant was, at all times relevant to this action, and is currently a

12   recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation

13   Act and provided and provides a "program or activity" where "program or activity" is described

14   as "all the operations of" the recipient which includes the educational and rehabilitative

15   programs and activities in Juvenile Hall. 29 U.S.C. § 794(b).

16     177. Defendants have violated the rights of Plaintiffs and members of the Plaintiff

17   Class secured by Section 504 and its implementing regulations.

18     178. Defendants exclude from participation in and deny the benefits of Defendants'

19   educational and rehabilitative programs and activities for Plaintiffs and members of the Plaintiff

20   Class by reason of their disabilities by, *inter alia*, failing to provide Plaintiffs and members of the

21   Plaintiff Class with the special education and related services that they require due to their

22   disabilities, thereby denying them the benefits of Defendants' educational and rehabilitative

23   programs and activities and locking Plaintiffs and members of the Plaintiff class in solitary

24   confinement due to their disabilities, thereby excluding them from Defendants' educational and

25   rehabilitative programs and activities.

26     179. Defendants also deny Plaintiffs and members of the Plaintiff Class the

27   opportunity to equally, effectively and meaningfully participate in and benefit from Defendants'

28   educational and rehabilitative programs and activities by, *inter alia*, failing to provide Plaintiffs

1  and members of the Plaintiff Class with the special education and related services that they

2  require due to their disabilities, thereby denying them the benefits of Defendants' educational

3  and rehabilitative programs and activities and locking Plaintiffs and members of the Plaintiff

4  class in solitary confinement due to their disabilities, thereby excluding them from Defendants'

5  educational and rehabilitative programs and activities.

6          180.    Furthermore, Defendants fail to make reasonable modifications to their policies,

7  practices, and procedures when such modifications are necessary to avoid discriminating against

8  Plaintiffs and members of the Plaintiff Class by, *inter alia*, not providing additional educational

9  and rehabilitative programs or activities when youth with disabilities are in solitary confinement,

10 not inquiring into whether a young person has a disability and/or whether his or her conduct is

11 disability-related before placing him or her in solitary confinement and not prohibiting the use of

12 solitary confinement for youth with disabilities.

13         181.    Defendants further utilize methods of administration that have the effect of

14 subjecting Plaintiffs and members of the Plaintiff Class to discrimination on the basis of

15 disability and the purpose and effect of defeating or substantially impairing accomplishments of

16 the objectives of Defendants' educational and rehabilitative programs and activities with respect

17 to Plaintiffs and members of the Plaintiff Class by, *inter alia*, denying educational and

18 rehabilitative programs and activities while youth with disabilities are locked in solitary

19 confinement, failing to inquire into whether a young person has a disability and/or whether his or

20 her conduct is disability-related before placing him or her in solitary confinement and using of

21 solitary confinement for youth with disabilities.

22         182.    Defendants are also aiding and perpetuating discrimination against persons with

23 disabilities in Defendants' programs, services or activities by, *inter alia*, maintaining policies and

24 practices that allow for discrimination and allowing for discrimination of each co-defendant to

25 continue unchecked.

26         183.    Defendants are otherwise subjecting youth with disabilities detained in Juvenile

27 Hall to discrimination.

28         184.    In addition, Defendants have violated rights of Plaintiffs and members of the

*G.F., et al. v. Contra Costa County, et al.*, Case No.
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                    40

1   Plaintiff Class secured by Section 504's regulations by *inter alia*:

2          a)  Failing to provide a free appropriate public education to each qualified

3              handicapped person who is in Defendants' jurisdiction (45 C.F.R. § 84.33(a));

4          b)  Failing to provide special education and related aids and services that are

5              designed to meet individual educational needs of handicapped persons as

6              adequately as the needs of non-handicapped persons are met (45 C.F.R. §

7              84.33(b)).

