1  SHAWNA PARKS (CA BAR NO. 208301)  (sparks@dralegal.org)
   MARY-LEE K. SMITH (CA BAR NO. 239086)  (msmith@dralegal.org)
2  REBECCA WILLIFORD (CA BAR NO. 269977 )  (rwilliford@dralegal.org)
   KARA JANSSEN (CA BAR NO. 274762)  (kjanssen@dralegal.org)
3  DISABILITY RIGHTS ADVOCATES
   2001 Center Street, Fourth Floor
4  Berkeley, CA  94704-1204
   Telephone:     (510) 665-8644
5  Facsimile:     (510) 665-8511

6  HERNAN VERA (CA BAR NO. 175149)  (hvera@publiccounsel.org)
   LAURA FAER (CA BAR NO. 223846)  (lfaer@publiccounsel.org)
7  PUBLIC COUNSEL
   2001 Center Street, Fourth Floor
8  Berkeley, CA  94704-1204
   Telephone:     (510) 529-3419
9  Facsimile:     (213) 385-9089

10 GRACE A. CARTER (CA BAR NO. 101610)  (gracecarter@paulhastings.com)
   GINA COOK (CA BAR NO. 245611 )  (ginacook@paulhastings.com)
11 PAUL HASTINGS LLP
   55 Second Street, Twenty-Fourth Floor
12 San Francisco, CA  94105-3441
   Telephone:     (415) 856-7000
13 Facsimile:     (415) 856-7100
   *Attorneys for Plaintiffs*

14                      **UNITED STATES DISTRICT COURT**

15                      **NORTHERN DISTRICT OF CALIFORNIA**

16 | G.F., by and through her guardian ad litem, Gail F.; W.B., by and through his guardian ad litem, CiCi C.; Q.G., by and through his guardian ad litem, Barbara C.; and on behalf of themselves and a class of those similarly situated, | **Case No.  C 13-3667-SBA** |
|---|---|
| Plaintiffs, | **DECLARATION OF PETER LEONE IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| CONTRA COSTA COUNTY; CONTRA COSTA COUNTY DEPARTMENT OF PROBATION; PHILIP KADER, in his official capacity, Chief County Probation Officer; BRUCE PELLE, in his official capacity, Superintendent of Juvenile Hall; CONTRA COSTA COUNTY OFFICE OF EDUCATION; JOSEPH A. OVICK, in his official capacity as Superintendent, Contra Costa County Office of Education; LYNN MACKEY, in her official capacity, Director of Contra Costa County Court Schools. | |
| Defendants. | |

*G.F., et al. v. Contra Costa County, et al.*, **Case No. C 13-3667-SBA**
**DECLARATION OF PETER LEONE ISO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, PETER E. LEONE, declare as follows:

1. I am a researcher and Professor of Special Education in the College of Education at the University of Maryland. I have been a Professor at the University of Maryland for more than 30 years. My office is located at 1308 Benjamin Building, College Park, Maryland 20742. If called upon to testify, I could and would do so competently as follows.

2. This declaration is submitted in support of the Motion for Class Certification filed by counsel on behalf of Plaintiffs and the class of similarly situated youth. I was asked by Plaintiffs to analyze the policies and practices at Contra Costa County Juvenile Hall ("CCCJH") and CCCJH's on-site school – Mt. McKinley – with regard to their revision of Individual Education Plans ("IEPs"), their provision of special education services, and their use of solitary confinement and its impact on the provision of special education services.

3. I graduated from the University of Washington in 1981 with a Doctor of Philosophy in Special Education. Prior to completing my Ph.D., I attended the University of Iowa from 1968 through 1974, earning my Bachelor of Arts in History in 1972 and my Masters of Special Education in 1974. My curriculum vitae is attached as Exhibit A to this declaration.

4. I have expertise in, among other things, effective education and special education programs for incarcerated youth with disabilities, educational entitlements of incarcerated youth, and systemic reform of programming in juvenile and adult correctional facilities for people with disabilities.

5. For more than 25 years, I have visited juvenile and adult correctional facilities in the United States in a number of different roles. I have served the Courts as an expert, monitor, master, and receiver. I have worked with plaintiffs' and defendants' attorneys in class actions and with the U.S. Department of Justice's Civil Rights Division, and have researched education programs and the prevalence and treatment of individuals with developmental and other disabilities. Though much of my work has been in juvenile correction facilities, I have worked in adult correction facilities in Maryland, New York, Pennsylvania, Illinois, North Carolina, New Hampshire, Florida, Connecticut, Texas, and California.

