SHAWNA PARKS (CA BAR NO. 208301) (sparks@dralegal.org)
MARY-LEE K. SMITH (CA BAR NO. 239086) (msmith@dralegal.org)
REBECCA WILLIFORD (CA BAR NO. 269977) (rwilliford@dralegal.org)
KARA JANSSEN (CA BAR NO. 274762) (kjanssen@dralegal.org)
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, CA 94704-1204
Telephone: (510) 665-8644
Facsimile: (510) 665-8511

HERNAN VERA (CA BAR NO. 175149) (hvera@publiccounsel.org)
LAURA FAER (CA BAR NO. 223846) (lfaer@publiccounsel.org)
PUBLIC COUNSEL
2001 Center Street, Fourth Floor
Berkeley, CA 94704-1204
Telephone: (510) 529-3419
Facsimile: (213) 385-9089

GRACE A. CARTER (CA BAR NO. 101610) (gracecarter@paulhastings.com)
GINA COOK (CA BAR NO. 245611) (ginacook@paulhastings.com)
PAUL HASTINGS LLP
55 Second Street, Twenty-Fourth Floor
San Francisco, CA 94105-3441
Telephone: (415) 856-7000
Facsimile: (415) 856-7100

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| G.F., by and through her guardian ad litem, Gail F.; W.B., by and through his guardian ad litem, CiCi C.; Q.G., by and through his guardian ad litem, Barbara C.; and on behalf of themselves and a class of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONTRA COSTA COUNTY; CONTRA COSTA COUNTY DEPARTMENT OF PROBATION; PHILIP KADER, in his official capacity, Chief County Probation Officer; BRUCE PELLE, in his official capacity, Superintendent of Juvenile Hall; CONTRA COSTA COUNTY OFFICE OF EDUCATION; JOSEPH A. OVICK, in his official capacity as Superintendent, Contra Costa County Office of Education; LYNN MACKEY, in her official capacity, Director of Contra Costa County Court Schools.<br><br>Defendants. | Case No. C 13-3667-SBA<br><br>CLASS ACTION<br><br>**DECLARATION OF STUART GRASSIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: October 29, 2013<br>Time: 1:30 PM<br>Place: Courtroom 1, 4th Floor<br>Judge: Saundra B. Armstrong |

I, STUART GRASSIAN, declare as follows:

1. I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts, and was on the teaching staff of the Harvard Medical School continually from 1974 until 2002. I currently reside in Chestnut Hill, Massachusetts. If called upon to testify, I could and would do so competently as follows.

2. This declaration is submitted in support of the Motion for Class Certification filed by counsel on behalf of Plaintiffs and the class of similarly situated youth. I was asked by Plaintiffs' counsel to opine on the use of solitary confinement at Contra Costa County Juvenile Hall ("CCCJH") and its impact on the provision of special education services to disabled youth incarcerated at CCCJH. For this purpose, I reviewed a number of documents relating to solitary confinement policies and practices at CCCJH, produced by the Contra Costa County Office of Education and other entities pursuant to Public Records Act requests.

3. I graduated from New York University School of Medicine in 1973 with a degree of Doctor of Medicine degree. I then completed my residency in adult and adolescent psychiatry at Harvard Medical School / Beth Israel Hospital, Boston, Massachusetts from 1974 to 1977. I obtained Certification in Psychiatry by the American Board of Psychiatry and Neurology in 1979, and in 1996 I obtained subspecialty-certification in Forensic Psychiatry. I attended Harvard College from 1963-1967, majoring in Social Relations, and earned my Bachelor's Degree in 1967. I was a graduate student in Sociology at Brandeis University, Waltham, Massachusetts, from 1967-1969, earning a Master's Degree in 1969. I also earned a degree a *Juris Doctorate* from Suffolk University in 1986. My curriculum vitae is attached as Exhibit A to this declaration.

4. I have had extensive experience in evaluating the psychiatric effects of stringent conditions of confinement, and have served as an expert in a number of both individual and class-action lawsuits addressing this issue. I have been retained as an expert in class-action lawsuits regarding these issues in Massachusetts (2), New York State (3), California (2), Kentucky, Michigan, New Jersey, Ohio (2), Texas, and Florida, as well as individual cases in other States, including Arizona, California, Connecticut, Florida, Georgia, Kentucky, Maine,

1 | Massachusetts, Mississippi, New Mexico, New York, Pennsylvania, Texas, Virginia and the
2 | State of Washington. My experience has included class-action suits regarding juvenile detention
3 | facilities in New Jersey, Ohio, and Texas, as well as individual suits regarding such detention in
4 | California and New Mexico.