8       185.   Because Defendants' discriminatory conduct is ongoing, declaratory relief and

9   injunctive relief are appropriate remedies.  Further, as a direct result of Defendants' actions,

10  Plaintiffs and members of the Plaintiff Class are suffering irreparable harm and lost educational

11  opportunities, and therefore, speedy and immediate relief is appropriate.

12      186.   Pursuant to 29 U.S.C. § 794a, Plaintiffs are entitled to declaratory and injunctive

13  relief and to recover from Defendants the reasonable attorneys' fees and costs incurred in

14  bringing this action.

**FOURTH CAUSE OF ACTION**

**Violation of California Government Code § 11135**

**Against All Defendants**

***(Cal. Gov't Code § 11135 et seq.)***

19      187.   Plaintiffs incorporate by reference each and every allegation contained in the

20  foregoing paragraphs as if specifically alleged herein.

21      188.   California Government Code section 11135 sets forth a nondiscrimination policy

22  for state programs.  It provides that in pertinent part:

23          [n]o person in the State of California shall, on the basis of race,
            national origin, ethnic group identification, religion, age, sex,
24          sexual orientation, color, genetic information or disability, be
            unlawfully denied full and equal access to the benefits of, or be
25          unlawfully subjected to discrimination under, any program or
            activity that is conducted, operated, or administered by the state or
26          by any state agency, is funded directly by the state, or receives any
            financial assistance from the state. Cal. Gov't Code § 11135(a).

27

28

189. It is a discriminatory practice for a recipient of state financial assistance, in carrying out any program or activity, on the basis of disability, (a) to deny a person the opportunity to participate in, or benefit from an aid, benefit or service; (b) to afford a person the opportunity to participate in or benefit from an aid, benefit or service that is not equal to that afforded others; (c) to provide a person with an aid, benefit or service that is not as effective in affording an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . . (g) to otherwise limit a person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving any aid, benefit or service resulting from the program or activity." 22 Cal. Code Regs. § 98101 (a), (b), (c), (g).

190. It is also discrimination for a recipient of state financial assistance to utilize criteria or methods of administration that: (1) have the purpose or effect of subjecting a person to discrimination on the basis of disability; (2) have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program with respect to a person with a disability. . ." 22 Cal. Code Regs. § 98101(i).

191. Each Defendant was, at all times relevant to this action, and is currently operating or administering a program or activity that receives state financial assistance, within the meaning of Section 11135 including educational and rehabilitative programs and activities in the Juvenile Hall.

192. Defendants have violated the rights of Plaintiffs and members of the Plaintiff Class secured by Section 11135 *et seq.* and the regulations promulgated thereunder, 22 Cal. Code Regs. § 98100, *et seq.*

193. Defendants deny full and equal access for Plaintiffs and members of the Plaintiff Class to the benefits of Defendants' educational and rehabilitative programs and activities by, *inter alia*, failing to provide Plaintiffs and members of the Plaintiff Class with the special education and related services that they require due to their disabilities to fully and equally access educational and rehabilitative programs and activities and locking Plaintiffs and members

1   of the Plaintiff class in solitary confinement due to their disabilities, thereby denying them full

2   and equal access to educational and rehabilitative programs and activities.

3       194.   Defendants deny Plaintiffs and members of the Plaintiff Class the opportunity to

4   equally, effectively and meaningfully participate in and benefit from Defendants' educational

5   and rehabilitative programs and activities by, *inter alia*, failing to provide Plaintiffs and members

6   of the Plaintiff Class with the special education and related services that they require due to their

7   disabilities, thereby denying them the benefits of Defendants' educational programs and

8   activities and locking Plaintiffs and members of the Plaintiff class in solitary confinement due to

9   their disabilities thereby excluding them from Defendants' educational programs and activities.