6. I am currently serving as the expert to the Court regarding programming for and treatment of adult inmates with developmental disabilities in California Department of Corrections facilities in *Clark v. California*, No. 3:96-cv-01486-CRB, which is before the United States District Court for the Northern District of California. I have been serving as the expert to the Court in that matter since 1998.

7. In 2007, I was a member of the Blue Ribbon Task Force on the Texas Youth Commission. As a Task Force member, I was charged with developing systemic reform in Texas' juvenile justice agency.

8. Between 2004 and 2007, I was a member of a consulting group chosen to monitor and support the implementation of a settlement agreement between the Arizona Department of Juvenile Corrections and the United States Department of Justice, Civil Rights Division. I visited Arizona facilities on a regular basis and worked with the agencies in ensuring compliance with the settlement agreement.

9. Notably, between 1999 and 2001, I worked as the expert for defendants New York City Department of Corrections and New York City Board of Education in the landmark special education class action *Handberry v. Thompson*, which was before the United States District Court for the Southern District of New York. As a result of the *Handberry* case, special education services are now provided to inmates in the Riker's Island Jails.

10. In addition, between 1999 and 2006, I was the Director of the National Center on Education, Disability, and Juvenile Justice ("EDJJ"). The EDJJ was a research, training, and technical assistance project funded by the United States Department of Education. To date, I continue to maintain the EDJJ web site to disseminate information.

11. In addition to my many years as a consultant, expert, and monitor for the Courts and United States Departments of Justice and Education, I have also written and published extensively in the area of prevention of and interventions for youth delinquency. Many of my studies have illuminated the strong correlation between disability and involvement in the juvenile and criminal justice systems. I have studied extensively the special education and mental health

needs of this population.

12. In 1990, I edited a book titled "Understanding Troubled and Troubling Youth." Subsequently, I have authored chapters in more than ten books and have published numerous journal articles in peer-reviewed academic journals such as Education and Treatment of Children, Focus on Exceptional Children, Journal of Emotional and Behavioral Disorders, Remedial and Special Education, Journal of Criminal Justice Education, Journal of Special Education, and Journal of Correctional Education.

13. In addition, I have given numerous presentations nationally on topics such as appropriate special education programming for youth and young adults with disabilities in correctional institutions and effective reentry and rehabilitative programming for youth and young adults that prevents or reduces recidivism by teaching employment and self-sufficiency skills.

14. In formulating my opinions in this case, I have relied on my own extensive body of research in the field of education in juvenile and adult correctional facilities. A detailed list of my publications can be found in my curriculum vitae. In particular, I reviewed and relied upon the following studies and reports which I co-authored and which have been reviewed by my academic peers and duly published in well-respected scientific and psychological journals, or have been submitted to an international human rights organization:

   a) Leone, Peter E., Zaremba, Barbara A. & Chapin, Michelle S., *Understanding the Overrepresentation of Youths with Disabilities in Juvenile Detention*, The District of Columbia Law Review Vol. 3, No. 389 (1995). A true and correct copy of this study is attached as Exhibit B to this declaration.

   b) Weissman, Marsha, Cregor, Matthew, Gainsborough, Jenni, Kief, Nicole, Leone, Peter E. & Sullivan, Elizabeth, *The Right to Education in the Juvenile and Criminal Justice Systems in the United States, Submission to Vernor Munoz, Special Rapporteur on the Right to Education*, Human Rights Council, United Nations, December 31, 2008. A true and correct copy of this study is attached as Exhibit C to this declaration.

c) Quinn, Mary Magee, Rutherford, Robert B., Leone, Peter E., Osher, David M. & Poirier, Jeffrey M., *Youth With Disabilities in Juvenile Corrections: A National Survey*, Exceptional Children, Vol. 71, No. 3, pp. 339-45 (2005). A true and correct copy of this study is attached as Exhibit D to this declaration.

d) Krezmien, Michael P., Mulcahy, Candace A. & Leone, Peter E., *Detained and Committed Youth: Examining Differences in Achievement, Mental Health Needs, and Special Education Status, Education and Treatment of Children*, Vol. 31, No. 4 (2008). A true and correct copy of this study is attached as Exhibit E to this declaration.