5. I have also been retained by the United States Department of Justice in its investigation of the Pennsylvania prison system, and also by the Department of Corrections of the State of Florida. I have also been consulted by the Office of Military Commissions of the United States Department of Defense in regard to the detainees at Guantanamo. In addition, I been retained and consulted by a variety of public advocacy groups, including The Legal Aid Society of New York, Prisoner's Legal Services of New York, the Center for Constitutional Rights, The Massachusetts Correctional Legal Services, The Massachusetts Civil Liberties Union, and the National Prison Project of the American Civil Liberties Union.

6. My observations and conclusions regarding the psychiatric effects of solitary confinement have been cited in a number of federal court decisions, for example: *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988), and *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995). I prepared a written declaration for *Madrid* describing the medical literature and historical experience concerning the psychiatric effects of restricted and isolated conditions of confinement as well as of other conditions of restricted environmental and social stimulation, and subsequently published the general (non-institution specific) and non-redacted (non-inmate specific) portions of that declaration as a paper entitled *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006). This paper describes the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation, and more specifically, observations concerning the effects of segregated confinement on prisoners. A true and correct copy of this paper is attached as Exhibit B to this declaration. My *curriculum vitae* (attached) lists other articles I have published on this subject.

7. I have given numerous lectures and seminars regarding the issue of the

psychiatric effects of solitary confinement, including among others, lectures at Harvard Medical School-Beth Israel Hospital, Boston, Harvard Law School, The Bar Associations of New York, Virginia, and Nova Scotia, The Federal Capital Defenders Habeas Unit, The National Prison Project of the NAACP, The Correctional Association of New York, The Office of Military Commissions of the U.S. Department of Defense, as well as invited oral and/or written testimony before the United States Senate and State legislative hearings in New York State, Maine and Massachusetts.

8. In formulating my opinions in this case, I have relied upon my own experience evaluating and interviewing several hundred adults and juveniles who either are currently or have been previously housed in solitary confinement. I have also relied upon the extensive body of medical literature described in my Washington University article (attached as Exhibit B), as well as the following literature regarding cognitive and behavioral development in adolescents:

    a) Casey, B.J., Jones, R., & Hare, T.: "The Adolescent Brain," *Ann. N.Y. Acad. Sci.* 1124: 111-126 (2008). A true and correct copy of this article is attached as Exhibit C.

    b) Ernst, M. & Mueller, S.C.: "The adolescent brain: Insights from Functional Neuroimaging Research," *Dev. Nuerobiol.*, 68(6): 729-743 (2008). A true and correct copy of this article is attached as Exhibit D.

    c) Romeo, R. & McEwen, B.: "Stress and the Adolescent Brain," *Ann. N.Y. Acad. Sci.* 1094: 202-214 (2006). A true and correct copy of this article is attached as Exhibit E.

    d) Steinberg, L.: "Cognitive and Affective Development in Adolescence," *Trends in Cognitive Science*, Vol. 9, No. 2 (2005). A true and correct copy of this article is attached as Exhibit F.

    e) Steinberg, L.: "Adolescent Development and Juvenile Justice," *Annual Review of Clinical Psychology*, Vol. 5: 459-85 (2009). A true and correct copy of this article is attached as Exhibit G.

9. As described in my Washington University article (attached as Exhibit B), it has long been known that severe restriction of environmental and social stimulation has profoundly deleterious effect on mental functioning; this issue has been a major concern in many medical and military situations, as well as in exploration and in anticipation of space travel, among others. And in response to the alarm raised by the "brainwashing" of American POW's in Korea, the U.S. CIA has devoted substantial resources to the study of solitary confinement.

10. As described in the literature attached as Exhibits C-G, solitary confinement causes a constellation of symptoms including panic attacks, perceptual distortions and hallucinations, confusional states, and intense agitation with loss of impulse control leading to random violence, often self-directed (for example, cutting, banging one's body against the cement walls, etc.). The medical literature has revealed significant vulnerability factors predicting especially poor response to solitary confinement. These include central nervous system dysfunction and cognitive impairment, as well as preexisting psychiatric difficulties (especially, Attention Deficit Hyperactivity Disorder, Bipolar and other Affective Mood Disorders, and disorders resulting in increased emotional reactivity such as Post Traumatic Stress Disorder, and the various "Cluster B" Personality Disorders).

11. Adolescence is itself a major vulnerability factor. It has long been observed that adolescents are particularly prone to impulsive and chaotic behavior, something which typically does not settle down until somewhere during early adulthood. Recent brain research has revealed that brain function and structure remains plastic, even during adulthood. One of the most dramatic findings is that the brain undergoes major change during adolescence; there is both extensive pruning and extensive strengthening of synaptic connections, ultimately allowing the frontal lobes to inhibit the emotional reactivity imbedded in the limbic system, and thus allowing judgment to prevail over impulse. It is a process that, even in good circumstances, lasts into early adulthood. But adolescents in juvenile detention very commonly have histories of particularly intense emotional reactivity and impulsivity and/or cognitive impairment; indeed, much of the behavior that leads to juvenile detention is a product of such difficulties. For them, the process of brain function maturation will inevitably be slower and more arduous.