10       195.   Defendants further utilize methods of administration that have the effect of

11   subjecting Plaintiffs and members of the Plaintiff Class to discrimination on the basis of

12   disability and the purpose and effect of defeating or substantially impairing accomplishments of

13   the objectives of Defendants' educational and rehabilitative programs and activities with respect

14   to Plaintiffs and the Plaintiff Class by, *inter alia*, denying educational programs and activities

15   while youth with disabilities are locked in solitary confinement, failing to inquire into whether a

16   young person has a disability and/or whether his or her conduct is disability-related before

17   placing him or her in solitary confinement and using of solitary confinement for youth with

18   disabilities.

19       196.   California Government Code section 11135 further requires that the programs and

20   activities that receive financial assistance from the state "shall meet the protections and

21   prohibitions contained in Section 202 of the federal Americans with Disabilities Act . . . except

22   that if the laws of this state prescribe stronger protections and prohibitions, the programs and

23   activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions."

24   Cal. Gov't Code § 11135(b).  Here because Defendants are violating Title II of the ADA, they

25   also are violating California Government Code section 11135.

26       197.   Because Defendants' discriminatory and wrongful conduct is ongoing,

27   declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of

28

*G.F., et al. v. Contra Costa County, et al.*, Case No.
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**    43

1  Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm

2  and lost education opportunities and therefore speedy and immediate relief is appropriate.

3      198.    Pursuant to California Code of Civil Procedure sections 526(a) and 1021.5,

4  Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and

5  costs incurred in bringing this action.

6                        **FIFTH CAUSE OF ACTION**

7      **Violation of California Education Code for Special Education Requirements**

8                          **Against All Defendants**

9                        *(Cal. Educ. Code §§ 56000, et seq.)*

10     199.    Plaintiffs incorporate by reference each and every allegation contained in the

11  foregoing paragraphs as if specifically alleged herein.

12     200.    Individuals with exceptional needs are entitled to receive a free appropriate public

13  education ("FAPE") in accordance with IDEA and its implementing regulations. Cal. Educ.

14  Code § 56040.

15     201.    A student may qualify as an individual with exceptional needs under one of the

16  following: Hearing Impairment, Hearing and Visual Impairment, Language or Speech Disorder,

17  Visual Impairment, Severe Orthopedic Impairment, Other Health Impairments, Autistic-Like

18  Behaviors, Mental Retardation, Serious Emotional Disturbance, Specific Learning Disability. 5

19  Cal. Code Regs. § 3030.

20     202.    Under California Education Code section 56000 *et seq.*, Defendants are required

21  to meet certain conditions, including, but not limited to:

22          a)  Identifying, locating and assessing all children with disabilities, who are in

23              need of special education and related services, and establishing written policies

24              and procedures to do so (Cal. Educ. Code § 56301(a), (d)(1));

25          b)  Conducting individual assessments by qualified persons knowledgeable about

26              the suspected disability before an initial placement in special education and

27              related services (Cal. Educ. Code § 56320) and conducting reassessments

28              every three years (Cal Educ. Code § 56381(a)(2));

c) When a student transfers, providing FAPE, including services comparable to previous IEP, for a time not to exceed 30 days by which time the new placement shall adopt the previous IEP or develop, adopt and implement a new IEP (Cal. Educ. Code § 56043(m)(l) and Cal. Educ. Code § 56325);

d) For each student with a disability, developing and implementing an appropriate Individualized Education Programs (IEPs), defined as a written statement that is developed, reviewed, and revised which must include, but is not limited to including:

  (i)   Present levels of academic achievement and functional performance (Cal. Educ. Code § 56345(a)(1));

  (ii)  Measurable annual goals (Cal. Educ. Code § 56345(a)(2));

  (iii) Criteria for determining whether annual goals are being achieved (Cal. Educ. Code § 56345(a)(3));

  (iv)  Specific special educational instruction, related services, supplementary aids and services to be provided, based on peer-reviewed research to the extent possible (Cal. Educ. Code § 56345(a)(4));

  (v)   Explanation of extent, if any, to which pupil will not participate with non-disabled pupils in their regular class and activities (Cal. Educ. Code § 56345(a)(5));