15. In formulating my opinions, I also reviewed and relied on the following studies which have been reviewed by academic peers and duly published either in well-respected scientific and/or psychological journals or have been sponsored and published by an office of the United States government:

a) Petersilia, Joan, Turner, Susan & Fain, Terry, *Profiling Inmates in the Los Angeles County Jails: Risks, Recidivisms, and Release Options*, National Criminal Justice Center (August 21, 2001). A true and correct copy of this study is attached as Exhibit F to this declaration.

b) Rutherford, Robert B., Bullis, Michael, Wheeler Anderson, Cindy & Griller-Clark, Heather M., *Youth With Disabilities in the Correctional System: Prevalence Rates and Identification Issues*, United States Department of Justice, Office of Juvenile Justice and Delinquency Prevention, and United States Department of Education, Office of Special Education Program (July 2002). A true and correct copy of this study is attached as Exhibit G to this declaration.

c) Wolf Harlow, Caroline, *Bureau of Justice Statistics: Education and Correctional Populations*, United States Department of Justice, Office of Justice Programs (January 2003). A true and correct copy of this study is attached as Exhibit H to this declaration.

d) Fink, Carolyn M., *Special Education Inservice for Correctional Educators*, Journal of Correctional Education, Vol. 41, Issue 4, pp. 186-190 (December 1990). A

true and correct copy of this study is attached as Exhibit I to this declaration.

e) Steurer, Stephen J. & Smith, Linda G., *Education Reduces Crime: Three-State Recidivism Study Executive Summary*, Correctional Education Association (February 2003). A true and correct copy of this study is attached as Exhibit J to this declaration.

f) California Department of Education, Response to Request for Guidance on Specialized Academic Instruction (January 28, 2011). A true and correct copy of this document is attached as Exhibit K to this declaration.

16. In formulating my opinions, I also reviewed and relied on the following documents which contain information regarding Plaintiffs and CCCJH:

a) Contra Costa County Office of Education letter dated May 3, 2013 regarding "DRA Request for Documents," which contains the intake procedures for students who are transferred to Mt. McKinley School in CCCJH. A true and correct copy of this document is attached as Exhibit L to this declaration.

b) Individualized Education Programs for the following McKinley students:
   i) G.F.: 5/10/12 and 8/7/12 (attached as Exhibits M and N respectively)
   ii) Q.G.: 5/18/2010 and 1/7/2011[1] (attached as Exhibits O and P respectively)
   iii) W.B.: 504 Plan dated 1/18/11 and IEP dated 3/13/13 (attached as Exhibits Q and R respectively)
   iv) D.H.: 5/23/12 and 5/28/13 (attached as Exhibits S and T respectively)
   v) D.W.: 9/20/11 and 9/19/12 (attached as Exhibits U and V respectively)
   vi) K.B.: 5/31/11 and 4/3/12 (attached as Exhibits W and X respectively)
   vii) D.W.: 5/24/12 and 11/30/12 (attached as Exhibits Y and Z respectively)

c) Contra Costa County Probation Department, "Security Programs," which documents CCCJH's policies regarding solitary confinement. A true and correct copy of this document is attached as Exhibit AA to this declaration.

---

[1] The January 7, 2011 IEP for Q.G. is erroneously dated January 7, 2010.

*G.F., et al. v. Contra Costa County, et al.*, Case No. C 13-3667
**DECLARATION OF PETER LEONE ISO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**     5

17. It appears, based on my review of these documents that CCCJH engages in several common practices across all students with disabilities.

18. A first common practice is to place all incoming students with disabilities in the general education setting regardless of what their IEPs required before coming to CCCJH.

19. Pursuant to federal education law, all local education agencies, such as Contra Costa County Office of Education, are supposed to offer a "continuum of alternative placements." 34 C.F.R. § 300.115. In practice, a continuum of alternative placements should include, among other things, special day classes and resource specialist programs. *Id.*

20. I have reviewed the intake procedures document for Contra Costa County Office of Education (attached as Exhibit L) and observed that special day classes and resource specialist programs are not offered within CCCJH.

21. This policy is consistent with my observations in reviewing the IEP documents from students with disabilities in CCCJH. These documents, pertaining to seven students at CCCJH, include each student's IEP from immediately before they entered CCCJH and the IEP that was developed for each student after they transferred to Mt. McKinley.