1	12.	One of the more disturbing findings, however, is that emotional stress and illness can alter brain functioning permanently, and this is of course especially true for younger people. As described above, solitary confinement can cause severe psychiatric illness, and this – like any other major psychiatric breakdown – will in turn often leave the individual with a posttraumatic stress disorder. Existing research regarding the long-term effects of solitary confinement suggests that such confinement will cause lifelong harm, and this harm will be especially severe when the person so confined was an adolescent.

13.	In formulating my opinions in this case, I also reviewed and relied upon the following documents which contain information regarding CCCJH:

a) Contra Costa County Office of Education letter dated May 3, 2013 regarding "DRA Request for Documents", which contains data regarding the absence of manifestation determinations for students who are at Mt. McKinley School. A true and correct copy of this letter is attached as Exhibit H.

b) Contra Costa County Probation Department, "Security Programs", which documents Contra Costa County Juvenile Hall's policies regarding solitary confinement. A true and correct copy of this document is attached as Exhibit I.

c) Lindy Khan & Lynn Mackey, "Engaging Students Who Are At Risk Through Instruction To Address Gaps in Academic Skills and Accelerate Learning", which contains school enrollment figures at Mt. McKinley. A true and correct copy of this document is attached as Exhibit J.

d) Philip Kader, "Contra Costa County Probation Overview", which contains an overview of the County Probation department and photographs of cells and general conditions at CCCJH. A true and correct copy of this document is attached as Exhibit K.

///
///
///
///

14. Based upon my review of these records, it is my understanding that CCCJH policy employs solitary confinement, not just as a relatively brief means of calming down a situation (such as is the case in psychiatric seclusion), but rather as a form of discipline and punishment. CCCJH uses three levels of solitary confinement, which they label as "maximum security," "security risk," and "special program." (Exh. I.) Maximum security is the most restrictive program (followed closely by security risk) and is meant for youth who display dangerous and severe behaviors. *Id.* Special program is used as a behavior modification program for when youth habitually violate minor rule infractions and/or their behavior is not congruent with the safety or stability of the housing unit. *Id.*

15. Youth who are on maximum security and security risk are confined in their cells and are not allowed to participate in any unit activities with the group. (Exh. I.) Youth on maximum security and security risk are permitted to exercise alone for two 30-minute periods each day. *Id.* Visits with the Juvenile Hall Chaplain, Mental Health Therapists, and Probation Officers are permitted only with supervisory approval. *Id.*

16. Youth who are on special program are similarly confined to their cells and their access to activities, exercise, and contact with other groups is determined by the Institutional Supervisor. (Exh. I.)

17. The policies for maximum security and security risk do not provide for the provision of any educational services while the student is in solitary confinement. (Exh. I.) When youth are on special program, the Institutional Supervisor can determine "restrictions on school attendance." *Id.* In practice, the County of Education has acknowledged that these restrictions make it difficult to provide appropriate education access to students on special program. (Exh. J.)

18. Just as juveniles with psychiatric and/or cognitive impairment are more likely to commit behaviors causing them to be placed in detention, so too they are more likely to behave in a manner that subjects them to punishment while in detention. This behavior can often be directly linked to their disabilities. However, from July 2012 through April 2013, staff at CCCJH conducted no manifestation determinations to evaluate whether the behavior that youth

were being punished for was a manifestation of their disabilities. (Exh. H.)

19. Given that solitary confinement has a particularly detrimental impact on youth, especially those who have psychiatric and/or cognitive difficulties, placing such youth in solitary carries significant risk. Yet despite this risk, CCCJH's solitary confinement policies fail to provide for assessment of the youths' vulnerabilities to decompensation in solitary, nor of services that will be required while they are in such confinement. In fact, CCCJH's solitary confinement policies permit visits from Mental Health Therapists only with supervisory appeal and only when two or three Probation Counselors are on the unit. (Exh. I)

20. Solitary confinement is not an effective deterrent for misbehavior of individuals who are already impulsive and emotionally reactive. Indeed, the mental state and behavior of such individuals are very likely to worsen during and after such confinement, leading to a vicious cycle of worsening behavior and increasing punishment by placement in a situation that causes behavior to deteriorate further.

21. Based upon my review of the solitary confinement policies at CCCJH, coupled with the medical literature and my own extensive experience in this field, it is my opinion that the solitary confinement policies at CCCJH are ineffective, target youth with disabilities, and create a vicious cycle whereby juveniles with disabilities are denied treatment, suffer worsening of symptoms, and are deprived of special education and related services to which they are entitled.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

This declaration was executed on this 3rd day of August, 2013, in Chestnut Hill, Massachusetts.

Signature: _____
Stuart Grassian, M.D.