  (vi)  Individual appropriate accommodations in the administration of state-wide or district-wide assessments (Cal. Educ. Code § 56345(a)(6)); and

  (vii)        Projected date for the beginning of services and modifications, and anticipated frequency, location, and duration of services and accommodations (Cal. Educ. Code § 56345(a)(7))

e) Implementing the IEP and related services (Cal. Educ. Code § 56345(c);

f) Holding annual IEP team meetings to review the student's progress and create/revise IEP document (Cal. Educ. Code § 56043(j));

g) If the IEP team finds that instructional/behavioral approaches specified in the student's IEP have been ineffective, conducting a functional analysis assessment (FAA) and developing a behavioral intervention plan (BIP) (5 Cal.Code Regs. § 3052(b), (c));

h) If behavior leads to removal from school for more than ten days, conducting a manifestation determination IEP meeting to determine if the behavior is a manifestation of the student's disability (Cal. Educ. Code § 48915.5);

i) Implementing procedural safeguards for children with disabilities, consisting, at a minimum, of notice to parents or guardians of their procedural rights regarding the identification, evaluation, or education placement of a child or the provision of a FAPE to a child, and the right to present complaints and to an impartial due process hearing on such complaints (Cal. Educ. Code § 56301(d)(2)).

203.   By failing to identify, locate, assess and then provide a FAPE (including appropriate IEPs, special education, and related services to eligible students within the custody of the Probation Department), and by failing to provide procedural safeguards specified in the statute implementing the IDEA (including manifestation determinations), Defendants have violated and continue to violate rights secured by California Education Code sections 56000 *et seq.*, and its implementing regulations.

204.   As a direct and proximate result of the aforementioned acts, Plaintiffs and members of the Plaintiff Class have suffered, and continue to suffer irreparable harm and lost educational opportunity in their education, based on their disabilities.

205.   Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm and lost education opportunities and therefore speedy and immediate relief is appropriate.

206.   Pursuant to California Code of Civil Procedure sections 526(a) and 1021.5, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and

1    costs incurred in bringing this action.

2                  **SIXTH CAUSE OF ACTION**

3    **Violation of California Education Code for General Education Requirements**

4                      **Against All Defendants**

5         207.    Plaintiffs incorporate by reference each and every allegation contained in the

6    foregoing paragraphs as if specifically alleged herein.

7         208.    Pursuant to California law, students are entitled to 240 minutes of instruction

8    minimum for each school day (Cal. Educ. Code § 48645.3); 400 minutes of physical education

9    each 10 school days for an average of 40 minutes of physical education per day (Cal. Educ. Code

10    §§ 51220(d) and 51222); and, provision of state approved textbooks and instructional materials

11    so that each student has a textbook or instructional material to use in class and to take home (Cal.

12    Educ. Code § 35186(f)(1)). Moreover, suspension of a student requires certain due process

13    protections including notice to the student and parents and an opportunity to respond. Cal. Educ.

14    Code § 48911(b), (d). Furthermore, suspending students in excess of five consecutive

15    schooldays and/or allowing students to be suspended for more than 20 schooldays within a

16    school year is prohibited. Cal. Educ. Code § 48911 and Cal. Educ. Code § 48903 respectively.

17         209.    Defendants, who are charged with providing 240 minutes of instruction each

18    school day, have failed to provide and continue to fail to provide such instruction time to

19    Plaintiffs and members of the Plaintiff Class in solitary confinement.

20         210.    Defendants, who are charged with providing on average 40 minutes of physical

21    education per day, have failed to provide and continue to fail to provide such physical education

22    to Plaintiffs and members of the Plaintiff Class, particularly those in solitary confinement.

23         211.    Defendants, who are charged with providing educational services to Plaintiffs and

24    members of the Plaintiff Class, have failed to provide and continue to fail to provide Plaintiffs

25    and members of the Plaintiff Class with state approved textbooks and instructional materials so

26    that each student has a textbook or instructional materials, or both, to use in class and to take into

27    their cells.