22. The IEPs that were developed before each student entered Mt. McKinley include a wide range of intensive services resulting in various placements, such as full-time special day classes and non-public schools. After entering Mt. McKinley, all of these students were put in the general education setting. I have created a chart summarizing the "before" and "after" IEPs for each student. The chart is attached as Exhibit BB to this declaration.

23. A second common practice is the misuse of "specialized academic instruction."

24. In the intake procedures document attached as Exhibit L, Contra Costa County Office of Education adopts the policy that any student whose IEP required Resource Specialist ("RS") or Special Day Class ("SDC") should receive "Specialized Academic Instruction."

25. "Specialized Academic Instruction" is a term of art which is also known as "specially-designed instruction." Under federal laws, such instruction is defined as "adapting, as appropriate, to the needs of an eligible student, the content, methodology, or delivery of

instruction to address the unique needs that result from the student's disability, and to ensure access by the student to the general curriculum, so that he or she can meet the educational standards that apply to all students." 34 C.F.R. § 300.39(b)(3).

26. Specialized academic instruction, as the name suggests, is instruction or teaching. It is typically provided by a certified special education teacher or paraprofessional under the supervision of a special education teacher.

27. Specialized academic instruction is a delivery model, not a program. Thus, it cannot replace programs such as a Resource Specialist Program. Indeed, the California Department of Education ("CDE") issued guidance on this matter because of concerns that specialized academic instruction was being misused to eliminate the continuum of placements. (*See* Exhibit K.) The CDE concluded that when specialized academic instruction is provided only in a general education setting, federal and state laws and regulations may be violated where the necessary supports, services and personnel are not being provided for effective instruction to occur. (*See id.*) However, the substitution of specialized academic instruction in a general education setting, instead of a comprehensive Resource Specialist Program, is precisely the policy that Mt. McKinley has adopted. This policy is consistent with my observations in reviewing the IEP documents provided to me, notably, each of the IEPs that were developed at Mt. McKinley offers specialized academic instruction – usually 45 to 90 minutes. This instruction is, as discussed above, offered in the general education setting.

28. These uniform placements and services represent a reduction in special education services from those services that each youth received prior to attending Mt. McKinley. The Mt. McKinley IEPs do not state why a change in placement or a reduction in services was warranted based on each individual student's assessment and needs. For instance, G.F.'s records indicate that she was in a non-public school placement receiving 314 minutes of special education per day (i.e. full-time). However, the IEP developed at Mt. McKinley placed her in a general education setting and reduced her special education instruction to 45 minutes per day. There was no re-assessment done and no explanation as to why the placement and services had changed.

Indeed, in the case of G.F., the Mt. McKinley IEP even changed her eligibility for special education from "emotional disturbance" to "other health impairment," also without assessment or explanation. This was a pattern I saw throughout the IEPs I reviewed.

29. Based on my review of the IEP documents and my own 30 years of extensive experience working with individuals with disabilities and evaluating IEPs, it is my opinion that the Mt. McKinley IEPs do not offer comparable special education services to those that were included in each student's pre-Mt. McKinley IEP. The Mt. McKinley IEPs do not appear to be individualized educational programs and instead appear to be "one-size-fits-all" IEPs. Based on my experience reviewing IEPs from other juvenile detention facilities across the nation, I would have expected to see some variation in the IEP placements and services, even in a small sample size.

30. The third common practice that I identified at CCCJH is the use of solitary confinement as a form of discipline for detained youths. CCCJH uses three levels of solitary confinement, which they label as maximum security, security risk, and special program. (*See* Exhibit CC.)

31. The policies for maximum security and security risk do not provide for the provision of any educational services while the student is in solitary confinement. *Id.* When youth are on special program, the institutional supervisor can determine "restrictions on school attendance." *Id.*

32. From my review of the solitary confinement policies at CCCJH, I found no policies or procedures that assess whether the behavior leading to solitary confinement was related to the juvenile's disability. Public records indicate that if there is such a policy, it is not followed in practice. Specifically, records indicate that there have been no behavioral intervention plans developed at Mt. McKinley from July 2012 through April 2013. (Exhibit L.) Similarly, no manifestation determinations have been held at Mt. McKinley during the same period. (*Id.*) This means that when youth are put in solitary confinement, there is no evaluation as to whether the behaviors were disability related.

1  I declare under penalty of perjury pursuant to the laws of the United States of America
2  that the foregoing is true and correct to the best of my knowledge.
3  This declaration was executed on this 7th day of August, 2013, in Lancaster, California.

_____

Peter E. Leone