28         212.    Defendants, who are charged with providing educational services to Plaintiffs and

---

1   members of the Plaintiff Class, have suspended and continue to suspend Plaintiffs and members

2   of the Plaintiff Class without due process protections.

3       213.   Defendants, who are charged with providing educational services to Plaintiffs and

4   members of the Plaintiff Class, have allowed and continue to allow Plaintiffs and members of the

5   Plaintiff Class to be suspended from school for more than 20 schooldays within a school year.

6       214.   Because Defendants' discriminatory and wrongful conduct is ongoing,

7   declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of

8   Defendants' actions, Plaintiffs and members of the Class are suffering irreparable harm and lost

9   education opportunities and therefore speedy and immediate relief is appropriate.

10      215.   Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable

11  attorneys' fees and costs incurred in bringing this action.  Cal. Civ. Proc. Code §§ 526(a),

12  1021.5.

13                          **REQUEST FOR RELIEF**

14      WHEREFORE, Plaintiffs pray for the following relief:

15      1.     Order that Plaintiffs may maintain this action as a class action pursuant to Rule

16  23(b)(2) of the Federal Rules of Civil Procedure;

17      2.     Order and declare that the Defendants' conduct as alleged herein has violated, and

18  continues to violate, IDEA, 20 U.S.C. §§ 1400 *et seq.*, and accompanying regulations, the ADA,

19  42 U.S.C. §§ 12101 *et seq.*, and accompanying regulations, Section 504 of the Rehabilitation

20  Act, 29 U.S.C. § 794, and accompanying regulations, California Education Code section 56000

21  *et seq.*, and accompanying regulations, and California Government Code sections 11135, *et seq.*

22  and accompanying regulations.

23      3.     Preliminary and permanently enjoin Defendants from violating IDEA, 20 U.S.C.

24  §§ 1400 *et seq.*, and accompanying regulations, the ADA, 42 U.S.C. §§ 12101 *et seq.*, and

25  accompanying regulations, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and

26  accompanying regulations, California Education Code section 56000 *et seq.*, and accompanying

27  regulations, and California Government Code sections 11135, *et seq.* and accompanying

28  regulations.

---

*G.F., et al. v. Contra Costa County, et al.*, Case No.
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**                48

4.   Order Defendants to provide Plaintiffs and the members of the Plaintiff Class:

    a.   meaningful access to education provided by Defendants in compliance with federal and state special education laws;

    b.   general education and special education and related services to all youth with disabilities in solitary confinement in any of its forms;

    c.   reasonable modifications to policies, practices and procedures to ensure that youth with disabilities do not suffer discrimination based on their disability, including by means of placement in solitary confinement;

    d.   compensatory education to youth with disabilities who have served and are currently serving time in Juvenile Hall;

5.   Order the appointment of a special master to oversee the implementation of the above-listed systems, processes, and mechanisms and grant the special master legal authority to administer specific programs and activities of Defendants as may be necessary to ensure the provision of special education services to Plaintiffs and members of the Plaintiff Class;

6.   Retain jurisdiction of this case until Defendants have complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction;

7.   Award Plaintiffs' attorneys' fees and costs, as provided by statute; and

8.   Any such other relief as the Court finds just and proper.

DATED: August 8, 2013         Respectfully submitted,

SHAWNA PARKS
MARY-LEE K. SMITH
REBECCA WILLIFORD
KARA JANSSEN
DISABILITY RIGHTS ADVOCATES

Mary-Lee K. Smith
Attorneys for Plaintiffs

HERNAN VERA
LAURA FAER
PUBLIC COUNSEL

_____

Laura Faer
Attorneys for Plaintiffs


GRACE A. CARTER
GINA GUARIENTI COOK
PAUL HASTINGS LLP


_____/s/_____
Grace A. Carter
Attorneys for Plaintiffs