1   SIDNEY M. WOLINSKY (CA BAR NO. 33716)  (swolinsky@dralegal.org)
    MARY-LEE K. SMITH (CA BAR NO. 239086)  (msmith@dralegal.org)
2   REBECCA WILLIFORD (CA BAR NO. 269977 )  (rwilliford@dralegal.org)
    KARA JANSSEN (CA BAR NO. 274762)  (kjanssen@dralegal.org)
3   DISABILITY RIGHTS ADVOCATES
    2001 Center Street, Fourth Floor
4   Berkeley, CA  94704-1204
    Telephone:     (510) 665-8644
5   Facsimile:      (510) 665-8511

6   HERNAN VERA (CA BAR NO. 175149)  (hvera@publiccounsel.org)
    LAURA FAER (CA BAR NO. 223846)  (lfaer@publiccounsel.org)
7   PUBLIC COUNSEL
    2001 Center Street, Fourth Floor
8   Berkeley, CA  94704-1204
    Telephone:     (510) 529-3419
9   Facsimile:      (213) 385-9089

10  GRACE A. CARTER (CA BAR NO. 101610)  (gracecarter@paulhastings.com)
    GINA COOK (CA BAR NO. 245611 )  (ginacook@paulhastings.com)
11  PAUL HASTINGS LLP
    55 Second Street, Twenty-Fourth Floor
12  San Francisco, CA  94105-3441
    Telephone:     (415) 856-7000
13  Facsimile:      (415) 856-7100
    *Attorneys for Plaintiffs*

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16  | | |
    |---|---|
    | G.F., by and through her guardian ad litem, Gail F.; W.B., by and through his guardian ad litem, CiCi C.; Q.G., by and through his guardian ad litem, Barbara C.; and on behalf of themselves and a class of those similarly situated, | **Case No.**  C 13-3667-SBA **CLASS ACTION** **EXHIBITS A THROUGH J TO THE DECLARATION OF STUART GRASSIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
    | Plaintiffs, | Date:   March 18, 2014 |
    | v. | Time:   2:00 PM |
    | CONTRA COSTA COUNTY; and CONTRA COSTA COUNTY OFFICE OF EDUCATION. | Place:   Courtroom 1, 4th Floor Judge:  Saundra B. Armstrong |
    | Defendants. | |

# EXHIBIT A

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467-3976
Phone (617) 244-3315  Fax (617) 244-2792
stgrassian@aol.com

Born:  June 29, 1946

## EDUCATION, TRAINING, FACULTY POSITIONS.

| | |
|---|---|
| 1963-1967 | Harvard Club Scholar, Harvard University, Cambridge, MA |
| 1967 | B.A. Cum Laude, Harvard University, Cambridge, MA |
| 1967-1969 | NIMH Fellow in Sociology, Brandeis University, Waltham, MA |
| 1969 | M.A., Sociology, Brandeis University, Waltham, MA |
| 1970 | NSF Fellow in Psychiatry, Bellevue Hospital, NY |
| 1973 | M.D., New York University School of Medicine, NY |
| 1973-1974 | Intern (Medicine), New York University Medical Center, NY |
| 1974-1977 | Resident in Psychiatry, Beth Israel Hospital, Boston, MA.<br>Teaching Fellow in Psychiatry, Harvard Medical School. |
| 1977-2003 | Clinical Instructor in Psychiatry, Harvard Medical School. |
| 1978-1980 | Assistant Clinical Professor of Psychiatry, Tufts University School of Medicine. |
| 1982-1986 | Suffolk University Law School; J.D. 1986; Daniel Fern Award. |
| 1986 | Bar Examination completed;  entry into Massachusetts Bar.(remain on "retired" status through present.) |

## LICENSURE.

| | |
|---|---|
| 1974- | Massachusetts Medical License #37749. |

## BOARD CERTIFICATIONS

| | |
|---|---|
| 1979 | Diplomate, American Board of Psychiatry and Neurology   (ABPN) in Psychiatry. |
| 1994 | Diplomate Certification, ABPN, Added Qualifications in Addiction Psychiatry. |
| 1996 | Diplomate Certification, ABPN, Added Qualifications in Forensic Psychiatry |

## MAJOR PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 1977 - | Private practice in Psychiatry:  Cambridge, MA (1977-1979), Chestnut Hill, MA (1979-   ), Stoneham, MA (1980-2003) |
| 1977-1978 | Clinical Director, Inpatient Service, Dorchester Mental Health Center, Boston, MA |
| 1978-1980 | Director, Inpatient Service, WestRosPark Mental Health Center, Boston, MA |
| 1979-1983 | Medical Staff, Lecturer, Glover Memorial Hospital, Needham, MA |
| 1980-1994 | Attending Psychiatrist, Adult & Adolescent Inpatient Services, New England Memorial Hospital, Stoneham, MA |
| 1980-1983 | Director, Adult & Adolescent Inpatient Services, Department of |

Psychiatry, New England Memorial Hospital, Stoneham, MA
1983-1994    Attending Psychiatrist, Addictions Treatment Unit, New England
             Memorial Hospital, Stoneham, MA
1987-1993    Supervising Psychiatrist, Outpatient Department, New England
             Memorial Hospital, Stoneham, MA
1992-1994    Psychiatric Director, Partnership Recovery Center, Melrose-
             Wakefield Hospital, Melrose, MA (Day treatment program for
             Addiction rehabilitation)


## CONSULTATIONS, AFFILIATIONS, BOARD MEMBERSHIPS

1979-        Massachusetts Correctional Legal Services. (Psychiatric Effects
             of Solitary Confinement, Psychiatric Effects of Strip Search Procedures)
1980-        Massachusetts Civil Liberties Union. (Psychiatric Effects of Strip
             Search Procedures, Psychiatric Effects of Solitary Confinement)
1993-        Massachusetts Department of Corrections, Stress Management
             Unit. (Occupational Stress among Correctional Staff)
1993-4       Board of Trustees, New England Memorial Hospital, Stoneham, MA.
1995         Consultation to Psychiatric Expert/Special Master; Madrid v Gomez
             Federal District Court, Northern District, CA #C-90-3094TEH.
             (Psychiatric Effects of Solitary Confinement)
1995-        Consultant to Massachusetts Professional Recovery Committee,
             and to Substance Abuse Rehabilitation Program of the
             Massachusetts Board of Registration in Nursing. (Addictive
             Disorders, Impaired professionals)
1997         Botech Corporation, Cambridge, MA. (Effects of Solitary Confinement)
1998         Psychiatric Expert in Compliance Monitoring; Eng v Coombe
             Federal District Court, Western District, NY, CIV #80-385-S.
             (Effects of Solitary Confinement)
2000-2       The Desisto School, Lenox MA
2001-        Consultant, Florida Department of Corrections. (Solitary Confinement
             and Mental Health Issues in Florida State Prisons.)
2001-        Board of Advisors, Correctional Association of New York, (Mental Health
             Issues in New York State Prisons).
2002-4       Board of Directors, Massachusetts 9/11 Fund.
2002-4       American Boyschoir School, Princeton, NJ.
2002-3       Poly Prep School, Brooklyn, NY.
2009.        U.S. Department of Defense, Office of Military Commissions. Effects of
             Confinement on Guantanamo Detainees, Arlington, Va,.
2010         Texas ACLU. Expert in K.C. v. Townsend, challenging conditions in state's xsadolescent
             female detention facility.
2012-        Advisory Committee. New York State Commission on Quality of Care and Advocacy for
             Persons with Disabilities (CQCAPD) .

# PROFESSIONAL SOCIETY/COMMITTEE/STAFF MEMBERSHIPS

| | |
|---|---|
| 1974-2003. | Member, American Psychiatric Association & Massachusetts Psychiatric Society Committee Memberships. |
| |           Inpatient Psychiatry Committee (1981-1984) |
| |           Private Practice Committee (1992-1995) |
| |           Chair, Presidents Task Force on Managed Care (1993-1994) |
| |           Steering Committee, Managed Care Retreat (1993-1994) |
| 1974-1977 | Resident in Psychiatry, Beth Israel Hospital, Boston, MA. Clinical Fellow in Psychiatry, Harvard Medical School. |
| 1977-2003 | Courtesy Staff, Beth Israel Hospital, Boston, MA Assistant in Psychiatry (1977-1991) Associate in Psychiatry (1991-2003) Clinical Instructor in Psychiatry, Harvard Medical School. |
| 1980-1999 | Active Staff, Boston Regional Medical Center, Stoneham, MA Committee Memberships |
| |           Credentials Committee (1986-1990) |
| |           Chair, Bylaws Committee (1987-1990) |
| |           Medical Staff Executive Committee (1989-1992) |
| | Chief of Staff (1990-1992) |
| | Board of Trustees (1990-1992) |
| 1992 - | Active/Courtesy Staff, Melrose-Wakefield Hospital, Melrose, MA |
| 1993-2000 | Psychiatric Network of Massachusetts Committee Memberships |
| |           Steering Committee (1993-1994) |
| |           Chairman, Board of Directors (1994-1995) |

# AWARDS

| | |
|---|---|
| 2005. | National Alliance for the Mentally Ill (NAMI). Exemplary Psychiatrist Award, Presented at Annual Meeting, American Psychiatric Association, May 2005. |

# TEACHING APPOINTMENTS, PRESENTATIONS

| | |
|---|---|
| 1967 | Teaching Fellow, Harvard Graduate School of Education, Cambridge, MA |
| 1967-1969 | Teaching Fellow, Department of Sociology, Brandeis University, Waltham, MA |
| 1973 | Clinical Fellow in Psychiatry, New York University Medical Center, New York, NY |
| 1974-1977 | Clinical Fellow in Psychiatry, Harvard Medical School, Boston, MA |
| 1975-1976 | Consultant and Lecturer, Human Resources Institute, Brookline, MA |
| 1977-2003 | Clinical Instructor, Department of Psychiatry, Harvard Medical School, Boston, MA |
| 1978-80 | Assistant Clinical Professor, Department of Psychiatry, Tufts University Medical Center, Boston, MA |
| 1987 | Faculty, Third International Conference on Restricted Environmental Stimulation, New York, NY: "Effect of REST In |

| | |
|---|---|
| | Solitary Confinement and Psychiatric Seclusion" |
| 1987 | Guest Lecturer, Suffolk University School of Law, Boston, MA: "Commitability and the Right to Refuse Treatment" |
| 1988 | Faculty, 32nd Institute on Hospital and Community Psychiatry, Boston, MA |
| 1990 | Massachusetts Bar Association Symposium, Boston, MA: "Drugs and Alcohol on Campus" |
| 1992 – | Faculty, American Academy of Psychiatry and Law, Boston, MA: "Effects of Childhood Sexual Abuse" |
| 1993 | Faculty, Massachusetts Department of Corrections Stress Unit, Statewide Seminar, MA: "Stress Awareness for Managers" |
| 1993 | Massachusetts Continuing Legal Education Seminar, Boston, MA: "Psychiatric Effects of Physical and Sexual Assault" |
| 1994 | Massachusetts Academy of Trial Attorneys Seminar, Boston, MA: "Psychiatric Evaluation of Victims of Violent Crime" |
| 1994 | Beth Israel Hospital/Harvard Medical School, Boston, MA: "Psychiatric Consequences of Solitary Confinement; "Effects of Sensory Deprivation and Social Isolation in a Vulnerable Population" |
| 1994 | Massachusetts Medical Society, Committee on Managed Care, Waltham, MA: "Ethics of Managed Care" |
| 1994 | Prison Psychiatric Group, Albany, NY: "Criminality and Mental Illness, Revisited: Disorders of Volition". (Lecture sponsored by Pfizer Pharmaceuticals) |
| 1995 | Suffolk University Advanced Legal Studies, Boston, MA: "Sexual Abuse: Memory, Truth and Proof" |
| 1995 | Massachusetts Association of Trial Attorneys Seminar, Boston, MA: "Premises Liability/Negligent Security: Psychiatric Testimony and the Role of the Psychiatric Expert" |
| 1996 | New England Society for the Study of Dissociation, McLean Hospital, Belmont, MA: "Impact of Forensic Issues on Treating Victims of Violence" |
| 1996 | Harvard Medical School, Children's Hospital Family Violence Seminar, Boston, MA: "Trauma and Memory" |
| 1996 | Trauma and Memory: An International Research Conference, Durham, NH: "Factors Distinguishing True and False Memory of Childhood Sexual Abuse" |
| 1996 | Trauma and Memory: An International Research Conference, Durham, NH: "Memory of Sexual Abuse by a Parish Priest" |
| 1997 | Correctional Association of New York, NY: "Psychiatric Effects of Solitary Confinement". |
| 1998 | Massachusetts Board of Registration in Medicine and Northeastern University Conference, Substance Abuse and The Licensed Professional, Boston, MA: "Addictions and Compulsions: Disorders of Volition" |
| 2000 | Human Rights Watch and American Civil Liberties Union Foundation Conference. Washington, D.C. "Super-Maximum Security Confinement in the United States." |
| 2003 | Capital Habeus Unit Training Conference of the Defender Services Division of the United States Courts, San Antonio, TX. (lecture |

| | |
|---|---|
| | regarding death row confinement and its effects on post-conviction appeal process.) |
| 2003 | NAACP Legal Defense Fund Conference, Airlie, VA. 7/03. Lecture regarding mental health issues and solitary confinement of prisoners. |
| 2005 | Vera Institute. National Commission on Safety and Abuse in Prisons. Newark NJ, July 2005. Effects of Isolation. |
| 2005. | NAACP Legal Defense Fund, Airlie Conference, Va. July 2005. "'Volunteers' in Death Row". |
| 2006 | University of California at Davis, Symposium - The Neurobiology of Torture. "What is Known about the Neurobiological Effects of Solitary Confinement." |
| 2009 | Keynote Address. Nova Scotia Barristers' Society. "Psychiatric Effects of Solitary Confinement". |
| 2010 | "Psychiatric Effects of Solitary Confinement". Presentation at Virginia Bar Association Meeting, Richmond, VA. |
| 2010 | Harvard Prisoners Legal Assistance Project. Invited lecture regarding psychiatric effects of confinement and impact on advocacy. |
| 2010 | Discussant, Symposium at Annual Meeting of American Psychological Association, San Diego, CA. "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation." |
| 2012 | Civil Rights Committee, New York State Bar Association. "Psychiatric Effects of Solitary Confinement". |
| 2012 | Columbia University, "Incarceration and Isolation: A Workshop". Joint Meeting with the Liman Public Interest Program at Yale Law School, and the Lowenstein International Human Rights Clinic at Yale Law School |

## MEDIA, PUBLIC AFFAIRS PRESENTATIONS

| | |
|---|---|
| 1988 | NBC-TV, Today Show "Small Group Confinement of Female Political Prisoners at the Federal Penitentiary in Lexington, KY" |
| 1990 | NPR-TV, News Interview Program: "Psychiatric Effects of Small Group Confinement" |
| 1990 | PBS-TV, Point of View "Through the Wire", Documentary regarding women confined for politically motivated crimes |
| 1991 | WBZ-TV, Boston, MA: Channel 4 Nightly News "Statute of Limitations on Cases of Childhood Sexual Abuse" |
| 1992 | Boston Globe, New York Times, etc.: "Effects of Childhood Sexual Abuse by a Catholic Priest" |
| 1992 | Boston Globe, New York Times, San Francisco Chronicle, Los Angeles Times, etc.: "Psychiatric Effects of Solitary Confinement" |
| 1993 | New England Cable News, Newton, MA: Commentator regarding insanity defense in Kenneth Sequin trial |
| 1993 | Massachusetts House of Representatives, Judiciary Committee testimony: Proposed change in Statute of Limitations in cases of childhood sexual abuse |
| 1993 | CBS-TV, 60 Minutes "Pelican Bay – Psychiatric Effects of Solitary Confinement in California's High-Tech Maximum Security Prison" |
| 1993 | New England Cable News, Newton, MA: News Night "False Memory and Recovered Memory of Childhood Sexual Abuse" |
| 1993 | WCVB-TV, Boston, MA: Chronicle "Sentencing of Father Porter – The Effect on the Victims" |
| 1994 | WHDH-TV, Boston, MA: Boston Common "False Memory Syndrome". |

| 1994 | FOX-TV, Boston, MA: At Issue "Psychiatric Effects of Solitary Confinement" |
|------|------|
| 1996 | New England Cable News, Newton, MA: News Night "The Insanity Defense" |
| 1998 | ABC-TV, Nightline with Ted Koppel; Primetime Live "Crime and Punishment" |
| 1998 | WBZ-TV, Boston, MA: Channel 4 Nightly News "Perpetrators of Sexual Abuse: Dangers to the Community" |
| 1999 | ABC-TV, 20/20 "Effects of Solitary Confinement" |
| 2003 | Discovery Channel. "Mohammed Atta: Profile of a Terrorist". |
| 2003 | Invited Testimony, Joint Legislative Hearing, New York State Assembly, New York City, November 2003. "Disciplinary Confinement and Treatment of Prison Inmates with Serious Mental Illness." |
| 2004 | Invited Testimony, Massachusetts State Legislature. Joint Committee on Public Safety. "The Cost of Corrections". |
| 2010 | Invited Testimony, Maine State Legislature: "Solitary Confinement in Maine." |
| 2010 | National Geographic Television: "Explorer: Solitary Confinement". |
| 2011 | National Religious Campaign Against Torture. "Solitary Confinement". |

(Due to the extensive public interest in the issue of solitary confinement, I have also provided interviews and contributions to a number articles in various newspapers, magazines, and radio and television news reports and documentaries; I have not been able to keep up a catalogue of these, though they certainly include The Boston Globe, The New York Times, The Los Angeles Times, The San Francisco Chronicle, The Denver Post, New Yorker Magazine, and National Public Radio, as well as others.)


## MAJOR INTERESTS IN FORENSIC PSYCHIATRY

### 1. Psychiatric Effects of Solitary Confinement

I have had extensive experience in evaluating the psychiatric effects of stringent conditions of confinement, and have served as an expert in a number of both individual and class-action lawsuits addressing this issue. My observations and conclusions regarding the psychiatric effects of such confinement have been cited in a number of federal court decisions, for example: *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988), and *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995).

I prepared a written declaration for *Madrid* describing the medical literature and historical experience concerning the psychiatric effects of restricted and isolated conditions of confinement as well as of other conditions of restricted environmental and social stimulation, and subsequently prepared the general (non-institution specific) and non-redacted (non-inmate specific) portions of that declaration into a general statement, which I have entitled *Psychiatric Effects of Solitary Confinement*, 22 Wash. University Journal of Law and Policy, (2006). It describes the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation, and more specifically, observations concerning the effects of segregated confinement on prisoners.

I have given lectures and seminars regarding this issue. Although I do not have a complete list of those lectures and seminars, they include, but are not limited to, lectures at Harvard Medical School-Beth Israel Hospital, Boston, at meetings of the Nova Scotia and of the Virginia Bar Associations, The Office of Military Commissions of the U.S. Department of Defense, The Federal Capital Defenders Habeas Unit and The Correctional Association of New York, as well as, invited testimony before state legislative hearings in New York, Massachusetts and Maine. In January 2012, I will be addressing this issue at the New York State Bar Association. In addition, I was recently appointed as a consultant to the Psychiatric Correctional Advisory Committee of the New York State Commission on Quality of Care and Advocacy for People with Disabilities

I have been retained as an expert in class-action lawsuits regarding these issues in Massachusetts (2), New York (3), California (2), Kentucky, Michigan, New Jersey, Ohio (2), Texas and Florida, as well as individual cases in other states, including California, Connecticut, Florida, Georgia, Maine, Massachusetts, New Mexico, New York, Pennsylvania, Texas, Virginia and the State of Washington. I have been retained and consulted by a variety of public advocacy groups, including The Legal Aid Society of New York, Prisoner's Legal Services of New York, the Center for Constitutional Rights, The Massachusetts Correctional Legal Services, The Massachusetts Civil Liberties Union, the National Prison Project of the American Civil Liberties Union, and the Department of Corrections of the State of Florida. Since the tragic events of September 11, 2001, I have also been consulted regarding the confinement of a number of individuals who were deemed to be "enemy combatants" and/or were either charged with or convicted of conspiring against the United States. These include individuals who were confined in Guantánamo, in the Navy Brig in Charleston, S.C., in the Federal ADX prison in Florence, Colorado and in the SeaTac facility in Seattle, Washington, as well as in federal detention centers in New York City and Miami, Florida. Decisions in some of those cases, and my published findings, have been cited in Federal Appellate decisions, and have also generated significant national media interest.

Issues have included: mental illness among inmates so confined; effect on ability to assist in inmate's own legal defense (both pretrial and postconviction); "volunteering" for execution; impact on inmate's ability to cooperate with government in debriefing and testifying. Additionally, have been consulted in a number of cases involving detention (at Guantanamo, Charleston S.C. Naval Brig, and various Federal Detention Centers) of accused terrorists.

The 1983 American Journal of Psychiatry article listed below described the paradigmatic neuropsychiatric syndrome associated with solitary confinement. A more extensive review of the literature, including clinical and experimental literature concerning the effects of decreased environmental and social stimulation, as well as specifically, observations concerning the effects of segregated confinement on prisoners, is contained in he 2006 Washington University article listed below.

Peer-Reviewed Medical Publications:
"Psychopathological Effects of Solitary Confinement", Am J Psychiatry 140:11, 1983.
"Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement", Intl J Law & Psychiatry 8:49, 1986.

Law Journals:
"Psychiatric Effects of Solitary Confinement", Washington Univ. Journal of Law & Policy Vol 22: pp. 325-383, 2007.

Book Chapter:
"Neuropsychiatric Effects of Solitary Confinement" in Ojeda, ed., The Trauma of Psychological Torture, Praeger, Westport Conn., 2008.

On-Line Publications:
"'Fatal Flaws' in the Colorado Solitary Confinement Study". In Solitary Watch; Posted November 15, 2010

## 2. Strip Search Procedures, Sexual and Physical Assault

Psychiatric expert in a number of strip search cases in Federal and Massachusetts state courts. Testimony has been cited by the Federal Appeals Court in Cole v Snow. Consulted in settlement of three class action suits.

Psychiatric expert in cases of rape, sexual and physical assault. Substantial experience in evaluating the effects of childhood sexual abuse, and the processing over time of memories of that abuse. Evaluated approximately 100 victims of childhood sexual abuse, including many of the plaintiffs in the clergy sex abuse scandals in Massachusetts. Consulted to private schools around such issues.

Research and Presentations:

Principal Investigator, Beth Israel Hospital, Department of Psychiatry, Boston, MA.
"Psychiatric and Addictive Problems in Survivors of Childhood Sexual Abuse Perpetrated by Father Porter."
"Vicissitudes of Memory of Childhood Trauma".

With Joseph De Rivera, Ph.D.: "Recovery of Memory of Childhood Sexual Abuse and Creation of False Memories; Can These Processes be Distinguished?".

## 3. **Addictive Disorders.**

Testimony in a number of criminal and civil cases. My testimony in a highly publicized case, In re Cockrum, helped to establish that an individual who was otherwise highly competent, was not competent to act in his own behalf in appealing his murder conviction, as a result of an underlying addictive and suicidal compulsion.

4. Civil Rights Issues
Expert in a number of cases regarding racial and sexual harassment in employment and housing situations, including cases brought by Civil Rights Division of the United States Department of Justice, and by Greater Boston Legal Services, and in strip search procedures by law enforcement and prison personnel.

*(updated 2/12)*

# EXHIBIT B

PSYCHIATRIC EFFECTS OF SOLITARY CONFINEMENT, 22 Wash. U. J.L. & Pol'y 325

39

22 Wash. U. J.L. & Pol'y 325

**Washington University Journal of Law and Policy**
2006

Prison Reform: Commission on Safety and Abuse in America's Prisons
PSYCHIATRIC EFFECTS OF SOLITARY CONFINEMENT[a1]
Stuart Grassian[a1]

Copyright (c) 2006 Washington University; Stuart Grassian

**Table of Contents**

| | |
|---|---|
| Preface | 327 |
| I. Overview | 327 |
| II. Solitary Confinement Can Cause Severe Psychiatric Harm | 333 |
| A. Solitary Confinement Can Cause a Specific Psychiatric Syndrome | 333 |
| 1. The Specific Psychiatric Syndrome Associated with Solitary Confinement | 335 |
| 2. This Syndrome has the Characteristics of an Acute Organic Brain Syndrome--A Delirium | 337 |
| B. The Historical Experience with Solitary Confinement: The Nineteenth Century Experience | 338 |
| 1. The Origin of the American Penitentiary: The Nineteenth Century German Experience | 338 |
| 2. Psychological Effects of Severe Isolation | 341 |
| C. The Twentieth Century Experience: Prisoners of War, "Brain Washing," and Experimental Research | 343 |
| 1. Prisoners of War and "Brain Washing" | 343 |
| 2. Experimental Research on Sensory Deprivation | 345 |
| D. Factors Effecting Response to Sensory Restriction and Solitary Confinement | 346 |
| 1. Differing Conditions of Isolation | 346 |
| 2. The Perceived Intent of the Isolation Experience | 347 |
| 3. Individual Differences in Response | 347 |
| a. Findings at Pelican Bay State Prison | 349 |
| b. Attention Deficit and Antisocial Personality Disorders | 350 |
| c. Langley v. Coughlin | 351 |

d. Effects on Psychologically More Resilient Inmates: Baraldini v. Meese and Hameed v. Coughlin     352

E. Long Term Effects of Solitary and Small Group Confinement     353

III. Conclusions     354

Appendix A: Reports of Psychiatric Disturbances in Other Conditions of Restricted Environmental Stimulation     356

I. Aviation     356

II. Small Group Confinement     357

III. Polar Habitation     358

IV. Explorers: Solo Voyages     361

V. Medical Conditions     362

A. Eye Patched Patients     362

B. Poliomyelitis     363

C. Cardiac Patients     363

D. Hearing-Impaired Individuals     364

E. Other Medical Patients     365

VI. Occupational Situations     365

VII. Animal Studies     365

Appendix B: The Nineteenth Century German Experience with Solitary Confinement     367

Appendix C: Experimental Research on the Psychiatric Effect of Profound Sensory Deprivation: Factors Influencing Vulnerability to Psychiatric Harm     373

I. The Influence of Expectation     373

II. Individual Differences in Response     374

A. Effects of Sensory Deprivation on Antisocial Personality Disorder     376

1. Aversive Conditioning     376

a. Ethical Considerations     378

b. SHU Incarceration is not Aversive Conditioning     378

(i) The behavior being changed:     379

(ii) The "punishment":     379

Appendix D: Reports of the Long-Term Effects of Solitary Confinement in Former Political Prisoners and in Prisoners of War: Solitary Confinement as a Means     380

of "Brain Washing" and "Indoctrinating"

### *327 Preface

Dr. Grassian is a Board Certified Psychiatrist who was on the faculty of the Harvard Medical School for over twenty-five years. He has had extensive experience in evaluating the psychiatric effects of solitary confinement, and in the course of his professional involvement, has been involved as an expert regarding the psychiatric impact of federal and state segregation and disciplinary units in many settings. His observations and conclusions regarding this issue have been cited in a number of federal court decisions. The following statement is largely a redacted, non-institution and non-inmate specific, version of a declaration which was submitted in September 1993 in Madrid v. Gomez.[1] To enhance the readability of this statement, much of the supporting medical literature is described in the appendices to the statement.

### I. Overview

Solitary confinement--that is the confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction--can cause severe psychiatric harm. It has indeed long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning; this issue has been a major concern for many groups of patients including, for example, patients in intensive care units, spinal patients immobilized by the need for prolonged traction, and patients with impairment of *328 their sensory apparatus (such as eye-patched or hearing-impaired patients). This issue has also been a very significant concern in military situations, polar and submarine expeditions, and in preparations for space travel.

The United States was actually the world leader in introducing prolonged incarceration, and solitary confinement, as a means of dealing with criminal behavior. The "penitentiary system" began in the United States, first in Philadelphia, in the early nineteenth century, a product of a spirit of great social optimism about the possibility of rehabilitation of individuals with socially deviant behavior.[2] The Americans were quite proud of their "penitentiary system" and they invited and encouraged important visitors from abroad to observe them.[3] This system, originally labeled as the "Philadelphia System," involved almost an exclusive reliance upon solitary confinement as a means of incarceration and also became the predominant mode of incarceration, both for post conviction and also for pretrial detainees, in the several European prison systems which emulated the American model.[4]

The results were, in fact, catastrophic. The incidence of mental disturbances among prisoners so detained, and the severity of such disturbances, was so great that the system fell into disfavor and was ultimately abandoned. During this process a major body of clinical literature developed which documented the psychiatric disturbances created by such stringent conditions of confinement.[5]

The paradigmatic psychiatric disturbance was an agitated confusional state which, in more severe cases, had the characteristics of a florid delirium, characterized by severe confusional, paranoid, and hallucinatory features, and also by intense agitation and random, impulsive, often self-directed violence. Such disturbances were often *329 observed in individuals who had no prior history of any mental illness. In addition, solitary confinement often resulted in severe exacerbation of a previously existing mental condition. Even among inmates who did not develop overt psychiatric illness as a result of solitary confinement, such confinement almost inevitably imposed significant psychological pain during the period of isolated confinement and often significantly impaired the inmate's capacity to adapt successfully to the broader prison environment.

It is both tragic and highly disturbing that the lessons of the nineteenth century experience with solitary confinement are today being so completely ignored by those responsible for addressing the housing and the mental health needs in the prison setting. For, indeed, the psychiatric harm caused by solitary confinement had become exceedingly apparent well over one hundred years ago. Indeed, by 1890, with In re Medley,[6] the United States Supreme Court explicitly recognized the massive psychiatric harm caused by solitary confinement:

> This matter of solitary confinement is not . . . a mere unimportant regulation as to the safe-keeping of the prisoner . . . .

. . . [E]xperience [with the penitentiary system of solitary confinement] demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover snfficient mental activity to be of any snbsequent service to the community.[7]

The consequences of the Supreme Court's holding were quite dramatic for Mr. Medley. Mr. Medley had been convicted of having murdered his wife. Under the Colorado statute in force at the time of the murder he would have been executed after about one additional *330 month of incarceration in the county jail. But in the interim between Mr. Medley's crime and his trial the Colorado legislature had passed a new statute which called for the convicted mnrderer to be, instead, incarcerated in solitary confinement in the state prison during the month prior to his execution.[8] Unhappily, when the legislature passed the new law it simultaneously rescinded the older law without allowing for a bridging clause which wonld have allowed for Mr. Medley's sentencing under the older statute.[9]

Mr. Medley appealed his sentencing nnder the new statute, arguing that punishment under this new law was so substantially more burdensome than punishment under the old law as to render its application to him ex post facto.[10] The Supreme Court agreed with him, even though it simultaneously recognized that if Mr. Medley was not sentenced under the new law, he could not be sentenced at all.[11] Despite this, the Court held that this additional punishment of one month of solitary confinement was simply too egregious to ignore; the Court declared Mr. Medley a free man, and ordered his release from prison.[12]

Dramatic concerns about the profound psychiatric effects of solitary confinement have continued into the twentieth century, both in the medical literature and in the news. The alarm raised about the "brain washing" of political prisoners of the Soviet Union and of Communist China--and especially of American prisoners of war during the Korean War--gave rise to a major body of medical and scientific literature concerning the effects of sensory deprivation and social isolation, including a substantial body of experimental research.[13]

This literature, as well as my own observations, has demonstrated that, deprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment. *331 Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium.

This fact is not surprising. Most individuals have at one time or another experienced, at least briefly, the effects of intense monotony and inadequate environmental stimulation. After even a relatively brief period of time in such a situation an individual is likely to descend into a mental torpor or "fog," in which alertness, attention, and concentration all become impaired. In such a state, after a time, the individual becomes increasingly incapable of processing external stimuli, and often becomes "hyperresponsive" to such stimulation. For example, a sudden noise or the flashing of a light jars the individual from his stupor and becomes intensely unpleasant. Over time the very absence of stimulation causes whatever stimulation is available to become noxious and irritating. Individuals in such a stupor tend to avoid any stimulation, and withdraw progressively into themselves and their own mental fog.

An adequate state of responsiveness to the environment requires both the ability to achieve and maintain an attentional set and the ability to shift attention. The impairment of alertness and concentration in solitary confinement leads to two related abnormalities: the inability to focus, and the inability to shift attention. The inability to focus (to achieve and maintain attention) is experienced as a kind of dissociative stupor--a mental "fog" in which the individual cannot focus attention, and cannot, for example, grasp or recall when he attempts to read or to think.

The inability to shift attention results in a kind of "tunnel vision" in which the individual's attention becomes stuck, almost always on something intensely unpleasant, and in which he cannot stop thinking about that matter; instead, he becomes obsessively fixated upon it. These obsessional preoccupations are especially troubling. Individuals in solitary confinement easily become preoccupied with some thought, some perceived slight or irritation, some sound or smell coming from a neighboring cell, or, perhaps most commonly, by some bodily sensation. Tortured by it, such individuals are unable to stop dwelling on it. In solitary confinement ordinary stimuli become intensely unpleasant and small irritations become maddening.

Individuals in such confinement brood upon normally *332 unimportant stimuli and minor irritations become the focus of increasing agitation and paranoia. I have examined countless individuals in solitary confinement who have become obsessively preoccupied with some minor, almost imperceptible bodily sensation, a sensation which grows over time into a worry, and finally into an all-consuming, life-threatening illness.

Individuals experiencing such environmental restriction find it difficult to maintain a normal pattern of daytime alertness and nighttime sleep. They often find themselves incapable of resisting their bed during the day--incapable of resisting the paralyzing effect of their stupor--and yet incapable of any restful sleep at night. The lack of meaningful activity is further compounded by the effect of continual exposure to artificial light and diminished opportunity to experience natural daylight. And the individual's difficulty in maintaining a normal day-night sleep cycle is often far worsened by constant intrusions on nighttime dark and quiet, such as steel doors slamming shut, flashlights shining in their face, and so forth.

There are substantial differences in the effects of solitary confinement upon different individuals. Those most severely affected are often individuals with evidence of subtle neurological or attention deficit disorder, or with some other vulnerability. These individuals suffer from states of florid psychotic delirium, marked by severe hallucinatory confusion, disorientation, and even incoherence, and by intense agitation and paranoia. These psychotic disturbances often have a dissociative character, and individuals so affected often do not recall events which occurred during the course of the confusional psychosis. Generally, individuals with more stable personalities and greater ability to modulate their emotional expression and behavior and individuals with stronger cognitive functioning are less severely affected. However, all of these individuals will still experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli (especially noxious stimuli).

Moreover, although many of the acute symptoms suffered by these inmates are likely to subside upon termination of solitary confinement, many--including some who did not become overtly psychiatrically ill during their confinement in solitary--will likely suffer permanent harm as a result of such confinement. This harm is *333 most commonly manifested by a continued intolerance of social interaction, a handicap which often prevents the inmate from successfully readjusting to the broader social environment of general population in prison and, perhaps more significantly, often severely impairs the inmate's capacity to reintegrate into the broader community upon release from imprisonment.

Many inmates housed in such stringent conditions are extremely fearful of acknowledging the psychological harm or stress they are experiencing as a result of such confinement. This reluctance of inmates in solitary confinement is a response to the perception that such confinement is an overt attempt by authorities to "break them down" psychologically, and in my experience, tends to be more severe when the inmate experiences the stringencies of his confinement as being the product of an arbitrary exercise of power, rather than the fair result of an inherently reasonable process. Furthermore, in solitary confinement settings, mental health screening interviews are often conducted at the cell front, rather than in a private setting, and inmates are generally quite reluctant to disclose psychological distress in the context of such an interview since such conversation would inevitably be heard by other inmates in adjacent cells, exposing them to possible stigma and humiliation in front of their fellow inmates.

## II. Solitary Confinement Can Cause Severe Psychiatric Harm

### A. Solitary Confinement Can Cause a Specific Psychiatric Syndrome

During the course of my involvement as an expert I have had the opportunity to evaluate the psychiatric effects of solitary confinement in well over two hundred prisoners in various state and federal penitentiaries. I have observed that, for many of the inmates so housed, incarceration in solitary caused either severe exacerbation or recurrence of preexisting illness, or the appearance of an acute mental illness in individuals who had previously been free of any such illness.

I became aware of the particular toxicity of solitary confinement when I first had the opportunity to evaluate prisoners in solitary *334 confinement as a result of my involvement in a class action lawsuit in Massachusetts, which challenged conditions in solitary confinement at the maximum security state penitentiary in Walpole, Massachusetts.[14] The clinical observations I made in the course of my involvement in that lawsuit, coupled with my research into the medical literature concerning this issue, have formed the basis of two articles I have since published on this topic in peer-reviewed journals.[15]

My subsequent professional experience has included observations of similar phenomena in many other solitary confinement settings.

When I initially agreed to evaluate the Walpole prisoners I had not yet reviewed the literature on the psychiatric effects of solitary confinement and I was somewhat skeptical; I expected that inmates would feign illness and exaggerate whatever psychiatric symptomatology they suffered. I discovered, however, something very different. Contrary to my expectations, the prisoners appeared to be extremely defensive about the psychiatric problems they were suffering in Special Housing Unit (SHU); they tended to rationalize away their symptoms, avoid talking about them, or deny or distort their existence all in an apparent effort to minimize the significance of their reactions to isolation. Numerous interviews began with statements such as "solitary doesn't bother me" or "some of the guys can't take it--not me," or even with the mention of a symptom and a simultaneous denial of its significance: "As soon as I got in I started cutting my wrists. I figured it was the only way to get out of here."

As these interviews progressed the facile accounts gave way to descriptions of experiences that were very worrisome. For example, one inmate was unable to describe the events of the several days surrounding his wrist-slashing, nor could he describe his thoughts or feelings at the time. Similarly, the prisoner who said he could "take it" eventually came to describe panic, fears of suffocation, and paranoid distortions which he suffered while in isolation. Moreover, *335 the specific psychiatric symptoms reported were strikingly consistent among the inmates:

1. The Specific Psychiatric Syndrome Associated with Solitary Confinement

a. Hyperresponsivity to External Stimuli: More than half the prisoners reported a progressive inability to tolerate ordinary stimuli. For example, "You get sensitive to noise, the plumbing system. Someone in the tier above me pushes the button on the faucet . . . It's too loud, gets on your nerves. I can't stand it. I start to holler."

b. Perceptual Distortions, Illusions, and Hallucinations: Almost a third of the prisoners described hearing voices, often in whispers and often saying frightening things to them. There were also reports of noises taking on increasing meaning and frightening significance. For example, "I hear noises, can't identify them--starts to sound like sticks beating men, but I'm pretty sure no one is being beaten . . . I'm not sure." These perceptual changes at times became more complex and personalized:

> They come by with four trays; the first has big pancakes. I think I am going to get them. Then someone comes up and gives me tiny ones--they get real small, like silver dollars. I seem to see movements, real fast motions in front of me. Then seems like they are doing things behind your back, can't quite see them. Did someone just hit me? I dwell on it for hours.

c. Panic Attacks: Well over half the inmates interviewed described severe panic attacks while in SHU.

d. Difficulties with Thinking, Concentration, and Memory: Many reported symptoms of difficulty in concentration and memory. One prisoner described his experience, "I can't concentrate, can't read . . . Your mind's narcotized. Sometimes I can't grasp words in my mind that I know. Get stuck, have to think of another word. Memory's going. You feel like you are losing something you might not get back." In some cases this problem was far more severe, leading to acute psychotic, confusional states. One prisoner had slashed his wrists during such a state and his confusion and disorientation had actually been noted in his medical record.

*336 e. Intrusive Obsessional Thoughts: Emergence of Primitive Aggressive Ruminations: Almost half the prisoners reported the emergence of primitive aggressive fantasies of revenge, torture, and mutilation of the prison guards. In each case the fantasies were described as entirely unwelcome, frightening, and uncontrollable. For example, one prisoner recounted
I try to sleep sixteen hours a day, block out my thoughts; muscles tense, think of torturing and killing the guards; lasts a couple of hours. I can't stop it. Bothers me. Have to keep control. This makes me think I'm flipping my mind . . . I get panicky, thoughts come back--pictured throwing a guard in lime--eats away at his skin, his flesh--torture him--try to block it out, but I can't.

f. Overt Paranoia: Almost half the prisoners interviewed reported paranoid and persecutory fears. Some of these persecutory fears were short of overt psychotic disorganization. For example, one prisoner recalled "sometimes I get paranoid--think they meant something else. Like a remark about Italians. Dwell on it for hours. Get frantic. Like when they push buttons on the sink. Think they did it just to annoy me." In other cases this paranoia deteriorated into overt psychosis:

Spaced out. Hear singing, people's voices, 'Cut your wrists and go to Bridgewater and the Celtics are playing tonight.' I doubt myself. Is it real? . . . I suspect they are putting drugs in my food, they are putting drugs in my cell . . . The Reverend, the priest, even you, you're all in cahoots in the Scared Straight Program.

g. Problems with Impulse Control: Slightly less than half of the prisoners reported episodes of loss of impulse control with random violence: "I snap off the handle over absolutely nothing. Have torn up mail and pictures, throw things around. Try to control it. Know it only hurts myself." Several of these prisoners reported impulsive self-mutilation; "I cut my wrists many times in isolation. Now it seems crazy. But every time I did it, I wasn't thinking--lost control--cut myself without knowing what I was doing."

*337 2. This Syndrome has the Characteristics of an Acute Organic Brain Syndrome--A Delirium

Clearly, these symptoms were very dramatic. Moreover, they appeared to form a discreet syndrome--that is, a constellation of symptoms occurring together and with a characteristic course over time, thus suggestive of a discreet illness. Moreover, this syndrome was strikingly unique; some of the symptoms described above are found in virtually no other psychiatric illness. The characteristic acute dissociative, confusional psychoses are a rare phenomenon in psychiatry. Similarly, cases of random, impulsive violence in the context of such confusional state is exceedingly rare. But the most unique symptoms in this cluster are the striking and dramatically extensive perceptual disturbances experienced by the isolated person. Indeed, these disturbances are almost pathognomonic of the syndrome, meaning they are symptoms virtually found nowhere else. For example, loss of perceptual constancy (objects becoming larger and smaller, seeming to "melt" or change form, sounds becoming louder and softer, etc.) is very rare and, when found, is far more commonly associated with neurological illness (especially seizure disorders and brain tumors affecting sensory integration areas of the brain) than with primary psychiatric illness.[16]

In addition, functional psychiatric illness very rarely presents with such severe and florid perceptual distortions, illusions, and hallucinations simultaneously affecting multiple perceptual modalities--auditory, visual, olfactory, tactile, and kinesthetic.[17]

Similarly, hyperresponsivity to external stimuli with a dysesthetic (subjectively painful) response to such stimuli, is likewise rare. In fact, it is exceedingly rare; so rare that appearance of this symptom also might suggest an organic brain dysfunction etiology.[18]

*338 Thus, the fact that all of these quite unusual symptoms ran together in the same syndrome was itself a clear confirmation of the distinct nature of this syndrome. While this syndrome is strikingly atypical for the functional psychiatric illnesses, it is quite characteristic of an acute organic brain syndrome: delirium, a syndrome characterized by a decreased level of alertness and EEG abnormalities; by the same perceptual and cognitive disturbances, fearfulness, paranoia, and agitation; and random, impulsive, and self-destructive behavior which I observed in the Walpole population.

Moreover, delirium is a syndrome which is known to result from the type of conditions, including restricted environmental stimulation, which are characteristic of solitary confinement. Even the EEG abnormalities characteristic of delirium have been observed in individuals exposed to conditions of sensory deprivation. By now the potentially catastrophic effects of restricted environmental stimulation have been the subject of a voluminous medical literature; annual international symposia are being held on the subject, and the issue has even found its way into the popular media. The literature is summarized in the appendices to this statement.

## B. The Historical Experience with Solitary Confinement: The Nineteenth Century Experience

1. The Origin of the American Penitentiary: The Nineteenth Century German Experience

Preindustrial societies had often not made any fundamental distinction between deviant behavior seen as the product of

"criminal intent" as opposed to behavior seen as stemming from "mental illness."[19] For such societies, deviant behavior--whatever its origins--was a social evil that was deeply feared and cruelly punished.

**\*339** In Colonial America the Salem witch trials were but one example of a continuing tendency to equate "lunacy" with "demonic possession" and, ultimately, with "evil."[20] Deviant behavior was naturally feared and hated; the instinctive response was to punish it cruelly, lock it away, banish it, or kill its perpetrator. Thus, in Colonial America generally, the social response to deviant behavior was relatively simple: the protection of the larger society was paramount, while the distinction between "illness" and "evil" was far less critical. Indeed, the social response to deviance largely stemmed from the severe puritanical belief in innate human evil that deserved violent retaliation such as whipping, pillories, stockades, brandings, and, ultimately, the gallows. At times, when there was a more "humane" response to persons viewed as suffering from lunacy this response consisted simply of keeping the individual caged under lock and key, often for the rest of his life.

But in the early nineteenth century, a surge of great social optimism swept over America, and along with this grew a belief in the possibility of social reform, perhaps an overly optimistic faith in the possibility of rehabilitation of persons whose behavior was deviant.[21] Not coincidentally, this spirit gave rise virtually simultaneously to two great social reform movements in the United States: the development of large mental hospitals and the construction of the first large penitentiaries.

Both of these institutions were founded upon a similar premise--namely, that psychological and social deviance was largely a result of the evils and stresses of "modern society," and both held a fundamental belief that healing would naturally occur if the deviant individual was removed from the evils of the larger society, and thus enabled to know his own true nature.[22]

In the case of the mental hospital this belief gave rise to the concept of a healing, pastoral, therapeutic community.[23] But, in the case of the penitentiary, an additional safeguard was obviously **\*340** required: the inmates clearly had to be protected, not only from the evil influences of the broader society, but also from the evil influences of each other.[24] The proper approach thus appeared to be to give each inmate the opportunity to live a life alone, like a penitent monk in his own monastic cell.

Thus, the earliest American penitentiaries were, generally, systems of rigid solitary confinement.[25] Extravagant attention was paid to the design of these institutions, to ensure the absolute and total isolation of the offender from any evil and corrupting influences.[26] The Philadelphia Prison, completed in 1829, was particularly conscientious in this regard:

> The arrangements . . . guaranteed that convicts would avoid all contamination and follow a path to reform. Inmates remained in solitary cells for eating, sleeping, and working . . . . No precaution against contamination was excessive. Officials placed hoods over the head of a new prisoner when marching him to his cell so he would not see or be seen by other inmates.

. . . Thrown upon his own innate sentiments, with no evil example to lead him astray, . . . the criminal would start his rehabilitation. Then, after a period of total isolation, without companions, books, or tools, . . . [h]e would return to the community cured of vice and idleness, to take his place as a responsible citizen.[27]

The American penitentiary, and the Philadelphia System, became world-famous; no important visitor to the United States neglected to tour its penitentiaries and to bring back their principles for emulation in Europe. Some such as Alexis de Tocqueville of France and Nicholas Julius from Prussia came specifically for that purpose.[28] Tocqueville wrote of the utter, "perfect" desolation of the American **\*341** penitentiary, of the "profound silence" within its "vast walls," likening it to the silence of death.[29]

2. Psychological Effects of Severe Isolation

The openness with which these institutions were held up to public scrutiny led in time to open concern about the psychological effects of such confinement. During a tour of the United States in 1842, Charles Dickens wrote with pathos of the Philadelphia Prison:

> The system here is rigid, strict, and hopeless solitary confinement. . . . Over the head and face of every prisoner who comes into the melancholy house, a black hood is drawn, and in this dark shroud, . . . he is led to the cell from which he never again comes forth, until his whole term of imprisonment has expired. He is a man buried alive . . . . dead to everything but torturing anxieties and horrible despair.

. . . .

The first man I saw . . . answered . . . always with a strange kind of pause . . . . He gazed about him and in the act of doing so fell into a strange stare as if he had forgotten something.

In another cell was a German, . . . a more dejected, broken-hearted, wretched creature, it would be difficult to imagine. . . .

There was a sailor . . . . [w]hy does he stare at his hands and pick the flesh open, upon the fingers, and raise his eyes for an instant . . . to those bare walls . . . ?[30]

American concern about the effects of rigid solitary confinement began as early as the 1830s.[31] Statistical comparisons began to be made between the Philadelphia system and its chief competitor: the Auburn system prevailing in New York State at the Auburn and Sing-Sing penitentiaries.[32] The latter system also utilized solitary *342 confinement, but less rigidly; inmates left their cells to work together in workshops and exercise in a common courtyard, although here, too, absolute and strict silence was maintained at all times.[33] Statistical comparisons began to generate evidence that "[i]t was unnatural . . . to leave men in solitary, day after day, year after year; indeed, it was so unnatural that it bred insanity."[34] The Philadelphia Prison system appeared to have a higher incidence not only of insanity but also of physical disease and death than its New York State system counterpart.[35]

Meanwhile, the American system had been emulated in many major European prisons, such as at Halle, Germany.[36] Although the Americans had been the world leaders in instituting rigid solitary confinement in their penitentiary system, German clinicians eventually assumed the task of documenting its demise. Between 1854 and 1909, thirty-seven articles appeared in German scientific journals on the subject of psychotic disturbances among prisoners, summarizing years of work and hundreds of cases. A major review of this literature was published in 1912.[37] A summary and synthesis of this rather large body of work appears as an appendix to this article.[38]

But it should be noted that interest in the problem was not purely academic; psychotic disturbances among prisoners were of such frequency in these prisons that they attracted administrative as well as clinical concern, and great effort was made to explain this disturbing incidence. Thus, the literature covered a variety of issues: speculation, for example, on the "moral degeneracy" of the prison population; comparison of the psychopathology of those who committed "crimes of passion" with those who committed "crimes against property"; or documentation of the incidence of the major diagnostic categories of the time (for example, "circular insanity," "alcoholic psychoses," epilepsy, and general paresis) among the prison population.

*343 However, multiple reports based on careful clinical observation suggested that a substantial majority of these prison psychoses were direct reactions to the conditions of imprisonment itself. Gradually, a clinically distinguishable syndrome of acute reactive prison psychoses began to be defined. Different variables were considered in attempting to explain the etiology of these reactive prison psychoses, including long versus short durations of imprisonment, or imprisonment of those already convicted versus imprisonment while awaiting trial. However, the most consistent factor described, reported in over half the total literature, was solitary confinement.

## C. The Twentieth Century Experience: Prisoners of War, "Brain Washing," and Experimental Research

1. Prisoners of War and "Brain Washing"

Unfortunately, other than some anecdotal reports, there was little discussion of the psychological effects of solitary confinement in the medical literature during the first half of the twentieth century. Undoubtedly, this was in part a consequence of the disastrous earlier experience with such confinement. As statistical evidence accumulated during the nineteenth century that solitary confinement produced a very disturbing incidence of insanity, physical disease, and death the system fell into disrepute and, with this, it had changed from an open, optimistic experiment in social reform into a hidden, secretive place of punishment and control.

Its devastating psychological impact, however, did not change, a fact which became suddenly and very painfully evident in

the 1950s as the American public began hearing the frightening and dramatic reports of "brain washing" of American prisoners of war in Korea--reports that alterations in the sensory environment were being intentionally imposed upon these prisoners in a seemingly Orwellian attempt to profoundly disrupt their psychological equilibrium.[39]

By the 1950s, reports had already appeared of major psychiatric disturbances among survivors of prolonged solitary confinement in **344 war,[40] but during the decade of the Korean War major attention was riveted on the occurrence of these disturbances not only in war but in a variety of other settings as well. In 1956 the Group for the Advancement of Psychiatry (GAP) held a symposium, "Factors Used to Increase the Susceptibility of Individuals to Forceful Indoctrination," to study methods used by the Chinese and Russian Communists to "indoctrinate" and "break the will" of political prisoners and prisoners of war.[41] Dr. Milton Meltzer, former Chief Medical Officer at Alcatraz Federal Penitentiary, contributed his observations of psychiatric disturbances among prisoners exposed to punitive solitary confinement at Alcatraz.[42] These prisoners were rarely confined for periods beyond one week.[43] Despite this, Dr. Meltzer described acute psychotic breakdowns among prisoners so confined; his descriptions closely paralleled the observations at Walpole:

> The motor effects ranged from occasional tense pacing, restlessness and sense of inner tension with noise making, yelling, banging and assaultiveness at one extreme, to a kind of regressed, dissociated, withdrawn, hypnoid and reverie-like state at the other. . . .

. . . [T]he sense of self, the ego and ego boundary phenomena are profoundly affected by the isolation.[44]

In the same symposium Dr. John Lilly of the National Institute of Mental Health noted that despite the importance of other factors which tended to "weaken personalities and make them more susceptible to [forced indoctrination]"--such as semi-starvation, physical pain and injury, and sleep deprivation--social and sensory isolation was still the central pathogenic factor in such confinement.[45]

**345 2. Experimental Research on Sensory Deprivation

An experimental model was therefore designed to study the effect of such sensory deprivation; this research, conducted during the 1950s and early 1960s, primarily at Harvard and McGill University Medical Centers, was in fact funded in large part by the United States government--and especially by the Department of Defense and the Central Intelligence Agency. This research is described in an appendix to this article.[46] Its relevant conclusions can, however, be described relatively briefly:

In these studies subjects were placed in a situation designed for maximum reduction perceptually informative external stimuli (light-proof, sound-proof rooms; cardboard tubes surrounding the arms and hands to reduce proprioceptive and tactile sensation; and so on).[47] The research revealed that characteristic symptoms generally developed in such settings. These symptoms included perceptual distortions and illusions in multiple spheres (visual, auditory, tactile, olfactory); vivid fantasies, often accompanied by strikingly vivid hallucinations in multiple spheres; derealization experiences; and hyperresponsivity to external stimuli. What was also clear, however, was that while some subjects tolerated such experiences well, many did not, and characteristic syndromes were observed, including the above symptoms and cognitive impairment; massive free-floating anxiety; extreme motor restlessness; emergence of primitive aggressive fantasies which were often accompanied by fearful hallucinations; and a decreased capacity to maintain an observiug, reality-testing ego function. In some cases an overt psychosis supervened with persecutory delusions and, in other cases, a marked dissociative, catatonic-like stupor (delirium) with mutism developed. EEG recordings confirmed the presence of abnormalities typical of stupor and delirium.

These findings clearly demonstrated that this experimental model did reproduce the findings in the non-experimental situations, **346 including the findings among prisoners of war held in solitary confinement.

## D. Factors Effecting Response to Sensory Restriction and Solitary Confinement

Much of the subsequent research in this area attempted to delineate variables which might explain these differing outcomes. These variables can be divided into two categories: i) differences among various conditions of perceptual deprivation, and ii)

differences in preexisting personality functioning among individuals experiencing such conditions.

1. Differing Conditions of Isolation

One of the factors that was commonly cited in the research was the intensity and duration of the sensory deprivation. More severe sensory restriction, the presence of noxious stimulation, and longer duration of the sensory deprivation experience have all been associated with an increased risk of adverse psychiatric consequences.

In my experience, conditions experienced by inmates in various prison solitary confinement settings generally bear some similarities (a cell of roughly fifty to eighty square feet; approximately twenty-two and one-half hours per day locked in the cell; about one hour per day of yard exercise, five out of the seven days each week), in other respects the conditions are fairly variable. For example, some cells have barred doors, which allow better ventilation, sound transmission, and visual connection with the outside environment than do mesh steel doors; solid steel doors are the most restrictive--especially when they are either hinged or slide shut with almost no air gap from the wall. Moreover, administrative conditions regarding the amount and circumstances of visitation, the availability of reading material and television, and so forth are all factors which vary from institution to institution, and even from time to time within a given institution.

*347 2. The Perceived Intent of the Isolation Experience

In addition to the factors described above, another critical factor in determining the effect of isolation appears to be the perceived intent of the isolation. Experimental research has demonstrated that an individual who receives clues which cause him to experience the isolation situation as potentially threatening is far more likely to develop adverse psychiatric reactions to the isolation experience.[48] Conversely, if the subject has reason to believe the situation is likely to be benign he will be far more likely to tolerate or even enjoy it.[49] Among the latter group of subjects who tolerated isolation well, many reported pleasant or at least non-threatening visual imagery, fantasy, and hallucinatory experiences.[50] "His mind may begin to wander, engage in daydreams, slip off into hypnogogic reveries with their attendant vivid pictorial images . . . he may be quietly having sexual or other pleasurable thoughts."[51]

This finding is perhaps not surprising. It appears that sensory restriction produces perceptual disturbances and illusions which are analogous to those produced by hallucinogenic drugs, and clearly, while there are some individuals who could be said to have volunteered to undergo such hallucinatory, psychotic-like experiences it must be almost uniformly terrifying to be forced to undergo an experience similar to that induced by hallucinogenic drugs.

3. Individual Differences in Response

Many studies have demonstrated that there is great variability among individuals in regard to their capacity to tolerate a given condition of sensory restriction. This variability helps to provide further insight into the nature of the toxic effect of such isolation conditions, and provides striking corroboration of the fact that such *348 deprivation of environmental stimulation, especially when of prolonged duration, is toxic to brain functioning and causes symptoms characteristic of stupor and delirium.

Generally, individuals with mature, healthy personality functioning and of at least average intelligence are most able to tolerate the regressive pull and perceptual intrusions of such isolation situations. On the other hand, individuals with primitive or psychopathic functioning or borderline cognitive capacities, impulse-ridden individuals, and individuals whose internal emotional life is chaotic or fearful are especially at risk for severe psychopathologic reactions to such isolation.[52]

Moreover, there is clear evidence that, in a situation of restricted environmental stimulation, preexisting central nervous system dysfunction is a major predisposing factor to the development of adverse psychiatric reactions and of overt delirium. For example, in one study of patients suffering visual deprivation following eye surgery (eye-patched patients), those patients with preexisting central nervous system dysfunction were found to be at especially high risk to develop symptoms of delirium.[53] Further, the presence of a preexisting personality disorder or impairment of psychosocial functioning was associated with increased risk of incapacitating fearfulness, paranoia, agitation, and irrational aggression toward staff.[54]

In addition, individuals may at times be exposed to situations which cause impairment of central nervous system functioning.

Such situations--especially if they impair the individual's state of alertness (for example, sleep deprivation, abnormal sleep-wake cycles, or the use of sedating medication) will substantially increase the individual's vulnerability to the development of delirium. Delirium among post-surgical patients and the so-called "ICU psychoses" are examples of this phenomenon.[55] One of the characteristic difficulties *349 experienced by inmates in solitary confinement is abnormal sleep-wake cycles and impaired sleep.

a. Findings at Pelican Bay State Prison

These findings received further corroboration in my observations of inmates at Pelican Bay State Prison, California. In 1991-1992, as part of my participation in Madrid v. Gomez--a class-action lawsuit challenging conditions at Pelican Bay State Prison, a new "supermax" facility in California[56]--I evaluated forty-nine inmates housed in the SHU at the institution and prepared a lengthy report to the federal court of my findings.[57] Many of the inmates I evaluated there suffered severe psychiatric disturbances while housed in Pelican Bay SHU, either springing up de novo while so incarcerated or representing a recurrence or severe exacerbation of preexisting illness. Of the forty-nine inmates I evaluated, at least seventeen were actively psychotic and/or acutely suicidal and urgently in need of acute hospital treatment, and twenty-three others suffered serious psychopathological reactions to solitary confinement, including (in several cases) periods of psychotic disorganization.

The clinical data at Pelican Bay also added striking corroboration to the conclusion that the severe and prolonged restriction of environmental stimulation in solitary confinement is toxic to brain functioning. The data demonstrated that the most severe, florid psychiatric illnesses resulting from solitary confinement tend to be suffered by those individuals with preexisting brain dysfunction. As noted before, I have observed a high incidence of preexisting central nervous system dysfunction among the inmates I evaluated in solitary confinement settings. This was also the case at Pelican Bay, and statistical analysis of the Pelican Bay data quite dramatically demonstrated that inmates with such preexisting vulnerability were the most likely to develop overt confusional, agitated, hallucinatory psychoses as a result of SHU confinement.

*350 b. Attention Deficit and Antisocial Personality Disorders

In addition, research regarding Attention Deficit Hyperactivity Disorder and Antisocial Personality Disorder demonstrated that these conditions are similarly associated with a particular inability to tolerate restricted environmental stimulation. There is increasing evidence that childhood impulsivity and Attention Deficit Hyperactivity Disorder bear some relationship to Antisocial Personality Disorder, in that both are characterized by impulsivity and stimulation-seeking behavior, and both involve biologically based abnormalities in central nervous system functioning. Moreover, the clinical literature demonstrates that individuals with Antisocial Personality Disorder are especially intolerant of restricted environmental stimulation. For example, the psychopathic individual has been characterized as pathologically "stimulation seeking," "impulsive," and "unable to tolerate routine and boredom."[58]

Given the exigencies of conducting clinical observations of inmates in solitary confinement it is not surprising that little systematic attempt has been made to elucidate the underlying psychological characteristics of those most at risk for developing severe psychopathological reactions to such isolation. However, among the clinical reports on Ganser's Syndrome, a related condition, in non-prison populations are several studies of patients in psychiatric hospitals.[59] These patients were, of course, available for extensive psychological assessment and observation, and these reports described the majority of these patients as suffering long-standing hysterical character disorders, having problems with severe impulsivity, childhood truancy, and antisocial behavior patterns.[60]

Thus, the medical literature demonstrates that individuals whose internal emotional life is chaotic and impulse-ridden and individuals with central nervous system dysfunction may be especially prone to *351 psychopathologic reactions to restricted environmental stimulation in a variety of settings. Yet, among the prison population, it is quite likely that these are the very individuals who are especially prone to committing infractions that result in stricter incarceration, including severe isolation and solitary confinement.

c. Langley v. Coughlin[61]

In the late 1980s I interviewed and reviewed the medical records of several dozen inmates confined in maximum security

prisons in New York State, including a large group of women incarcerated at the maximum security women's prison for the state of New York at Bedford Hills. During the process of these evaluations it became clear that a very high percentage of these women had a history of serious emotional or organic mental difficulties. Many had severe cognitive limitations, were highly emotionally labile, impulse ridden, and prone to psychotic disorganization. In many cases the infraction which led to their original incarceration was an act which had been committed impulsively and chaotically. Under the stress of imprisonment these inmates became even more unable to conform their behavior to the requirements of their situation.

Inevitably, this resulted in their being sentenced to terms in the SHU, and once in the SHU their subsequent course was often a nightmare. Many became grossly disorganized and psychotic, smearing themselves with feces, mumbling and screaming incoherently all day and night, some even descending to the horror of eating parts of their own bodies.

The resulting lawsuit was ultimately settled by consent decree. The settlement provided injunctive relief as well as monetary damages both for the mentally ill inmates whose emotional condition had deteriorated during their incarceration in the SHU, and also for the non-mentally ill women who had been subjected to the bedlam of mental illness created in their SHU environment. The injunctive relief required the prison to begin to reframe the meaning it gave to **\*352** behavioral disturbances which they had previously responded to by further SHU time.[62] Under the settlement the prison began to actively consider whether such disturbances were the result of organic personality disturbances, affective or impulse disorders, or even of schizophreniform illness. The result of these changes was apparently quite dramatic.

Many of the prisoners who had been in SHU began to be treated in a residential psychiatric unit within the prison. This unit had previously refused to treat such inmates, claiming that their security needs were greater than could be handled. When pressed to provide services as a result of the settlement not only did the unit discover that it was able to provide those services, but moreover discovered that the custodial and security needs of these inmates dramatically decreased when their behavioral disturbances were framed as psychiatric problems rather than as a security issue. Thus, as a result of the settlement of the lawsuit, all parties to the suit benefited-- prisoners and the officers of the correctional facility alike. I followed the result of the litigation in my capacity as an expert member of the settlement.

d. Effects on Psychologically More Resilient Inmates: Baraldini v. Meese[63] and Hameed v. Coughlin[64]

In 1988 in the course of my involvement in Baraldini v. Meese, a class-action challenging the confinement of a small group of women in a subterranean security housing unit at the Federal Penitentiary in Lexington, Kentucky, I had the opportunity to interview several women who were in confinement in this facility. These women had been convicted of having committed politically motivated crimes, were all highly educated, and had a history of relatively strong psychological functioning prior to their confinement. None of these women developed the florid confusional psychosis described earlier in this affidavit, yet each of them demonstrated significant **\*353** psychopathological reactions to their prolonged confinement in a setting of severe environmental and social isolation. These included perceptual disturbances, free-floating anxiety, and panic attacks. These inmates also uniformly described severe difficulties in thinking, concentration, and memory; for example, one inmate reported that she was able to perform tasks requiring some mental effort--such as reading or writing--only for about the first three hours of the morning after she awoke; by then, her mind had become so slowed down, so much "in a fog," that she was entirely unable to maintain any meaningful attention or expend any meaningful mental effort.

I have since evaluated a number of individuals who evidenced strong psychological adjustment prior to imprisonment. For example, in 1993 I evaluated Bashir Hameed, an inmate who had been incarcerated in the SHU at Shawangunk Correctional Facility and who had brought suit concerning his incarceration there. As I described in my testimony in that case, Mr. Hameed is an individual who evidences strong prior psychological adjustment and no prior psychiatric history, yet became significantly ill as a result of his SHU confinement.

## E. Long Term Effects of Solitary and Small Group Confinement

Long-term studies of veterans of prisoner of war camps, and of kidnapping and hostage situations have demonstrated that while many of the acute symptoms I outlined above tend to subside after release from confinement, there are also long-term effects which may persist for decades.[65] These not only include persistent symptoms of post traumatic stress (such as flashbacks, chronic hypervigilance, and a pervasive sense of hopelessness), but also lasting personality changes--especially including a continuing pattern of intolerance of social interaction, leaving the individual socially impoverished and

withdrawn, subtly angry and fearful when forced into social interaction.[66]

**\*354** In addition, from time to time I have had the opportunity to evaluate individuals who had been incarcerated in solitary confinement several years previously. I have found the same pattern of personality change described above: these individuals had become strikingly socially impoverished and experienced intense irritation with social interaction, patterns dramatically different from their functioning prior to solitary confinement.

### III. Conclusions

The restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning, producing a stuporous condition associated with perceptual and cognitive impairment and affective disturbances. In more severe cases, inmates so confined have developed florid delirium--a confusional psychosis with intense agitation, fearfulness, and disorganization. But even those inmate who are more psychologically resilient inevitably suffer severe psychological pain as a result of such confinement, especially when the confinement is prolonged, and especially when the individual experiences this confinement as being the product of an arbitrary exercise of power and intimidation. Moreover, the harm caused by such confinement may result in prolonged or permanent psychiatric disability, including impairments which may seriously reduce the inmate's capacity to reintegrate into the broader community upon release from prison.

Many of the prisoners who are housed in long-term solitary confinement are undoubtedly a danger to the community and a danger to the corrections officers charged with their custody. But for many they are a danger not because they are coldly ruthless, but because they are volatile, impulse-ridden, and internally disorganized.

As noted earlier in this statement, modern societies made a fundamental moral division between socially deviant behavior that was seen as a product of evil intent, and such behavior that was seen as a product of illness. Yet this bifurcation has never been as simple as might at first glance appear. Socially deviant behavior can in fact be described along a spectrum of intent. At one end are those whose behavior is entirely "instrumental"--ruthless, carefully planned, and **\*355** rational; at the other are individuals whose socially deviant behavior is the product of unchecked emotional impulse, internal chaos, and often of psychiatric or neurological illness.

It is a great irony that as one passes through the levels of incarceration-- from the minimum to the moderate to the maximum security institutions, and then to the solitary confinement section of these institutions--one does not pass deeper and deeper into a subpopulation of the most ruthlessly calculating criminals. Instead, ironically and tragically, one comes full circle back to those who are emotionally fragile and, often, severely mentally ill. The laws and practices that have established and perpetuated this tragedy deeply offend any sense of common human decency.

### \*356 Appendix A: Reports of Psychiatric Disturbances in Other Conditions of Restricted Environmental Stimulation

The psychopathologic syndrome which I have described in the body of this article is found in other settings besides isolation in civil prisons. Some of these settings involve small group, rather than solitary isolation, and the studies have demonstrated that isolated groups comprising two individuals may be the most pathogenic of all. These studies also suggest that those individuals with below average intelligence and poor psychosocial adjustment prior to isolation developed more severe psychiatric difficulties during isolation. In some studies, such disturbances persisted at a one year follow-up after reentry.

### I. Aviation

One particular study, by Bennett, has described psychiatric disturbances among pilots of the British Royal Air Force who had been exposed in-flight to periods of restricted auditory and visual stimulation.[67] All of the groups he described became significantly anxious; many suffered full-blown panic attacks, and many experienced unusual sensations which they were very reluctant to describe. The most severely disturbed groups refused to expose themselves further to the isolation conditions of these flights. At all levels of impairment, however, anxiety was common (both panic and free-floating anxiety). Pilots reported anxiety symptoms such as feeling "hot and tense and powerless" and "nervous and afraid."[68] Feelings of

derealization, feelings of detachment from reality, and perceptual distortions were described. Some of these perceptual distortions were dangerous--such as having the impression that the aircraft was turning when it was not--and resulted in serious errors in *357 judgment like making the aircraft spiral dangerously downward after attempting to "correct" for what was incorrectly perceived as a turning aircraft.

Another study described strikingly similar symptoms among United States Navy pilots exposed to periods of in-flight isolation.[69] Among pilots who flew alone at high altitude (meaning in a situation of monotonous visual and sensory stimulation) and flying with a minimum of pilot activity, over one third experienced frightening feelings of unreality and became severely anxious.[70]

## II. Small Group Confinement

Many studies--both anecdotal and experimental--have been made of individuals confined together in small groups. Groups thus described have ranged in size from two to approximately sixty individuals, the larger groups include reports of men isolated on a Pacific island, in submarines, and on Antarctic expeditions.[71] The most consistent finding was of dramatically increased levels of hostility, interpersonal conflict, and paranoia.[72] Individuals exposed to such conditions also tend to become irrationally territorial, staking out "areas of exclusive or special use, [and] acting with hostility to trespasses by others."[73]

Confined groups comprising just two individuals may be the most pathogenic of all, associated with especially high rates of mutual paranoia and violent hostility. Admiral Byrd believed it to be extremely unsafe to staff an Antarctic base unit with just two men:

> *358 [I]t doesn't take two men long to find each other out. . . . [T]he time comes . . . when even his [campmate's] unformed thoughts can be anticipated, his pet ideas become a meaningless drool, and the way he blows out a pressure lamp or drops his boots on the floor or eats his food becomes a rasping annoyance. . . . Men who have lived in the Canadian bush know well what happens to trappers paired off this way . . . .

. . . During my first winter at Little America I walked for hours with a man who was on the verge of murder or suicide over imaginary persecutions by another man who had been his devoted friend.[74]

## III. Polar Habitation

Psychiatric disturbances have been described in Arctic and Antarctic inhabitants (explorers, researchers, and their support staff), spending varying periods in winter isolation. In these regions, winters last for up to nine months with weather conditions so cold (-100°F) that leaving the confines of the indoors is dangerous.[75] Typically, teams of work groups have fewer than fifty members who spend up to two years working in small quarters.[76] Small group isolation conditions at these stations have been compared to life in prisons by at least one researcher: "[T]he isolation imposed by the harsh environment [of the Antarctic] is rarely experienced outside penal conditions."[77]

A review of the literature on the psychological adjustment to Antarctic living described a staff wintering over at a British Antarctic station; those of the staff who adjusted best tended to be socially mature, intelligent, reserved, and trusting individuals.[78] Similarly, *359 French, United States, and Australian studies revealed that intelligence and previous social adjustment predicted a decreased risk for psychiatric disturbance among workers at Antarctic stations.[79] On the other hand, lack of respect for authority and aggression were important markers for poor isolation adjustment.[80]

Similarly, another study correlated outcome measures with psychological testing obtained prior to work station assignment.[81] These researchers found specifically that persons with antisocial and psychotic tendencies were poor risks for efficient functioning in conditions of isolation.[82]

As a result of these disturbing findings among Antarctic workers, systematic efforts have been made to provide psychological screening of potential station employees and to ameliorate the isolation conditions prevailing in such stations.[83] Despite these

efforts, significant psychiatric disturbances have continued to be observed.[84] The fact that these individuals were confined in small groups rather than alone was not found to prevent these disturbances; indeed, one of the central pathogenic factors cited in this literature has been the interpersonal tension and hostility generated by small group confinement.[85]

Studies have described a "winter-over syndrome" including progressively worsening depression, hostility, sleep disturbance, impaired cognitive functioning, and paranoia during small group winter confinement in the Antarctic.[86] Strikingly similar findings were reported by the United States Navy Medical Neuropsychiatric Research Unit, which found high incidences of sleep disturbance, depression, anxiety, aggression, somatic complaints, and a **\*360** progressive impoverishment of social relationships as the winter progressed.[87] Psychiatric problems worsened as the length of time in this confinement increased; in one study of a group of Japanese winter-stationed in the Antarctic, periodic psychological testing revealed increasing levels of anxiety and depression as the winter progressed.[88] Similar findings have been described among a group of Americans stationed in the Antarctic.[89]

A review of the literature on the psychological adjustment to Arctic life described a syndrome which parallels the Antarctic literature: sleep disturbances, apathy, irritability, cognitive dysfunction, hallucinations, depression, and anxiety were widely reported as a result of the small group isolation endured by inhabitants.[90] They also reported "depression, irritability, [and] easily provoked anger which may escalate into dramatic and florid acting out and, not surprisingly, a breakdown in relationships with other members of the group. . . . [I]nsomnia, pallor, loss of appetite, loss of interest, psychomotor retardation, paranoidal ideation, [and] nonspecific hallucinations of light flashes and sudden movements [were also experienced]."[91] Even when Arctic workers were adequately preselected by psychological screening, trained, and supported sleep difficulties, apathy, and irritability persisted.

Studies on reintegration into the home environment after Antarctic living found persisting problems and symptoms including sleep disturbances, cognitive slowing, emotional withdrawal, resentment of authority, indecisiveness, and poor communication even one year after reintegration.[92]

Robert J. Biersner and Robert Hogan summarized the findings related to personality variables in the Arctic and Antarctic workers: "Individuals with high needs for novelty and new sensations, . . . who are emotionally unstable, or who are unconcerned with social **\*361** approval seem unsuited for . . . such environments . . . . The opposite [traits are found in] those who adjust well."[93]

### IV. Explorers: Solo Voyages

Anecdotal reports of shipwrecked sailors and individuals accomplishing long solo sea voyages have generally described "disturbances in attention and in organization of thought, labile and extreme affect, hallucinations and delusions."[94] Dramatic anecdotal reports have appeared from time to time. Some of these were summarized in a review article by Dr. Philip Solomon, one of the lead scientists in the Harvard Medical School/Boston City Hospital group:
Christine Ritter in her very sensitive document A Woman in the Polar Night, reported that at times she saw a monster . . . [and] experienced depersonalization to the extent that she thought she and her companions were dissolving in moonlight 'as though it were eating us up' . . . The Spitzbergen hunters use the term ran (strangeness) to describe these experiences . . . .[95]

Tales of the sea have provided many accounts of hallucinatory phenomena. John Slocum sailed alone around the world . . . [In the South Atlantic] he suddenly saw a man, who at first he thought to be a pirate, take over the tiller . . . .

Walter Gibson, a soldier in the British Indian Army, was on a ship torpedoed in the Indian Ocean by the Japanese in World War II . . . . [The shipwrecked survivors] reported that "all of us at various stages in that first week became a prey to hallucinations" . . . [As the weeks passed] the feeling of comradeship disappeared and the men began to find themselves "watching our fellows covertly and suspiciously."[96] **\*362** Murder, suicide, and cannibalism followed as social controls dissolved.[97]

### V. Medical Conditions

## A. Eye Patched Patients

Restricted environmental stimulation conditions also occur post-operatively and in certain medical conditions. In a study of one hundred American patients with macular degeneration of the retina, a high percentage of such patients experienced disturbing visual hallucinations.[98] Those patients who were relatively cognitively limited, those who were socially isolated, and those with simultaneous sensory impairment in another modality (for example, hearing-impaired patients) fared worst.[99] But other factors, including the presence of concomitant medical illness, did not appear to affect the incidence of hallucinations.[100]

In an especially relevant study of eye patched patients, it was determined that psychologically well-adjusted patients (as assessed prior to surgery) tended not to develop visual hallucinations during the period when their eyes were patched, whereas those suffering preexisting personality disturbances did tend to develop such hallucinations.[101] Among those patients who did develop hallucinations, almost half developed complex hallucinations involving human figures and with content suggesting serious preoccupations with themes of depression and anxiety.[102] Moreover, among those patients who had both preexisting personality disturbances and difficulty with their premorbid psychosocial adjustment, eye patching produced severe psychiatric symptomatology, including: paranoid thoughts about being poisoned, physically harmed or attacked; psychomotor agitation; interpersonal *363 aggressiveness; inability to comply with staff directives; fearful visual hallucinations; and incapacitating anxiety.[103] In this most disturbed group, symptoms had not remitted when observed one week after their eye patches were removed.[104]

Other studies have also found patients to suffer from perceptual distortions, thinking disturbances, and mood changes following the visual deprivation that is part of postoperative recovery in eye surgery.[105] Furthermore, it was noted that "[i]n patients with . . . brain damage, there were also delirioid symptoms, e.g., confusion, disorientation, memory impairment, vivid hallucinations [and disorganized] hyperkinetic activity . . . ."[106] Finally, in C. Wesley Jackson's extensive literature review of hospitalized eye patched patients, psychiatric disturbance was commonly found.[107] These patients suffered from unusual emotional, cognitive, and sensory-perceptual disturbances similar to those previously described.

## B. Poliomyelitis

Polio patients confined to tank-type respirators have become psychotic as a direct result of such confinement; moreover, they became more ill, with more florid hallucinations and delusions, at night when sensory input was diminished.[108] The same florid hallucinatory, delusional psychosis has been found in other patients similarly confined in tank respirators.[109]

## C. Cardiac Patients

Patients with decompensated heart disease are at times placed on very strict bed rest; some of these patients have developed acute *364 confusional, paranoid, hallucinatory psychoses, especially at night during periods of decreased sensory input.

Studies of postoperative open heart surgery patients who were bed confined-- their visual stimulation restricted to looking up at a white-tiled hospital room ceiling--revealed a high rate of disordered thinking, visual and auditory hallucinations, and disorientation.[110] There is an extremely disturbing incidence of psychosis following open heart surgery, ranging in various studies from 14% to 30%.[111] Upon recovery these patients described their postoperative environment as a major pathogenic factor in producing their psychiatric illness.[112] Perceptual disturbances and emotional liability, as well as paranoia, depression, and obsessive-compulsive reactions to the restrictive postoperative environment have been documented in other studies as well.[113]

## D. Hearing-Impaired Individuals

Another condition of restricted environmental stimulation leading to psychiatric disturbance involves the hearing impaired. Studies of the deaf consistently find significantly higher rates of paranoia in these individuals.[114] High rates of paranoia have been reported in both the developmentally hearing impaired as well as those who *365 became deaf in later life. Experimentally induced deafness in psychiatrically unimpaired adults also produced paranoia.[115]

### E. Other Medical Patients

Disorientation and delusional psychoses have also been reported among immobilized orthopedic patients and in patients postsurgically bed-confined. Nursing researchers have studied this phenomenon and have concluded that frightening hallucinatory experiences "are probably far more widespread than has been suspected."[116]

## VI. Occupational Situations

Researchers reported in the New England Journal of Medicine on a study of fifty long-distance truck drivers; of these, thirty experienced vivid visual hallucinations and some became disoriented as if in a dream.[117]

## VII. Animal Studies

As noted in the body of this article, many prisoners confined in solitary become intolerant of normal levels of environmental (especially social) stimulation. These reports receive experimental confirmation in laboratory research on animals. Such research demonstrates that sensory deprivation produces an intolerance to normal levels of environmental stimulation; animals exposed to sensory deprivation conditions became overly aroused-- "hyperexcitable"--when exposed to normal levels of environmental stimulation, often resulting in severe behavioral disturbances.[118]

*366 One study produced agitation in mice and rats after a few days of isolation, a report which corroborated previous studies with rats.[119] Others have also found isolation-induced aggressive behavior in mice (such as biting attacks).[120] Further, social isolation has been demonstrated to produce profound and lasting psychological effects in primates. Researchers have noted that over four hundred published investigations of the effects of social isolation on primates show such deleterious effects as self-mutilation and disturbances in perception and learning.[121] They found that in adult rhesus monkeys even brief periods of social isolation produce compromised cognitive processing.[122] Others have produced symptoms of depression in rhesus monkeys by confining them for thirty days.[123] They concluded that solitary "confinement produced greater destructive behavioral effects in less time and with fewer individual differences among subjects than did total social isolation, previously [demonstrated to be] the most powerful technique for producing psychopathological behavior among monkey subjects."[124] Induced depression through confinement has been reported in both young and mature monkeys.[125] Finally, isolation-produced fear in dogs has been clearly demonstrated.[126]

### *367 Appendix B: The Nineteenth Century German Experience with Solitary Confinement

Between 1854 and 1909 thirty-seven articles appeared in the German medical literature on the subject of psychotic disturbances among prisoners, summarizing years of work and many hundreds of cases. A major review of this literature was published in 1912.[127] Solitary confinement was the single most important factor identified in the etiology of these psychotic illnesses.

Indeed, the first report on the subject of prison psychoses was that of Delbruck, chief physician of the prison at Halle, in which the frequency of mental disturbances was at last so great that it attracted the attention of the authorities.[128] Delbruck's report concluded that prolonged absolute isolation has a very injurious effect on the body and mind and that it seems to predispose inmates to hallucinations and advised the immediate termination of solitary confinement.[129]

In 1863 Gutsch reported on eighty-four cases of psychosis stemming from solitary confinement and described vivid hallucinations and persecutory delusions, apprehensiveness, psychomotor excitation, sudden onset of the syndrome, and rapid recovery upon termination of solitary confinement.[130] Many of these individuals developed "suicidal and maniacal outbreaks."[131]

In 1871, in a report on fifteen cases of acute reactive psychoses, some of which apparently occurred within hours of incarceration in solitary, Reich described hallucinosis and persecutory delusions in addition to severe anxiety leading to motor excitement--"[t]he patient becomes noisy, screams, runs aimlessly about, destroys and ruins everything that comes in

his way."[132] He also described an acute confusional state accompanying these symptoms, sudden *368 cessation of symptoms, recovery, and subsequent amnesia for the events of the psychosis.[133]

In a statistical summary, Knecht reported in 1891 on the diagnostic assessment of 186 inmates at the "insane department" of the prison at Waldheim and concluded that over half of the total inmates in this department were there due to reactive manifestations to solitary confinement.[134] The majority of these inmates became insane within two years of confinement in solitary.[135]

In 1884 Sommer reported on 111 cases describing an acute, reactive, hallucinatory, anxious, confusional state associated with solitary confinement, emphasizing the "excited outbursts" and "vicious assaults" of these patients.[136] His patients' illness began with difficulty in concentration and hyperresponsivity to minor "inexplicable" external stimuli. These "elementary disturbances of the sensorium (i.e., the five senses)" were seen as leading to "elementary hallucinations" which became more numerous, eventually including auditory, visual, and olfactory hallucinations and eventually becoming incorporated with fearful persecutory delusions.[137]

In 1889 Kirn described 129 cases of psychosis among the inmates at the county jail at Freiburg, concluding that in fifty of those cases, "solitary confinement can be definitely considered as the etiological factor, (and these) show a certain characteristic stamp" including persecutory delusions and hallucinations in multiple spheres (auditory, visual olfactory, tactile).[138] He also noted that these symptoms often precipitated at night:

> [T]he patient is suddenly surprised at night by hallucinatory experiences which bring on an anxious excitement. These manifestations become constant from now on, in many cases occurring only at night, in others also in the daytime. Attentive patients not infrequently hear at first a humming and buzzing *369 in their ears, unpleasant noises and inarticulate sounds which they cannot understand until finally they hear well differentiated sounds and distinct words and sentences. . . .

> . . . The visual hallucinations are very vivid.[139]

In 1888 Moeli contributed a description of "vorbereiden"--also known as "the symptom of approximate answers."[140] Ten years later Ganser contributed to the literature the elucidation of a syndrome which included Moeli's symptom.[141] As Arieti points out, Ganser's Syndrome became well known-- indeed, almost a codification of the whole body of literature on the prison psychoses.[142] Ganser provided a comprehensive and well-elucidated synthesis of symptoms, most of which had been previously described elsewhere. The syndrome he described included (in addition to vorbereiden) vivid visual and auditory hallucinations, a distinct clouding of consciousness, sudden cessation of symptoms "as from a dream," and "a more or less complete amnesia for the events during the period of clouded consciousness."[143] Ganser's most original description was of "hysterical stigmata" within the syndrome, including conversion symptoms, especially total analgesia.[144]

Some of the German authors failed to note whether the inmates they were describing were housed in solitary confinement and, unfortunately, Ganser was one of these, stating only that his were prisoners awaiting trial. However, Langard, in 1901, also reporting on observations of accused prisoners awaiting trial, described an acute violent hallucinatory confusion with persecutory delusions and *370 specifically stated that this syndrome occurred exclusively among those who awaited trial in solitary confinement.[145]

Also in 1901 Raecke similarly reported on prisoners awaiting trial and described the full syndrome described by Ganser, including vorbereiden; he specifically condemned solitary confinement as responsible for the syndrome.[146] He described his cases as beginning with apathy, progressing to "inability to concentrate, a feeling of incapacity to think," and even catatonic features, including negativism, stupor, and mutism.[147]

In another report, written the same year, Skliar reported on sixty case histories of which he identified twenty-one as acute prison psychoses caused by solitary confinement.[148] While vorbereiden was not noted, most of the other symptoms described by Ganser and Raecke were, including massive anxiety and fearful auditory and visual hallucinations; in severe cases, hallucinations of smell, taste, and "general sensation" as well as persecutory delusions, senseless agitation and violence, confusion, and disorientation.[149] The psychosis developed rapidly, at times within hours of incarceration in solitary confinement.[150] Catatonic symptomatology was also noted.[151]

The German literature reported only on prisoners who suffered gross psychotic symptomatology, some of whom were observed in hospitals or "insane departments" of prisons; thus, these reports generally described only syndromal expressions that rose to the level of overt psychosis. The German reports do, however, powerfully demonstrate the existence of a particular, clinically distinguishable psychiatric syndrome associated with solitary confinement. These multiple reports described a syndrome which included:

1. Massive free-floating anxiety.

2. "Disturbances of the Sensorium," including --

*371 a. hyperresponsivity to external stimuli; and

b. vivid hallucinations in multiple spheres (including auditory, visual, olfactory, gustatory, and tactile modalities); in some reports, these began as simple "elementary" hallucinations and progressed to complex, formed hallucinations.

3. Persecutory delusions, often incorporating coexistent complex hallucinations.

4. Acute confusional states. In some reports these were seen as beginning with simple inattention and difficulty in concentration. In others, the onset was described as sudden. The confusional state and disorientation was in several reports described as resembling a dissociative, dreamlike state, at times involving features of a catatonic stupor, including negativism and mutism; and, upon recovery, leaving a residual amnesia for the events of the confusional state. Ganser and others observed hysterical conversion symptoms during this confusional state.

5. Vorbereiden: This was an infrequent finding, mostly described in conjunction with a confusional, hallucinatory state.

6. Motor excitement, often associated with sudden, violent destructive outbursts.

7. Characteristic course of the illness:

a. onset was described by some authors as sudden, by others as heralded by a progression beginning with sensory disturbances and/or inattention and difficulty in concentration; and

b. in many cases, rapid subsidence of acute symptoms upon termination of solitary confinement.

The German reports were generally based upon prisoners who had been hospitalized because of their psychotic illness. In contrast, the population reported upon in the Walpole study was not preselected by overt psychiatric status. Despite this, all of the major symptoms *372 reported by the German clinicians were observed in the Walpole population, except for vorbereiden and hysterical conversion symptoms. In addition, less severe forms of the isolation syndrome were observed in the Walpole population, including:

• Perceptual distortions and loss of perceptual constancy, in some cases without hallucinations.

• Ideas of reference and paranoid ideation short of overt delusions.

• Emergence of primitive aggressive fantasies which remained ego-dystonic and with reality-testing preserved.

• Disturbances of memory and attention short of overt disorientation and confusional state.

• Derealization experiences without massive dissociative regression.

Since Ganser's report has become the twentieth century's clearest memory of a much vaster body of literature, it is also of interest to review the literature describing observations of Ganser's Syndrome in non-prison populations. Several of these reports have been studies of patients in psychiatric hospitals suffering from this syndrome. Since these patients were

hospitalized, it was possible to obtain more extensive evaluation and testing of their status. Several reports described a majority of the patients studied as suffering long standing hysterical conversion symptoms; impulsivity, childhood truancy, and antisocial behavior were also commonly described.[152] These findings suggest also that antisocial behavior patterns and psychopathic personality disorder may bear a close relationship to primitive hysterical personality disorder, a relationship which has been described by other authors as well.[153]

### *373 Appendix C: Experimental Research on the Psychiatric Effect of Profound Sensory Deprivation: Factors Influencing Vulnerability to Psychiatric Harm

As noted in the body of this article, laboratory research has demonstrated that experimentally induced sensory deprivation has major psychological effects and can precipitate severe psychiatric illness. Much of the research in this area attempted to delineate factors in addition to the duration and intensity of sensory restriction which might account for these differing outcomes. The factors which have been elucidated include two which are especially relevant to this discussion and may help to explain the particular malignancy of sensory deprivation in solitary confinement: expectation and individual response.

### I. The Influence of Expectation

Research has suggested that a subject's reaction to participation in a sensory deprivation experiment could be profoundly manipulated by external cues imposed by the experimenter:

> [These] dramatic effects could be a function of the demand characteristics of the experimental situation. .
> . .

There is evidence . . . that preparing a subject for probable hallucinations significantly affects the frequency of hallucinations. . . . [S]uch devices as "panic buttons" in experiments are in a sense eloquent "instructions." The use of such a device increases the subject's expectation that something intolerable may occur, and, with it, the likelihood of a bad experience.[154] *374 In the experiment, the researchers exposed two groups of subjects to identical conditions of sensory deprivation. The experimental group's introduction to the experiment included the presence of a medical "Emergency Tray," and instructions about a "Panic Button." As predicted, the experimental group became significantly more symptomatic in measures of cognitive impairment and restlessness, and also more symptomatic in every other measure--including perceptual aberrations, anxiety, and spatial disorientation.[155]

In a related manner, prisoners in solitary confinement generally view such confinement as threatening and punitive, and often as a deliberate attempt to make them "crack up" or "break my spirit." In light of this, it is not surprising that the only recent report suggesting no major ill effect of solitary confinement utilized prisoners who volunteered to spend four days in solitary confinement.[156]

### II. Individual Differences in Response

Several authors have directed attention to the fact that within a given experimental format, massive differences in response can be observed among individual subjects. Often subjects who tolerated the experimental situation well reported pleasant, or at least non-threatening, visual imagery, fantasy, and hallucinatory experiences. The individual's mind may begin to wander, engage in daydreams, slip off into hypnogogic reveries with their attendant vivid pictorial images. The individual may be quietly having sexual and other pleasurable thoughts.[157]

On the other hand,
Another subject in the same situation may deal with it in quite another manner. He may soon complain of all manner of things: the bed is causing him a backache, his mind is a blank . . . . [He also complains of] intense boredom, tenseness, *375 depressive feelings or of having unpleasant thoughts or picture-like images that disturb him.[158]

In response to these concerns about the incidence of psychopathological reactions to sensory deprivation, an important thrust

of the experimentation in this area has been, by prescreening, to select as subjects only those persons demonstrating, by some measure, psychological strength and capacity to tolerate regression. The theoretical premise of such work has been:

[I]n the sensory deprivation experiments, it is the ego's autonomy from the drives that is predominately involved . . . . Differences in drive-discharge thresholds, phantasy [sic] and daydream capacity, capacity for what [is] . . . termed "regression in the service of the ego" are other theoretically relevant structural dimensions accounting for differences in isolation behavior.[159]

These ideas have been subjected to experimental verification, which has corroborated that some individuals tolerate such isolation better than others. For example, two researchers, using the Rohrshach Test for prescreening, concluded that the Rohrshach manifestations of an individual's defense and control mechanisms appear to be a reliable measure for predicting whether an individual will be effective in controlling the drive-dominated responses that might emerge during the individual's period of reduced sensory stimulation.[160]

Anecdotal reports in a similar vein appear from time to time in the literature. A subject of one study became panicky during sensory deprivation and stated he had been diagnosed "borderline psychotic."[161] Curtis and Zuckerman report on a psychotic paranoid reaction in one subject who suffered delusions for several days afterward, and severe anxiety and depression lasting several weeks; *376 personality test prescreening had suggested poor adjustment, hostility, lack of insight, and insecurity in interpersonal relationships.[162]

Others prescreened forty-three subjects and identified seven as suffering "personality deviations." Two of these subjects, who were diagnosed as borderline, developed frightening, aggressive fantasies, paranoia, and difficulty in reality testing; one of them prematurely terminated the experiment. Two others were diagnosed as psychopathic; both forced the premature termination of the experiment by disruptive behavior.[163]

Others, using interview techniques and formal psychological test data, studied the effects of two to six days of sensory deprivation on hospitalized psychiatric patients. Among the previously non-psychotic patients they studied, two developed overt paranoid psychoses during the experiment, ultimately necessitating electroshock treatment. These particular individuals appeared to have been unable to tolerate the emergence of aggressive fantasies and images during the sensory deprivation experience.[164]

## A. Effects of Sensory Deprivation on Antisocial Personality Disorder

### 1. Aversive Conditioning

Individuals with psychopathic personality disorder are probably among the least tolerant of sensory deprivation. One researcher has described the essential core of psychopathic pathology as a pathological inability to tolerate restricted environmental stimulation:

The psychopath is almost universally characterized as [pathologically stimulus seeking and] highly impulsive . . . . He is unable to tolerate routine and boredom. . . . [H]is outbursts frequently appear to be motivated by little more than a need for thrills and excitement. . . .

*377 It is the impulsivity and lack of even minimal tolerance for sameness which appear to be the primary and distinctive features of the disorder.[165]

He goes on to argue that psychopathic individuals may chronically exist in a state of relative stimulus deprivation: "[H]ighly impulsive, psychopathic behavior [may be seen] in terms of stimulation-seeking pathology. If decreased reactivity and/or rapid adaptation [to environmental stimuli] do produce in these persons an affective state of unpleasantness close to that produced by severe sensory deprivation or monotony in the normal individual . . . ."[166]

He argues that behavioral impulsivity in such individuals may be an effort at coping with this condition of relative sensory deprivation which they experience: "It may be possible . . . to view much of the impulsivity of the psychopath, his need to

create excitement and adventure, his thrill-seeking behavior, and his inability to tolerate routine and boredom as a manifestation of an inordinate need for increases or changes in the pattern of stimulation."[167]

A later study, directly comparing psychopathic inmates with non-psychopathic controls, corroborated these findings. The psychopathic inmates scored significantly higher on measures of boredom susceptibility and of impulsivity. The authors concluded that psychopaths are pathologically stimulation seeking and incapable of tolerating isolation conditions.[168]

Others, in a large scale study of criminal offenders suffering from mental illness, noted that the prevalence of severe mental illness is higher among incarcerated offenders than among the general population; and that, compared with non-mentally ill inmates, the mentally ill inmates were more likely to be housed in solitary. Moreover many of these mentally ill inmates suffered from a combination of psychiatric disorders predisposing them to both psychotic breakdown and to extreme impulsivity (often including *378 substance abuse). Such individuals tended to be highly impulsive, lacking in internal controls, and tended to engage in self-abusive and self-destructive behavior in the prison setting, and especially so when housed in solitary.[169]

Many of the inmates placed in solitary confinement are thus likely to be among the least capable of tolerating the experience, and among the most likely to suffer behavioral deterioration as a consequence of such confinement. Solitary confinement has at times been rationalized as being a form of "aversive conditioning," intended to extinguish negative inmate behaviors. Yet this assertion ignores many of the most basic tenets of any behavior modification treatment, and would in any case clearly violate the ethical guidelines governing the use of aversive conditioning:

a. Ethical Considerations

First of all, since aversive conditioning--the use of punishment as a means of inducing behavior change--is inherently suspect ethically and creates an inherent risk of harm, very clear outcome variables have to be articulated and systematically measured over time. As a result of these serial measurements, there must be clear evidence that the undesirable behavior is in fact lessening in frequency and intensity. Such measurement will also identify those patients for whom such aversive conditioning is actually harmful, allowing these individuals to be removed from the aversive treatment protocol. Were such measurements done in the prison setting, staff would inevitably be required to acknowledge the behavioral deterioration which many inmates were suffering as a result of placement in solitary, and in such cases, ethical considerations would have required transferring the inmate out of such confinement.

b. SHU Incarceration is not Aversive Conditioning

SHU incarceration does not meet criteria for aversive conditioning. Indeed, any behavior modification scheme must define and describe very explicitly two variables:

*379 (i) The behavior being changed:

Behavior researchers have learned that in order for a subject to benefit from aversive (or any other form of) conditioning, the behavior at issue must be a single, very clearly defined behavior. When multiple behaviors are responded to by the same reinforcer or punishment, learning and behavior change does not occur. Thus, placement in SHU, which is "punishment" for a host of different behaviors, is simply not being used in a manner consistent with an intent of behavior modification; there is inadequate linkage of any specific behavior to this "punishment."

(ii) The "punishment":

Moreover, SHU confinement is quite clearly not "punishment." To be effective, a "punishment" must be very closely linked in time to the targeted behavior, and for learning to occur, there must be repeated opportunities to experience this close link between the target behavior and the punishment. Thus, the "punishment" must be brief and immediate. For example, a mild but painful electric shock or a sudden very loud noise would be ideal punishments in aversive conditioning.

Occasionally "time outs," the brief use of a seclusion room to quickly control disruptive behavior, are used as part of an aversive conditioning program. But when this technique is employed, it is used very quickly and for a very brief period of

time--in order for the "time out" to work as a behavior modifier, there must be very clear alternative behaviors which, when manifested, will immediately end the "time out."

For any behavior modification scheme to work then, there must always be an exquisitely close relationship between behavior and response. Indeterminate or prolonged sentencing to solitary simply has nothing to do with aversive conditioning.

### *380 Appendix D: Reports of the Long-Term Effects of Solitary Confinement in Former Political Prisoners and in Prisoners of War: Solitary Confinement as a Means of "Brain Washing" and "Indoctrinating"

Although concerns about the psychiatric effects of solitary confinement among prisoners of war were raised in the medical literature at least as early as post-World War II, this issue reached massive public exposure only after the fearful news of "brain washing" among American prisoners of war in Korea. As is well known, the 1950's were an era of tremendous fear of Communism and of the attempts by communist states to "indoctrinate" people into their ideology. As noted in the body of this article, in the 1950s the United States Department of Defense and the Central Intelligence Agency sponsored a great deal of research on these issues. The results of extensive research done for the Department of Defense were subsequently published.[170] The paper documented interrogation techniques of the Soviet KGB in regard to the incarceration of political prisoners, and the Chinese communists' imprisonment of American prisoners of war in Korea.

The report indicated that the KGB operated detention prisons, many of which were "modern . . . well built and spotlessly clean . . . [with] attached medical facilities and rooms for the care of sick detainees. An exercise yard is a standard facility."[171] Incarceration in these prisons is almost universally in solitary confinement, in a cell approximately ten feet by six feet in size.[172] "An almost invariable feature of the management of any important suspect under detention is a period of total isolation in a detention cell."[173]

This isolation was seen as a central feature of the imprisonment: "The effects upon prisoners of the regimen in the isolation cell are *381 striking. . . . A major aspect of this prison experience is isolation. . . . [In the cells] [h]is internal as well as external life is disrupted" and "he develops a predictable group of symptoms, which might almost be called 'disease syndrome.'"[174]

This syndrome develops over time:

> He becomes increasingly anxious and restless, and his sleep is disturbed. . . .

The period of anxiety, hyperactivity, and apparent adjustment to the isolation routine usually continues from one to three weeks. As it continues, the prisoner becomes increasingly dejected and dependent. He gradually gives up all spontaneous activity within his cell and ceases to care about personal appearance and actions. Finally, he sits and stares with a vacant expression, perhaps endlessly twisting a button on his coat. He allows himself to become dirty and disheveled. . . . He goes through the motions of his prison routine automatically, as if he were in a daze. . . . Ultimately he seems to lose many of the restraints of ordinary behavior. He may soil himself. He weeps; he mutters . . . . It usually takes from four to six weeks to produce this phenomenon in a newly imprisoned man.[175] Addressing the emotional impact on prisoners of such confinement, the report noted that:

> His sleep is disturbed by nightmares. Ultimately he may reach a state of depression in which he ceases to care about his personal appearance and behavior and pays little attention to his surroundings. In this state the prisoner may have illusory experiences. A distant sound in the corridor sounds like someone calling his name. The rattle of a footstep may be interpreted as a key in the lock opening the cell.

*382 Some prisoners may become delirious and have visual hallucinations.[176]

However, the report also notes that each individual may respond differently: Not all men who first experience total isolation react in precisely this manner. In some, these symptoms are less conspicuous. In others, dejection and utter despondence set in earlier, or later. Still others, and especially those with pre-existing personality disturbances, may become frankly psychotic.[177]

The authors of this report note that the procedures in the Chinese detention camps are somewhat more complex. Prisoners there underwent an initial period of isolation similar to that found in the Soviet prisons.[178] In the second phase, however they were housed in extremely tight quarters within "group cells" comprising approximately eight prisoners.[179] Under the tensions and hostilities created in this environment, brutality of prisoners by other prisoners was almost inevitable and was, according to the authors, apparently an intended result of this "group cell" confinement.[180]

There are many long-term studies of American prisoners of war; unfortunately, the factor of solitary confinement has not generally been separated out in these studies. However, one relatively recent study of Korean prisoners of war described long-term effects including interpersonal withdrawal and suspiciousness, confusion, chronic depression, and apathy toward environmental stimuli. Irritability, restlessness, cognitive impairment, and psychosomatic ailments were extremely common in the group, most of whom had suffered periods of incarceration in solitary confinement at the hands of the Chinese. This report also included a case report of one individual exposed to harsh conditions of solitary confinement for more than sixteen months; thirty years after release, he continued suffering sleep disturbances, nightmares, fearfulness, interpersonal suspicion and withdrawal, severe anxiety, and severe depression. These former prisoners also had psychosomatic ailments including **\*383** gastrointestinal disturbances, chronic headaches, and obsessive ruminations. They tended to become confused and thus cognitively impaired and were emotionally volatile and explosive.[181]

In former prisoners of war in the Korean conflict, approximately forty years after their release from confinement, solitary confinement was cited as one of the severe stressors in this group. These former prisoners demonstrated persistent anxiety, psychosomatic ailments, suspiciousness, confusion, and depression. They tended to be estranged and detached from social interaction, suffered from obsessional ruminations, and tended to become confused and cognitively impaired, suffering memory and concentration difficulties which affected their cognitive performance on formal testing.[182]

Footnotes

d1     This article was prepared from a statement given to the Commission on Safety and Abuse in America's Prisons. As the article is an overview of the psychiatric effects of confinement throughout history it is not fully footnoted

a1     M.D. Phone: (617) 244-3315; Fax: (617) 244-2792; 401 Beacon Street, Chestnut Hill, Mass. 02467-3976; e-mail: stgrassian@aol.com.

1      889 F. Supp. 1146 (N.D. Cal. 1995), rev'd and remanded, 150 F.3d 1030 (9th Cir. 1998).

2      An excellent history of the Philadelphia System is found in Norman Johnston et al., Eastern State Penitentiary: Crucible of Good Intentions (1994).

3      See David Rothman, The Discovery of the Asylum 81 (1971); see also Gustave de Beaumont & Alexis de Tocqueville, On the Penitentiary System in the United States and Its Application in France, http:// www.law.du.edu/sterling/Content/ALH/Tocqueville_Pen.pdf; Charles Dickens, American Notes and Pictures from Italy (Leonee Ormond ed., Everymans Library 1997) (1842).

4      Rothman, supra note 3, at 96-101.

5      See Appendix D (describing this literature).

6      134 U.S. 160 (1890).

[7]     Id. at 167-68.

[8]     Id. at 162-63.

[9]     Id. at 166.

[10]    Id. at 162.

[11]    Id. at 166.

[12]    Id. at 174.

[13]    The Manipulation of Human Behavior 2-3, 35 (Albert D. Biderman & Herbert Zimmer eds., 1961).

[14]    Libby v. Comm'r of Corr., 432 N.E.2d 486 (Mass. 1982).

[15]    See Stuart Grassian & Nancy Friedman, Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement, 8 Int'l J.L. & Psychiatry 49 (1986); Stuart Grassian, Psychopathological Effects of Solitary Confinement, 140 Am. J. Psychiatry 1450 (1983).

[16]    When seen in primary psychiatric illness, it is basically only seen in especially severe, insidious, early onset schizophrenia--the kind of schizophrenic illness which has always been thought to clinically "feel" like a fundamentally biological/neurologic disease.

[17]    In fact, in the more common psychotic illnesses such as schizophrenia and psychotic depression, auditory hallucinations are by far the most common type; visual hallucinations come a distant second; and hallucinations in all other modalities are actually very uncommon. Moreover, combined modality hallucinations (other than the combination of auditory with visual) are exceedingly rare.

[18]    This symptom is similar, for example, to the experience many people have during a febrile illness of finding any touching of their body exceedingly unpleasant, or the inability of a patient with a headache to tolerate an even ordinary volume of sound, or the inability of some pregnant women to tolerate even ordinary smells without becoming nauseated.

[19]    Rothman, supra note 3, at 4-5, 62-65.

[20]    George Ives, A History of Penal Methods: Criminals, Witches, Lunatics 58-59, 68-73 (reprint 1970) (1914).

[21]    Rothman, supra note 3, at 57-58, 79.

[22]    Id. at 82.

[23]    Id. at 133.

[24]    Id. at 83.

25   Id.

26   Id. at 82-83.

27   Id. at 85-86.

28   Id. at 81.

29   Id. at 97.

30   P. Herbert Liederman, Man Alone: Sensory Deprivation and Behavioral Change, 8 Correctional Psychiatry & J. Soc. Therapy 64, 66 (1962).

31   Rothman, supra note 3, at 87-88.

32   Id. at 88.

33   Id. at 95, 97.

34   Id. at 87.

35   Id. at 87-88.

36   See Paul Nitsche & Karl Wilmanns, The History of the Prison Psychoses (Francis M. Barnes, Jr. & Bernard Glueck trans., 1912).

37   See id.

38   See Appendix B.

39   Lawrence E. Hinkle, Jr., The Physiological State of the Interrogation Subject as It Affects Brain Function, in The Manipulation of Human Behavior, supra note 13, at 35.

40   See, e.g., Christopher Burney, Solitary Confinement (1952).

41   See Group for the Advancement of Psychiatry, Factors Used to Increase the Susceptibility of Individuals to Forceful Indoctrination (1956).

42   Id. at 96-103.

43    Id. at 98.

44    Id.

45    Id. at 89.

46    See Appendix C.

47    See, e.g., Charles A. Brownfield, Isolation: Clinical and Experimental Approaches (1965); Sensory Deprivation: A Symposium Held at Harvard Medical School (Philip Solomon et al. eds., 1961) [hereinafter Sensory Deprivation--Harvard].

48    See Nancy A. Wright & David S. Abbey, Perceptual Deprivation Tolerance and Adequacy of Defenses, 20 Perceptual & Motor Skills 35 (1965).

49    Leo Goldberger, Experimental Isolation: An Overview, 122 Am. J. Psychiatry 774, 777 (1966).

50    Id.

51    Id.

52    See Appendix C (describing these studies in more detail).

53    Eugene Ziskind, Isolation Stress in Medical and Mental Illness, 168 J. Am. Med. Ass'n 1427, 1428 (1958).

54    Hillel Klein & Rafael Moses, Psychological Reaction to Sensory Deprivation in Patients with Ablatio Retinae, 24 Psychotherapy & Psychosomatics 41, 49-51 (1974). A more extensive review of this literature is contained in Appendix A to this declaration.

55    Appendix A discusses this issue in more detail.

56    Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995), rev'd and remanded, 150 F.3d 1030 (9th Cir. 1998).

57    Much of the literature review and historical material in the present declaration is taken from my Madrid declaration.

58    Herbert C. Quay, Psychopathic Personality as Pathological Stimulation-Seeking, 122 Am. J. Psychiatry 180, 180 (1965). Appendix B contains a more detailed discussion.

59    See, e.g., Merle R. Ingraham & David M. Moriarty, A Contribution to the Understanding of the Ganser Syndrome, 8 Comprehensive Psychiatry 35 (1967); Rupert H. May et al., The Ganser Syndrome: A Report of Three Cases, 130 J. Nervous & Mental Diseases 331 (1960).

60    May et al., supra note 59, at 331-36.

[61] There are two companion cases: Langley v. Coughlin, 715 F. Supp. 522 (S.D.N.Y. 1989); and Langley v. Coughlin, 709 F. Supp. 482 (S.D.N.Y. 1989), aff'd, 888 F.2d 252 (2d Cir. 1989).

[62] Langley, 709 F. Supp. 482.

[63] 691 F. Supp. 432 (D.D.C. 1988), rev'd sub nom., Baraldini v. Thornburgh, 884 F.2d 615 (D.C. Cir. 1989).

[64] 57 F.3d 217 (2d Cir. 1995).

[65] See Lawrence E. Hinkle, Jr. & Harold G. Wolff, Communist Interrogation and Indoctrination of "Enemies of the States" (1956).

[66] This literature is reviewed in Appendix D to this declaration.

[67] A.M. Hastin Bennett, Sensory Deprivation in Aviation, in Sensory Deprivation--Harvard, supra note 47, at 161-73.

[68] Id. at 164.

[69] Brant Clark & Ashton Graybiel, The Break-off Phenomenon, 28 J. Aviation Med. 121 (1957).

[70] Id. at 122.

[71] See Seward Smith, Studies of Small Groups in Confinement, in Sensory Deprivation: Fifteen Years of Research 374-76 (John Peter Zubek ed., 1969) [hereinafter Sensory Deprivation: Fifteen Years]. For articles reporting effects in arctic environments, see Jeanette J. Cochrane & S.J.J. Freeman, Working in Arctic and Sub-Arctic Conditions: Mental Health Issues, 34 Can. J. Psychiatry 884 (1989); Eric Gunderson & Paul D. Nelson, Adaptation of Small Groups to Extreme Environments, Aerospace Med., Dec. 1963, at 1111; Charles S. Mullin & H.J.M. Connery, Psychological Study at an Antarctic IGY Station, 10 U.S. Armed Forces Med. J. 290 (1959).

[72] Smith, supra note 71, at 377.

[73] Id. at 380.

[74] Id. at 381.

[75] Gunderson & Nelson, supra note 71, at 1111.

[76] Id.

[77] Robert J. Biersner & Robert Hogan, Personality Correlates of Adjustment in Isolated Work Groups, 18 J. Research in Personality 491, 491 (1989).

[78] See Esther D. Rothblum, Psychological Factors in the Antarctic, 124 J. Psych. 253 (1990).

79    Id. at 256; see also Smith, supra note 71, at 393-95.

80    Mullin & Connery, supra note 71, at 292.

81    See Morgan W. Wright et al., Personality Factors in the Selection of Civilians for Isolated Northern Stations, 8 Can. Psychologist 23 (1967).

82    Id. at 29.

83    Cochrane & Freeman, supra note 71, at 889.

84    K. Natani & J. Shurley, Sociopsychological Aspects of a Winter Vigil at South Pole Station, in Human Adaptability to Antarctic Conditions 89-114 (Eugene Gunderson ed., Am. Geophysical Union 1974).

85    See Biersner & Hogan, supra note 77, at 491-96.

86    See, e.g., R. Strange & W. Klein, Emotional and Social Adjustment of Recent Winter-Over in Isolated Antarctic Stations, 7 Antarctic Bibliography 229 (1974).

87    See E.K. Eric Gunderson, Emotional Symptoms in Extremely Isolated Groups, 9 Archives Gen. Psychiatry 362 (1963); Gunderson & Nelson, supra note 71, at 1111-15.

88    Rothblum, supra note 78, at 253-73.

89    Gunderson & Nelson, supra note 71, at 1114.

90    See Cochrane & Freeman, supra note 71, at 889.

91    Id. at 887.

92    Rothblum, supra note 78, at 267.

93    Biersner & Hogan, supra note 77, at 495.

94    Peter Suedfeld, Introduction and Historical Background, in Sensory Deprivation: Fifteen Years, supra note 71, at 7.

95    Philip Solomon et al., Sensory Deprivation: A Review, 114 Am. J. Psychiatry 357, 357-58 (1957).

96    Id.

[97]   Id.

[98]   See Suzanne Holroyd et al., Visual Hallucinations in Patients with Macular Degeneration, 149 Am. J. Psychiatry 1701, 1703 (1992).

[99]   Id. at 1703-04.

[100]  Id.

[101]  Klein & Moses, supra note 54, at 49.

[102]  Id.

[103]  Id. at 50.

[104]  Id.

[105]  See, e.g., Eugene Ziskind et al., Observations on Mental Symptoms in Eye Patched Patients: Hypnagogic Symptoms in Sensory Deprivation, 116 Am. J. Psychiatry 893 (1960); Ziskind, supra note 53.

[106]  Ziskind et al., supra note 105, at 894.

[107]  See C. Wesley Jackson, Jr., Clinical Sensory Deprivation: A Review of Hospitalized Eye-Surgery Patients, in Sensory Deprivation: Fifteen Years, supra note 71, at 337-43.

[108]  Solomon et al., supra note 95, at 361.

[109]  Id. at 362.

[110]  See, e.g., N. Egerton & J.H. Kay, Psychological Disturbances Associated with Open Heart Surgery, 110 Brit. J. Psychiatry 433 (1964); Donald S. Kornfeld et al., Psychiatric Complications of Open-Heart Surgery, 273 New Eng. J. Med. 287 (1965); Herbert R. Lazarus & Jerome H. Hagens, Prevention of Psychosis Following Open-Heart Surgery, 124 Am. J. Psychiatry 1190 (1968); Larkin M. Wilson, Intensive Care Delirium, 130 Archives Internal Med. 225 (1972).

[111]  Robert E. Lee & Patricia A. Ball, Some Thoughts on the Psychology of the Coronary Care Unit Patient, 75 Am. J. Nursing 1498, 1501 (1975).

[112]  Kornfeld et al., supra note 110, at 290.

[113]  See, e.g., Rosemary Ellis, Unusual Sensory and Thought Disturbances After Cardiac Surgery, 72 Am. J. Nursing 2021 (1972); Alvin G. Goldstein, Hallucinatory Experience: A Personal Account, 85 J. Abnormal Psychol. 423 (1976); Linda Reckhow Thomson, Sensory Deprivation: A Personal Experience, 73 Am. J. Nursing 266 (1973); Lee & Ball, supra note 111.

[114] See, e.g., Kenneth Z. Altshuler, Studies of the Deaf: Relevance to Psychiatric Theory, 127 Am. J. Psychiatry 1521 (1971); F. Houston & A.B. Royse, Relationship Between Deafness and Psychotic Illness, 100 J. Mental Sci. 990 (1954).

[115] See Phil G. Zimbardo et al., Induced Hearing Deficit Generates Experimental Paranoia, 212 Sci. 1529, 1529-31 (1981).

[116] Florence S. Downs, Bed Rest and Sensory Disturbances, 74 Am. J. Nursing 434, 438 (1974).

[117] Ross A. McFarland & Ronald C. Moore, Human Factors in Highway Safety, 256 New Eng. J. Med. 792, 797 (1957).

[118] See Austin H. Riesen, Excessive Arousal Effects of Stimulation After Early Sensory Deprivation, in Sensory Deprivation--Harvard, supra note 47, at 35-36.

[119] See T.C. Barnes, Isolation Stress in Rats and Mice as a Neuropharmacological Test, 18 Fed'n Proc. 365 (1959).

[120] Kinzo Matsumoto et al., Desipramine Enhances Isolation-Induced Aggressive Behavior in Mice, 39 Pharmacology Biochemistry & Behav. 167, 168 (1991).

[121] See David A. Washburn & Duane M. Rumbaugh, Impaired Performance from Brief Social Isolation of Rhesus Monkeys, 105 J. Comp. Psychol. 145 (1991).

[122] Id. at 145.

[123] William T. McKinney et al., Depression in Primates, 127 Am. J. Psychiatry 1313, 1316 (1971).

[124] Id. at 1317.

[125] See Harry F. Harlow & Steven J. Suomi, Induced Depression in Monkeys, 12 Behav. Biology 273 (1974).

[126] See W.R. Thompson & R. Melzack, Early Environment, 194 Sci. Am. 38 (1956).

[127] See Nitsche & Wilmanns, supra note 36.

[128] Id. at 1.

[129] Id. at 2.

[130] Id. at 8.

[131] Id.

[132] Id. at 31.

[133]    Id. at 32-33.

[134]    Id.

[135]    Id. at 17.

[136]    Id. at 12, 16.

[137]    Id. at 12-16.

[138]    Id. at 21.

[139]    Id. at 23-24.

[140]    Vorbereiden is a rather remarkable symptom of deranged and confused thought processes in which the individual's response to a question suggests that he grasped the gist of the question, and his answer is clearly relevant to the question, and related to the obvious correct answer, yet it still oddly manages to be incorrect. An example would be: Q: "How many colors are there in the flag of the United States" A: "Four" . Q: "What are they?" A: "Yellow" .

[141]    Ganser, Ueber Einen Eigenartigen Hysterischen Dämmerzustand, 30 Archiv für Psychiatrie und Nervenkran-Kheiten [Arch Psych. & Nervenk] 633 (1898) (F.R.G.).

[142]    American Handbook of Psychiatry 710-12 (Gerald Caplan ed., 2d ed. 1974).

[143]    Id.

[144]    Id.

[145]    Nitsche & Wilmanns, supra note 36, at 32.

[146]    Id. at 34.

[147]    Id. at 33-35.

[148]    Id. at 40.

[149]    Id. at 41.

[150]    Id.

[151]   Id.

[152]   See, e.g., Ingraham & Moriarty, supra note 59; May et al., supra note 59; Milo Tyndel, Some Aspects of the Ganser State, 102 J. Mental Sci. 324 (1956); Herbert Weiner & Alex Braiman, The Ganser Syndrome, 111 Am. J. Psychiatry 767 (1955).

[153]   See Robert A. Woodruff, Jr. et al., Psychiatric Diagnosis (1974).

[154]   Martin T. Orne & Karl E. Scheibe, The Contribution of Nondeprivation Factors in the Production of Sensory Deprivation Effects: The Psychology of the "Panic Button," 68 J. Abnormal & Soc. Psychol. 3, 4 (1964) (citations omitted).

[155]   Id. at 3-12.

[156]   See Richard H. Walters et al., Effects of Solitary Confinement on Prisoners, 119 Am. J. Psychiatry 771 (1963).

[157]   Wright et al., supra note 81, at 36.

[158]   Leo Goldberger, Experimental Isolation: An Overview, 122 Am. J. Psychiatry 774, 777 (1966).

[159]   Id. at 778 (footnotes omitted).

[160]   Wright et al., supra note 81, at 37.

[161]   Sanford J. Freedman & Milton Greenblatt, Studies in Human Isolation II: Hallucinations and Other Cognitive Findings, 11 U.S. Armed Forces Med. J. 1479, 1486 (1960).

[162]   George C. Curtis & Marvin Zuckerman, A Psychopathological Reaction Precipitated by Sensory Deprivation, 125 Am. J. Psychiatry 255, 256 (1968).

[163]   See Henry U. Grunebaum et al., Sensory Deprivation and Personality, 116 Am. J. Psychiatry 878 (1960).

[164]   See H. Azima & Fern J. Cramer, Effects of Partial Perceptual Isolation in Mentally Disturbed Individuals, 17 Diseases Nervous Sys. 117 (1956).

[165]   Quay, supra note 58, at 80.

[166]   Id. at 182.

[167]   Id. at 181.

[168]   See Timothy D. Emmons & Warren W. Webb, Subjective Correlates to Emotional Responsivity and Stimulation Seeking in

Psychopaths, Normals, and Acting-Out Neurotics, 42 J. Consulting & Clinical Psychol. 620 (1974).

[169]    Curtis & Zuckerman, supra note 162, at 271-72.

[170]    Hinkle & Wolff, supra note 65.

[171]    Id. at 125.

[172]    Id.

[173]    Id. at 126.

[174]    Id. at 127.

[175]    Id. at 128.

[176]    Id.

[177]    Id. at 129.

[178]    Id. at 153.

[179]    Id. at 156.

[180]    Id. at 159.

[181]    See Patricia B. Sutker et al., Cognitive Deficits and Psychopathology Among Former Prisoners of War and Combat Veterans of the Korean Conflict, 148 Am. J. Psychiatry 67 (1991).

[182]    Id. at 68.

End of Document                                         © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT C**

ANNALS OF THE NEW YORK ACADEMY OF SCIENCES

*Volume 1124*

# The Year in Cognitive Neuroscience 2008

*Edited by*

ALAN KINGSTONE AND MICHAEL B. MILLER

*Published by Blackwell Publishing on behalf of the New York Academy of Sciences*

*Boston, Massachusetts*

*2008*

This material may be protected by Copyr___ ___w (Title 17 U.S. Code)

# The Adolescent Brain

**B.J. Casey,**[a] **Rebecca M. Jones,**[a] **and Todd A. Hare**[b]

[a]*Sackler Institute, Weill Medical College of Cornell University, New York, New York, USA*

[b]*California Institute of Technology, Pasadena, California, USA*

Adolescence is a developmental period characterized by suboptimal decisions and actions that are associated with an increased incidence of unintentional injuries, violence, substance abuse, unintended pregnancy, and sexually transmitted diseases. Traditional neurobiological and cognitive explanations for adolescent behavior have failed to account for the nonlinear changes in behavior observed during adolescence, relative to both childhood and adulthood. This review provides a biologically plausible model of the neural mechanisms underlying these nonlinear changes in behavior. We provide evidence from recent human brain imaging and animal studies that there is a heightened responsiveness to incentives and socioemotional contexts during this time, when impulse control is still relatively immature. These findings suggest differential development of bottom-up limbic systems, implicated in incentive and emotional processing, to top-down control systems during adolescence as compared to childhood and adulthood. This developmental pattern may be exacerbated in those adolescents prone to emotional reactivity, increasing the likelihood of poor outcomes.

*Key words:* adolescence; prefrontal cortex; nucleus accumbens; amygdala; limbic; impulsivity; reward; development; risk taking; emotion

## Introduction

Adolescence is the period between childhood and adulthood encompassed by changes in physical, psychological, and social development (Ernst et al. 2006). These alterations make this period a time of vulnerability and adjustment (Steinberg 2005). According to the National Center for Health Statistics, there are over 13,000 adolescent deaths in the United States each year. Approximately 70% of these deaths result from motor vehicle crashes, unintentional injuries, homicide, and suicide (Eaton et al. 2006). Results from the 2005 National Youth Risk Behavior Survey (YRBS) show that adolescents engage in behaviors that increase their likelihood of death or illness by driving a vehicle after drinking or without a seat belt, carrying weapons, using illegal substances, and engaging in unprotected sex resulting in unintended pregnancies and STDs, including HIV infection (Eaton et al. 2006). These statistics underscore the importance of understanding risky choices and behavior in adolescents.

Adolescence is also a time of increased emotional reactivity. During this period, the social environment is changing such that more time is spent with peers versus adults, and more conflicts arise between the adolescent and his/her parents (Csikszentmihalyi et al. 1977; Steinberg 1989). These changes in social interactions may influence the rise of emotional reactivity. In addition, given the increase in risky choices and behavior during adolescence, it appears the value of positive and negative information may be exaggerated. Greater emotional reactivity and sensitivity during adolescence may play a role in the higher incidence of affective disorder onset and addiction during this developmental period (Pine et al. 2001; Silveri et al. 2004; Steinberg 2005).

A number of cognitive and neurobiological hypotheses have been postulated to explain why adolescents engage in suboptimal choice behavior. In a recent review of the literature on human adolescent brain development, Yurgelun-Todd (2007) suggests that cognitive development during adolescence is associated with progressively greater efficiency of cognitive control and affective modulation. An increase in activity in the prefrontal regions as an indication of maturation (Rubia et al. 2000; Rubia et al. 2006; Tamm et al. 2002) and diminished activity in irrelevant brain regions (Brown et al. 2005; Durston et al. 2006; Monk

Address for correspondence: BJ Casey, Sackler Institute, Weill Cornell Medical College, 1300 York Avenue, Box 140, New York, NY 10021, Voice: +212-746-5832 fax: 212-746-5755 USA.
bjc2002@med.cornell.edu

Ann. N.Y. Acad. Sci. 1124: 111–126 (2008). © 2008 New York Academy of Sciences.

et al. 2003) are described as the neurobiological explanation for the behavioral changes associated with adolescence. This general pattern, of improved cognitive control and emotion regulation with maturation of the prefrontal cortex, suggests a linear increase in development from childhood to adulthood.

As evidenced by the National Center for Health Statistics on adolescent behavior and mortality, suboptimal choices and actions observed during adolescence represent a nonlinear change in behavior, distinct from childhood and adulthood. If immaturity of prefrontal cortex were the basis for suboptimal choice behavior and heightened emotional reactivity in adolescence, then children who have less developed prefrontal cortex and cognitive abilities should look remarkably similar or even worse than adolescents. Thus, immature prefrontal function alone cannot account for adolescent behavior.

This review will provide evidence from developmental animal and human neuroimaging studies that may account for nonlinear changes in behavior and development during adolescence. A model of adolescent brain development is presented in the context of risk factors including suboptimal decision making and heightened emotional reactivity.

## Development of Goal-directed Behavior: Risk versus Impulse

An accurate conceptualization of cognitive and neurobiological changes during adolescence must treat adolescence as a transitional developmental period (Spear 2000), rather than a single snapshot in time (Casey et al. 2005). In other words, to understand this developmental period, transitions into and out of adolescence are necessary for distinguishing distinct attributes of this stage of development. Adolescent behavior has been described as impulsive and risky, almost synonymously, yet these behaviors rely on different cognitive and neural processes (Casey et al. in press), which suggest distinct constructs with different developmental trajectories.

A cornerstone of cognitive development is the ability to suppress inappropriate thoughts and actions in favor of goal-directed ones, especially in the presence of compelling incentives (Casey et al. 2005; Casey et al. 2000; Casey et al. 2002). A number of classic developmental studies have shown that this ability develops throughout childhood and adolescence (Case 1972; Flavell et al. 1966; Keating & Bobbitt 1978; Pascual-Leone 1970). Several theorists (e.g., Bjorkland 1985, 1987; Case 1985) have argued that cognitive development is due to increases in processing speed and efficiency and not due to an increase in mental capacity. Other theorists have included the construct of "inhibitory" processes in their account of cognitive development (Harnishfeger & Bjorkland 1993). According to this account, immature cognition is characterized by susceptibility to interference from competing sources that must be suppressed (e.g., Brainerd & Reyna 1993; Dempster 1993) (Casey et al. 2002; Diamond 1985; Munakata & Yerys 2001). Thus goal-directed behavior requires the control of impulses or delay of gratification for optimization of outcomes, and this ability appears to mature across childhood and adolescence.

On a cognitive or behavioral level, the immature cognition of adolescence is characterized as impulsive (i.e., lacking cognitive control) and risk taking, with these constructs used synonymously and without appreciation for distinct developmental trajectories for each. Human imaging and animal studies suggest distinct neurobiological and developmental trajectories for the neural systems that underlie these separate constructs of impulse control and risky decisions. Specifically, a review of the literature suggests that impulsivity diminishes with age across childhood and adolescence (Casey et al. 2005; Casey et al. 2002; Galvan et al. 2007) and is associated with protracted development of the prefrontal cortex (Casey et al. 2005; Casey et al. 2002; Galvan et al. 2007) and is associated with protracted development of the prefrontal cortex (Casey et al. 2005). However, there are individual differences in the degree of impulsivity, regardless of age.

In contrast to the linear increase with age associated with impulse control, risk taking appears greater during adolescence relative to childhood and adulthood and is associated with subcortical systems known to be involved in evaluation of incentives and affective information. Human imaging studies that are reviewed here suggest an increase in subcortical activation (accumbens and amygdala) when making risky choices and processing emotional information (Ernst et al. 2005; Monk et al. 2003; Montague & Berns 2002) (Kuhnen & Knutson 2005; Matthews et al. 2004) that is exaggerated in adolescents, relative to children and adults (Ernst et al. 2005; Galvan et al. 2006).

These findings suggest distinct neurobiological trajectories for impulse versus risk taking behavior. The limbic subcortical systems appear to be developed by adolescence in contrast to control systems that show a protracted and linear developmental course into young adulthood. The prefrontal cortical control systems are necessary for overriding inappropriate choices and actions in favor of goal-directed ones.



**FIGURE 1.** Illustrations of the most common magnetic resonance methods used in the study of human development. **(A)** Structural magnetic resonance imaging (MRI) to produce structural images of the brain useful for anatomical and morphometric studies, **(B)** diffusion tensor imaging (DTI) measures myelination and directionality of fiber tracts between anatomical structures, and **(C)** functional MRI (fMRI) measures patterns of brain activity within those structures (from Casey et al. 2005).

## Animal Studies of Adolescent Brain Development

Until recently, much of our understanding of the adolescent brain has come from animal studies. These experiments have been critical for obtaining information about the neurochemical and cellular changes that occur as a function of age. The validity of animal models to study adolescence has been questioned, since it is argued that only humans undergo the psychological stress of adolescence (e.g., Bogin 1994). However, animals including rodents and nonhuman primates exhibit increased social interactions during adolescence (Primus & Kellogg 1989) as well as novelty-seeking and risk-taking behaviors (Adriani et al. 1998; Spear 2000). These behavioral findings suggest that animal models are appropriate for studying neurobiological changes during adolescence.

Studies in rodents have shown at the cellular level that there are distinct changes in limbic and prefrontal regions during adolescence. During early puberty, there is an overproduction of axons and synapses, followed by rapid pruning in later adolescence (Crews et al. 2007). Specifically, there is dendritic pruning in the amygdala (Zehr et al. 2006), nucleus accumbens (Teicher et al. 1995), and prefrontal cortex (Andersen & Teicher 2004; Andersen et al. 2000) and continual growth in the density of the fibers connecting the amygdala and prefrontal cortex into early adulthood (Cunningham et al. 2002). There is more prolonged pruning throughout adolescence in the prefrontal cortex versus the accumbens (Andersen et al. 2000; Teicher et al. 1995). These differences in pruning in rodents are consistent with our model suggesting that the accumbens matures earlier than the prefrontal cortex.

Consistent with the cellular changes in animals, there are alterations in neurotransmission in these subcortical and cortical areas. Animal studies have shown that dopamine is crucial for communication between the accumbens, amygdala, and prefrontal cortex and that signaling between these regions relies upon the fine balance between excitatory and inhibitory dopamine transmission (Floresco & Tse 2007; Grace et al. 2007; Jackson et al. 2001). There are significant peaks in dopamine expression during adolescence. Dopamine projections to the prefrontal cortex continue to develop into early adulthood, with dopamine levels peaking in the prefrontal cortex during adolescence versus earlier or later in life in nonhuman primates (Rosenberg & Lewis 1994, 1995) and in rats (Kalsbeek et al. 1988). Dopamine receptor expression is highest in the accumbens during early adolescence (Tarazi et al. 1998). These findings in rodents suggest that there are specific regions undergoing structural changes, and therefore, connections and communication between subcortical and cortical regions are in transition and in flux during adolescence. Significant evidence suggests that the neuroanatomical changes described above are also occurring during adolescence in humans, but our methods for studying humans only provide an approximate index of such changes.

## Neuroimaging Studies of Human Brain Development

Our current understanding of the human adolescent brain has come from advances in neuroimaging methodologies that can be used with developing human populations. These methods depend on magnetic resonance imaging (MRI) methods (see FIG. 1) and include structural MRI, which is used to measure the size and shape of structures; diffusion tensor imaging (DTI), which is used to index connectivity of white matter fiber tracts; and functional MRI which is used to measure patterns of brain activity. These methods have



**FIGURE 2.** Illustration of gray matter volume maturation over the cortical surface from 5 to 20 years of age (from Lenroot & Giedd 2006).

furthered our understanding of the neurobiological basis and development of reward or incentive behavior relative to goal-directed behavior.

### MRI Studies of Human Brain Development

Several studies have used structural MRI to map the developmental course of the normal brain (for review, see Durston et al. 2001). Although the brain reaches approximately 90% of its adult size by age six, the gray and white matter subcomponents of the brain continue to undergo dynamic changes throughout adolescence. Data from recent longitudinal MRI studies indicate that the change in gray matter volume over time has an inverted U-shape pattern and has greater regional variation than white matter (Giedd 2004; Gogtay et al. 2004, Sowell et al. 2003, 2004). In general, regions that involve primary functions, such as motor and sensory systems, mature earliest compared to the higher-order association areas that integrate these primary functions (Gogtay et al. 2004; Sowell et al. 2004). MRI studies show loss of cortical gray matter first in primary sensorimotor areas, followed by that in the dorsolateral prefrontal and lateral temporal cortices (Gogtay et al. 2004) (see Fig. 2). This pattern of change is consistent with nonhuman primate (Bourgeois et al. 1994) and human postmortem studies (Huttenlocher 1979) indicating that the prefrontal cortex is one of the last brain regions to mature. In contrast to gray matter, white matter volume increases in a roughly linear pattern throughout development and into adulthood (Gogtay et al. 2004). These changes most likely reflect ongoing myelination of axons by oligodendrocytes enhancing neuronal conduction and communication.

When examining neuroanatomical changes across development, the subcortical regions are often overlooked, however, it is important to note that these areas have some of the largest changes during development in the brain, particularly in the basal ganglia (Sowell et al. 1999) and specifically in males (Caviness et al. 1996; Giedd et al. 1996; Reiss et al. 1996). Developmental changes in structural volume within basal ganglia and prefrontal regions are interesting in light of the previously mentioned animal work showing pruning in these regions during adolescence. These processes allow for the fine tuning and strengthening of connections between prefrontal and subcortical regions during development and learning that may correspond to greater cognitive control.

How do these changes in structure relate to differences in cognition? A number of studies have related frontal lobe structural maturation and cognitive function using neuropsychological and cognitive measures (e.g., Sowell et al. 2003). Specifically, these studies showed associations between MRI-based regional volumes of the prefrontal cortex and basal ganglia with measures of cognitive control (i.e., ability to override an inappropriate response in favor of another or to suppress attention toward irrelevant stimulus attribute in favor of relevant stimulus attribute) (Casey et al. 1997, 1997). These findings suggest that cognitive changes are reflected in structural brain changes and underscore the importance of subcortical (basal ganglia) as well as cortical (e.g., prefrontal cortex) development. While these findings showed associations between structure and function, a more in-depth discussion of functional imaging evidence for changes in activity that more directly coincide with behavior across development is presented in the fMRI section.

### DTI Studies of Human Brain Development

The MRI-based morphometry studies previously reviewed suggest that during development, cortical connections are fine tuned via elimination of an overabundance of synapses and by strengthening of relevant connections, although these measures do not have the resolution to visualize or measure synapses. Recent advances in MRI technology, like DTI, provide a potential tool for examining the role of specific white matter tracts in the development of the brain and behavior (for review, see Cascio et al. 2007). Examining white matter tracts can provide knowledge about pathways of connectivity in the brain, and presumably it is via these pathways that information is able to travel from one region of the brain to another (Cascio et al. 2007). Relevant to this paper are the neuroimaging studies that have linked the development of white matter fiber tracts with improvements in cognitive ability with age.

Recently, associations have been shown between DTI-based measures of prefrontal white matter development and cognition in children. Nagy and colleagues showed a positive correlation between maturation of prefrontal–parietal fiber tracts and working memory in children (Nagy et al. 2004), which is consistent with functional neuroimaging studies showing differential recruitment of these regions in children relative to adults. Using a similar approach, Liston and colleagues (2006) have shown that white matter tracts between prefrontal–basal ganglia and posterior fiber tracts continue to develop across childhood into adulthood, but only tracts between the prefrontal cortex and basal ganglia are correlated with impulse control, as measured by performance on a go/no-go task. The prefrontal fiber tracts were defined by regions of interests, which were identified in an fMRI study using the go/no-go task. In developmental DTI studies, fiber tract measures were correlated with age, but specificity of particular fiber tracts with cognitive performance were shown by dissociating the particular tract (Liston et al. 2006) or cognitive ability (Nagy et al. 2004). These findings highlight the importance of examining not only regional, but also related circuitry changes, when making inferences about neural changes in cognition across development.

### Functional MRI Studies of Human Brain Development

Compared to MRI and DTI, fMRI is a more direct approach for examining behavior changes during development and for establishing structure–function relationships. Using fMRI to measure functional changes in the developing brain has significant potential for the field of developmental science and provides a means for constraining interpretations of adolescent behavior.

As stated previously, the development of the prefrontal cortex is believed to play an important role in the maturation of higher cognitive abilities such as decision making and cognitive control (Casey et al. 2002; Casey et al. 1997; Hare & Casey 2005). Many behavioral paradigms, together with fMRI, have assessed the neurobiological basis of these abilities, including flanker, Stroop, and go/no-go tasks (Casey et al. 1997; Casey et al. 2000; Durston et al. 2003). Collectively, these studies show that children recruit distinct but often larger and more diffuse prefrontal regions when performing these tasks than do adults. The patterns of brain activity that are important for task performance, such as those regions that correlate with cognitive performance, become more fine tuned with age. Regions that are not correlated with task performance diminish in activity with age. This pattern has been observed across both cross-sectional (Brown et al. 2005) and longitudinal studies (Durston et al. 2006) and across a variety of paradigms. Neuroimaging studies cannot definitively characterize the mechanism of such developmental changes as dendritic arborization or synaptic pruning. However, these studies suggest that change over a period of time results in both refinement in brain regions as well as fine tuning of projections from these regions (Brown et al. 2005; Bunge et al. 2002; Casey et al. 1997; Casey et al. 2002; Luna et al. 2001; Moses et al. 2002; Schlaggar et al. 2002; Tamm et al. 2002; Thomas et al. 2004; Turkeltaub et al. 2003).

### Functional MRI Studies of Behavior during Adolescence

The question remains how can fMRI studies help explain whether adolescents, compared to children or adults, are 1) lacking sufficient cognitive control (impulsive), 2) risky in their choices and actions, and 3) more sensitive to affective information when required to exert cognitive control than children or adults.

Impulse control, as measured by cognitive control tasks like the go/no-go task, shows a linear pattern of development across childhood and adolescence, as described above. However, we were interested in understanding changes across development in top-down control regions and subcortical reward-seeking regions. It is only recently that risk taking in adolescents has been examined with neuroimaging techniques (Ernst et al. 2005; May et al. 2004). These studies have focused primarily on the region of the accumbens, a portion of the basal ganglia involved in predicting reward outcomes. Although two recent reports showed less ventral prefrontal activity (Eshel et al. 2007) and posterior mesofrontal activity (Bjork et al. 2007) in adolescents versus adults on risk-taking behavior, the goal of our studies was to characterize the development of limbic subcortical regions involved in motivation and emotional reactivity in conjunction with top-down control regions (prefrontal cortex). Many studies have examined the neural response in children and adolescents to affective information (e.g., emotional faces) ( Baird et al. 1999; Killgore et al. 2001; Monk et al. 2003; Thomas et al. 2001b; Yurgelun-Todd & Killgore 2006) but typically have used passive viewing or attention tasks (Monk et al. 2003) unrelated to processing of the affective information. Our studies examine how affect influences cognitive control across development and characterizes the activation of the subcortical systems (amygdala) involved in affect regulation relative to the cortical (prefrontal) regions associated with cognitive control.

## A Neurobiological Model of Adolescence

How do neural changes in subcortical regions (e.g., accumbens and amygdala) associated with reward-seeking and emotion coincide with development of the prefrontal regions and do they relate to impulsivity and risk-taking behaviors? We have developed a neurobiological model of adolescent development within this framework that builds on rodent models (Laviola et al. 1999; Spear 2000) and recent imaging studies of children, adolescents, and adults (Ernst



**FIGURE 3.** The traditional explanation of adolescent behavior has been that it is due to the protracted development of the prefrontal cortex. Our model takes into consideration the development of the prefrontal cortex together with subcortical limbic regions (e.g., nucleus accumbens and amygdala) that have been implicated in risky choices and emotional reactivity.

et al. 2005; Galvan et al. 2007; Galvan et al. 2006; Hare & Casey, in press). FIGURE 3 depicts this model illustrating how bottom-up limbic and prefrontal top-down control regions should be considered together. The graph shows different developmental trajectories for these systems, with limbic systems developing earlier than prefrontal control regions. According to this model, the individual is biased more by functionally mature limbic regions during adolescence (i.e., imbalance of limbic relative to prefrontal control), compared to children, for whom these systems are both still developing, and compared to adults, for whom these systems are fully mature. This perspective provides a basis for nonlinear shifts in behavior across development, due to earlier maturation of this limbic system relative to the less mature top-down prefrontal control region. Furthermore, with development and experience, the functional connectivity between these regions provides a mechanism for top-down control of these regions (Hare & Casey, in press). Our model reconciles the contradiction between health statistics of risky behavior during adolescence and the astute observation by Reyna and Farley (2006) that adolescents are able to reason and understand risks of behaviors in which they engage.

According to our model, in emotionally salient situations, the more mature limbic system will win over the prefrontal control system. In other words, when a poor

decision is made in an emotional context, the adolescent may know better, but the salience of the emotional context biases his or her behavior in opposite direction of the optimal action.

Our neurobiological model proposes that the combination of heightened responsiveness to rewards and immaturity in behavioral control areas may bias adolescents to seek immediate rather than long-term gains, perhaps explaining their increase in risky decision making and emotional reactivity. Tracking subcortical (e.g., accumbens and amygdala) and cortical (e.g., prefrontal) development of decision making and emotional reactivity across childhood and through adulthood provides additional clarification on whether changes reported in adolescence are specific to this period of development or, rather, reflect maturation that is steadily occurring in a somewhat linear pattern from childhood to adulthood.

Two recent fMRI studies spanning from childhood to adulthood provide empirical evidence consistent with our neurobiological model. In the first study (Galvan et al. 2006), we examined behavioral and neural responses to reward manipulations across development, focusing on brain regions implicated in reward-related learning and behavior in animal (Hikosaka & Watanabe 2000; Pecina et al. 2003; Schultz 2006) and adult imaging studies (e.g., Knutson et al. 2001; O'Doherty et al. 2001; Zald et al. 2004) and in studies of addiction (Hyman & Malenka 2001; Volkow & Li 2004). Based on rodent models (Laviola et al. 1999; Spear 2000) and previous imaging work (Ernst et al. 2005), we hypothesized that relative to children and adults, adolescents would show exaggerated responses to reward as indexed by elevated accumbens activity in concert with less mature recruitment of top-down prefrontal control regions.

Our findings were consistent with rodent models (Laviola et al. 2003) and previous imaging studies during adolescence (Ernst et al. 2005), which show enhanced accumbens activity to rewards. Adolescents, as compared to children and adults, showed an exaggerated accumbens response in anticipation of reward. However, both children and adolescents showed a less mature response in prefrontal control regions than adults. These findings suggest that there are different developmental trajectories for these regions. The enhancement in accumbens activity during adolescence may relate to the increase in impulsive and risky behaviors observed during this period of development (see FIG. 4).

In the second study, we examined the development of behavioral and neural responses in performance of an emotional go/no-go paradigm (Hare & Casey,



**FIGURE 4.** Magnitude and extent of accumbens and OFC activity to reward. Adolescents (13–17 years) showed greater percent signal change to large rewards than either children (aged 7–11 years) or adults (23–29 years) in the accumbens (**A**). Children had the greatest percent signal change in the OFC compared to adolescents and adults (**B**). Children had the greatest volume of activity in the accumbens relative to adolescents and adults (**C**). Children and adolescents showed greater volume of activity in the OFC than adults (**D**). Adapted from Galvan et al. (2006).

in press; Hare et al. 2005). During the experiment, participants were presented with two emotional facial expressions (fearful, neutral, or happy) and were asked to respond to one of the emotions (e.g., fear) and suppress their response to the other emotion (e.g., neutral). In the context of negative emotional information (fearful faces), reaction times improved with age but were longer when detecting fearful faces relative to a neutral or happy face. This slowing in reaction time was correlated with greater amygdala activity (Hare & Casey, in press). Activity in the orbital frontal cortex increased with age, and greater orbital frontal activity relative to amygdala was associated with more efficiency in suppressing emotional reactivity (longer reaction times and greater amygdala activity). These findings are in accordance with animal studies (Baxter et al. 2000) which show connectivity between the



**FIGURE 5.** Bilateral amygdala activation (left). Graph depicts amygdala activity in adults, teenagers, and children. Adapted from Hare et al. (in press).

amygdala and orbital frontal cortex are important for assessing changes in emotional value of an object and adapting behavior accordingly.

Differential recruitment of prefrontal and subcortical regions has been reported across a number of developmental fMRI studies (Casey et al. 2002; Monk et al. 2003; Thomas et al. 2004). These findings were typically interpreted in terms of immature prefrontal regions rather than as an imbalance between prefrontal and subcortical regional development. Given evidence of prefrontal regions in guiding appropriate actions in different contexts (Miller & Cohen 2001), immature prefrontal activity might hinder appropriate estimation of future outcomes, especially when making a decision within an emotional context (i.e., heat of the moment). This interpretation is consistent with previous research showing elevated subcortical, relative to cortical, activity when decisions are biased by immediate versus long-term gains (McClure et al. 2004). Further, fMRI studies have shown limbic subcortical activity positively correlates with suboptimal choice behaviors (Kuhnen & Knutson 2005).

In sum, during adolescence, relative to childhood or adulthood, an immature ventral prefrontal cortex may not provide sufficient top-down control of robustly activated reward and affect processing regions (e.g., accumbens and amygdala). This imbalance in development of these regions and relative top-down control results in less influence of prefrontal systems (orbitofrontal cortex) relative to the accumbens and amygdala in reward valuation and emotional reactivity.

## Why Would the Adolescent Brain Be Programmed This Way?

Adolescence can be described as a progressive transition from childhood into adulthood with an indefinable ontogenetic time course (Spear 2000) yet often co-occurring with puberty, which is defined by specific biological markers. The significant neuroendocrinological changes associated with puberty, such as increases in adrenal and gonadal hormones, are correlated with the development of secondary sexual characteristics and can influence brain function (for a review see Spear 2000). The onset and hormone fluctuations of puberty may provide an explanation for the observed functional differences in subcortical activity between children and adolescents, versus activity in the prefrontal region, which reflects a linear change with age.

From an evolutionary perspective, adolescence is the period in which independence skills are acquired in order to increase the success of separating from the protective influence of the family. It is also a period when there is an increase in the likelihood of harm such as injury, depression, anxiety, drug use, and addiction (Kelley et al. 2004). However, our neurobiological model suggests that risky behavior and emotional reactivity are the products of a biologically driven imbalance between increased novelty and positive sensation seeking in conjunction with immature "self-regulatory competence" (Steinberg 2004).

As previously mentioned, during adolescence, independence-seeking behaviors are prevalent across

species, such as increases in peer-directed social interactions and intensifications in novelty seeking and risk-taking behaviors. In other species such as rodents, nonhuman primates, and birds, behaviors like seeking out same-age peers and fighting with parents are also observed and may be important adaptive skills to remove the adolescent from the home territory in order to mate (Spear 2000). Relative to adults, periadolescent rats show increased novelty-seeking behaviors in a free-choice novelty paradigm (Laviola et al. 1999). Neurochemical evidence indicates that the balance in the adolescent brain between cortical and subcortical dopamine systems begins to shift toward greater cortical dopamine levels during adolescence (Spear 2000). And as previously described, in the nonhuman primate there is an increase in dopamine enervation of the prefrontal cortex into early adulthood (Rosenberg & Lewis 1995). Thus this elevated risk-taking behavior appears to occur across species and have important adaptive functions.

It is possible that this developmental pattern is an evolutionary feature. One needs to engage in high-risk behavior in order to leave the family and village to find a mate. This risk behavior occurs simultaneously with an increase in sexual hormones, resulting in adolescents seeking sexual partners and is seen in other species. In conjunction with this novelty-seeking behavior, there would need to be some mechanism for detecting cues of safety or danger. The increase in emotional reactivity during this period may allow adolescents to be more vigilant and aware of threat, to ensure their survival as they move from a safe environment to a novel one. In today's society when adolescence may extend indefinitely—with individuals well into their 20s living with their parents, remaining financially dependent, and choosing mates later in life—these behaviors may be deemed inappropriate.

## Biological Predispositions, Development, and Risky Behavior

The recognition of individual differences in impulse control and taking risks is not new in the field of psychology (Benthin et al. 1993). Perhaps one of the classic examples of individual differences in the social, cognitive, and developmental psychology literatures is delay of gratification (Mischel et al. 1989). Delay of gratification is typically assessed in 3- to 4-year-old toddlers. A toddler is seated in a room with two cookies and a bell. The child is then told that the experimenter will leave the room in order to prepare for upcoming activities and explains to the child that if she remains in her seat

and does not eat a cookie, she will receive the large reward (2 cookies). If the child cannot wait, she should ring a bell to summon the experimenter and thereby receive the smaller reward (1 cookie). Distractions in the room are minimized, with no toys, books, or pictures. The experimenter returns after 15 minutes or after the child has rung the bell, eaten the rewards, or shown any signs of distress. Mischel (1989) showed that children typically behave in one of two ways: 1) either they ring the bell almost immediately in order to have the cookie, which means they only get one; or 2) they wait and optimize their gains to receive both cookies. This observation suggests that some individuals are better than others in their ability to control impulses in the presence of highly salient incentives, and this bias can be detected in early childhood (Mischel et al. 1989). This differential in impulse control appears to remain throughout adolescence and young adulthood (Eigsti et al. 2006).

What might explain individual differences in decision making and behavior? Some theorists have postulated that the dopaminergic mesolimbic circuitry, implicated in reward processing, underlies risky behavior (Blum et al. 2000), and that individual differences in this circuitry might relate to the propensity to engage in risky behavior (O'Doherty 2004). A number of studies have shown increases in activity in the nucleus accumbens immediately prior to making risky choices on monetary-risk paradigms (Kuhnen & Knutson 2005; Matthews et al. 2004; Montague & Berns 2002), and as described previously, adolescents show exaggerated accumbens activity to rewarding outcomes relative to children or adults (Ernst et al. 2005; Galvan et al. 2006). Collectively, these data suggest that as a group adolescents may be more likely to engage in risky choices (Gardener & Steinberg 2005). However, some adolescents will be more prone than others to engage in risky behaviors, putting them at potentially greater risk for negative outcomes. Therefore it is important to consider individual variability when examining complex brain–behavior relationships related to risk taking and reward processing in developmental populations.

To explore individual differences in risk-taking behavior, Galvan and colleagues (2007) recently examined the association between activity in reward-related neural circuitry in anticipation of a large monetary reward with behavioral measures of risk taking and impulsivity in adolescence. Specifically, Galvan and colleagues used functional magnetic resonance imaging and anonymous self-report rating scales of risky behavior, risk perception, and impulsivity in individuals between the ages of 7 and 29 years (see FIG. 6). There was a positive association between accumbens



**FIGURE 6.** Activity in the nucleus accumbens in anticipation of reward **(A)**. Percent change in fMRI signal in the accumbens in anticipation of reward as a function of age **(B)**. The association between accumbens activity to reward and the likelihood of engaging in risky behavior in three age groups **(C)** (Adapted from Galvan et al. 2007).

activity and the likelihood of engaging in risky behavior across development. In other words, those individuals, who perceived risky behaviors as leading to dire consequences, activated the accumbens less to reward. Impulsivity ratings were not associated with accumbens activity, but rather with age, further dissociating impulse control from incentive-based risky behaviors. These findings suggest that during adolescence, some individuals have a predisposition to engage in risky behaviors due to developmental neural changes.

Adolescent behavior is repeatedly characterized as impulsive and risky, yet this review of the imaging literature suggests different neurobiological substrates and developmental trajectories for these two types of behavior. Specifically, impulsivity is associated with immature ventral prefrontal development and gradually diminishes from childhood to adulthood (Casey et al. 2005). The negative correlation between impulsivity ratings and age in the study by Galvan and colleagues (2007) further supports this notion. In contrast, risk taking is associated with an increase in accumbens activity (Kuhnen & Knutson 2005; Matthews et al. 2004; Montague & Berns 2002) that is exaggerated in adolescents, relative to both children and adults (Ernst et al. 2005; Galvan et al. 2006). Thus adolescent choices and behavior cannot be explained by impulsivity or protracted development of the prefrontal cortex alone, as children would then be predicted to be greater risk takers. The findings provide a neural basis for why some adolescents are at greater risk than others, but also demonstrate a basis for why adolescent risk-taking behavior in general is different from risk taking in children and adults.

## Adolescence, Individual Differences, and Affective Disorders

Adolescence is a time of greater emotional reactivity and a period when symptoms of many psychiatric disorders (e.g., schizophrenia, depression, anxiety) manifest. Normal adolescent development can be interpreted as the coordination of emotions and behavior in the social and intellectual environment, and the development of psychopathology during adolescence can be seen as resulting from a difficulty in balancing these factors (Steinberg 2005). We have previously described enhanced bottom-up emotional processing in subcortical regions relative to less effective top-down modulation in prefrontal regions to affective information during adolescence. It is possible that this imbalance may play a role in the increased risk for affective disorders during adolescence (Steinberg 2005). Clearly, not all adolescents develop psychopathology; there must be individual variability in emotional reactivity and the ability to modulate these behaviors. Individual differences may predispose a person to be at greater risk for poorer outcomes.

The amygdala has been implicated as a key neural region in emotional dysregulation in psychiatric disorders. This region is essential to learning the emotional significance of cues in the environment (see Maren & Quirk 2004 for review). In animal studies, amygdala lesions result in a reduction of fear behavior (Anglada-Figueroa & Quirk 2005; Davis & Whalen 2001; Kalin et al. 2004), and human neuroimaging studies have shown increases in activity in the amygdala to fearful stimuli in adults (Breiter et al. 1996; Morris et al. 1998) and in children (Thomas et al. 2001b). There is evidence for dysregulation of amygdala activity in anxious and depressed children (Thomas et al. 2001a) and adults (Leppanen 2006; Rauch et al. 2003; Thomas et al. 2001a).

In a recent study, we examined individual differences in anxiety levels as measured by the Spielberger State Trait Anxiety Index and neural responses to affective information in adolescents and adults during an emotional go/no-go task (Hare et al. in press). Adolescents showed greater initial amygdala activity than



**FIGURE 7.** Picture depicts left orbitofrontal activity. Graph illustrates correlation of activity in the OFC and in the amygdala in both adults and adolescents (adapted from Hare et al. in press).

adults, and sustained amygdala activity was correlated with trait anxiety. Increased activity in orbitofrontal regions correlated with a decrease in amygdala activity over time (i.e., repeated presentation of a fearful face, see Fig. 7), suggesting dampening of emotional reactivity due to top-down control from prefrontal regions. These findings are consistent with animal studies showing the importance of the orbitofrontal cortex (OFC) in extinction of fear conditioning in animals with repeated exposure to empty threat (Gallagher et al. 1999).

Our results are consistent with previous fMRI studies in clinically anxious adults and children that have shown unregulated amygdala activity to negative emotional information and less activity in the prefrontal cortex (McClure et al. 2007; Shin et al. 2004; Thomas et al. 2001b) in adolescents at risk for anxiety disorders (Perez-Edgar et al. 2007). Together these findings suggest that prefrontal regions serve to regulate emotional reactivity and that individual differences in emotion regulation may be due to an imbalance in activity between these regions that is exacerbated during adolescence.

## Conclusions

Human imaging studies show structural and functional changes in frontolimbic regions (Jernigan et al. 1991; Giedd et al. 1999; Giedd et al. 1996; Sowell et al. 1999; for review, Casey et al. 2005; Jernigan et al. 1991; Giedd et al. 1999; Giedd et al. 1996; Sowell et al. 1999) for review, (Casey et al. 2005) that seem to par-

allel increases in cognitive control and self-regulation (Casey et al. 1997; Luna & Sweeney 2004; Luna et al. 2001; Rubia et al. 2000; Steinberg 2004). These changes appear to show a shift in activation of prefrontal regions from diffuse to more focal recruitment over time (Brown et al. 2005; Bunge et al. 2002; Casey et al. 1997; Durston et al. 2006; Moses et al. 2002) and elevated recruitment of subcortical regions during adolescence (Casey et al. 2002; Durston et al. 2006; Luna et al. 2001). Although neuroimaging studies cannot definitively characterize the mechanism of such developmental changes, these changes in volume and structure may reflect development within, and refinement of, projections to and from these brain regions during maturation suggestive of fine tuning of the system with development.

We have discussed the importance of considering individual variability when examining complex brain–behavior relationships related to risk taking, reward processing, and emotional reactivity in developmental populations. Using an approach that looks at developmental trajectories, rather than snapshots in time, allows one to comprehensively study these behaviors during development and examine individual differences. It is not possible to fully explain the emergence of affective disorders or atypical development by simply examining one time point. Longitudinal studies across development would be the best methodology to address these issues.

Taken together, the findings synthesized here indicate that increased risk-taking behavior and greater emotional reactivity in adolescence are associated with different developmental trajectories of subcortical

limbic regions relative cortical control regions. These developmental changes can be exacerbated by individual differences (e.g., genetic risk) in baseline activity of limbic systems.

This model of development reconciles a number of contradictions and myths about adolescence. First, there have been many reports that suggest that adolescent behavior is due to protracted development of prefrontal cortex. However, if this were the case, then children would engage in similar or worse behavior than adolescents. The National Center for Health Statistics on adolescent behavior and mortality shows that suboptimal choices and actions observed during adolescence represent a nonlinear change in behavior, distinct from childhood and adulthood. Adolescents, unlike children, may be in situations (e.g., driving a car) that may put them at greater risk for mortality, but even when taking these conditions into account, there is still a significant elevation of risky behavior in adolescents in comparison to children. Furthermore, experimental studies have shown that when risk is held constant, such as in the appraisal of risky vignettes, children perceive greater risk in hypothetical scenarios than do adolescents (reviewed in Furby & Beyth-Marom 1992). Our neurodevelopmental model provides an explanation for these nonlinear changes in behavior.

Reyna and Farley (2006) have reconciled the second myth by showing that adolescents are able to reason and understand risks of behaviors in which they engage and do not consider themselves invincible. Prior research has also shown that adolescents knowingly engage in risky behavior, and this is often due to influences of feelings, emotions, and peers (Gardener & Steinberg 2005; Steinberg 2004, 2005). The observation that adolescents know that they are engaging in risky behavior is not supported by the sole explanation of a less developed prefrontal cortex. In this context, our model suggests that the adolescent is capable of making rational decisions, but in emotionally charged situations the more mature limbic system will win over the prefrontal control system.

When faced with an immediate personal decision, adolescents will rely less on intellectual capabilities and more on feelings. Nevertheless, when reasoning about a hypothetical, moral dilemma, the adolescent will rely more on logical information (Steinberg 2005). In other words, when a poor decision is made in the heat of the moment, the adolescent may know better, but the salience of the emotional context biases his or her behavior in opposite direction of the optimal action. This work coincides with studies of social cognition showing that adolescents make more rational decisions about hypothetical scenarios versus real-life situations (Sobesky 1983). The environmental context and emotional significance of the decision greatly influence the adolescent (Steinberg 2005).

Our findings and model have significant implications for heated debates on public policy and the treatment of minors in our judicial system. Adolescents show adult levels of intellectual capability earlier than they show evidence of adult levels of impulse control (Reyna & Farley 2006). As such, adolescents may be capable of making informed choices about their future (e.g., terminating a pregnancy) but do not yet have full capacity to override impulses in emotionally charged situations that require decisions in the heat of the moment. Unfortunately, judges, politicians, advocates, and journalists are biased toward drawing a single line between adolescence and adulthood for different purposes under the law that is at odds with developmental cognitive neuroscience (Steinberg et al. in press). Our neurodevelopmental model of adolescence will hopefully help to make strides in moving this single line to multiple lines that consider developmental changes across both context (emotionally charged or not) and time (in the moment or in the future).

## Acknowledgments

This work was supported in part by grants from the National Institute of Drug Abuse R01 DA18879 and the National Institute of Mental Health R01 MH73175 and P50 MH62196 to BJC.

## Conflict of Interests

The authors declare no conflicts of interest.

## References

Adriani, W., Chiarotti, F., & Laviola, G. (1998). Elevated novelty seeking and peculiar d-amphetamine sensitization in peri-adolescent mice compared with adult mice. *Behav. Neurosci, 112*(5), 1152–1166.

Andersen, S. L., & Teicher, M. H. (2004). Delayed effects of early stress on hippocampal development. *Neuropsychopharmacology, 29*(11), 1988–1993.

Andersen, S. L., Thompson, A. T., Rutstein, M., Hostetter, J. C., & Teicher, M. H. (2000). Dopamine receptor pruning in prefrontal cortex during the periadolescent period in rats. *Synapse, 37*(2), 167–169.

Anglada-Figueroa, D., & Quirk, G. J. (2005). Lesions of the basal amygdala block expression of conditioned fear but not extinction. *J. Neurosci, 25*(42), 9680–9685.

Baird, A. A., Gruber, S. A., Fein, D. A., Maas, L. C., Steingard, R. J., Renshaw, P. F., et al. (1999). Functional magnetic

resonance imaging of facial affect recognition in children and adolescents. *J Am Acad Child Adolesc Psychiatry*, 38(2), 195–199.

Baxter, M. G., Parker, A., Lindner, C. C., Izquierdo, A. D., & Murray, E. A. (2000). Control of response selection by reinforcer value requires interaction of amygdala and orbital prefrontal cortex. *J Neurosci*, 20(11), 4311–4319.

Benthin, A., Slovic, P., & Severson, H. (1993). A psychometric study of adolescent risk perception. *J Adolesc*, 16(2), 153–168.

Bjork, J. M., Smith, A. R., Danube, C. L., & Hommer, D. W. (2007). Developmental differences in posterior mesofrontal cortex recruitment by risky rewards. *J Neurosci*, 27(18), 4839–4849.

Bjorklund, D. F. (1985). The role of conceptual knowledge in the development of organization in children's memory. In C. J. Brainerd & M. Pressley (Eds.), *Basic Processes in Memory Development: Progress in Cognitive Development Research* (pp. 103–142). New York: Springer-Verlag.

Bjorklund, D. F. (1987). How age changes in knowledge base contribute to the development of children's memory: An interpretive review. *Developmental Review*, 7, 93–130.

Blum, K., Braverman, E. R., Holder, J. M., Lubar, J. F., Monastra, V. J., Miller, D., et al. (2000). Reward deficiency syndrome: a biogenetic model for the diagnosis and treatment of impulsive, addictive, and compulsive behaviors. *J Psychoactive Drugs*, 32 Suppl, i-iv, 1–112.

Bogin, B. (1994). Adolescence in evolutionary perspective. *Acta Paediatr Suppl*, 406, 29–35; discussion 36.

Bourgeois, J. P., Goldman-Rakic, P. S., & Rakic, P. (1994). Synaptogenesis in the prefrontal cortex of rhesus monkeys. *Cereb Cortex*, 4(1), 78–96.

Brainerd, C. J., & Reyna, V. F. (1993). Memory independence and memory interference in cognitive development. *Psychol Rev*, 100(1), 42–67.

Breiter, H. C., Etcoff, N. L., Whalen, P. J., Kennedy, W. A., Rauch, S. L., Buckner, R. L., et al. (1996). Response and habituation of the human amygdala during visual processing of facial expression. *Neuron*, 17(5), 875–887.

Brown, T. T., Lugar, H. M., Coalson, R. S., Miezin, F. M., Petersen, S. E., & Schlaggar, B. L. (2005). Developmental changes in human cerebral functional organization for word generation. *Cereb Cortex*, 15(3), 275–290.

Bunge, S. A., Dudukovic, N. M., Thomason, M. E., Vaidya, C. J., & Gabrieli, J. D. (2002). Immature frontal lobe contributions to cognitive control in children: evidence from fMRI. *Neuron*, 33(2), 301–311.

Cascio, C. J., Gerig, G., & Piven, J. (2007). Diffusion tensor imaging: Application to the study of the developing brain. *J Am Acad Child Adolesc Psychiatry*, 46(2), 213–223.

Case, R. (1972). Balidation of a neo-Piagetian capacity construct. *Journal of Experimental Child Psychology*, 14, 287–302.

Case, R. (1985). *Intellectual Development Birth to Adulthood*. New York: Academic Press.

Casey, B. J., Castellanos, F. X., Giedd, J. N., Marsh, W. L., Hamburger, S. D., Schubert, A. B., et al. (1997a). Implication of right frontostriatal circuitry in response inhibition and attention-deficit/hyperactivity disorder. *J Am Acad Child Adolesc Psychiatry*, 36(3), 374–383.

Casey, B. J., Galvan, A., & Hare, T. A. (2005a). Changes in cerebral functional organization during cognitive development. *Curr Opin Neurobiol*, 15(2), 239–244.

Casey, B., Getz, S., & Galvan, A. (in press). *Developmental Review*.

Casey, B. J., Giedd, J. N., & Thomas, K. M. (2000a). Structural and functional brain development and its relation to cognitive development. *Biol Psychol*, 54(1–3), 241–257.

Casey, B. J., Thomas, K. M., Davidson, M. C., Kunz, K., & Franzen, P. L. (2002a). Dissociating striatal and hippocampal function developmentally with a stimulus-response compatibility task. *J Neurosci*, 22(19), 8647–8652.

Casey, B. J., Thomas, K. M., Welsh, T. F., Badgaiyan, R. D., Eccard, C. H., Jennings, J. R., et al. (2000b). Dissociation of response conflict, attentional selection, and expectancy with functional magnetic resonance imaging. *Proc Natl Acad Sci, USA*, 97(18), 8728–8733.

Casey, B. J., Tottenham, N., & Fossella, J. (2002b). Clinical, imaging, lesion, and genetic approaches toward a model of cognitive control. *Dev Psychobiol*, 40(3), 237–254.

Casey, B. J., Tottenham, N., Liston, C., & Durston, S. (2005b). Imaging the developing brain: what have we learned about cognitive development? *Trends in Cognitive Science*, 9(3), 104–110.

Casey, B. J., Trainor, R. J., Orendi, J. L., Schubert, A. B., Nystrom, L. E., Giedd, J. N., et al. (1997b). A developmental functional MRI study of prefrontal activation during performance of a go-no-go task. *Journal of Cognitive Neuroscience*, 9, 835–847.

Caviness, V., Kennedy, D., Richelme, C., Rademacher, J., & Filipek, P. (1996). The human brain age 7–11 years: a volumetric analysis based on magnetic resonance images. *Cereb Cortex*, 6(5), 726–736.

Crews, F., He, J., & Hodge, C. (2007). Adolescent cortical development: a critical period of vulnerability for addiction. *Pharmacol Biochem Behav*, 86(2), 189–199.

Csikszentmihalyi, M., Larson, R., & Prescott, S. (1977). The ecology of adolescent activity and experience. *Journal of Youth and Adolescence*, 6, 281–294.

Cunningham, M. G., Bhattacharyya, S., & Benes, F. M. (2002). Amygdalo-cortical sprouting continues into early adulthood: implications for the development of normal and abnormal function during adolescence. *J Comp Neurol*, 453(2), 116–130.

Davis, M., & Whalen, P. J. (2001). The amygdala: vigilance and emotion. *Mol Psychiatry*, 6(1), 13–34.

Dempster, F. N. (Ed.) (1993). *Resistance to Interference: Developmental Changes in a Basic Processing Mechanism*. (Vol. 1). New York: Springer-Verlag.

Diamond, A. (1985). Development of the ability to use recall to guide action, as indicated by infants' performance on AB. *Child Development*, 56, 868–883.

Durston, S., Davidson, M. C., Thomas, K. M., Worden, M. S., Tottenham, N., Martinez, A., et al. (2003). Parametric manipulation of conflict and response competition using rapid mixed-trial event-related fMRI. *Neuroimage*, 20(4), 2135–2141.

Durston, S., Davidson, M. C., Tottenham, N., Galvan, A., Spicer, J., Fossella, J. A., et al. (2006). A shift from diffuse to focal cortical activity with development. *Dev Sci*, 9(1), 1–8.

Durston, S., Hulshoff, H. E., Casey, B. J., Giedd, J. N., Buitelaar, J. K., & Van Engeland, H. (2001). Anatomical MRI of the developing human brain: What have we learned? *J Am Acad Child Adolesc Psychiatry*, *40*(9), 1012–1020.

Eaton, L. K., Kinchen, S., Ross, J., Hawkins, J., Harris, W. A., Lowry, R., et al. (2006). Youth risk behavior surveillance-United States, 2005, surveillance summaries. *Morbidity and Mortality Weekly Report*, *55*(SS-5), 1–108.

Eigsti, I. M., Zayas, V., Mischel, W., Shoda, Y., Ayduk, O., Dadlani, M. B., et al. (2006). Predicting cognitive control from preschool to late adolescence and young adulthood. *Psychol Sci*, *17*(6), 478–484.

Ernst, M., Nelson, E. E., Jazbec, S., McClure, E. B., Monk, C. S., Leibenluft, E., et al. (2005). Amygdala and nucleus accumbens in responses to receipt and omission of gains in adults and adolescents. *Neuroimage*, *25*(4), 1279–1291.

Ernst, M., Pine, D. S., & Hardin, M. (2006). Triadic model of the neurobiology of motivated behavior in adolescence. *Psychol Med*, *36*(3), 299–312.

Eshel, N., Nelson, E. E., Blair, R. J., Pine, D. S., & Ernst, M. (2007). Neural substrates of choice selection in adults and adolescents: development of the ventrolateral prefrontal and anterior cingulate cortices. *Neuropsychologia*, *45*(6), 1270–1279.

Flavell, J. H., Feach, D. R., & Chinsky, J. M. (1966). Spontaneous verbal rehearsal in a memory task as a function of age. *Child Development*, *37*, 283–299.

Floresco, S. B., & Tse, M. T. (2007). Dopaminergic regulation of inhibitory and excitatory transmission in the basolateral amygdala-prefrontal cortical pathway. *J Neurosci*, *27*(8), 2045–2057.

Furby, L., & Beyth-Marom, R. (1992). Risk taking in adolescence: A decision-making perspective. *Developmental Review*, *12*(1), 1–44.

Gallagher, M., McMahan, R. W., & Schoenbaum, G. (1999). Orbitofrontal cortex and representation of incentive value in associative learning. *J Neurosci*, *19*(15), 6610–6614.

Galvan, A., Hare, T., Voss, H., Glover, G., & Casey, B. J. (2007). Risk-taking and the adolescent brain: who is at risk? *Dev Sci*, *10*(2), F8–F14.

Galvan, A., Hare, T. A., Parra, C. E., Penn, J., Voss, H., Glover, G., et al. (2006). Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents. *J Neurosci*, *26*(25), 6885–6892.

Gardener, M., & Steinberg, L. (2005). Peer influence on risk taking, risk preference, and risky decision making in adolescence and adulthood: an experimental study. *Developmental Psychology*, *41*, 625–635.

Giedd, J. N. (2004). Structural magnetic resonance imaging of the adolescent brain. *Ann N Y Acad Sci*, *1021*, 77–85.

Giedd, J. N., Blumenthal, J., Jeffries, N. O., Castellanos, F. X., Liu, H., Zijdenbos, A., et al. (1999). Brain development during childhood and adolescence: a longitudinal MRI study. *Nat Neurosci*, *2*(10), 861–863.

Giedd, J. N., Snell, J. W., Lange, N., Rajapakse, J. C., Casey, B. J., Kaysen, D., et al. (1996). Quantitative magnetic resonance imaging of human brain development: ages 4–18. *Cereb Cortex*, *6*, 551–560.

Gogtay, N., Giedd, J. N., Lusk, L., Hayashi, K. M., Greenstein, D., Vaituzis, A. C., et al. (2004). Dynamic mapping of human cortical development during childhood through early adulthood. *Proc Natl Acad Sci U S A*, *101*(21), 8174–8179.

Grace, A. A., Floresco, S. B., Goto, Y., & Lodge, D. J. (2007). Regulation of firing of dopaminergic neurons and control of goal-directed behaviors. *Trends Neurosci*, *30*(5), 220–227.

Hare, T., & Casey, B. (in press). *Biological Psychiatry*.

Hare, T. A., & Casey, B. J. (2005). The neurobiology and development of cognitive and affective control. *Cognition, Brain, Behavior*, *9*(3), 273–286.

Hare, T. A., Tottenham, N., Davidson, M. C., Glover, G. H., & Casey, B. J. (2005). Contributions of amygdala and striatal activity in emotion regulation. *Biol Psychiatry*, *57*(6), 624–632.

Hare, T. A., Tottenham, N., Voss, H. U., Glover, G. H., & Casey, B. J. (in press). The adolescent brain and potential risk for anxiety and depression. *Biological Psychiatry*.

Harnishfeger, K. K., & Bjorkland, F. (1993). The ontogeny of inhibition mechanisms: A renewed approach to cognitive development. In M. L. Howe & R. Pasnck (Eds.), *Emerging Themes in Cognitive Development* (Vol. 1, pp. 28–49). New York: Springer-Verlag.

Hikosaka, K., & Watanabe, M. (2000). Delay activity of orbital and lateral prefrontal neurons of the monkey varying with different rewards. *Cereb Cortex*, *10*(3), 263–271.

Huttenlocher, P. R. (1979). Synaptic density in human frontal cortex - developmental changes and effects of aging. *Brain Res*, *163*(2), 195–205.

Hyman, S. E., & Malenka, R. C. (2001). Addiction and the brain: the neurobiology of compulsion and its persistence. *Nat Rev Neurosci*, *2*(10), 695–703.

Jackson, M. E., Frost, A. S., & Moghaddam, B. (2001). Stimulation of prefrontal cortex at physiologically relevant frequencies inhibits dopamine release in the nucleus accumbens. *J Neurochem*, *78*(4), 920–923.

Jernigan, T. L., Zisook, S., Heaton, R. K., Moranville, J. T., Hesselink, J. R., & Braff, D. L. (1991). Magnetic resonance imaging abnormalities in lenticular nuclei and cerebral cortex in schizophrenia. *Arch Gen Psychiatry*, *48*, 881–890.

Kalin, N. H., Shelton, S. E., & Davidson, R. J. (2004). The role of the central nucleus of the amygdala in mediating fear and anxiety in the primate. *J Neurosci*, *24*(24), 5506–5515.

Kalsbeek, A., Voorn, P., Buijs, R. M., Pool, C. W., & Uylings, H. B. (1988). Development of the dopaminergic innervation in the prefrontal cortex of the rat. *J Comp Neurol*, *269*(1), 58–72.

Keating, D. P., & Bobbitt, B. L. (1978). Individual and developmental differences in cognitive processing components of mental ability. *Child Development*, *49*, 155–167.

Kelley, A. E., Schochet, T., & Landry, C. F. (2004). Risk taking and novelty seeking in adolescence: introduction to part I. *Ann N Y Acad Sci*, *1021*, 27–32.

Killgore, W. D., Oki, M., & Yurgelun-Todd, D. A. (2001). Sex-specific developmental changes in amygdala responses to affective faces. *Neuroreport*, *12*(2), 427–433.

Knutson, B., Adams, C. M., Fong, G. W., & Hommer, D. (2001). Anticipation of increasing monetary reward selectively recruits nucleus accumbens. *J Neurosci, 21*(16), RC159.

Kuhnen, C. M., & Knutson, B. (2005). The neural basis of financial risk taking. *Neuron, 47*(5), 763–770.

Laviola, G., Adriani, W., Terranova, M. L., & Gerra, G. (1999). Psychobiological risk factors for vulnerability to psychostimulants in human adolescents and animal models. *Neurosci Biobehav Rev, 23*(7), 993–1010.

Laviola, G., Macri, S., Morley-Fletcher, S., & Adriani, W. (2003). Risk-taking behavior in adolescent mice: psychobiological determinants and early epigenetic influence. *Neurosci Biobehav Rev, 27*(1–2), 19–31.

Lenroot, R. K., & Giedd, J. N. (2006). Brain development in children and adolescents: insights from anatomical magnetic resonance imaging. *Neurosci Biobehav Rev, 30*(6), 718–729.

Leppanen, J. M. (2006). Emotional information processing in mood disorders: a review of behavioral and neuroimaging findings. *Curr Opin Psychiatry, 19*(1), 34–39.

Liston, C., Watts, R., Tottenham, N., Davidson, M. C., Niogi, S., Ulug, A. M., et al. (2006). Frontostriatal microstructure modulates efficient recruitment of cognitive control. *Cereb Cortex, 16*(4), 553–560.

Luna, B., & Sweeney, J. A. (2004). The emergence of collaborative brain function: FMRI studies of the development of response inhibition. *Ann N Y Acad Sci, 1021*, 296–309.

Luna, B., Thulborn, K. R., Munoz, D. P., Merriam, E. P., Garver, K. E., Minshew, N. J., et al. (2001). Maturation of widely distributed brain function subserves cognitive development. *Neuroimage, 13*(5), 786–793.

Maren, S., & Quirk, G. J. (2004). Neuronal signalling of fear memory. *Nat Rev Neurosci, 5*(11), 844–852.

Matthews, S. C., Simmons, A. N., Lane, S. D., & Paulus, M. P. (2004). Selective activation of the nucleus accumbens during risk-taking decision making. *Neuroreport, 15*(13), 2123–2127.

May, J. C., Delgado, M. R., Dahl, R. E., Stenger, V. A., Ryan, N. D., Fiez, J. A., et al. (2004). Event-related functional magnetic resonance imaging of reward-related brain circuitry in children and adolescents. *Biol Psychiatry, 55*(4), 359–366.

McClure, E. B., Monk, C. S., Nelson, E. E., Parrish, J. M., Adler, A., Blair, R. J., et al. (2007). Abnormal attention modulation of fear circuit function in pediatric generalized anxiety disorder. *Arch Gen Psychiatry, 64*(1), 97–106.

McClure, S. M., Laibson, D. I., Loewenstein, G., & Cohen, J. D. (2004). Separate neural systems value immediate and delayed monetary rewards. *Science, 306*(5695), 503–507.

Miller, E. K., & Cohen, J. D. (2001). An integrative theory of prefrontal cortex function. *Annu Rev Neurosci, 24*, 167–202.

Mischel, W., Shoda, Y., & Rodriguez, M. I. (1989). Delay of gratification in children. *Science, 244*(4907), 933–938.

Monk, C. S., McClure, E. B., Nelson, E. E., Zarahn, E., Bilder, R. M., Leibenluft, E., et al. (2003). Adolescent immaturity in attention-related brain engagement to emotional facial expressions. *Neuroimage, 20*(1), 420–428.

Montague, P. R., & Berns, G. S. (2002). Neural economics and the biological substrates of valuation. *Neuron, 36*(2), 265–284.

Morris, J. S., Friston, K. J., Buchel, C., Frith, C. D., Young, A. W., Calder, A. J., et al. (1998). A neuromodulatory role for the human amygdala in processing emotional facial expressions. *Brain, 121*(Pt 1), 47–57.

Moses, P., Roe, K., Buxton, R. B., Wong, E. C., Frank, L. R., & Stiles, J. (2002). Functional MRI of global and local processing in children. *Neuroimage, 16*(2), 415–424.

Munakata, Y., & Yerys, B. E. (2001). All together now: when dissociations between knowledge and action disappear. *Psychol Sci, 12*(4), 335–337.

Nagy, Z., Westerberg, H., & Klingberg, T. (2004). Maturation of white matter is associated with the development of cognitive functions during childhood. *J Cogn Neurosci, 16*(7), 1227–1233.

O'Doherty, J., Kringelbach, M. L., Rolls, E. T., Hornak, J., & Andrews, C. (2001). Abstract reward and punishment representations in the human orbitofrontal cortex. *Nat Neurosci, 4*(1), 95–102.

O'Doherty, J. P. (2004). Reward representations and reward-related learning in the human brain: insights from neuroimaging. *Curr Opin Neurobiol, 14*(6), 769–776.

Pascual-Leone, J. A. (1970). A mathematical model for transition in Piaget's developmental stages. *Acta Psychologica, 32*, 301–345.

Pecina, S., Cagniard, B., Berridge, K. C., Aldridge, J. W., & Zhuang, X. (2003). Hyperdopaminergic mutant mice have higher "wanting" but not "liking" for sweet rewards. *J Neurosci, 23*(28), 9395–9402.

Perez-Edgar, K., Roberson-Nay, R., Hardin, M. G., Poeth, K., Guyer, A. E., Nelson, E. E., et al. (2007). Attention alters neural responses to evocative faces in behaviorally inhibited adolescents. *Neuroimage, 35*(4), 1538–1546.

Pine, D. S., Cohen, P., & Brook, J. S. (2001). Emotional reactivity and risk for psychopathology among adolescents. *CNS Spectr, 6*(1), 27–35.

Primus, R. J., & Kellogg, C. K. (1989). Pubertal-related changes influence the development of environment-related social interaction in the male rat. *Dev Psychobiol, 22*(6), 633–643.

Rauch, S. L., Shin, L. M., & Wright, C. I. (2003). Neuroimaging studies of amygdala function in anxiety disorders. *Ann N Y Acad Sci, 985*, 389–410.

Reiss, A., Abrams, M., Singer, H., Ross, J., & Denckla, M. (1996). Brain development, gender and IQ in children. A volumetric imaging study. *Brain, 119*, 1763–1774.

Reyna, V., & Farley, F. (2006). Risk and rationality in adolescent decision making: implications for theory, practice, and public policy. *Psychological Science in the Public Interest, 7*(1), 1–44.

Rosenberg, D. R., & Lewis, D. A. (1994). Changes in the dopaminergic innervation of monkey prefrontal cortex during late postnatal development: a tyrosine hydroxylase immunohistochemical study. *Biol Psychiatry, 36*(4), 272–277.

Rosenberg, D. R., & Lewis, D. A. (1995). Postnatal maturation of the dopaminergic innervation of monkey prefrontal and motor cortices: a tyrosine hydroxylase immunohistochemical analysis. *J Comp Neurol, 358*(3), 383–400.

Rubia, K., Overmeyer, S., Taylor, E., Brammer, M., Williams, S. C., Simmons, A., et al. (2000). Functional frontalisation

with age: mapping neurodevelopmental trajectories with fMRI. *Neurosci Biobehav Rev, 24*(1), 13–19.

Rubia, K., Smith, A. B., Woolley, J., Nosarti, C., Heyman, I., Taylor, E., et al. (2006). Progressive increase of frontostriatal brain activation from childhood to adulthood during event-related tasks of cognitive control. *Hum Brain Mapp, 27*(12), 973–993.

Schlaggar, B. L., Brown, T. T., Lugar, H. M., Visscher, K. M., Miezin, F. M., & Petersen, S. E. (2002). Functional neuroanatomical differences between adults and school-age children in the processing of single words. *Science, 296*(5572), 1476–1479.

Schultz, W. (2006). Behavioral theories and the neurophysiology of reward. *Annual Reviews of Psychology, 57*, 87–115.

Shin, L. M., Orr, S. P., Carson, M. A., Rauch, S. L., Macklin, M. L., Lasko, N. B., et al. (2004). Regional cerebral blood flow in the amygdala and medial prefrontal cortex during traumatic imagery in male and female Vietnam veterans with PTSD. *Arch Gen Psychiatry, 61*(2), 168–176.

Silveri, M. M., Tzilos, G. K., Pimentel, P. J., & Yurgelun-Todd, D. A. (2004). Trajectories of adolescent emotional and cognitive development: effects of sex and risk for drug use. *Ann N Y Acad Sci, 1021*, 363–370.

Sobesky, W. (1983). The effects of situational factors on moral judgements. *Child Development, 54*, 575–584.

Sowell, E. R., Peterson, B. S., Thompson, P. M., Welcome, S. E., Henkenius, A. L., & Toga, A. W. (2003). Mapping cortical change across the human life span. *Nat Neurosci, 6*(3), 309–315.

Sowell, E. R., Thompson, P. M., Holmes, C. J., Jernigan, T. L., & Toga, A. W. (1999). In vivo evidence for post-adolescent brain maturation in frontal and striatal regions. *Nat Neurosci, 2*(10), 859–861.

Sowell, E. R., Thompson, P. M., & Toga, A. W. (2004). Mapping changes in the human cortex throughout the span of life. *Neuroscientist, 10*(4), 372–392.

Spear, L. P. (2000). The adolescent brain and age-related behavioral manifestations. *Neurosci Biobehav Rev, 24*(4), 417–463.

Steinberg, L. (1989). Pubertal maturation and parent-adolescent distance: an evolutionary perspective. In G. Adams, R. Montemayor & T. Gullotta (Eds.), *Advances in Adolescent Behavior and Development* (pp. 71–97). Newbury Park, CA: Sage Publications.

Steinberg, L. (2004). Risk taking in adolescence: what changes, and why? *Ann N Y Acad Sci, 1021*, 51–58.

Steinberg, L. (2005). Cognitive and affective development in adolescence. *Trends Cogn Sci, 9*(2), 69–74.

Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (in press). Are adolescents less mature than adults? Minors' access to abortion, the juvenile death penalty, and the alleged APA "Flip-Flop".

Tamm, L., Menon, V., & Reiss, A. L. (2002). Maturation of brain function associated with response inhibition. *J Am Acad Child Adolesc Psychiatry, 41*(10), 1231–1238.

Tarazi, F. I., Tomasini, E. C., & Baldessarini, R. J. (1998). Postnatal development of dopamine and serotonin transporters in rat caudate-putamen and nucleus accumbens septi. *Neurosci Lett, 254*(1), 21–24.

Teicher, M. H., Andersen, S. L., & Hostetter, J. C., Jr. (1995). Evidence for dopamine receptor pruning between adolescence and adulthood in striatum but not nucleus accumbens. *Brain Res Dev Brain Res, 89*(2), 167–172.

Thomas, K. M., Drevets, W. C., Dahl, R. E., Ryan, N. D., Birmaher, B., Eccard, C. H., et al. (2001a). Amygdala response to fearful faces in anxious and depressed children. *Arch Gen Psychiatry, 58*(11), 1057–1063.

Thomas, K. M., Drevets, W. C., Whalen, P. J., Eccard, C. H., Dahl, R. E., Ryan, N. D., et al. (2001b). Amygdala response to facial expressions in children and adults. *Biol Psychiatry, 49*(4), 309–316.

Thomas, K. M., Hunt, R. H., Vizueta, N., Sommer, T., Durston, S., Yang, Y., et al. (2004). Evidence of developmental differences in implicit sequence learning: an FMRI study of children and adults. *J Cogn Neurosci, 16*(8), 1339–1351.

Turkeltaub, P. E., Gareau, L., Flowers, D. L., Zeffiro, T. A., & Eden, G. F. (2003). Development of neural mechanisms for reading. *Nat Neurosci, 6*(7), 767–773.

Volkow, N. D., & Li, T. K. (2004). Drug addiction: the neurobiology of behaviour gone awry. *Nat Rev Neurosci, 5*(12), 963–970.

Yurgelun-Todd, D. (2007). Emotional and cognitive changes during adolescence. *Curr Opin Neurobiol, 17*(2), 251–257.

Yurgelun-Todd, D. A., & Killgore, W. D. (2006). Fear-related activity in the prefrontal cortex increases with age during adolescence: a preliminary fMRI study. *Neurosci Lett, 406*(3), 194–199.

Zald, D. H., Boileau, I., El-Dearedy, W., Gunn, R., McGlone, F., Dichter, G. S., et al. (2004). Dopamine transmission in the human striatum during monetary reward tasks. *J Neurosci, 24*(17), 4105–4112.

Zehr, J. L., Todd, B. J., Schulz, K. M., McCarthy, M. M., & Sisk, C. L. (2006). Dendritic pruning of the medial amygdala during pubertal development of the male Syrian hamster. *J Neurobiol, 66*(6), 578–590.

# EXHIBIT D

# NIH Public Access
## Author Manuscript
*Dev Neurobiol.* Author manuscript; available in PMC 2009 December 4.

Published in final edited form as:
*Dev Neurobiol.* 2008 May ; 68(6): 729–743. doi:10.1002/dneu.20615.

# The adolescent brain: Insights from functional neuroimaging research

**M. Ernst and S.C. Mueller**
Emotional Development and Affective Neuroscience Branch, National Institute of Mental Health, National Institutes of Health, USA

## Abstract

With the development of functional neuroimaging tools, the past two decades have witnessed an explosion of work examining functional brain maps, mostly in the adult brain. Against this backdrop of work in adults, developmental research begins to gather a substantial body of knowledge about brain maturation. The purpose of this review is to present some of these findings from the perspective of functional neuroimaging. First, a brief survey of available neuroimaging techniques (i.e., fMRI, MRS, MEG, PET, SPECT, and infrared techniques) is provided. Next, the key cognitive, emotional, and social changes taking place during adolescence are outlined. The third section gives examples of how these behavioral changes can be understood from a neuroscience perspective. The conclusion places this functional neuroimaging research in relation to clinical and molecular work, and shows how answers will ultimately come from the combined efforts of these disciplines.

## Introduction

The study of *human* brain development across the lifespan has now become feasible with the advent of functional neuroimaging tools. The past two decades have witnessed an explosion of work examining functional brain maps, mostly of the adult brain. This experience has brought expertise and experimental standards in the methodology and interpretation of findings, paving the way for developmental brain research.

A number of functional neuroimaging tools, including electromagnetic (fMRI, MRS, MEG), and nuclear medicine (PET, SPECT), and infrared techniques are available. These techniques offer different advantages and limitations. The choice of the imaging modality mostly depends on the scientific question, and, of course, on the availability of the equipment at the research facility. A major limitation in the use of nuclear medicine techniques in the healthy pediatric population concerns radiation exposure. For this reason, most of the developmental work comes from fMRI research. However, imaging children poses unique challenges, relatively to those associated with research in adults. First, children tend to be more anxious in unfamiliar medical environments. Second, they have more difficulty remaining still in the scanner (Thomas et al., 1999; Poldrack et al., 2002). Both issues can be minimized with practice in a mock scanner, which familiarizes children with the environment, and helps them learn how to remain immobile (Rosenberg et al., 1997). In addition, the use of head restraint systems or motion training paired with feedback systems in the mock scanner have shown promising findings on motion artifacts (Slifer et al., 1993; Temple et al., 2001). A third issue concerns the validity of applying data acquisition algorithms and analytic tools used in adults to the

Address for Correspondence: Monique Ernst, M.D., Ph.D., 15K North Drive, SDAN, NIMH, NIH, Bethesda, MD, 20892, USA, ernstm@mail.nih.gov.
Invited contribution to special edition entitled "Dynamic imaging of the developing nervous system" (J. Glover, Ed.)

This material may be protected by Copyright law (Title 17 U.S. Code)

pediatric population. While not significant in adolescents, this concern becomes substantial in younger children, particularly those younger than 6 years of age (Muzik et al., 2000). The main reasons are the age-related changes in brain sizes overall and individual structure sizes (Tien et al., 1992; Giedd et al., 1996; Paus et al., 1999; Durston et al., 2001; Giedd, 2004; Gogtay et al., 2004), and water content (Sakuma et al., 1991; Nomura et al., 1994), which is the basic substrate of the MRI signal (Paus et al., 2001). Adjustment in scanning parameters for data acquisition (Saunders et al., 2007), and use of age-appropriate structural brains for group analyses (Muzik et al., 2000) become critical. Much work needs to be done in this area. These issues, in addition to the status of vulnerable population as a whole, explain the scarcity of studies in this age group.

Here, we will first provide an overview of the functional neuroimaging techniques that have contributed to an understanding of brain development. This section will be followed by a review of the key cognitive, emotional, and social changes taking place during adolescence. The third section will give examples of how these behavioral changes can be understood from a neuroscience perspective. We will conclude by placing this research in relation to clinical and molecular work, and show how answers will ultimately come from the combined efforts of these disciplines.

Of note, this review is focused on *functional* neuroimaging research, and *structural* neuroimaging techniques and studies will not be addressed specifically.

## Functional neuroimaging techniques

Comprehensive reviews of the functional neuroimaging techniques can be found in the volume, "Functional Neuroimaging in Child Psychiatry" (Ernst, and Rumsey, 2000) and its upcoming new edition "Neuroimaging in Developmental Clinical Neuroscience" (Rumsey and Ernst, in press). In brief, these techniques fall into two categories, those which utilize magnetic fields (functional magnetic resonance imaging [fMRI], magnetic resonance spectroscopy [MRS], and magnetoencephalography [MEG]) and those which use ionizing radiation (positron emission tomography [PET] and single photon emission computed tomography [SPECT]).

The physics underlying these two technologies are fundamentally different. PET and SPECT measure radioactive counts in the brain that accumulate over a certain amount of time (Herscovitch and Ernst, 2000), and MR measures distortions in electromagnetic fields proportional to changes in the concentration of deoxyhemoglobin (Blood Oxygen Level Dependent signal [BOLD]) (Eden and Zeffiro, 2000). PET and SPECT require that the radioactive compounds be prepared in a radiochemistry laboratory. Because of the short half-lives of these compounds for PET use, this laboratory needs to be in short proximity of the PET scanner. This is not so much the case in SPECT, which typically uses compounds with longer radioactive half-life. The success of these techniques is based on the development of radioligands that give valid and reliable measurements of the *in vivo* behavior of biological molecules of interest (see Table 1). MR requires electromagnetic isolation of the scanner room. Both technologies depend on the collaboration of physicists, mathematicians and clinicians. PET/SPECT requires the additional contribution of radiochemists.

PET and SPECT are similar techniques, with the practical difference that SPECT is easier to use in terms of both radiochemistry and instrumentation, but provides lower quantitative accuracy and is more limited by the relatively narrower range of available radioligands (Tables 1–2). For simplicity, we will focus mainly on PET technology.

PET paired with the tracer $H_2^{15}O$ (radioactive water) and fMRI both provide measures of cerebral blood flow that index neural activity. These techniques differ in their temporal resolution, i.e., approximately 60 seconds with PET and 2 to 5 seconds in fMRI (Figure 1).

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Spatial resolution is fairly equivalent, except that PET permits a better delineation of medial temporal and orbital frontal structures than fMRI. Indeed, the fMRI signal is affected by the proximity of air in the frontal sinuses. FMRI instrumentation and sequences of acquisition continue to be refined, with the goal of providing better spatial and temporal resolution and of minimizing physiological artifacts. MEG records electrical activity directly without the use of ionizing radiation and provides high temporal resolution, but moderate spatial resolution, particularly with respect to subcortical structures (Rojas et al., 2000). MEG is less available than either PET or fMRI, and thus fewer studies have been completed using this method. Figure 1 provides a comparison of the spatial and temporal resolution among imaging neuroscience tools.

The major drawback with PET is radiation exposure. It restricts the number of possible repeated measures, which is a serious limitation for developmental studies. Limits on radiation exposure to research subjects are set by regulatory bodies such as the US Department of Health and Human Services (e.g., http://www.hhs.gov, http://www.nrc.gov) and institutional radiation safety committees. In contrast, fMRI imposes no limit on repeated scanning. On the one hand, the PET signal (radioactive counts) is substantially stronger than the fMRI signal, and does not require large number of repeated measurements. On the other hand, repeated measures are required in the design of experiments that compare different experimental conditions, or for longitudinal studies. Regarding fMRI, it is important to stress that this technique is far from being without risk. Failure to carefully follow fMRI precaution guidelines, i.e., banning ferromagnetic material from the MR scanner room, can be lethal.

PET paired with radioligands and MRS provide neurochemical measures (Tables 1–2). Whereas PET and SPECT track the physiological behavior of molecules (e.g., neurotransmitter receptor binding potential, rate of neurotransmitter synthesis, synaptic concentration changes of neurotransmitter), MRS indexes the relative concentration of metabolites, whose functions are not as well-delineated (Table 3). PET and SPECT can detect very small concentrations (nanomolar range) of the compounds under study, whereas MRS is limited to larger amounts (millimolar range). For this reason, only compounds present in large quantities in the brain can be imaged. The main limitation in the advancement of PET and SPECT methods lies with the development of radioligands. In MRS, the sensitivity and specificity of the signals are the critical limiting factors. Tables 1–3 are providing exemplars of the measures that can be obtained with MRS, PET and SPECT.

Potentially exciting future techniques are optical imaging (see chapter…) and the use of transcranial magnetic stimulation (TMS) in combination with other imaging tools. As a caveat, TMS's potential adverse effects still need to be better characterized before being used experimentally in children.

Research in neurodevelopment is based principally on the study of healthy children. Ethical considerations mandate that studies with this *vulnerable* population be of minimal risk (http://www.hhs.gov/ohrp/humansubjects/guidance/45cfr46.htm#subpartd), and as such, preclude the use of techniques such as PET or SPECT (Arnold et al., 2000; Munson et al., 2006). Although PET/SPECT studies have been conducted in healthy minors (Chugani et al., 1987; Ernst et al., 1997; Ernst et al., 1999; Takahashi et al., 1999), they will not be covered herein, since the majority of developmental work has been done with fMRI. Finally, because of the difficulty in imaging younger children and the paucity of studies in this age group, this chapter is dedicated to the late childhood/adolescence period.

## Cognitive, affective, and social changes in adolescence

Adolescence is defined operationally as the transition period that characterizes the passage from childhood to adulthood. During this period, individuals acquire the skills that permit them

to move away from the familial cell and start an independent and sexually active life. In humans, the skills necessary to make this transition successfully occur at multiple levels, within the cognitive, emotional and social spheres. These refinements result from synergistic changes in biology and environment. One of the most significant changes occurring in adolescence is puberty.

Puberty refers to sexual maturation, which affects both primary and secondary sexual characteristics, and results from adrenal and gonadic hormonal changes (for review see (Sisk and Foster, 2004). Besides physical development, pubertal maturation influences metabolism, and behavior through its modulation of brain function (Romeo et al., 2001; Romeo and Sisk, 2001; Nunez et al., 2002; Hebbard et al., 2003). The specificity and extent of hormonal-related cerebral changes are unclear. Studies of individuals with early or late puberty suggest that hormonal changes may not significantly affect cognitive development, in contrast to their influence on emotional development. Although the regional distribution of sex hormone receptors in the brain, i.e., sites of direct hormonal action, is fairly well documented (Yuan et al., 1995; Gu et al., 1999; Rosas-Arellano et al., 1999; Gundlah et al., 2000; Pareto et al., 2004; Catalano et al., 2005; Clark et al., 2006), the precise contribution of pubertal hormonal changes on the structural and functional development of the brain still needs to be determined. Research on the contribution of puberty to the shaping of brain function is wide open. Because of the scarcity of data using functional neuroimaging in this area, puberty will not be addressed in the remainder of this review.

Although cognitive function improves dramatically, qualitatively as well as quantitatively, from infancy into childhood, when the basic scaffold of adult cognition is in place, it continues to be refined across adolescence. Reaction time shortens (Williams et al., 1999; Bedard et al., 2002), motoric and cognitive inhibition improves (Munoz et al., 1998; Williams et al., 1999; Bedard et al., 2002), working memory capacity increases (Gathercole et al., 2004; Bayliss et al., 2005), computation processing expands as the number of items successfully manipulated increases (Bayliss et al., 2005), and the ability to set up rules for adaptive behavior that takes into account time estimation rises (McCormack et al., 1999). These elemental components of cognition contribute to permit adaptive goal-directed behavior.

However, observations suggest enhanced mood lability and emotional intensity in adolescence (Buchanan et al., 1992). Adolescence represents the peak onset of mood disorders (Pine et al., 1998; Angold et al., 1999), which supports the notion of alterations of affective regulation during this period. In addition, affective processes and response to reward/punishments, which contribute substantially to decision-making, may present in adolescence specific features that facilitate risk-taking behavior in this age group (Gerrard et al., 1996; Dahl, 2001; Martin et al., 2002).

Although also influenced by affective processing, social behavior presents unique characteristics in adolescence. This period is known for the primacy of peer relationships which tend to replace familial ties (Steinberg, 1989; Steinberg and Morris, 2001; Gardner and Steinberg, 2005). It is also a time for intense romantic involvement, as well as idealistic beliefs and extreme behaviors (Bouchey and Furman, 2003; Brown, 2004).

## Neuroimaging in development

Structural neuroimaging has provided fundamental information regarding brain maturation. In adolescence, these structural changes vary by regions and include changes in the ratio of gray and white matter. Principally, white matter, an index of myelination, increases, while gray matter, an index of cellular and unmyelinated fiber density, decreases (Paus et al., 1999; Gogtay et al., 2006; Mabbott et al., 2006). Although the histological significance of these white and gray matter changes are not known at present, these changes could reflect, at least partially,

the combination of processes of myelination, and pruning. Myelination provides faster communication between regions, and pruning more efficient neural coding. These two processes could contribute to faster reaction time and greater capacity for cognitive manipulation.

Of most interest, these structural changes are protracted and occur at different points in time according to regions. Changes seem to progress from posterior to anterior dorsal regions, such that parietal gray matter loss is most prominent from childhood to adolescence and frontal gray matter decrease is most salient from adolescence to adulthood (Sowell et al., 2004; Gogtay et al., 2006). Much less is known about ontogenic changes of subcortical structures. Reduced striatal volume with age has been reported (Giedd et al., 1996), whereas no systematic changes in hippocampal volume could be detected (Suzuki et al., 2005).

The significance of these changes at the behavioral level is not clear. The contribution of learning and experience vs. genetically determined alterations need to be elucidated. It is also critical to obtain information on connectivity. Diffusion tensor imaging can contribute to this question but improvements to the technique are still needed to interpret the findings (Neil et al., 2002; Schmithorst et al., 2002; Bengtsson et al., 2005). Functional neuroimaging can also help translate the functional significance of these structural changes.

The regional heterogeneity of maturation rates may have critical implications for the neural basis of the adolescent behavior. An attractive hypothesis is that of an imbalance between cognitive and emotional processing networks, mediated by a developmental shift in the balance between mesolimbic/striatal and mesocortical dopamine systems during adolescence (Spear, 2000; Andersen, 2003). A related hypothesis proposes an adolescent-typical pattern of equilibrium among three systems, approach, avoidance and supervisory systems (Ernst et al., 2006). Adolescent behavior suggests enhanced recruitment of limbic structures associated with the coding of emotions, and reduced or less efficient recruitment of cognitive inhibitory structures such as the ventrolateral prefrontal cortex. Approach-related structures, such as ventral striatum, that preferentially translate sensory inputs into appetitive stimuli to be approached, might be engaged more easily than are avoidance-related structures, such as amygdala, which preferentially translate sensory inputs into aversive stimuli to be avoided. Both scenarios would explain a propensity for intense emotions, novelty-seeking and risk-taking behavior, and diminished control over emotional processing.

At present, neurodevelopmental research using functional neuroimaging has been limited to cross-over studies that compare different age groups. Longitudinal studies, the gold-standard for examining development, are difficult to conduct, not only because of the research cost, but also in view of the rapid changes in instrumentation which often compromise the reliability of repeated measures. As will be seen below, three basic potential group differences can be noted in the immature brain: (1) lesser engagement of the mature network; (2) greater engagement of the mature network; (3) engagement of a different network, or any combination of the above. The interpretation of such findings continues to be speculative, and will need to be corroborated by additional judiciously designed experiments.

# Developmental functional neuroimaging

## Cognitive processes: Attention, working memory and response inhibition

The general principle underlying fMRI studies relies on the subtraction rule (Owen et al., 2001). This rule posits that task performance can engage several elemental cognitive processes, each of them relying on specific neural circuits. By manipulating the tasks and the type of cognitive processes being engaged, the specific circuit recruited by a given cognitive process can be isolated through subtraction of the different activation maps. For example, the activation

map of a decision-making task associated with monetary rewards subtracted from the activation map of the same task without monetary rewards would provide information on the neural processing of rewards. Although simplistic, this theoretical framework seems to be adequate for most research questions.

A number of processes have been studied this way, including attention, working memory, response inhibition, and reward-related performance (Figure 2). These normative developmental studies are still in their infancy and need not only to be further validated but also to be examined from different perspectives to better understand their functional and developmental significance.

**Attention and Working Memory**—Only a few studies have examined the development of attention using functional neuroimaging (Konrad et al., 2005). Konrad et al (2005) showed in children between 8–12 yo (N = 16) significantly reduced activity in brain areas associated with attention such as the frontal midbrain or temporo-parietal areas, relative to older controls (ages 20–34, N = 16). However, more areas outside the expected networks were activated in children relative to adults, which suggested that additional neural networks were required to support the underdeveloped attentional networks.

Developmental studies of working memory have focused mostly on visuospatial information rather than object or verbal stimuli. Most studies found enhanced activation with age (8 or 9 yo through 18 yo) in the circuits already identified in adults for supporting this process: dorsal or lateral prefrontal cortex and intra- or posterior parietal cortex (Klingberg et al., 2002; Kwon et al., 2002; Olesen et al., 2003).

In addition, sex differences in working memory performance seemed to emerge in adolescence. Schweinsburg et al (Schweinsburg et al., 2005) reported that males showed greater activity in frontopolar cortex during a spatial working memory task, while females exhibited reduced activity in the anterior cingulate. This suggested that males and females recruited different brain regions to perform a spatial working memory task.

**Response Inhibition**—A combination of increased and decreased regional activations with age has been reported in studies of response inhibition. A number of paradigms have been used, including antisaccade (Luna et al., 2001), go/no-go (Tamm et al., 2002; Durston and Casey, 2006; Rubia et al., 2006), stop signal (Rubia et al., 2006), and Stroop tasks (Adleman et al., 2002; Marsh et al., 2006).

Luna et al. (2001) contrasted fMRI results among children (7–12 yo), adolescents (13–17 yo) and young adults (18–22 yo) during the performance of an antisaccade task, and found decreased activation in the superior middle gyrus but increased activation in the striatum, intraparietal sulcus, frontal eye field and lateral cerebellum with age. Activation of the dorsolateral prefrontal cortex was found to peak in adolescents relative to children and adults. How these qualitatively different developmental trajectories influence each other, and are integrated into patterns that subserve age-related typical cognitive control, is critical to understand.

Using the go/no-go task, Tamm et al (2002) reported age-related increased activation in left inferior frontal gyrus and reduced activation in superior and middle frontal gyri between 8 years and 20 years of age. Based on the notion that findings in adults converge towards the inferior prefrontal cortex as the seat for inhibitory control, the findings in adolescents suggest a strengthening of the mature substrates of inhibition, while relying less on the more immature neural correlates of inhibition. Similar activations in inferior frontal and anterior cingulate area have been reported in another developmental sample (8 to 20 years) (Durston, Mulder et al.,

NIH-PA Author Manuscript

2006). Rubia et al. (2006) found increased prefrontal, temporo-parietal and striatal activation with age (10–17 yo vs. 20–43 yo).

Using the Stroop task, Adleman et al (2002) found increased activation in parietal cortex between children (7–11 yo) and adolescents (12–16 yo), and then increase in left middle frontal gyrus between adolescents and young adults (18–22 yo). This finding suggests qualitative differences in neural maturation in children and adolescents. Marsh et al. (2006) compared 20 children (mean age 13.5 years) with 50 adults (mean age 31.9 years), and reported greater activation in adults than in children in brain areas typically activated by the Stroop task (right frontostriatal circuits) and known to subserve self-regulatory function.

Overall, adults seem to be more able to recruit a specific circuit supporting response inhibition. Because of the differences among studies, including task constructs, age ranges, and sample sizes, it is difficult to clearly delineate the neural network responsible for response inhibition per se. The significance of decreased activation with age suggests disengagement of alternative neural circuits used in younger populations. However, the recruitment of these alternative neural networks may represent reliance on different cognitive strategies employed by younger individuals. It may also signal ongoing learning processes, or nonspecific age-group differences in their efforts to complete the task. Each of these interpretations can be tested in future work.

## Affective and social processes

To date, much neuroimaging research directed toward the study of emotion has used paradigms involving the perception of facial expressions (Nelson et al., 2003; Lieberman et al., 2005; Meyer-Lindenberg et al., 2005; Noesselt et al., 2005; Pessoa et al., 2005; Fitzgerald et al., 2006; Rich et al., 2006; Roberson-Nay et al., 2006; Williams et al., 2006). These studies have focused primarily on the amygdala, which has been associated with fear processing (LeDoux, 2000) and social coding (Adolphs, 2003). Furthermore, negative emotions have been assessed more consistently, primarily because these emotions are easier to evoke and to control experimentally than positive emotions.

Davidson and Slagter (2000) have pointed out potential issues regarding developmental studies of emotion. For example, the perception and the production of emotion may be more difficult to separate in children than in adults, because stimuli used to probe emotion (e.g., facial expressions) may more readily evoke emotion in children than in adults. For this reason, the evaluation of behavioral performance and physiological reactions become important adjuncts in neuroimaging studies of emotion.

The largest neuroimaging developmental study of emotion to date compared 30 healthy adults (21–40 yo) with 31 healthy adolescents (9–17 yo) on a facial emotion task (Figure 3) (Guyer et al., in press). Findings replicated previous work (Monk et al., 2003), showing greater activation of the amygdala in adolescents compared to adults during passive viewing of fearful vs. neutral faces. In addition, adults showed greater amygdala-hippocampal functional connectivity than adolescents across the whole task. This finding may suggest that maturational changes strengthen amygdala/hippocampus interactions in forming memories of faces (Kilpatrick and Cahill, 2003;Dolcos et al., 2005). This interpretation would be in line with the continuing development of the relationship between cognitive and affective systems during adolescence (Casey et al., 2000;Nelson et al., 2005;Ernst et al., 2006). Of note, sex and age were not correlated with amygdala activation in neither the adolescent group nor the adult group (Guyer et al in press).

The main finding of greater amygdala activation in adolescents than in adults in response to fearful faces was consistent with prior work (Monk et al., 2003; Killgore and Yurgelun-Todd,

2004), but in opposite direction to the finding by Thomas et al. (Thomas et al., 2001), which used a sample of 12 adolescents (9–13 yo) and 6 adults (18–30 yo) as well as a different experimental design.

These findings are based on passive viewing, which, by nature, prevents the collection of self-reports. Consequently, their interpretation is limited. However, Guyer et al. (in press) also collected fear ratings in a different condition, and showed that these ratings did not differ between adults and adolescents. In addition, they included independently obtained eye movement data during the viewing of the faces. These data showed no differences in patterns of eye movements between adults and adolescents, perhaps indexing similar level of attention directed to the faces.

The field of affective developmental neuroscience research is wide open. The study of response to evocative face stimuli, which combines basic features of affective processing with features of social processing is only one way to probe the coding of emotions. Work is currently being conducted on social processes per se, using economic exchange paradigms and other tasks targeting issues of affiliations, fairness, trust, and theory of mind. Models of the neural networks involved in social processing are beginning to be proposed (Nelson et al., 2005), generating a priori hypotheses that can be tested in future work. It will be important to control for differences in emotion processing in these social paradigms, and, reciprocally, control for differences in social processing in affective paradigms, when appropriate.

## Reward circuitry

Reward-related processes are at the heart of motivated behavior. As such, they have been the object of a huge body of research. Within neuroscience, they have been probed within three major disciplines: addiction (Pecina et al., 2006; Mahler et al., 2007), learning (Martin-Soelch et al., 2007), and decision-making (Ernst and Paulus, 2005). A third field, neuroeconomics, is emerging (Sanfey et al., 2003; Huettel et al., 2006). The situation at a cross road of converging research domains presents, on the one hand, the advantage of generating a large amount of information to understand these processes, yet, on the other hand, the drawback of the potential for mixing terminology that carries slightly different meaning (e.g., reward can refer to positive reinforcement in learning theories, induction of positive valence state in affective neuroscience, or positive utility value in economics).

With this caveat in mind, developmental "reward" neuroscience work is starting to raise considerable interest.

Much of this work has been reviewed in the recent description of the "triadic model" (Ernst et al., 2006). Since then, a few studies have been published (Galvan et al., 2006; van Leijenhorst et al., 2006), supporting the basic tenets of Ernst et al's model (Figure 4). This developmental neurophysiological framework of reward processes originally proposed that the balance among three behavioral control systems differs between adults and adolescents. These three systems include an approach behavioral system, centered on the ventral striatum, an avoidance behavioral system, centered on the amygdala, and a supervisory system, centered on the medial prefrontal cortex.

The triadic model is based on a priori hypotheses that find their origins in evolutionary theories. We speculate that the adolescent brain undergoes unique changes that promote behaviors supporting the evolutionary fitness theme of optimal species reproduction. Adolescence is the time when individuals begin to move away from the familial cell and acquire independence in order to fulfill adult roles in terms of reproductively mature and socially competent behavior. This impetus to move away from the protective nest is necessary for preventing genetic inbreeding and for enabling genetic diversity, which serves the overall evolutionary fitness

goal. Behaviors of novelty-seeking and risk-taking facilitate this transition. As such, neural circuits that code approach behavior, such as ventral striatum, are likely to be more dominant during adolescence, whereas neural circuits that code avoidance, such as amygdala, are likely to be less powerful during adolescence than at other life periods.

A number of functional neuroimaging findings are consistent with this model. First, adolescents generally recruited a similar reward circuitry (May et al., 2004) as that identified in adults (Delgado et al., 2000) when responding to rewards or punishments. However, direct comparison of adults and adolescents showed that adolescents activated the ventral striatum more strongly than adults in response to rewarding stimuli (Ernst et al., 2005; Galvan et al., 2006), and deactivated the amygdala less strongly than adults in response to penalties (Ernst et al., 2005). In addition, during choice-making, adolescents engaged the medial prefrontal cortex, including the anterior cingulate gyrus, and orbital frontal cortex to a lesser extent than did adults (Figure 5)(Eshel et al., 2007).

Adolescents may differ from pre-adolescents in the function of the reward circuitry (Galvan et al., 2006). Indeed, pre-adolescents (mean age 11.3 years) were found to show greater modulation of the medial prefrontal cortex as a function of the likelihood of receiving a reward, during the anticipation of this reward, relative to adults (mean age 21 years) (van Leijenhorst et al., 2006). This is in contrast to Eshel's findings comparing response selection between adolescents (13.3 years old) and adults (see above). The discrepancy between both sets of findings might also relate to the different paradigms employed, rather than maturational changes between pre-adolescence and adolescence. Van Leijenhorst et al. (2006) manipulated the probability rather than the magnitude of the reward, and choice selection did not involve competing options, whereas Eshel et al. (2007) used a paradigm involving decision-making between two competing options that carried different risks and reward magnitudes. Thus, differences in age groups (13.3 yo vs. 11.3 yo) and/or in paradigms may account for the opposite findings of these studies with regards to the recruitment of medial prefrontal cortex in reward-processes.

Finally, Bjork et al. (2004) employed a monetary reaction-time task to directly compare adults and adolescents, and found that adolescents recruited less strongly the ventral striatum when anticipating possible gains. This finding, at odds with the studies by Ernst et al. (2005) and Galvan et al. (2006), highlights the need for more work.

## Future Direction

The present overview provides a window into the promises of developmental cognitive neuroscience research. Among these promises, three major themes stand out.

First, from a methodological standpoint, more knowledge is warranted to understand how developing brain physiology affects functional imaging parameters, to formulate standardized procedures and to create age-appropriate structural brain templates.

Second, the increased use of neuroimaging techniques in young populations will help to interpret findings from the traditional developmental psychology perspective and generate neuroanatomical models of cognitive, affective and social processes of behaviour. For instance, neuroimaging data could be used to support cognitive theories of memory development (Reyna and Brainerd, 1998), or elucidate the brain mechanisms that underlie cognitive (Gardner and Steinberg, 2005; Steinberg, 2005) or evolutionary (Ernst et al., 2006) models that seek to explain adolescence as an increased period of vulnerability for psychiatric disorders.

Third, based on the recognition that most adult psychiatric disorders have their biological roots anchored in the developing brain, it appears paramount to be able to identify and understand

the mechanism of these vulnerability factors across development. Normative data, including the role of sex and puberty, are clearly a requisite for this agenda and research is being under way to address this question using populations at risk by virtue of temperament or family history of psychiatric disorders (Guyer et al., 2006; Perez-Edgar et al., 2007; Monk et al., in press).

Finally, although not addressed in this chapter, a critical task of developmental cognitive neuroscience research will be to integrate molecular genetic advances with functional neuroimaging studies.

# References

Adleman NE, Menon V, Blasey CM, White CD, Warsofsky IS, Glover GH, Reiss AL. A developmental fMRI study of the Stroop color-word task. Neuroimage 2002;16:61–75. [PubMed: 11969318]

Adolphs R. Is the human amygdala specialized for processing social information? Ann N Y Acad Sci 2003;985:326–340. [PubMed: 12724168]

Andersen SL. Trajectories of brain development: Point of vulnerability or window of opportunity? Neurosci Biobehav Rev 2003;27:3–18. [PubMed: 12732219]

Angold A, Costello EJ, Erkanli A, Worthman CM. Pubertal changes in hormone levels and depression in girls. Psychol Med 1999;29:1043–1053. [PubMed: 10576297]

Arnold, LE.; Zametkin, A.; Caravella, L.; Korbly, N. Ethical issues in neuroimaging research with children. In: Ernst, M.; Rumsey, JM., editors. Functional neuroimaging in child psychiatry. Cambridge, UK: Cambridge University Press; 2000. p. 99-109.

Bayliss DM, Jarrold C, Baddeley AD, Gunn DM, Leigh E. Mapping the developmental constraints on working memory span performance. Dev Psychol 2005;41:579–597. [PubMed: 16060806]

Bedard AC, Nichols S, Barbosa JA, Schachar R, Logan GD, Tannock R. The development of selective inhibitory control across the life span. Dev Neuropsychol 2002;21:93–111. [PubMed: 12058837]

Bengtsson SL, Nagy Z, Skare S, Forsman L, Forssberg H, Ullen F. Extensive piano practicing has regionally specific effects on white matter development. Nat Neurosci 2005;8:1148–1150. [PubMed: 16116456]

Bjork JM, Knutson B, Fong GW, Caggiano DM, Bennett SM, Hommer DW. Incentive-elicited brain activation in adolescents: similarities and differences from young adults. J Neurosci 2004;24:1793–1802. [PubMed: 14985419]

Bouchey, HA.; Furman, W. Dating and romantic experience during adolescence. In: Adams, GR.; Berzonsky, MD., editors. Blackwell Handbook of Adolescence. Oxford: Blackwell Sci; 2003. p. 313-329.

Brown, BB. Adolescents' relationships with peers. In: Lerner, RM.; Steinberg, L., editors. Handbook of Adolescent Psychology. New York: Wiley; 2004. p. 363-394.

Buchanan CM, Eccles JS, Becker JB. Are adolescents the victims of raging hormones: evidence for activational effects of hormones on moods and behavior at adolescence. Psychol Bull 1992;111:62–107. [PubMed: 1539089]

Casey BJ, Giedd JN, Thomas KM. Structural and functional brain development and its relation to cognitive development. Biol Psychol 2000;54:241–257. [PubMed: 11035225]

Catalano PN, Bonaventura MM, Silveyra P, Bettler B, Libertun C, Lux-Lantos VA. GABA(B1) knockout mice reveal alterations in prolactin levels, gonadotropic axis, and reproductive function. Neuroendocrinology 2005;82:294–305. [PubMed: 16682806]

Chugani HT, Phelps ME, Mazziotta JC. Positron emission tomography study of human brain functional development. Ann Neurol 1987;22:487–497. [PubMed: 3501693]

Clark AS, Costine BA, Jones BL, Kelton-Rehkopf MC, Meerts SH, Nutbrown-Greene LL, Penatti CA, Porter DM, Yang P, Henderson LP. Sex- and age-specific effects of anabolic androgenic steroids on reproductive behaviors and on GABAergic transmission in neuroendocrine control regions. Brain Res 2006;1126:122–138. [PubMed: 17010954]

Dahl RE. Affect regulation, brain development, and behavioral/emotional health in adolescence. CNS Spectr 2001;6:60–72. [PubMed: 17008832]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Davidson RJ, Slagter HA. Probing emotion in the developing brain: functional neuroimaging in the assessment of the neural substrates of emotion in normal and disordered children and adolescents. Ment Retard Dev Disabil Res Rev 2000;6:166–170. [PubMed: 10982493]

Delgado MR, Nystrom LE, Fissell C, Noll DC, Fiez JA. Tracking the hemodynamic responses to reward and punishment in the striatum. J Neurophysiol 2000;84:3072–3077. [PubMed: 11110834]

Dolcos F, LaBar KS, Cabeza R. Remembering one year later: role of the amygdala and the medial temporal lobe memory system in retrieving emotional memories. Proc Natl Acad Sci U S A 2005;102:2626–2631. [PubMed: 15703295]

Durston S, Casey BJ. What have we learned about cognitive development from neuroimaging? Neuropsychologia 2006;44:2149–2157. [PubMed: 16303150]

Durston S, Hulshoff Pol HE, Casey BJ, Giedd JN, Buitelaar JK, van Engeland H. Anatomical MRI of the developing human brain: what have we learned? J Am Acad Child Adolesc Psychiatry 2001;40:1012–1020. [PubMed: 11556624]

Eden, GF.; Zeffiro, TA. Functional magnetic resonance imaging. In: Ernst, M.; Rumsey, JM., editors. Functional neuroimaging in child psychiatry. Cambridge, UK: Cambridge University Press; 2000. p. 45-58.

Ernst M, Cohen RM, Liebenauer LL, Jons PH, Zametkin A. Cerebral Glucose Metabolism In Adolescent Girls with Attention-Deficit/Hyperactivity Disorder. J Am Acad Child Adolesc Psychiatry 1997;36:1399–1406. [PubMed: 9334553]

Ernst M, Nelson EE, Jazbec S, McClure EB, Monk CS, Leibenluft E, Blair J, Pine DS. Amygdala and nucleus accumbens in responses to receipt and omission of gains in adults and adolescents. Neuroimage 2005;25:1279–1291. [PubMed: 15850746]

Ernst M, Paulus MP. Neurobiology of decision making: a selective review from a neurocognitive and clinical perspective. Biol Psychiatry 2005;58:597–604. [PubMed: 16095567]

Ernst M, Pine DS, Hardin M. Triadic model of the neurobiology of motivated behavior in adolescence. Psychol Med 2006;36:299–312. [PubMed: 16472412]

Ernst M, Zametkin A, Matochik JA, Pascualvaca D, Jons P, Cohen RM. High midbrain DOPA decarboxylase activity in children in ADHD. Am J Psychiatry 1999;156:1209–1215. [PubMed: 10450262]

Eshel N, Nelson EE, Blair RJ, Pine DS, Ernst M. Neural substrates of choice selection in adults and adolescents: development of the ventrolateral prefrontal and anterior cingulate cortices. Neuropsychologia 2007;45:1270–1279. [PubMed: 17118409]

Fitzgerald DA, Angstadt M, Jelsone LM, Nathan PJ, Phan KL. Beyond threat: amygdala reactivity across multiple expressions of facial affect. Neuroimage 2006;30:1441–1448. [PubMed: 16368249]

Galvan A, Hare TA, Parra CE, Penn J, Voss H, Glover G, Casey BJ. Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents. J Neurosci 2006;26:6885–6892. [PubMed: 16793895]

Gardner M, Steinberg L. Peer influence on risk taking, risk preference, and risky decision making in adolescence and adulthood: an experimental study. Dev Psychol 2005;41:625–635. [PubMed: 16060809]

Gathercole SE, Pickering SJ, Ambridge B, Wearing H. The structure of working memory from 4 to 15 years of age. Dev Psychol 2004;40:177–190. [PubMed: 14979759]

Gerrard M, Gibbons FX, Benthin A, Hessling RM. A longitudinal study of the reciprocal nature of risk behaviors and cognitions in adolescents: what you do shapes what you think, and vice versa. Health Psychology 1996;15:344–354. [PubMed: 8891713]

Giedd JN. Structural magnetic resonance imaging of the adolescent brain. Ann N Y Acad Sci 2004;1021:77–85. [PubMed: 15251877]

Giedd JN, Snell JW, Lange N, Rajapakse JC, Casey BJ, Kozuch PL, Vaituzis AC, Vauss YC, Hamburger SD, Kaysen D, Rapoport JL. Quantitative magnetic resonance imaging of human brain development: ages 4–18. Cereb Cortex 1996;6:551–560. [PubMed: 8670681]

Giedd JN, Vaituzis AC, Hamburger SD, Lange N, Rajapakse JC, Kaysen D, Vauss YC, Rapoport JL. Quantitative MRI of the temporal lobe, amygdala, and hippocampus in normal human development: ages 4–18 years. J Comp Neurol 1996;366:223–230. [PubMed: 8698883]

Gogtay N, Giedd JN, Lusk L, Hayashi KM, Greenstein D, Vaituzis AC, Nugent TF 3rd, Herman DH, Clasen LS, Toga AW, Rapoport JL, Thompson PM. Dynamic mapping of human cortical development during childhood through early adulthood. Proc Natl Acad Sci U S A 2004;101:8174–8179. [PubMed: 15148381]

Gogtay N, Nugent TF 3rd, Herman DH, Ordonez A, Greenstein D, Hayashi KM, Clasen L, Toga AW, Giedd JN, Rapoport JL, Thompson PM. Dynamic mapping of normal human hippocampal development. Hippocampus 2006;16:664–672. [PubMed: 16826559]

Gu G, Varoqueaux F, Simerly RB. Hormonal regulation of glutamate receptor gene expression in the anteroventral periventricular nucleus of the hypothalamus. J Neurosci 1999;19:3213–3222. [PubMed: 10191334]

Gundlah C, Kohama SG, Mirkes SJ, Garyfallou VT, Urbanski HF, Bethea CL. Distribution of estrogen receptor beta (ERbeta) mRNA in hypothalamus, midbrain and temporal lobe of spayed macaque: continued expression with hormone replacement. Brain Res Mol Brain Res 2000;76:191–204. [PubMed: 10762694]

Guyer AE, Monk CS, McClure EB, Nelson EE, Roberson-Nay R, Adler A, Leibenluft E, Pine DS, Ernst M. Developmental differences in amygdala response to fearful facial expressions. in press

Guyer AE, Nelson EE, Perez-Edgar K, Hardin MG, Roberson-Nay R, Monk CS, Bjork JM, Henderson HA, Pine DS, Fox NA, Ernst M. Striatal functional alteration in adolescents characterized by early childhood behavioral inhibition. J Neurosci 2006;26:6399–6405. [PubMed: 16775126]

Hebbard PC, King RR, Malsbury CW, Harley CW. Two organizational effects of pubertal testosterone in male rats: transient social memory and a shift away from long-term potentiation following a tetanus in hippocampal CA1. Exp Neurol 2003;182:470–475. [PubMed: 12895458]

Herscovitch, P.; Ernst, M. Functional brain imaging with PET and SPECT. In: Ernst, M.; Rumsey, JM., editors. Functional neuroimaging in child psychiatry. Cambridge, UK: Cambridge University Press; 2000. p. 3-26.

Huettel SA, Stowe CJ, Gordon EM, Warner BT, Platt ML. Neural signatures of economic preferences for risk and ambiguity. Neuron 2006;49:765–775. [PubMed: 16504951]

Killgore WD, Yurgelun-Todd DA. Activation of the amygdala and anterior cingulate during nonconscious processing of sad versus happy faces. Neuroimage 2004;21:1215–1223. [PubMed: 15050549]

Kilpatrick L, Cahill L. Amygdala modulation of parahippocampal and frontal regions during emotionally influenced memory storage. Neuroimage 2003;20:2091–2099. [PubMed: 14683713]

Klingberg T, Forssberg H, Westerberg H. Increased brain activity in frontal and parietal cortex underlies the development of visuospatial working memory capacity during childhood. J Cogn Neurosci 2002;14:1–10. [PubMed: 11798382]

Konrad K, Neufang S, Thiel CM, Specht K, Hanisch C, Fan J, Herpertz-Dahlmann B, Fink GR. Development of attentional networks: an fMRI study with children and adults. Neuroimage 2005;28:429–439. [PubMed: 16122945]

Kwon H, Reiss AL, Menon V. Neural basis of protracted developmental changes in visuo-spatial working memory. Proc Natl Acad Sci U S A 2002;99:13336–13341. [PubMed: 12244209]

LeDoux JE. Emotion circuits in the brain. Annu Rev Neurosci 2000;23:155–184. [PubMed: 10845062]

Lieberman MD, Hariri A, Jarcho JM, Eisenberger NI, Bookheimer SY. An fMRI investigation of race-related amygdala activity in African-American and Caucasian-American individuals. Nat Neurosci 2005;8:720–722. [PubMed: 15880106]

Luna B, Thulborn KR, Munoz DP, Merriam EP, Garver KE, Minshew NJ, Keshavan MS, Genovese CR, Eddy WF, Sweeney JA. Maturation of widely distributed brain function subserves cognitive development. Neuroimage 2001;13:786–793. [PubMed: 11304075]

Mabbott DJ, Noseworthy M, Bouffet E, Laughlin S, Rockel C. White matter growth as a mechanism of cognitive development in children. Neuroimage 2006;33:936–946. [PubMed: 16978884]

Mahler SV, Smith KS, Berridge KC. Endocannabinoid Hedonic Hotspot for Sensory Pleasure: Anandamide in Nucleus Accumbens Shell Enhances 'Liking' of a Sweet Reward. Neuropsychopharmacology. 2007

Marsh R, Zhu H, Schultz RT, Quackenbush G, Royal J, Skudlarski P, Peterson BS. A developmental fMRI study of self-regulatory control. Hum Brain Mapp 2006;27:848–863. [PubMed: 16421886]

Martin-Soelch C, Linthicum J, Ernst M. Appetitive conditioning: Neural bases and implications for psychopathology. Neurosci Biobehav Rev 2007;31:426–440. [PubMed: 17210179]

Martin CA, Kelly TH, Rayens MK, Brogli BR, Brenzel A, Smith WJ, Omar HA. Sensation seeking, puberty, and nicotine, alcohol, and marijuana use in adolescence. J Am Acad Child Adolesc Psychiatry 2002;41:1495–1502. [PubMed: 12447037]

May JC, Delgado MR, Dahl RE, Stenger VA, Ryan ND, Fiez JA, Carter CS. Event-related functional magnetic resonance imaging of reward-related brain circuitry in children and adolescents. Biol Psychiatry 2004;55:359–366. [PubMed: 14960288]

McCormack T, Brown GD, Maylor EA, Darby RJ, Green D. Developmental changes in time estimation: comparing childhood and old age. Dev Psychol 1999;35:1143–1155. [PubMed: 10442882]

Meyer-Lindenberg A, Hariri AR, Munoz KE, Mervis CB, Mattay VS, Morris CA, Berman KF. Neural correlates of genetically abnormal social cognition in Williams syndrome. Nat Neurosci 2005;8:991–993. [PubMed: 16007084]

Monk CS, Klein RG, Telzer EH, Schroth EA, Mannuzza S, Moulton JL III, Guardino M, Masten CL, McClure EB, Fromm S, Blair RJR, Pine DS, Ernst M. Amygdala and Nucleus Accumbens Activation to Emotional Facial Expressions in Children and Adolescents at Risk for Major Depression. American Journal of Psychiatry. in press

Monk CS, McClure EB, Nelson EE, Zarahn E, Bilder RM, Leibenluft E, Charney DS, Ernst M, Pine DS. Adolescent immaturity in attention-related brain engagement to emotional facial expressions. Neuroimage 2003;20:420–428. [PubMed: 14527602]

Munoz DP, Broughton JR, Goldring JE, Armstrong IT. Age-related performance of human subjects on saccadic eye movement tasks. Exp Brain Res 1998;121:391–400. [PubMed: 9746145]

Munson, S.; Eshel, N.; Ernst, M. Ethics of PET Research in Children. In: Charron, M., editor. Pediatric PET Imaging. New York: Springer; 2006.

Muzik O, Chugani DC, Juhasz C, Shen C, Chugani HT. Statistical parametric mapping: assessment of application in children. Neuroimage 2000;12:538–549. [PubMed: 11034861]

Neil J, Miller J, Mukherjee P, Huppi PS. Diffusion tensor imaging of normal and injured developing human brain - a technical review. NMR Biomed 2002;15:543–552. [PubMed: 12489100]

Nelson EE, Leibenluft E, McClure EB, Pine DS. The social re-orientation of adolescence: a neuroscience perspective on the process and its relation to psychopathology. Psychol Med 2005;35:163–174. [PubMed: 15841674]

Nelson EE, McClure EB, Monk CS, Zarahn E, Leibenluft E, Pine DS, Ernst M. Developmental differences in neuronal engagement during implicit encoding of emotional faces: an event-related fMRI study. J Child Psychol Psychiatry 2003;44:1015–1024. [PubMed: 14531584]

Noesselt T, Driver J, Heinze HJ, Dolan R. Asymmetrical activation in the human brain during processing of fearful faces. Curr Biol 2005;15:424–429. [PubMed: 15753036]

Nomura Y, Sakuma H, Takeda K, Tagami T, Okuda Y, Nakagawa T. Diffusional anisotropy of the human brain assessed with diffusion-weighted MR: relation with normal brain development and aging. AJNR Am J Neuroradiol 1994;15:231–238. [PubMed: 8192066]

Nunez JL, Sodhi J, Juraska JM. Ovarian hormones after postnatal day 20 reduce neuron number in the rat primary visual cortex. J Neurobiol 2002;52:312–321. [PubMed: 12210098]

Olesen PJ, Nagy Z, Westerberg H, Klingberg T. Combined analysis of DTI and fMRI data reveals a joint maturation of white and grey matter in a fronto-parietal network. Brain Res Cogn Brain Res 2003;18:48–57. [PubMed: 14659496]

Owen, AM.; Epstein, R.; Johnsrude, IS. fMRI: applications to cognitive neuroscience. In: Jezzard, P.; Matthews, PM.; Smith, SM., editors. Functional MRI. New York: Oxford University Press; 2001. p. 311-327.

Pareto D, Alvarado M, Hanrahan SM, Biegon A. In vivo occupancy of female rat brain estrogen receptors by 17beta-estradiol and tamoxifen. Neuroimage 2004;23:1161–1167. [PubMed: 15528115]

Paus T, Collins DL, Evans AC, Leonard G, Pike B, Zijdenbos A. Maturation of white matter in the human brain: a review of magnetic resonance studies. Brain Res Bull 2001;54:255–266. [PubMed: 11287130]

Paus T, Zijdenbos A, Worsley K, Collins DL, Blumenthal J, Giedd JN, Rapoport JL, Evans AC. Structural maturation of neural pathways in children and adolescents: in vivo study. Science 1999;283:1908–1911. [PubMed: 10082463]

Pecina S, Smith KS, Berridge KC. Hedonic hot spots in the brain. Neuroscientist 2006;12:500–511. [PubMed: 17079516]

Perez-Edgar K, Roberson-Nay R, Hardin MG, Poeth K, Guyer AE, Nelson EE, McClure EB, Henderson HA, Fox NA, Pine DS, Ernst M. Attention alters neural responses to evocative faces in behaviorally inhibited adolescents. Neuroimage 2007;35:1538–1546. [PubMed: 17376704]

Pessoa L, Padmala S, Morland T. Fate of unattended fearful faces in the amygdala is determined by both attentional resources and cognitive modulation. Neuroimage 2005;28:249–255. [PubMed: 15993624]

Pine DS, Cohen P, Gurley D, Brook J, Ma Y. The risk for early-adulthood anxiety and depressive disorders in adolescents with anxiety and depressive disorders. Arch Gen Psychiatry 1998;55:56–64. [PubMed: 9435761]

Poldrack RA, Pare-Blagoev EJ, Grant PE. Pediatric functional magnetic resonance imaging: progress and challenges. Top Magn Reson Imaging 2002;13:61–70. [PubMed: 11847501]

Reyna VF, Brainerd CJ. Fuzzy-trace theory and false memory: new frontiers. J Exp Child Psychol 1998;71:194–209. [PubMed: 9843625]

Rich BA, Vinton DT, Roberson-Nay R, Hommer RE, Berghorst LH, McClure EB, Fromm SJ, Pine DS, Leibenluft E. Limbic hyperactivation during processing of neutral facial expressions in children with bipolar disorder. Proc Natl Acad Sci U S A 2006;103:8900–8905. [PubMed: 16735472]

Roberson-Nay R, McClure EB, Monk CS, Nelson EE, Guyer AE, Fromm SJ, Charney DS, Leibenluft E, Blair J, Ernst M, Pine DS. Increased amygdala activity during successful memory encoding in adolescent major depressive disorder: An FMRI study. Biol Psychiatry 2006;60:966–973. [PubMed: 16603133]

Rojas, DC.; Teale, PD.; Reite, ML. Magnetoencephalography. In: Ernst, M.; Rumsey, JM., editors. Functional neuroimaging in child psychiatry. Cambridge, UK: Cambridge University Press; 2000. p. 77-95.

Romeo RD, Cook-Wiens E, Richardson HN, Sisk CL. Dihydrotestosterone activates sexual behavior in adult male hamsters but not in juveniles. Physiol Behav 2001;73:579–584. [PubMed: 11495662]

Romeo RD, Sisk CL. Pubertal and seasonal plasticity in the amygdala. Brain Res 2001;889:71–77. [PubMed: 11166688]

Rosas-Arellano MP, Solano-Flores LP, Ciriello J. Co-localization of estrogen and angiotensin receptors within subfornical organ neurons. Brain Res 1999;837:254–262. [PubMed: 10434010]

Rosenberg DR, Sweeney JA, Gillen JS, Kim J, Varanelli MJ, O'Hearn KM, Erb PA, Davis D, Thulborn KR. Magnetic resonance imaging of children without sedation: preparation with simulation. J Am Acad Child Adolesc Psychiatry 1997;36:853–859. [PubMed: 9183142]

Rubia K, Smith AB, Woolley J, Nosarti C, Heyman I, Taylor E, Brammer M. Progressive increase of frontostriatal brain activation from childhood to adulthood during event-related tasks of cognitive control. Hum Brain Mapp 2006;27:973–993. [PubMed: 16683265]

Sakuma H, Nomura Y, Takeda K, Tagami T, Nakagawa T, Tamagawa Y, Ishii Y, Tsukamoto T. Adult and neonatal human brain: diffusional anisotropy and myelination with diffusion-weighted MR imaging. Radiology 1991;180:229–233. [PubMed: 2052700]

Sanfey AG, Rilling JK, Aronson JA, Nystrom LE, Cohen JD. The neural basis of economic decision-making in the Ultimatum Game. Science 2003;300:1755–1758. [PubMed: 12805551]

Saunders DE, Thompson C, Gunny R, Jones R, Cox T, Chong WK. Magnetic resonance imaging protocols for paediatric neuroradiology. Pediatr Radiol 2007;37:789–797. [PubMed: 17487479]

Schmithorst VJ, Wilke M, Dardzinski BJ, Holland SK. Correlation of white matter diffusivity and anisotropy with age during childhood and adolescence: a cross-sectional diffusion-tensor MR imaging study. Radiology 2002;222:212–218. [PubMed: 11756728]

Schweinsburg AD, Nagel BJ, Tapert SF. fMRI reveals alteration of spatial working memory networks across adolescence. J Int Neuropsychol Soc 2005;11:631–644. [PubMed: 16212691]

Sisk CL, Foster DL. The neural basis of puberty and adolescence. Nat Neurosci 2004;7:1040–1047. [PubMed: 15452575]

Slifer KJ, Cataldo MF, Cataldo MD, Llorente AM, Gerson AC. Behavior analysis of motion control for pediatric neuroimaging. J Appl Behav Anal 1993;26:469–470. [PubMed: 8307831]

Sowell ER, Thompson PM, Toga AW. Mapping changes in the human cortex throughout the span of life. Neuroscientist 2004;10:372–392. [PubMed: 15271264]

Spear LP. The adolescent brain and age-related behavioral manifestations. Neurosci Biobehav Rev 2000;24:417–463. [PubMed: 10817843]

Steinberg, L. Pubertal maturation and parent-adolescent distance: an evolutionary perspective. In: Adams, GR.; Montemayor, R.; Gullotta, TP., editors. Advances in adolescent behavior and development. Newbury Park: Sage; 1989. p. 71-97.

Steinberg L. Cognitive and affective development in adolescence. Trends Cogn Sci 2005;9:69–74. [PubMed: 15668099]

Steinberg L, Morris AS. Adolescent development. Annu Rev Psychol 2001;52:83–110. [PubMed: 11148300]

Suzuki M, Hagino H, Nohara S, Zhou SY, Kawasaki Y, Takahashi T, Matsui M, Seto H, Ono T, Kurachi M. Male-specific volume expansion of the human hippocampus during adolescence. Cereb Cortex 2005;15:187–193. [PubMed: 15238436]

Takahashi T, Shirane R, Sato S, Yoshimoto T. Developmental changes of cerebral blood flow and oxygen metabolism in children. AJNR Am J Neuroradiol 1999;20:917–922. [PubMed: 10369366]

Tamm L, Menon V, Reiss AL. Maturation of brain function associated with response inhibition. J Am Acad Child Adolesc Psychiatry 2002;41:1231–1238. [PubMed: 12364845]

Temple E, Poldrack RA, Salidis J, Deutsch GK, Tallal P, Merzenich MM, Gabrieli JD. Disrupted neural responses to phonological and orthographic processing in dyslexic children: an fMRI study. Neuroreport 2001;12:299–307. [PubMed: 11209939]

Thomas KM, Drevets WC, Dahl RE, Ryan ND, Birmaher B, Eccard CH, Axelson D, Whalen PJ, Casey BJ. Amygdala response to fearful faces in anxious and depressed children. Arch Gen Psychiatry 2001;58:1057–1063. [PubMed: 11695953]

Thomas KM, King SW, Franzen PL, Welsh TF, Berkowitz AL, Noll DC, Birmaher V, Casey BJ. A developmental functional MRI study of spatial working memory. Neuroimage 1999;10:327–338. [PubMed: 10458945]

Tien RD, Kucharczyk J, Bessette J, Middleton M. MR imaging of the pituitary gland in infants and children: changes in size, shape, and MR signal with growth and development. AJR Am J Roentgenol 1992;158:1151–1154. [PubMed: 1566682]

van Leijenhorst L, Crone EA, Bunge SA. Neural correlates of developmental differences in risk estimation and feedback processing. Neuropsychologia 2006;44:2158–2170. [PubMed: 16574168]

Williams BR, Ponesse JS, Schachar RJ, Logan GD, Tannock R. Development of inhibitory control across the life span. Dev Psychol 1999;35:205–213. [PubMed: 9923475]

Williams LM, Liddell BJ, Kemp AH, Bryant RA, Meares RA, Peduto AS, Gordon E. Amygdala-prefrontal dissociation of subliminal and supraliminal fear. Hum Brain Mapp 2006;27:652–661. [PubMed: 16281289]

Yuan H, Bowlby DA, Brown TJ, Hochberg RB, MacLusky NJ. Distribution of occupied and unoccupied estrogen receptors in the rat brain: effects of physiological gonadal steroid exposure. Endocrinology 1995;136:96–105. [PubMed: 7828562]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript



**Figure 1.**
Figure illustrates some of the currently available cognitive neuroscience methods and sites of action on both temporal and spatial dimensions. Figure adapted from Churchland and Sejnowski, 1988.



**Figure 2.**
Midline sagittal slices of T1 MRI images of the brain on which loci of activation are depicted.
These activation maps provide a summary of the results described in the Cognitive Process
Section of this chapter. Loci of activation correspond to age group differences of neural
activation in response to various cognitive processes. Unfilled white circles represent sites of
activations that are greater for younger participants relative to adults. Conversely, filled white
circles represent sites of activations that are greater for adults relative to younger participants.
The figure was created using the MRIcro fMRI display software
(http://www.sph.sc.edu/comd/rorden/mricro.html). Peak coordinates originate from studies
reported in the text. When necessary, Talairach coordinates were transformed into MNI

coordinates (http://imaging.mrccbu.cam.ac.uk/imaging/MniTalairach). The sites of these activations have been projected to the midline section since they are all displayed at x = 0, even though most of these activation peaks are lateralized (see Table below).

Talairach coordinates for activations indicated in Figure 2

| Function | Reference | Talairach Coordinates (x, y, z) | | |
|---|---|---|---|---|
| Attention | Konrad, 2005 | −30 | 27 | −47 |
| | | −9 | −18 | −12 |
| | | 33 | −15 | −2 |
| | | 54 | −60 | 12 |
| | Rubia, 2006 | −50 | −30 | 26 |
| | | −32 | 7 | −2 |
| | | −29 | 37 | 13 |
| | | 3 | −74 | 37 |
| | | 25 | −4 | −2 |
| | | 40 | −59 | −24 |
| Conflict | Adleman, 2002 | −28 | 12 | 52 |
| | Konrad, 2005 | −27 | 56 | 17 |
| | | −18 | −52 | 63 |
| | | 45 | 38 | −4 |
| | | 53 | 14 | −18 |
| | Marsh, 2006 | 7 | 46 | 0 |
| | | 10 | 19 | 9 |
| | | 21 | −16 | 36 |
| | | −36 | 39 | 0 |
| | | −31 | 6 | 9 |
| | | −39 | 39 | 9 |
| | | 36 | 13 | 0 |
| Inhibition | Rubia, 2006 | 4 | 48 | 4 |
| | Tamm, 2002 | −34 | 12 | 6 |
| | | −14 | 46 | 46 |
| Switching | Rubia, 2006 | 14 | 19 | 26 |
| | | 32 | 19 | 9 |
| | | −40 | −33 | 53 |
| Working Memory | Klingberg, 2002 | 22 | −64 | 48 |
| | | 30 | 0 | 52 |
| | Kwon, 2002 | −38 | 54 | 10 |
| | | 48 | −48 | 38 |
| | Schweinsburg, 2005 | 2 | 52 | 7 |
| | | 30 | 62 | 3 |
| | | 26 | 61 | 35 |
| | | 44 | 29 | 35 |
| | | 12 | 62 | 8 |
| | | 44 | 43 | 52 |

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript



**Figure 3.**
SPM99 glass brain indicating greater amygdala activation for adolescents relative to adults in response to an emotional face viewing task (Guyer et al., in press).



**Figure 4.**
The triadic model from Ernst et al (2006) shows a functional imbalance among medial/ventral prefrontal cortex, ventral striatum and amygdala circuits in adolescents (left half) relative to the adult equilibrium (right half).

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript



**Figure 5.**
Coronal and sagittal views of the SPM99 T1 MRI brain, which shows activation loci that are greater for adults than adolescents in a decision making task. These foci are located in the left orbitofrontal/ventrolateral prefrontal cortex and anterior cingulate cortex (Eshel et al. 2007).

Table 1

Partial list of PET radiotracers

| Target system or process | Radiotracer |
|---|---|
| **Neuroreceptor Systems** | |
| Dopaminergic | |
| Pre-synaptic dopamine pool | 18F-fluoro-L-dopa, 18F-fluoro-L-m-tyrosine |
| D2 Dopamine receptors | 11C-N-methylspiperone, 11C-raclopride |
| | 18F-spiperone, 18F-N-methylspiperone |
| D1 Dopamine receptors | 11C-SCH23390 |
| Dopamine reuptake sites | 11C-nomifensine, 11C-cocaine, 18F-GBR |
| | 11C-carfentanil, 11C-diprenorphine |
| Opiate | 18F-cyclofoxy |
| Benzodiazepine | 11C-flumazenil |
| Serotonergic | |
| Pre-synaptic serotonin pool | 11C-α-methyl-tryptophan |
| 5-HT1A receptors | 11C-WAY100,655 |
| 5-HT2A receptors | 11C-MDL100,907, 18F-altanserin, 18F-setoperone |
| 5-HT reuptake sites | 11C-McN5652 |
| MAO-B enzyme | 11C-deprenyl |
| **Amino acid transport, protein synthesis** | |
| | 11C-methionine, 11C-leucine, 11C-tyrosine |
| **Tissue pH** | 11CO2, 11C-DMO |
| **Tissue drug kinetics** | 11C-phenytoin, 11C-valproate, 13N-BCNU |

NIH-PA Author Manuscript    NIH-PA Author Manuscript    NIH-PA Author Manuscript

NIH-PA Author Manuscript    NIH-PA Author Manuscript    NIH-PA Author Manuscript

**Table 2**

Partial list of SPECT radiotracers

| Target system or process | | SPECT radiotracers |
|---|---|---|
| *Cerebral Blood Flow* | | 123I-iodoamphetamine (123I-IMP) |
| | | 99mTc-exametazime (99mTc-HMPAO) |
| | | 99mTc-ethyl cysteinate dimer (99mTc-ECD) |
| *Cerebral plasma and red cell volume* | | 99mTc human serum albumin |
| | | 99mTc red blood cells |
| *Neuroreceptor Systems* | | |
| Dopaminergic | D2 Dopamine receptors | 123I-IBZM, 123I-epidepride |
| | D1 Dopamine receptors | 123I-SCH23982 |
| | Dopamine reuptake sites | 123I-β-CIT |
| Benzodiazepine | | 123I-iomazenil |
| Cholinergic | muscarinic | 123I-QNB, 123I-iododexetimide |
| Serotonergic | 5-HT2A receptors | 123I-R93274 |
| *Amino acid transport* | | 123I-iodo-α-methyl tyrosine |

Table 3

MRS Signal and functional significance

Tables adapted from Herscovitch et al., 2000, and Yurgelun-Todd and Renshaw, 2000

| Functional significance | Signals |
|---|---|
| **1H-MRS** | |
| Neuronal viability | N-acetyl-aspartate (NAA) |
| Levels increase with brain maturation | |
| Phospholipid metabolism | Choline (CHO) |
| Cellular energy metabolism | Creatinine + phospho creatine (CRE) |
| Anaerobic metabolism | Lactate (LAC) |
| **31P-MRS** | |
| Information on the energy status of the brain | High energy phosphates, phosphocreatine (PCr) peak and polyphosphate regions of the spectrum (primarily ATP) |
| Building blocks of membrane phospholipids | Phosphomonoesters (PME) peak phosphoethanolamine(GPE), phosphocholine (PC), α-glycerol phosphate (GP) (sugar phosphate) |
| Major catabolic products of membrane phospholipid degradation and phospholipids | Phosphodiester (PDE) peak, GPE, GPC, mobile phospholipids |
| Final end-product of all of the phosphorus metabolites | Pi peak |

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

# EXHIBIT E

ANNALS OF THE NEW YORK ACADEMY OF SCIENCES
Volume 1094

# RESILIENCE IN CHILDREN

*Edited by Barry M. Lester, Ann S. Masten, and
Bruce McEwen*

*Published by Blackwell Publishing on behalf of the New York Academy of Sciences*
*Boston, Massachusetts*
*2006*

**Mailing:** The *Annals of the New York Academy of Sciences* are mailed Standard Rate.
**Postmaster:** Send all address changes to *Annals of the New York Academy of Sciences*, Blackwell Publishing, Inc., Journals Subscription Department, 350 Main Street, Malden, MA 01248-5020. Mailing to rest of world by DHL Smart and Global Mail.

**Copyright and Photocopying**

© 2006 The New York Academy of Sciences. All rights reserved. No part of this publication may be reproduced, stored, or transmitted in any form or by any means without the prior permission in writing from the copyright holder. Authorization to photocopy items for internal and personal use is granted by the copyright holder for libraries and other users registered with their local Reproduction Rights Organization (RRO), e.g. Copyright Clearance Center (CCC), 222 Rosewood Drive, Danvers, MA 01923, USA (www.copyright.com), provided the appropriate fee is paid directly to the RRO. This consent does not extend to other kinds of copying such as copying for general distribution, for advertising or promotional purposes, for creating new collective works, or for resale. Special requests should be addressed to Blackwell Publishing at journalsrights@oxon.blackwellpublishing.com.

**Disclaimer:** The Publisher, the New York Academy of Sciences, and the Editors cannot be held responsible for errors or any consequences arising from the use of information contained in this publication; the views and opinions expressed do not necessarily reflect those of the Publisher, the New York Academy of Sciences, or the Editors.

*Annals* are available to subscribers online at the New York Academy of Sciences and also at Blackwell Synergy. Visit www.annalsnyas.org or www.blackwell-synergy.com to search the articles and register for table of contents e-mail alerts. Access to full text and PDF downloads of *Annals* articles are available to nonmembers and subscribers on a pay-per-view basis at www.annalsnyas.org.

The paper used in this publication meets the minimum requirements of the National Standard for Information Sciences Permanence of Paper for Printed Library Materials, ANSI Z39.48_1984.

ISSN: 0077-8923 (print); 1749-6632 (online)
ISBN-10: 1-57331-643-1 (paper); ISBN-13: 978-1-57331-643-9 (paper)

A catalogue record for this title is available from the British Library.

**Digitization of the *Annals of the New York Academy of Sciences***

An agreement has recently been reached between Blackwell Publishing and the New York Academy of Sciences to digitize the entire run of the *Annals of the New York Academy of Sciences* back to volume one.

The back files, which have been defined as all of those issues published before 1997, will be sold to libraries as part of Blackwell Publishing's Legacy Sales Program and hosted on the Blackwell Synergy website.

Copyright of all material will remain with the rights holder. Contributors: Please contact Blackwell Publishing if you do not wish an article or picture from the *Annals of the New York Academy of Sciences* to be included in this digitization project.

This material may be protected by Copyright law (Title 17 U.S. Code)

# Stress and the Adolescent Brain

RUSSELL D. ROMEO AND BRUCE S. McEWEN

*Laboratory of Neuroendocrinology, Rockefeller University, New York, New York, USA*

ABSTRACT: During adolescence the brain shows remarkable changes in both structure and function. The plasticity exhibited by the brain during this pubertal period may make individuals more vulnerable to perturbations, such as stress. Although much is known about how exposure to stress and stress hormones during perinatal development and adulthood affect the structure and function of the brain, relatively little is known about how the pubertal brain responds to stress. Furthermore, it is not clear whether stressors experienced during adolescence lead to altered physiological and behavioral potentials in adulthood, as has been shown for perinatal development. The purpose of this review is to present what is currently known about the pubertal maturation of the hypothalamic-pituitary-adrenal (HPA) axis, the neuroendocrine axis that mediates the stress response, and discuss what is currently known about how stressors affect the adolescent brain. Our dearth of knowledge regarding the effects of stress on the pubertal brain will be discussed in the context of our accumulating knowledge regarding stress-induced neuronal remodeling in the adult. Finally, as the adolescent brain is capable of such profound plasticity during this developmental stage, we will also explore the possibility of adolescence as a period of interventions and opportunities to mitigate negative consequences from earlier developmental insults.

KEYWORDS: adolescence; adrenocorticotropic hormone (ACTH); *amygdale;* hippocampus; hypothalamic-pituitary-adrenal (HPA); axis neuroendocrine; stress

## INTRODUCTION

Adolescence is increasingly being viewed as a significant period of developmental vulnerabilities.[5–7] For instance, puberty is marked by an increase in the morbidity and susceptibility to various psychological disorders, such as anxiety and depression.[8,9] However, it is presently unclear what central mechanisms may mediate the pubertal increase in these events. Interestingly, stressors in adulthood can lead to the onset and exacerbation of psychological disorders.[10] Furthermore, brain regions implicated in stress reactivity and

Address for correspondence: Russell D. Romeo, Laboratory of Neuroendocrinology, The Rockefeller University, Box 165, New York, NY 10021. Voice: +212-327-8623; fax: +212-327-8634.
  e-mail: romeor@rockefeller.edu

Ann. N.Y. Acad. Sci. 1094: 202–214 (2006). © 2006 New York Academy of Sciences.
  doi: 10.1196/annals.1376.022

emotionality, such as the hippocampus, medial prefrontal cortex (mPFC), and amygdala (AMY) undergo profound changes in both structure and function in response to stress.[4] Thus, stress-induced alterations in the pubertal nervous system may contribute to an individual's vulnerability to the onset of psychopathologies during adolescence. There is presently a paucity of knowledge regarding how stressors may affect the brain during adolescence. This is quite surprising for two reasons. First, stress reactivity changes dramatically depending on both the pubertal development and experience of an individual (see below). Second, brain regions that are highly sensitive to stress hormones play an important role in regulating emotionality and stress responsiveness (i.e., hippocampus, mPFC, AMY) continue to mature during the peripubertal period.[1–3,6,11–13] It is our hope that this review will provide a point of departure for future experiments elucidating the role of stress on the developing pubertal brain.

## Pubertal Maturation of the Hypothalamic-Pituitary-Adrenal (HPA) Axis

The release of stress hormones by the HPA axis is driven by the release of corticotropin-releasing hormone (CRH) and vasopressin (AVP) from the medial parvocellular division of the paraventricular hypothalamic nucleus (PVN). CRH and AVP are released into the portal system of the pituitary, which in turn causes the release of adrenocorticotropic hormone (ACTH) from the anterior pituitary. ACTH then stimulates the secretion of the glucocorticoids (e.g., cortisol in primates and corticosterone in most rodent species) from the adrenal cortex. The stress hormones secreted by the HPA axis indirectly control their own secretion through a classic neuroendocrine negative feedback loop. That is, the glucocorticoids feedback on the PVN and many other extrahypothalamic sites, in particular, the hippocampus and mPFC, to inhibit further release of CRH[14] (FIG. 1). In addition to extrahypothalamic sites of negative feedback on the PVN, projections from the central nucleus of the amygdala (CeA) can activate the PVN and modulate stress reactive behaviors[14] (FIG. 1).

Studies that have examined stress responsiveness in juvenile animals have demonstrated that although basal and stress-induced ACTH and corticosterone secretion are similar in prepubertal and adult animals, prepubertal animals have a much more prolonged ACTH and corticosterone stress response compared to adults. For example, in males exposed to either intermittent foot shock,[15] ether vapors,[16] or restraint,[17] corticosterone levels of prepubertal males take at least 45 to 60 min longer to return to baseline compared to adults (FIG. 2). It is important to note that this extended response exhibited by prepubertal animals is to both total and free corticosterone,[18] indicating that corticotropin-binding globulin (CBG) is not upregulated to "buffer" the prepubertal animal from this prolonged exposure to corticosterone.



**FIGURE 1.** A diagram of the HPA axis and various extrahypothalamic sites that play a role in modulating stress hormone secretion. Abbreviations, A = adrenal; ACTH = adrenocorticotropic hormone; AVP = vasopressin; CeA = central nucleus of the amygdala; CORT = corticosterone; CRH = corticotropin-releasing hormone; Hipp = hippocampus; H = hypothalamus; mPFC = medial prefrontal cortex; P = pituitary; PVN = paraventricular nucleus; (+), positive drive; and (−), negative feedback.

The above-mentioned studies examined the hormonal stress response in prepubertal and adult animals only in the context of a single, acute stressor. However, it is well documented that experience with a stressor can also influence stress reactivity. For instance, in adults, repeated exposure to a stressor leads to habituation of the stress response, such that peak stress hormone levels are blunted.[19–22] Interestingly, we found that experience and pubertal maturation interact to affect HPA axis plasticity.[18] Specifically, we showed that, in contrast to the extended response observed after acute stress, chronic stress resulted in prepubertal males exhibiting a higher peak ACTH and corticosterone (free and total) response immediately following the stressor, but a faster return to baseline, compared to adults (FIG. 3).

In addition to these endocrine differences in stress reactivity, we have also found that this differential response to acute and chronic stress is associated with differential neuronal activation in the PVN of prepubertal and adult



**FIGURE 2.** Plasma ACTH and corticosterone concentrations in prepubertal and adult males before and after a 30-min session of restraint stress.[17]

animals.[18] Moreover, we have established that a significantly larger proportion of CRH, but not AVP, cells are activated in the PVN in response to both acute and chronic stress in prepubertal compared to adult animals.[18] Together, these data indicate that experience-dependent plasticity of the HPA axis is markedly influenced by pubertal development, and that CRH neurons of the PVN are at least one neural locus involved in these changes.

The physiological and behavioral implications of these differential stress responses in prepubertal compared to adult animals are currently unknown. However, two factors may render the prepubertal brain especially vulnerable to stress. First, the prepubertal brain may be more sensitive to corticosterone, as a recent study showed an equivalent dose of corticosterone increased hippocampal N-methyl-D-aspartate (NMDA) receptor subunit expression (e.g., NR2A and NR2B) to a greater degree in prepubertal than adult males.[23] Second, brain regions that continue to mature during adolescence, such as hippocampus,[24–26] PFC,[1,11,27] and AMY,[12,28] are also the most sensitive to corticosterone.[4] Thus, upon encountering a similar stressor, the immature, and possibly more



**FIGURE 3.** Plasma corticosterone concentrations in prepubertal and adult males exposed to a single 30-min session of restraint (acute stress) or a daily 30-min session of restraint for 1 week (chronic stress).[18]

sensitive, prepubertal brain experiences differential exposure to corticosterone compared to the more fully developed adult brain.

### Stress and the Adolescent Brain: What We Can Learn from the Adult Brain

Though few experiments have examined the effects of stress on the structure of the pubertal brain, it is widely recognized that stressors experienced during adolescence can have long-lasting and profound consequences for the future behavioral and psychological function of an individual. For instance, human studies clearly demonstrate that stress burden during adolescence is strongly correlated with the subsequent onset of depressive and/or anxiety disorders in adulthood.[29] Similarly, studies in rodents indicate that animals exposed to stress during puberty show increases in basal and stress-induced anxiety-like behaviors upon reaching adulthood.[30,31] The neural correlates associated with these long-lasting changes in emotionality and behavior remain unknown. However, the effects of stress on the structural remodeling of the adult brain have been relatively well studied.[4] Thus, we will next discuss stress and structural remodeling of the adult brain, namely in the hippocampus, PFC, and AMY, to highlight current and future directions regarding the influence of stress on the adolescent brain.

#### Hippocampus

The hippocampus is critically important in learning and memory,[32] and continues to develop well into adolescence.[24,33] In adult male rats, chronic restraint (6-h per day of restraint stress for 3 weeks) or social stress significantly



**FIGURE 4.** Schematic diagrams of dendritic remodeling in the adult hippocampus (*top*), mPFC (*middle*), and basolateral amygdala (*bottom*). Note that the dendritic remodeling of both the hippocampus and mPFC are reversible, while basolateral amygdala dendritic hypertrophy is longer lasting.

reduces branching of the apical dendrites of the CA3 region of hippocampus[34–36] (FIG. 4). The apical dendrites of CA3 neurons receive inputs from the granule neurons of the dentate gyrus.[37] The stress-induced remodeling in the hippocampus is dependent on corticosterone as cyanoketone, a corticosterone synthesis inhibitor, blocks the stress-induced atrophy of the CA3 dendrites,[19] while chronic injections of corticosterone mimic the stress-induced atrophy.[38] Interestingly, these effects of stress on hippocampal structure are reversible such that 10 days after the last stress session dendritic branching reverts to prestress levels[39] (FIG. 4).

Parallel to these morphological studies, it was found that chronic stress results in spatial memory impairment.[40] Furthermore, chronically stressed animals pretreated with tianeptine, an antidepressant that blocks stress-induced CA3 dendritic atrophy,[41] showed spatial abilities similar to nonstressed control animals.[40] Together, these data indicated that stress potently affects the adult hippocampus and suggests that the stress-induced dendritic atrophy

demonstrated by the CA3 pyramidal cells adversely affects spatial cognition. It is important to note, however, that these effects of stress are reversible.

A recent study aimed at understanding stress and puberty showed that male rats exposed to variable physical and social stressors throughout adolescence exhibited volumetric deficits in CA1 and CA3 pyramidal cell layers as well as the dentate gyrus of the hippocampus.[25] The authors suggested that the reduction in hippocampal volume was due to stress blocking the normal maturational increase in hippocampal volume.[25] Interestingly, these effects on the hippocampus were not observed until 3 weeks after the stress sessions were terminated, indicating these effects of chronic stress on the developing adolescent hippocampus are delayed. Furthermore, the decrease in hippocampal volume was associated with deficits on the Morris water maze, a commonly used task to assess spatial memory.[25] Thus, these data indicate that, similar to the adult, the pubertal hippocampus is sensitive to stress. However, unlike the reversibility of the effect of stressors on the adult hippocampus, it appears that the effects of pubertal stress may be long-lasting, and perhaps permanent. Future studies will need to assess whether pubertal stress affects the structure and function of the hippocampus months after the stressors have been terminated, and whether behavioral effects persist into adulthood and aging. It will also be interesting to examine whether various pharmacological interventions shown to block stress-induced remodeling of the adult hippocampus, such as tianeptine,[41] phenytoin,[42] or lithium,[43] mitigate stress-induced changes in the pubertal hippocampus.

### Prefrontal Cortex

The PFC is a key brain region involved in the regulation of emotional behaviors, executive function, and fear extinction.[44] In adults, chronic restraint stress (6-h per day of restraint stress for 3 weeks) results in reductions in both apical dendritic branching and spine density of medial prefrontal cortical pyramidal neurons in layer II/III of the anterior cingulate cortex and prelimbic area[45,46] (FIG. 4). As chronic injections of corticosterone mimic the effects of chronic stress on the prefrontal cortex it appears that stress-induced release of corticosterone is involved in the mechanism for these morphological changes.[47] The remodeling of the mPFC in response to stress is reversible such that animals allowed to recover for 3 weeks after exposure to chronic stress show dendritic branching similar to nonstress controls[48] (FIG. 4). The stress-induced remodeling in the PFC is associated with impairment of attention set-shifting,[49] an adaptive behavior that is also impaired by lesions of the mPFC.[50] Moreover, whereas mPFC neurons show atrophy with chronic stress, neurons in the orbitofrontal cortex show growth as a result of repeated stress.[49] These data indicate the structure of the prefrontal cortex is sensitive to the remodeling effects of stress and these morphological changes may mediate, at least in part, the changes in emotionality after prolonged exposure to stress.[4]

Similar to the hippocampus, the prefrontal cortex continues to mature throughout adolescence.[1,11] However, it is presently unknown whether exposure to stress during puberty affects the structure and function of the prefrontal cortex. Given that the pubertal mPFC expresses glucocorticoid receptors (R. D. Romeo, unpublished observation), it seems likely that this brain area would be sensitive to stress. Based on the accumulating evidence that exposure to stressors during adolescence can lead to an increased propensity to develop emotional and psychological disorders (i.e., depression and anxiety),[29] it is imperative to understand the influence of stress and stress hormones on such an important node in the neuronal circuitry of emotional regulation.

## Amygdala

The AMY plays a central role in emotional memory and fear conditioning.[51] Unlike the stress-induced dendritic atrophy exhibited by the adult hippocampus and mPFC, adults show dendritic hypertrophy in the basolateral, but not central nucleus, of the amygdala after chronic immobilization stress (2-h per day of immobilization stress for 10 days; FIG. 4).[52,53] This chronic immobilization stress paradigm also results in elevated anxiety-like behaviors, suggesting that the dendritic hypertrophy influences anxiety levels.[54] Dissimilar to the reversibility of dendritic atrophy of the hippocampus[39] and mPFC,[48] stress-induced dendritic hypertrophy in the amygdala and increased levels of anxiety-like behaviors remain even after 3 weeks of stress-free recovery[55] (FIG. 4). It is presently unknown whether these effects of stress on amygdalar morphology are dependent upon stress-induced release of corticosterone. However, as glucocorticoid receptors are expressed in the amygdala,[56] it would appear likely that the effects of stress on the amygdala are, at least in part, due to the actions of corticosterone.

Pubertal development is marked by changes in the structure and function of the AMY.[28,33] However, the effects of stress on AMY during pubertal development remain unknown. Like the mPFC, the adolescent amygdala expresses abundant glucocorticoid receptors (R. D. Romeo, unpublished observation), indicating corticosterone sensitivity in this area. Future studies will need to examine the impact of stress on the developing AMY during puberty, and whether any effects on the structure and function of this brain region are transient or permanent.

## Adolescence as a Period of Interventions and Opportunities

Puberty is marked by profound changes in an individual's nervous system, physiology, and behavior.[12,57,58] Although this may render an individual especially vulnerable to harm during this period, it may also allow for interventions to mitigate earlier or concurrent emotional and/or physical trauma.[5]

A stunning example of puberty as a period of opportunity to diminish the impact of an earlier, negative trauma comes from a classic paper by Twiggs, Popolow, and Gerall.[59] In this study, prepubertal males were housed alone (solitary) or in groups (social) and then given lesions of the medial preoptic nucleus of the anterior hypothalamus (MPN), an area of the brain critical for the display of male reproductive behavior.[60] Although MPN lesions in adulthood lead to irreversible deficits in male mating, males receiving a lesion prior to puberty were able to show copulatory behaviors upon reaching adulthood.[59] Interestingly, however, only the animals raised in the social groups during adolescence demonstrated substantial behavioral reversal of the effects of MPN lesions.[59] These data indicate that pubertal development and the social environment can interact to diminish or even reverse prior brain damage.

Recent studies have also explored the ability of environmental enrichment during adolescence to offset the negative influences of perinatal stress. For instance, animals derived from stressful pregnancies show increases in anxiety-related behaviors and HPA reactivity and depressed play behavior later in life.[61,62] However, animals raised in an enriched environment (larger housing, toys, running wheel) during puberty do not show these negative physiological and behavioral effects of prenatal stress compared to prenatally stressed offspring raised under normal laboratory conditions.[61,62] In addition to prenatal stress, postnatal stress in the form of suboptimal maternal care and maternal separation leads to increased HPA reactivity and emotionality and reduced cognitive function in adulthood.[63,64] Similar to the studies mentioned above, animals exposed to postnatal stress, but raised in enriched environments during puberty, show less HPA reactivity and emotionality and greater cognitive abilities compared to their postnatally stressed counterparts that were raised in standard laboratory environments.[65–67] Taken together, these studies clearly demonstrate that the pubertal period of development can serve as a time of interventions and opportunities to reduce or reverse the adverse effects accumulated from earlier insults.

## CONCLUSIONS

The literature reviewed above indicates that stress reactivity is markedly influenced by both the pubertal maturation and the experience of the individual. Furthermore, although stress affects key regulatory nuclei related to stress responsiveness, emotional behavior, and cognitive function in adulthood, scant information exist about the effects of stress on the pubertal nervous system. Finally, it is important to note that despite the possible vulnerabilities of the pubertal brain to stress, adolescence may also provide opportunities to alleviate adverse effects of stress experienced earlier in development. Although much research remains to be done regarding the effects of stress on the structure and function of the adolescent brain, the vast body of stress research on adults

may aid in honing our potential hypothesis and provide a point of departure for future experiments.

# REFERENCES

1. GIEDD, J.N. 2004. Structural magnetic resonance imaging of the adolescent brain. Ann. N.Y. Acad. Sci. **1021:** 77–85.
2. BLAKEMORE, S.-J. & S. CHOUDHURY. 2006. Development of the adolescent brain: implications for executive function and social cognition. J. Child Psychol. Psychiatry **47:** 296–312.
3. MACCARI, S. *et al.* 2003. Prenatal stress and long-term consequences: implications of glucocorticoid hormones. Neurosci. Biobehav. Rev. **27:** 119–127.
4. MCEWEN, B.S. 2005. Glucocorticoids, depression, and mood disorders: structural remodeling in the brain. Metabolism **54:** 20–23.
5. ANDERSEN, S.L. 2003. Trajectories of brain development: point of vulnerability or window of opportunity. Neurosci. Biobehav. Rev. **27:** 3–18.
6. SPEAR, L.P. 2000. The adolescent brain and age-related behavioral manifestations. Neurosci. Biobehav. Rev. **24:** 417–463.
7. DAHL, R.E. 2004. Adolescent brain development: a period of vulnerabilities and opportunities. Ann. N.Y. Acad. Sci. **1021:** 1–22.
8. CONGER, J. & A. PETERSEN. 1984. Adolescence and Youth: Psychological Development in a Changing World. Harper and Row. New York.
9. MASTEN, A. 1987. Toward a developmental psychopathology of early adolescence. *In* Early Adolescent Transitions. M. Levin & E. McAnarny, Eds.: 261–278. Heath. Lexington, KY.
10. MCEWEN, B.S. 2003. Mood disorders and allostatic load. Biol. Psychiatry. **54:** 200–207.
11. GOGTAY, N. *et al.* 2004. Dynamic mapping of human cortical development during childhood through early adulthood. Proc. Natl. Acad. Sci. USA **101:** 8174–8179.
12. ROMEO, R.D. 2003. Puberty: a period of both organizational and activational effects of steroid hormones on neurobehavioral development. J. Neuroendocrinol. **15:** 1185–1192.
13. SUZUKI, M. *et al.* 2005. Male-specific volume expansion of the human hippocampus during adolescence. Cerebral Cortex **15:** 187–193.
14. HERMAN, J.P. *et al.* 2003. Central mechanisms of stress integration: hierarchical circuitry controlling hypothalamic-pituitary-adrenocortical responsiveness. Front Neuroendocrinol. **24:** 151–180.
15. GOLDMAN, L. *et al.* 1973. Postweaning development of negative feedback in the pituitary-adrenal system of the rat. Neuroendocrinology **12:** 199–211.
16. VAZQUEZ, D.M. & H. AKIL. 1993. Pituitary-adrenal response to ether vapor in the weanling animal: characterization of the inhibitory effect of glucocorticoids on adrenocorticotropin secretion. Pediatric Res. **34:** 646–653.
17. ROMEO, R.D. *et al.* 2004. Testosterone cannot activate an adult-like stress response in prepubertal male rats. Neuroendocrinology **79:** 125–132.
18. ROMEO, R.D. *et al.* 2006. Stress history and pubertal development interact to shape hypothalamic pituitary adrenal axis plasticity. Endocrinology **147:** 1664–1674.
19. MAGARINOS, A.M. & B.S. MCEWEN. 1995. Stress-induced atrophy of apical dendrites of hippocampal CA3c neurons: involvement of glucocorticoid secretion and excitatory amino acid receptors. Neuroscience **69:** 89–98.

20. MARTI, O. & A. ARMARIO. 1997. Influence of regularity of exposure to chronic stress on the pattern of habituation of pituitary-adrenal hormones, prolactin and glucose. Stress 1: 179–189.

21. HELMREICH, D.L. et al. 1997. Correlation between changes in stress-induced corticosterone secretion and GR mRNA levels. Stress 2: 101–112.

22. HARRIS, R.B.S. et al. 2004. Increased glucocorticoid response to a novel stress in rats that have been restrained. Physiol. Behav. 81: 557–568.

23. LEE, P.R., D. BRANDY & J.I. KOENIG. 2003. Corticosterone alters N-methyl-D-aspartate receptor subunit mRNA expression before puberty. Mol. Brain Res. 115: 55–62.

24. MEYER, G., R. FERRES-TORRES & M. MAS. 1978. The effects of puberty and castration on hippocampal dendritic spines of mice. A Golgi study. Brain Res. 155: 108–112.

25. ISGOR, C. et al. 2004. Delayed effects of chronic variable stress during peripubertal-juvenile period of hippocampal morphology and on cognitive and stress axis function in rats. Hippocampus 14: 636–648.

26. ANDERSEN, S.L. & M.H. TEICHER. 2004. Delayed effects of early stress on hippocampal development. Neuropsychopharmacol 29: 1988–1993.

27. GIEDD, J.N. et al. 1999. Brain development during childhood and adolescence: a longitudinal MRI study. Nat. Neurosci. 2: 861–863.

28. ROMEO, R.D. & C.L. SISK. 2001. Pubertal and seasonal plasticity in the amygdala. Brain Res. 889: 71–77.

29. TURNER, R.J. & D.A. LLOYD. 2004. Stress burden and the lifetime incidence of psychiatric disorder in young adults. Arch. Gen. Psychiatry 61: 481–488.

30. AVITAL, A. et al. 2006. Effects of early-life stress on behavior and neurosteroid levels in the rat hypothalamus and entorhinal cortex. Brain Res. Bull. 68: 419–424.

31. AVITAL, A. & G. RICHTER-LEVIN. 2004. Exposure of juvenile stress exacerbates the behavioural consequences of exposure to stress in the adult rat. Int. J. Neuropsychopharmacol. 8: 1–11.

32. EICHENBAUM, H. 1997. Declarative memory: insights from cognitive neurobiology. Ann. Rev. Neurosci. 48: 547–572.

33. GIEDD, J.N. et al. 1996. Quantitative MRI of the temporal lobe, amygdala, and hippocampus in normal human development: ages 4–18 years. J. Comp. Neurol. 366: 223–230.

34. WATANABE, Y., E. GOULD & B.S. MCEWEN. 1992. Stress induces atrophy of apical dendrites of hippocampal CA3 pyramidal neurons. Brain Res. 588: 341–345.

35. MCEWEN, B.S. 1999. Stress and hippocampal synaptic plasticity. Ann. Rev. Neurosci. 22: 105–122.

36. MCKITTRICK, C.R. et al. 2000. Chronic social stress reduces dendritic arbors in CA3 hippocampus and decreases binding to serotonin transporter sites. Synapse 36: 85–94.

37. BLACKSTAD, T.W. & A. KJAERHEIM. 1961. Special axo-dendritic synapses in the hippocampal cortex: electron and light microscopic studies on the layer of mossy fibers. J. Comp. Neurol. 117: 133–159.

38. WOOLLEY, C.S., E. GOULD & B.S. MCEWEN. 1990. Exposure to excess glucocorticoids alters dendritic morphology of adult hippocampal pyramidal neurons. Brain Res. 531: 225–231.

39. CONRAD, C.D. *et al.* 1999. Repeated restraint stress facilitates fear conditioning independently of causing hippocampal CA3 dendritic atrophy. Behav. Neurosci. **113:** 902–913.

40. CONRAD, C.D. *et al.* 1996. Chronic stress impairs rat spatial memory on the Y maze, and this effect is blocked by tianeptine pretreatment. Behav. Neurosci. **110:** 1321–1334.

41. WATANABE, Y. *et al.* 1992. Tianeptine attenuates stress-induced morphological changes in the hippocampus. Eur. J. Pharmacol. **222:** 157–162.

42. WATANABE, Y. *et al.* 1992. Phenytoin prevents stress- and corticosterone-induced atrophy of CA3 pyramidal neurons. Hippocampus **2:** 431–435.

43. WOOD, G.E. *et al.* 2004. Stress-induced structural remodeling in hippocampus: prevention by lithium treatment. Proc. Natl. Acad. Sci. USA **101:** 3973–3978.

44. SOTRES-BAYON, F., C.K. CAIN & J.E. LEDOUX. 2006. Brain mechanisms of fear extinction: historical perspectives on the contribution of prefrontal cortex. Biol. Psychiatry. **60:** 329–336.

45. RADLEY, J.J. *et al.* 2006. Repeated stress induces dendritic spine loss in the rat medial prefrontal cortex. Cerebral Cortex **16:** 313–320.

46. RADLEY, J.J. *et al.* 2004. Chronic behavioral stress induces apical dendritic reorganization of pyramidal neurons of the medial prefrontal cortex. Neuroscience **125:** 1–6.

47. WELLMAN, C.L. 2001. Dendritic reorganization in pyramidal neurons in medial prefrontal cortex after chronic corticosterone administration. J. Neurobiol. **49:** 245–253.

48. RADLEY, J.J. *et al.* 2005. Reversibility of apical dendritic retraction in the rat medial prefrontal cortex following repeated stress. Exp. Neurol. **196:** 199–203.

49. LISTON, C. *et al.* 2006. In review. Stress-induced alterations in prefrontal cortical dendritic morphology predict selective impairments in perceptual attentional set-shifting. J. Neurosci. **26:** 7870–7874.

50. BIRRELL, J.M. & V.J. BROWN. 2000. Medial frontal cortex mediates perceptual attentional set shifting in the rat. J. Neurosci. **20:** 4320–4324.

51. LEDOUX, J.E. 2000. Emotion circuits in the brain. Ann. Rev. Neurosci. **23:** 155–184.

52. VYAS, A. *et al.* 2002. Chronic stress induces contrasting patterns of dendritic remodeling in hippocampus and amygdala neurons. J. Neurosci. **22:** 6810–6818.

53. VYAS, A., S. BERNAL & S. CHATTARJI. 2003. Effects of chronic stress on dendritic arborization in the central and extended amygdala. Brain Res. **965:** 290–294.

54. VYAS, A. & S. CHATTARJI. 2004. Modulation of different states of anxiety-like behavior by chronic stress. Behav. Neurosci. **118:** 1450–1454.

55. VYAS, A., A.G. PILLAI & S. CHATTARJI. 2004. Recovery after chronic stress fails to reverse amygdaloid neuronal hypertrophy and enhanced anxiety-like behavior. Neuroscience **128:** 667–673.

56. VAN EEKELEN, J.A., M.C. BOHN & E. R. DE KLOET. 1991. Postnatal ontogeny of mineralocorticoid and glucocorticoid receptor gene expression in regions of the rat tel- and diencephalon. Dev. Brain Res. **61:** 33–43.

57. ROMEO, R.D. 2005. Neuroendocrine and behavioral development during puberty: a tale of two axes. Vitam. Horm. **71:** 1–25.

58. ROMEO, R.D., H.N. RICHARDSON & C.L. SISK. 2002. Puberty and the maturation of the male brain and sexual behavior: recasting a behavioral potential. Neurosci. Biobehav. Rev. **26:** 379–389.

59. Twiggs, D.G., H.B. Popolow & A.A. Gerall. 1978. Medial preoptic lesions and male sexual behavior: age and environmental interactions. Science **200:** 1414–1415.

60. Heimer, L. & K. Larsson. 1966/1967. Impairment of mating behavior on male rats following lesions of the preoptic-anterior hypothalamic continuum. Brain Res. **3:** 248–263.

61. Morley-Fletcher, S. *et al.* 2003. Environmental enrichment during adolescence reverses the effects of prenatal stress on play behaviour and HPA axis reactivity in rats. Eur. J. Neurosci. **18:** 3367–3374.

62. Laviola, G. *et al.* 2004. Beneficial effects of enriched environment on adolescent rats from stressed pregnancies. Eur. J. Neurosci. **20:** 1655–1664.

63. Meaney, M.J. 2001. Maternal care, gene expression, and the transmission of individual differences in stress reactivity across generations. Ann. Rev. Neurosci. **24:** 1161–1192.

64. Pryce, C.R. *et al.* 2005. Long-term effects of early-life environmental manipulations in rodents and primates: potential animal models in depression research. Neurosci. Biobehav. Rev. **29:** 649–674.

65. Bredy, T.W. *et al.* 2004. Peripubertal environmental enrichment reverses the effects of maternal care on hippocampal development and glutamate receptor subunit expression. Eur. J. Neurosci. **20:** 1355–1362.

66. Bredy, T.W. *et al.* 2003. Partial reversal of the effect of maternal care on cognitive function through environmental enrichment. Neuroscience **118:** 571–576.

67. Francis, D.D. *et al.* 2002. Environmental enrichment reverses the effects of maternal separation on stress reactivity. J. Neurosci. **22:** 7840–7843.

**EXHIBIT F**

Review    TRENDS in Cognitive Sciences  Vol.9 No.2 February 2005    Full text provided by www.sciencedirect.com

SCIENCE ⟨d⟩ DIRECT®

# Cognitive and affective development in adolescence

**Laurence Steinberg**

Department of Psychology, Temple University, Philadelphia, PA 19122, USA

**Questions about the nature of normative and atypical development in adolescence have taken on special significance in the last few years, as scientists have begun to recast old portraits of adolescent behavior in the light of new knowledge about brain development. Adolescence is often a period of especially heightened vulnerability as a consequence of potential disjunctions between developing brain, behavioral and cognitive systems that mature along different timetables and under the control of both common and independent biological processes. Taken together, these developments reinforce the emerging understanding of adolescence as a critical or sensitive period for a reorganization of regulatory systems, a reorganization that is fraught with both risks and opportunities.**

## Introduction

Adolescence is characterized by an increased need to regulate affect and behavior in accordance with long-term goals and consequences, often at a distance from the adults who provided regulatory structure and guidance during childhood. Because developing brain, behavioral and cognitive systems mature at different rates and under the control of both common and independent biological processes, this period is often one of increased vulnerability and adjustment. Accordingly, normative development in adolescence can profitably be understood with respect to the coordination of emotional, intellectual and behavioral proclivities and capabilities, and psychopathology in adolescence may be reflective of difficulties in this coordination process.

The notion that adolescence is a heightened period of vulnerability specifically because of gaps between emotion, cognition and behavior has important implications for our understanding of many aspects of both normative and atypical development during this period of the life-span. With respect to normative development, for instance, this framework is helpful in understanding age differences in judgment and decision-making, in risk-taking, and in sensation-seeking [1]. With respect to atypical development, the framework helps us to understand why adolescence can be a time of increased risk for the onset of a wide range of emotional and behavioral problems, including depression, violent delinquency and substance abuse [2].

Questions about the nature of normative and atypical development in adolescence have taken on special significance in the last few years as scientists have begun to recast old portraits of adolescent psychological development in light of new knowledge about adolescent brain development. Recent discoveries in the area of developmental neuroscience have stimulated widespread scientific and popular interest in the study of brain development during adolescence, as well as substantial speculation about the connections between brain maturation and adolescents' behavioral and emotional development. Indeed, the topic has garnered such widespread public interest that it was the subject of a recent cover story in *Time* magazine aimed at parents of teenagers [3], and was raised in arguments submitted in late 2004 to the United States Supreme Court in connection with the Court's consideration of the constitutionality of the juvenile death penalty [4].

## Brain development in adolescence

As reviewed in the accompanying article by Paus [5] there is growing evidence that maturational brain processes are continuing well through adolescence. Even relatively simple structural measures, such as the ratio of white-to-gray matter in the brain, demonstrate large-scale changes into the late teen-age years [6–8]. The impact of this continued maturation on emotional, intellectual and behavioral development has yet to be thoroughly studied, but there is considerable evidence that the second decade of life is a period of great activity with respect to changes in brain structure and function, especially in regions and systems associated with response inhibition, the calibration of risk and reward, and emotion regulation. Contrary to earlier beliefs about brain maturation in adolescence, this activity is not limited to the early adolescent period, nor is it invariably linked to processes of pubertal maturation (Figure 1).

Two particular observations about brain development in adolescence are especially pertinent to our understanding of psychological development during this period. First, much brain development during adolescence is in the particular brain regions and systems that are key to the regulation of behavior and emotion and to the perception and evaluation of risk and reward. Second, it appears that changes in arousal and motivation brought on by pubertal maturation precede the development of regulatory competence in a manner that creates a disjunction between the adolescent's affective experience

*Corresponding author*: Steinberg, L. (lds@temple.edu).

Available online 23 December 2004



| Early adolescence | Middle adolescence | Late adolescence |
|---|---|---|

Maturation of frontal lobes facilitates regulatory competence

*TRENDS in Cognitive Sciences*

**Figure 1.** It has been speculated that the impact of puberty on arousal and motivation occurs before the maturation of the frontal lobes is complete. This gap may create a period of heightened vulnerability to problems in the regulation of affect and behavior, which might help to explain the increased potential in adolescence for risk-taking, recklessness, and the onset of emotional and behavioral problems.

and his or her ability to regulate arousal and motivation. To the extent that the changes in arousal and motivation precede the development of regulatory competence – a reasonable speculation, but one that has yet to be confirmed – the developments of early adolescence may well create a situation in which one is starting an engine without yet having a skilled driver behind the wheel [9].

### Cognitive development in adolescence

Until recently, much of the work on adolescent cognitive development was devoted to a search for a core mechanism that could account parsimoniously for broad changes in adolescent thinking [10]. After nearly 50 years of searching, what has emerged instead is the necessity of an integrated account. What lies at the core of adolescent cognitive development is the attainment of a more fully conscious, self-directed and self-regulating mind [10]. This is achieved principally through the assembly of an advanced 'executive suite' of capabilities [11], rather than through specific advancement in any one of the constituent elements. This represents a major shift in prevailing views of adolescent cognition, going beyond the search for underlying elements [12] that are formed and operate largely outside awareness.

As Keating [10] has noted, the plausibility of such an integrative account has been substantially enhanced by recent major advances in the neurosciences [6–8,13–18], in comparative neuroanatomy across closely related primate species that illuminate core issues of human cognitive evolution [10,19], and in a deepened understanding of the critical role of culture and context in the shaping of cognitive and brain development [11,20]. Much of the underlying action is focused on specific developments in the prefrontal cortex, but with an equally significant role for rapidly expanding linkages to the whole brain [11,15,21]. This complex process of assembly is supported by increasingly rapid connectivity (through continued myelination of nerve fibers), particularly in communication among different brain regions, and by significant and localized synaptic pruning, especially in frontal areas that are crucial to executive functioning [6–8,18].

Whatever the underlying processes, during early adolescence, individuals show marked improvements in reasoning (especially deductive reasoning), information processing (in both efficiency and capacity), and expertise. These conclusions derive from studies of age differences in logical reasoning on tasks in which participants are asked to solve verbal analogies or analyze logical propositions; basic cognitive processes, such short- or long-term memory; and in specialized knowledge [10]. There has been broad consensus for more than 25 years that, as a result of these gains, individuals become more capable of abstract, multidimensional, planned and hypothetical thinking as they develop from late childhood into middle adolescence (less is known about cognitive changes during late adolescence). No research in the past several decades has challenge this conclusion.

### Implications of new brain maturation research for adolescent cognitive development

After a rather lengthy period during the late 1980s and early 1990s, when the study of adolescent cognitive development was more or less moribund, interest in intellectual development during adolescence has been revitalized in recent years in two ways. First, researchers in the field of developmental neuroscience began to direct attention to the study of structural and functional aspects of brain development during early adolescence [6,8,13,22]. These studies have pointed both to significant growth and significant change in multiple regions of the prefrontal cortex throughout the course of adolescence, especially with respect to processes of myelination and synaptic pruning (both of which increase the efficiency of information processing) [8,17,23]. These changes are believed to undergird improvements in various aspects of executive functioning, including long-term planning, metacognition, self-evaluation, self-regulation and the coordination of affect and cognition [10]. Most research has focused on age differences in skills known to be related to functioning in the dorsolateral region of the prefrontal cortex, such as those involving working memory, spatial working memory and planning [24–26], but two recent studies [27,28] indicate as well that adolescence is a time of improvement

in abilities that have been linked to functioning in the ventromedial prefrontal cortex, such as the calibration of risk and reward (Box 1).

In addition, adolescence appears to be a time of improved connectivity between regions of the prefrontal cortex and several other areas of the limbic system, a restructuring that further affects the ways in which individuals evaluate and respond to risk and reward [22,29]. Whether and to what extent these changes in brain structure and function are linked to processes of pubertal maturation is not known. Some aspects of brain development are coincident with, and likely linked to, neuroendocrinological changes occurring at the time of puberty, but others appear to take place along a different, and later, timetable. Disentangling the first set from the second is an important challenge for the field [9]. It is also important to note that there are relatively few studies of developmental changes in brain function (as opposed to structure) in adolescence, and that conclusions about the putative links between changes in cognitive performance and changes in brain structure during adolescence are suggestive, rather than conclusive.

## Cognitive development in context

A second relatively new direction in research on adolescent cognitive development has involved the study of cognitive development as it plays out in its social context and, in particular, as it affects the development of judgment, decision-making and risk-taking [30–35]. New perspectives on adolescent cognition-in-context emphasize that adolescent thinking in the real world is a function of social and emotional, as well as cognitive, processes, and that a full account of the ways in which the intellectual changes of adolescence affect social and emotional development must examine the ways in which affect and cognition interact [10]. Studies of adolescents' reasoning or problem-solving using laboratory-based measures of intellectual functioning might provide better understanding of adolescents' potential competence than of their actual performance in everyday settings, where judgment and decision-making are likely affected by emotional states, social influences and expertise [1]. Thus, whereas studies of people's responses to hypothetical dilemmas involving the perception and appraisal of risk show few reliable age differences after middle adolescence, studies of actual risk-taking (e.g. risky driving, unprotected sexual activity, etc.) indicate that adolescents are significantly more likely to make risky decisions than are adults.

One reasonable hypothesis is that adults and adolescents 16 and older share the same logical competencies, but that age differences in social and emotional factors, such as susceptibility to peer influence or impulse control, lead to age differences in actual decision-making [36]. Research that examines developmental changes in cognitive abilities assessed under varying social and emotional conditions (e.g. the same task administered under conditions of high versus low affective arousal, or in the presence versus absence of peers) would be potentially quite informative, as at least one study indicates that adolescents' risk taking is more influenced than that of adults by the presence of peers [37] (Figure 2).

Consistent with findings on the advances in reasoning, characteristic of the transition into adolescence, studies of social cognition demonstrate that the ways in which adolescents think about others becomes more abstract, more differentiated and more multidimensional [38]. More recent studies of changes in social cognition during adolescence have attempted to clarify the conditions under which relatively more advanced displays of social cognition are likely to be seen; to describe gender and cultural differences in certain aspects of social cognition, such as prosocial reasoning [39,40] or impression formation [41]; and to examine the links between social cognition and social behavior. These studies indicate that patterns of social cognitive development in adolescence, like patterns of cognitive development more generally, vary both as a function of the content under consideration and the emotional and social context in which the reasoning occurs [38].

For example, although individuals' thinking about moral dilemmas becomes more principled over the course

### Box 1. Age differences in ventromedial functioning

The most widely used task in the assessment of ventromedial functioning is the Iowa Gambling Task [56]. Subjects are asked to draw cards from one of four face-down decks; each card provides information on how much has been won and lost on that draw. Cards from two of the decks offer high rewards, but in one deck the rewards are paired either with occasional very high losses, and in the other with frequent modest losses, and continuing to draw from either of these decks results in a net loss over time. By contrast, cards from the other two decks offer low rewards, but these are paired either with frequent small losses, or sporadic, but modest, losses, and these decks lead to net gains over time.

Researchers monitor individuals' pattern of card selection over numerous trials. Healthy adults typically begin by drawing from the decks at random, then gradually increase their pulls from the 'good' decks and decrease their pulls from the 'bad' decks. The notable exceptions to this pattern are patients with lesions to the ventromedial prefrontal cortex, individuals with substance abuse problems, and individuals who report high levels of risk-taking in everyday life, all of whom persist in drawing from the 'bad' decks despite the net losses that result.

Only recently have studies examined age differences in the Iowa Gambling Task. In one study [27] of four age groups – 6–9 year-olds, 10–12 year-olds, 13–15 year-olds and 18–25 year-olds – the youngest subjects drew equally from the good and bad decks. The two middle groups showed modest improvement over time; by the final trial block, they were drawing from the good decks about 55% and 60% of the time, respectively. By the final block, however, the young adults were drawing from the good decks nearly 75% of the time, and they began shifting towards the good decks much earlier than the younger groups.

Another study, of 9- to 17-year-olds, also found significant improvement in performance on this task with age [28]. 14–17 year-olds drew from the good decks more often than 9–10 year-olds (although not more often than 11–13 year olds) and began shifting to the good decks earlier than did either of the younger groups. The researchers also administered two tasks known to activate the dorsolateral prefrontal cortex: a go/no-go task, which assesses response inhibition, and a digit span test, which assesses working memory. As expected, performance on both dorsolateral tasks improved with age. More importantly, however, there were no significant correlations between performance on the ventromedial task and performance on either of the dorsolateral tasks, suggesting that maturation of the ventromedial prefrontal cortex may be a developmentally distinct process from the maturation of other regions of the frontal lobe.



**Figure 2.** In a study designed to investigate age differences in risk-taking [37], participants were asked to play a computerized game in which they had opportunities to take driving risks, such as continuing to drive after a traffic light had turned yellow in order to drive the car further and earn more points. Individuals were randomly assigned to one of two conditions: playing the game alone, or playing it while two friends were watching and giving advice. The graph shows the number of times individuals risked crashing the car by stopping and then restarting it to try to drive a bit further after the yellow light had appeared. Adolescents (aged 13–16), youths (aged 18–22), and adults (aged 24 and older) demonstrated equivalent degrees of risk-taking when alone, but in the presence of peers, adolescents and youths, but not adults, took more risks.

of adolescence, their reasoning about real-life problems is often not as advanced as their reasoning about hypothetical dilemmas [42]. The correlation between adolescents' moral reasoning and their moral behavior is especially likely to break down when individuals define issues as personal choices rather than ethical dilemmas (for instance, when using drugs is seen as a personal matter rather than a moral issue) [43]. Similarly, when faced with a logical argument, adolescents are more likely to accept faulty reasoning or shaky evidence when they agree with the substance of the argument than when they do not [44,45]. And, although individuals' ability to look at things from another person's perspective increases in adolescence, the extent to which this advanced social perspective taking translates into tolerance for others' viewpoints depends on the particular issue involved [46]. In other words, adolescents' social reasoning, like that of adults, is influenced not only by their basic intellectual abilities, but by their desires, motives and interests.

## Affect and cognition

In contrast to most measures of cognitive development in adolescence, which seem to correlate more closely with age and experience rather than the timing of pubertal maturation, there is evidence for a specific link between pubertal maturation and developmental changes in arousal, motivation and emotion. For example, there is evidence that pubertal development directly influences the development of romantic interest and sexual motivation [47,48]. There is also evidence that some changes in emotional intensity and reactivity, such as changes in the frequency and intensity of parent–adolescent conflict, may be more closely linked to pubertal maturation than to age [49]. Some cognitive skills related to human face-processing have also shown intriguing alterations in mid-adolescence – an apparent *decrement* in face processing skills that is associated with sexual maturation (measured by Tanner staging by physical examinations) rather than

with age or grade level [50]. A parallel finding has been reported for voice recognition [51].

There is also evidence that increases in sensation-seeking, risk-taking and reckless behavior in adolescence are influenced by puberty and not chronological age. For example, in a study by Martin *et al.* [29], where sensation-seeking and risk behaviors were examined in a large group of young adolescents aged 11 to 14, there was no significant correlation between age and sensation-seeking, but a significant correlation between sensation-seeking and pubertal stage. There is also evidence in animal and human studies supporting a link between increasing levels of reproductive hormones and sensitivity to social status [52,53], which is consistent with the link between puberty and risk-taking, since several influential theories of adolescent risk-taking [54] suggest that at least some of this behavior is done in the service of enhancing one's standing with peers. Although further research is much needed, it appears that there are important links between pubertal maturation and social information-processing.

In some models of the development of affect regulation there is an explicit emphasis on cognitive systems exerting control over emotions and emotion-related behavior [55]. Many aspects of affect regulation involve the ability to inhibit, delay or modify an emotion or its expression in accordance with some rules, goals or strategies, or to avoid learned negative consequences. However, there is increasing understanding that cognitive-emotional interactions in adolescence also unfold in the other direction in important ways. Thus, just as cognition has an important impact on emotion, emotion has an important impact on basic cognitive processes, including decision-making and behavioral choice.

## Decision-making and risk-taking

Behavioral data have often made it appear that adolescents are poor decision-makers (i.e. their high-rates of participation in dangerous activities, automobile accidents, drug use and unprotected sex). This led initially to hypotheses that adolescents had poor cognitive skills relevant to decision-making or that information about consequences of risky behavior may have been unclear to them [56,57]. In contrast to those accounts, however, there is substantial evidence that adolescents engage in dangerous activities *despite* knowing and understanding the risks involved [29,58,59,60–63]. Thus, in real-life situations, adolescents do not simply rationally weigh the relative risks and consequences of their behavior – their actions are largely influenced by feelings and social influences [1].

In contrast to much previous work on adolescent decision-making that emphasized cognitive processes and mainly ignored affective ones, there is now increasing recognition of the importance of emotion in decision-making [64]. The 'decision' to engage in a specific behavior with long-term health consequences – such as smoking a cigarette, drinking alcohol, or engaging in unprotected sex – cannot be completely understood within the framework of 'cold' cognitive processes. ('Cold' cognition refers to thinking processes under conditions of low emotion and/or arousal whereas 'hot' cognition refers to thinking under conditions of strong feelings or high arousal and which

therefore may be much more important to understanding risky choices in real-life situations.) These affective influences are relevant in many day-to-day 'decisions' that are made at the level of 'gut-feelings' regarding what to do in a particular situation (rather than deliberate thoughts about outcome probabilities or risk value). These 'gut feelings' appear to be the products of affective systems in the brain that are performing computations that are largely outside conscious awareness [65,66]. How these feelings develop, become calibrated during maturation, and are influenced by particular types of experiences at particular points in development are only beginning to be studied within the framework of affective neuroscience [29]. It does, however, appear that puberty and sexual maturation have important influences on at least some aspects of affective influences on behavior through new drives, motivations and intensity of feelings, as well as new experiences that evoke strong feelings (such as developing romantic involvement) [67,68].

## The development of regulatory competence

During the adolescent transition, regulatory systems are gradually brought under the control of central executive functions, with a growing focus on the interface of cognition and emotion. Two important observations are especially important. The first is that the development of an integrated and consciously controlled 'executive suite' of regulatory capacities is a lengthy process. Yet, adolescents confront major, emotionally laden life dilemmas from a relatively early age – an age that has become progressively younger over historic time due to the decline in the age of pubertal onset and in the age at which a wide range of choices are thrust upon young people, as well as a decline in the active monitoring of adolescents by parents as a result of changes in family composition and labor force participation.

The second observation is that the acquisition of a fully coordinated and controlled set of executive functions occurs relatively later in development [10]. As such, it is less likely to be canalized (to the same degree as, say, early language acquisition), leaving greater opportunities for suboptimal trajectories. These suboptimal patterns of development take many different forms, clusters of which are associated with broad categories of psychopathology, such as the excessive down-regulation of mood and motivation that characterizes many internalizing difficulties, or the inadequate control of arousal that is associated with a wide range of risky behaviors typically seen as externalizing problems.

## Concluding comments

Like early childhood, adolescence may well be a sensitive or critical developmental period for both normative and maladaptive patterns of development [69–71]. Several aspects of development during this period are especially significant in this regard, among them: the role of puberty in a fundamental restructuring of many body systems and as an influence on social information-processing; the apparent concentration of changes in the adolescent brain in the prefrontal cortex (which serves as a governor of cognition and action) together with the enhanced inter-regional communication between the prefrontal cortex

and other brain regions; and the evidence for substantial synaptic pruning and for non-trivial physiological reversibility of behavioral and neuroendocrine patterns arising from early developmental experiences. Taken together, these developments reinforce the emerging understanding of adolescence as a critical or sensitive period for a reorganization of regulatory systems, a reorganization that is fraught with both risks and opportunities [10]. As we look to the future of research on cognitive and affective development in adolescence, the challenge facing researchers will be integrating research on psychological, neuropsychological and neurobiological development. What we now have are interesting pieces of a complicated puzzle, but the pieces have yet to be fit together in a way that moves the field out of the realm of speculation and towards some measure of certainty.

### Acknowledgements

Many of the ideas expressed in this article grew out of the work of the MacArthur Foundation Research Network on Psychopathology and Development. I am especially grateful to Ron Dahl, Dan Keating, David Kupfer, Ann Masten and Danny Pine for their contributions to the enterprise. Thanks also to Marnia Davis for bibliographic assistance.

### References

1 Steinberg, L. (2004) Risk-taking in adolescence: What changes, and why? Ann. N. Y. Acad. Sci. 1021, 51–58
2 Steinberg, L. et al. Psychopathology in adolescence: Integrating affective neuroscience with the study of context. In Developmental Psychopathology Vol. 1: Theory and Method (Cicchetti, D. and Cohen, D., eds), Wiley (in press)
3 Wallis, C. (2004) What makes teens tick. Time 10 May, pp. 56–65
4 Wiener, R. and Miller, M. (2004) Determining the death penalty for juveniles. APA Monitor on Psychology 35, 68
5 Paus, T. (2005) Mapping brain maturation and cognitive development during adolescence. Trends Cogn. Sci. 9, 000–000
6 Giedd, J. et al. (1999) Brain development during childhood and adolescence: A longitudinal MRI study. Nat. Neurosci. 2, 861–863
7 Sowell, E.R. et al. (2001) Improved memory functioning and frontal lobe maturation between childhood and adolescence: A structural MRI study. J. Int. Neuropsychol. Soc. 7, 312–322
8 Sowell, E.R. et al. (2002) Development of cortical and subcortical brain structures in childhood and adolescence: A structural MRI study. Dev. Med. Child Neurol. 44, 4–16
9 Dahl, R.E. (2001) Affect regulation, brain development, and behavioral/emotional health in adolescence. CNS Spectr. 6, 1–12
10 Keating, D.P. (2004) Cognitive and brain development. In Handbook of Adolescent Psychology (2nd edn) (Lerner, R.J. and Steinberg, L.D., eds), pp. 45–84, Wiley
11 Donald, M. (2001) A Mind So Rare: The Evolution of Human Consciousness, Norton
12 Dennett, D.C. (1996) Kinds of Minds: Toward an Understanding of Consciousness, Basic Books
13 Casey, B.J. et al. (2000) Structural and functional brain development and its relation to cognitive development. Biol. Psychol. 54, 241–257
14 Johnson, M.H. (2001) Functional brain development in humans. Nat. Rev. Neurosci. 2, 475–483
15 Luna, B. et al. (2001) Maturation of widely distributed brain function subserves cognitive development. Neuroimage 13, 786–793
16 Nelson, C.A. (1999) Neural plasticity and human development. Curr. Dir. Psychol. Sci. 8, 42–45
17 Paus, T. et al. (1999) Structural maturation of neural pathways in children and adolescents: in vivo study. Science 283, 1908–1911
18 Steingard, R.J. et al. (2002) Smaller frontal lobe white matter volumes in depressed adolescents. Biol. Psychiatry 52, 413–417
19 Rilling, J.K. and Insel, T.R. (1999) The primate neocortex in comparative perspective using magnetic resonance imaging. J. Hum. Evol. 37, 191–223

20 Francis, D.D. *et al.* (2002) Environmental enrichment reverses the effects of maternal separation on stress reactivity. *J. Neurosci.* 22, 7840–7843

21 Newman, J. and Grace, A.A. (1999) Binding across time: The selective gating of frontal and hippocampal systems modulating working memory and attentional states. *Conscious. Cogn.* 8, 196–212

22 Spear, P. (2000) The adolescent brain and age-related behavioral manifestations. *Neurosci. Biobehav. Rev.* 24, 417–463

23 Huttenlocher, P. (1994) Synaptogenesis, synapse elimination, and neural plicity in human cerebral cortex. In *Threats to Optimal Development: Integrating Biological, Psychological, and Social Risk Factors* (Vol. 27) (Nelson, C., ed.), pp. 35–54, Eralbaum

24 Luciana, M. and Nelson, C. (2002) Assessment of neuropsychological function through use of the Cambridge Neuropsychological Testing Automated Battery: Performance in 4- to 12-year-old children. *Dev. Neuropsychol.* 22, 595–624

25 Vuontella, V. *et al.* (2003) Audiospatial and visuospatial working memory in 6-13 year old school children. *Learn. Mem.* 10, 74–84

26 Welsh, M. *et al.* (1991) A normative-developmental study of executive function: A window on prefrontal function in children. *Dev. Neuropsychol.* 7, 131–149

27 Crone, E. and van der Molen, M. (2004) Developmental changes in real-life decision-making: Performance on a gambling task previously shown to depend on the ventromedial prefrontal cortex. *Dev. Neuropsychol.* 25, 251–279

28 Hooper, C. *et al.* (2004) Adolescents' performance on the Iowa Gabling Task: Implications for the development of decision-making and ventromedial prefrontal cortex. *Dev. Psychol.* 40, 1148–1158

29 Martin, C.A. *et al.* (2002) Sensation seeking, puberty and nicotine, alcohol and marijuana use in adolescence. *J. Am. Acad. Child Adolesc. Psychiatry* 41, 1495–1502

30 Cauffman, E. and Steinberg, L. (2000) (Im)maturity of judgment in adolescence: Why adolescents may be less culpable than adults. *Behav. Sci. Law* 18, 1–21

31 Fried, C.S. and Reppucci, N. (2001) Criminal decision-making: The development of adolescent judgment, criminal responsibility, and culpability. *Law Hum. Behav.* 25, 45–61

32 Maggs, J. *et al.* (1995) Risky business: The paradoxical meaning of problem behavior for young adolescents. *J. Early Adolesc.* 15, 344–362

33 Miller, D. and Byrnes, J. (1997) The role of contextual and personal factors in children's risk taking. *Dev. Psychol.* 33, 814–823

34 Scott, E. *et al.* (1995) Evaluating adolescent decision making in legal contexts. *Law Hum. Behav.* 19, 221–244

35 Steinberg, L. and Cauffman, E. (1996) Maturity of judgment in adolescence: Psychosocial factors in adolescent decisionmaking. *Law Hum. Behav.* 20, 249–272

36 Steinberg, L. *Adolescence* (7th edn), McGraw-Hill (in press)

37 Gardner, M. and Steinberg, L. Risk-taking among adolescents, young adults, and adults: The role of peer influence. *Dev. Psychol.* (in press)

38 Eisenberg, N. and Morris, A. (2004) Moral cognitions and prosocial responding in adolescence. In *Handbook of Adolescent Psychology* (Lerner, R. and Steinberg, L., eds), pp. 155–188, Wiley

39 Boehnke, K. *et al.* (1989) Developmental pattern of prosocial motivation: A cross national study. *J. Cross Cult. Psychol.* 20, 219–243

40 Jaffee, S. and Hyde, J.S. (2000) Gender differences in moral orientation: A meta-analysis. *Psychol. Bull.* 126, 703–726

41 Crystal, D. *et al.* (1998) Concepts of human differences: A comparison of American, Japanese, and Chinese children and adolescents. *Dev. Psychol.* 34, 714–722

42 Sobesky, W. (1983) The effects of situational factors on moral judgments. *Child Dev.* 54, 575–584

43 Kuther, T.L. and Higgins-D'Alessandro, A. (2000) Bridging the gap between moral reasoning and adolescent engagement in risky behavior. *J. Adolesc.* 23, 409–422

44 Klaczynski, P.A. (1997) Bias in adolescents' everyday reasoning and its relationships with intellectual ability, personal theories, and self-serving motivation. *Dev. Psychol.* 33, 273–283

45 Klaczynski, P. and Gordon, D. (1996) Everyday statistical reasoning during adolescence and young adulthood: Motivational, general ability, and developmental influences. *Child Dev.* 67, 2873–2891

46 Wainryb, C. *et al.* (2001) Children's, adolescents', and young adults' thinking about different types of disagreements. *Dev. Psychol.* 37, 373–386

47 Neeman, J. *et al.* (1995) The changing importance of romantic relationship involvement to competence from late childhood to late adolescence. *Dev. Psychopathol.* 7, 727–750

48 Udry, J. (1987) Hormonal and social determinants of adolescent sexual initiation. In *Adolescence and Puberty* (Bancroft, J., ed.), pp. 70–87, Oxford University Press

49 Steinberg, L. (1987) The impact of puberty on family relations: Effects of pubertal status and pubertal timing. *Dev. Psychol.* 23, 451–460

50 Diamond, R. *et al.* (1983) Genetic influences on the development of spatial skills during early adolescence. *Cognition* 13, 167–185

51 Mann, V. *et al.* (1979) Development of voice recognition: Parallels with face recognition. *J. Exp. Child Psychol.* 27, 153–165

52 Book, A. *et al.* (2001) The relationship between testosterone and aggression: A meta-analysis. *Aggression & Violent Behavior* 6, 579–599

53 Josephs, R.A. *et al.* (2003) Status, testosterone, and human intellectual performance: Stereotype threat as status concern. *Psychol. Sci.* 14, 158–163

54 Moffitt, T. (1993) Adolescence-limited and life-course-persistent antisocial behavior: A developmental taxonomy. *Psychol. Rev.* 100, 674–701

55 Thompson, R.A. and Fox, N.A. eds. (1994) Emotion regulation: A theme in search of definition. *Monogr. Soc. Res. Child Dev.* 59, No. 240

56 Botvin, G. (1991) Substance abuse prevention: Theory, practice, and effectiveness. In *Crime and Justice* (Tonry, M., ed.), pp. 461–519, University of Chicago Press

57 Tobler, N. (1986) Meta-analysis of 143 adolescent prevention programs: Quantitative outcome results of program participants compared to a control or comparison group. *J. Drug Issues* 16, 537–567

58 Benthin, A. *et al.* (1995) Adolescent health-threatening and health-enhancing behaviors: A study of word association and imagery. *J. Adolesc. Health* 17, 143–152

59 Cauffman, E. and Steinberg, L. (1995) The cognitive and affective influences on adolescent decision-making. *Temple Law Rev.* 68, 1763–1789

60 Slovic, P. (1987) Perception of risk. *Science* 236, 280–285

61 Slovic, P. (1998) Do adolescent smokers know the risks? *Duke Law J.* 47, 1133–1141

62 Slovic, P. (2000) What does it mean to know a cumulative risk? Adolescent's perceptions of short-term and long-term consequences of smoking. *J. Behav. Decis. Making* 13, 259–266

63 Slovic, P. (2000) Rejoinder: The perils of Viscusi's analyses of smoking risk perceptions. *J. Behav. Decis. Making* 13, 273–276

64 Loewenstein, G. and Lerner, J.S. The role of affect in decision-making. In *Handbook of Affective Science* (Goldsmith, H., ed.), Oxford University Press (in press)

65 Bechara, A. *et al.* (2000) Emotion, decision making and the orbitofrontal cortex. *Cereb. Cortex* 10, 295–307

66 Bechara, A. *et al.* (1999) Different contributions of the human amygdala and ventromedial prefrontal cortex to decision-making. *J. Neurosci.* 19, 5473–5481

67 Keating, D.P. and Sasse, D.K. (1996) Cognitive socialization in adolescence: Critical period for a critical habit of mind. In *Psychosocial Development During Adolescence: Progress in Developmental Contextualism* (Gullota, T.P., ed.), pp. 232–258, Sage

68 Richards, M.H. *et al.* (1998) Developmental patterns and gender differences in the experience of peer companionship during adolescence. *Child Dev.* 69, 154–163

69 Boyce, W.T. and Keating, D.P. Should we intervene to improve childhood circumstances? In *A Life Course Approach to Chronic Disease Epidemiology* (2nd edn) (Kuh, D. and Ben-Shlomo, Y., eds), Oxford University Press (in press)

70 Keating, D.P. and Hertzman, C. eds. (1999) *Developmental health and the wealth of nations: Social, biological, and educational dynamics,* Guilford Press

71 Meaney, M.J. (2001) Maternal care, gene expression, and the transmission of individual differences in stress reactivity across generations. *Annu. Rev. Neurosci.* 24, 1161–1192

# EXHIBIT G

Anna. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.



Annual Review of
Clinical Psychology

Volume 5, 2009

# Contents

Construct Validity: Advances in Theory and Methodology
  *Milton E. Strauss and Gregory T. Smith* .................................................... 1

Item Response Theory and Clinical Measurement
  *Steven P. Reise and Niels G. Waller* .......................................................... 27

Methodological Issues in Molecular Genetic Studies
of Mental Disorders
  *Carrie E. Bearden, Anna J. Jasinska, and Nelson B. Freimer* ............................. 49

Statistical Methods for Risk-Outcome Research: Being Sensitive
to Longitudinal Structure
  *David A. Cole and Scott E. Maxwell* .......................................................... 71

Psychological Treatment of Anxiety: The Evolution of Behavior
Therapy and Cognitive-Behavior Therapy
  *S. Rachman* ................................................................................... 97

Computer-Aided Psychological Treatments: Evolving Issues
  *Isaac Marks and Kate Cavanagh* ............................................................. 121

The Past, Present, and Future of HIV Prevention: Integrating
Behavioral, Biomedical, and Structural Intervention Strategies
for the Next Generation of HIV Prevention
  *Mary Jane Rotheram-Borus, Dallas Swendeman, and Gary Chovnick* ................. 143

Evolving Prosocial and Sustainable Neighborhoods and Communities
  *Anthony Biglan and Erika Hinds* ............................................................ 169

Five-Factor Model of Personality Disorder: A Proposal for DSM-V
  *Thomas A. Widiger and Stephanie N. Mullins-Sweatt* ................................... 197

Differentiating the Mood and Anxiety Disorders: A Quadripartite
Model
  *David Watson* ............................................................................... 221

When Doors of Perception Close: Bottom-Up Models of Disrupted
Cognition in Schizophrenia
  *Daniel C. Javitt* ............................................................................. 249

The Treatment of Borderline Personality Disorder: Implications
of Research on Diagnosis, Etiology, and Outcome
*Joel Paris* ................................................................................ 277

Development and Etiology of Disruptive and Delinquent Behavior
*Rolf Loeber, Jeffrey D. Burke, and Dustin A. Pardini* .................................... 291

Anxiety Disorders During Childhood and Adolescence:
Origins and Treatment
*Ronald M. Rapee, Carolyn A. Schniering, and Jennifer L. Hudson* ..................... 311

APOE-4 Genotype and Nenrophysiological Vulnerability
to Alzheimer's and Cognitive Aging
*Susan Bookheimer and Alison Burggren* .................................................. 343

Depression in Older Adults
*Amy Fiske, Julie Loebach Wetherell, and Margaret Gatz* ............................... 363

Pedophilia
*Michael C. Seto* ........................................................................ 391

Treatment of Smokers with Co-occurring Disorders: Emphasis on
Integration in Mental Health and Addiction Treatment Settings
*Sharon M. Hall and Judith J. Prochaska* ................................................ 409

Environmental Influences on Tobacco Use: Evidence from Societal
and Community Influences on Tobacco Use and Dependence
*K. Michael Cummings, Geoffrey T. Fong, and Ron Borland* .............................. 433

Adolescent Development and Juvenile Jnstice
*Laurence Steinberg* ..................................................................... 459

## Indexes

Cumulative Index of Contributing Authors, Volumes 1–5 ............................. 487

Cnmulative Index of Chapter Titles, Volnmes 1–5 ...................................... 489

## Errata

An online log of corrections to *Annual Review of Clinical Psychology* articles may be
found at http://clinpsy.annualreviews.org

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

This material may be protected by Copyright law (Title 17 U.S. Code)

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

# Adolescent Development and Juvenile Justice

## Laurence Steinberg

Department of Psychology, Temple University, Philadelphia, Pennsylvania 19122;
email: lds@temple.edu

Annu. Rev. Clin. Psychol. 2009. 5:459-85

The *Annual Review of Clinical Psychology* is online
at clinpsy.annualreviews.org

This article's doi:
10.1146/annurev.clinpsy.032408.153603

Copyright © 2009 by Annual Reviews.
All rights reserved

1548-5943/09/0427-0459$20.00

## Key Words

adolescence, crime, neuroscience, law, policy

## Abstract

Although justice system policy and practice cannot, and should not, be
dictated solely by studies of adolescent development, the ways in which
we respond to juvenile offending should be informed by the lessons of
developmental science. This review begins with a brief overview of the
history, rationale, and workings of the American juvenile justice system.
Following this, I summarize findings from studies of brain, cognitive,
and psychosocial development in adolescence that have implications for
the treatment of juveniles in the justice system. The utility of develop-
mental science in this context is illustrated by the application of these
research findings to three fundamental issues in contemporary justice
policy: the criminal culpability of adolescents, adolescents' competence
to stand trial, and the impact of punitive sanctions on adolescents' de-
velopment and behavior. Taken together, the lessons of developmental
science offer strong support for the maintenance of a separate juvenile
justice system in which adolescents are judged, tried, and sanctioned in
developmentally appropriate ways.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

## Contents

INTRODUCTION . . . . . . . . . . . . . . . . . . . 460
JUVENILE JUSTICE IN AMERICA:
   AN OVERVIEW . . . . . . . . . . . . . . . . . . 461
   The Origins of the Juvenile
      Justice System . . . . . . . . . . . . . . . . . . 461
   Critical Decision Points Along
      the Juvenile Justice Pipeline . . . . . 462
   The Relevance of Developmental
      Science to Decision Making
      in the Justice System . . . . . . . . . . . . 464
BRAIN, COGNITIVE, AND
   PSYCHOSOCIAL
   DEVELOPMENT IN
   ADOLESCENCE . . . . . . . . . . . . . . . . . . 465
   Adolescent Brain Development . . . . . 465
   Adolescent Cognitive
      Development . . . . . . . . . . . . . . . . . . . 467
   Adolescent Psychosocial
      Development . . . . . . . . . . . . . . . . . . . 468
JUVENILE JUSTICE ISSUES
   INFORMED BY
   DEVELOPMENTAL
   SCIENCE . . . . . . . . . . . . . . . . . . . . . . . 471
   Criminal Culpability of Youth . . . . . . 471
   Competence of Adolescents
      to Stand Trial . . . . . . . . . . . . . . . . . . 473
   Impact of Punitive Sanctions on
      Adolescent Development
      and Behavior . . . . . . . . . . . . . . . . . . . 477
SUMMARY AND CONCLUDING
   COMMENTS . . . . . . . . . . . . . . . . . . . . . 480

## INTRODUCTION

Few issues challenge a society's ideas about both the nature of human development and the nature of justice as much as serious juvenile crime. Because we neither expect children to be criminals nor expect crimes to be committed by children, the unexpected intersection between childhood and criminality creates a dilemma that most people find difficult to resolve. Indeed, the only ways out of this problem are either to redefine the offense as something less serious than a crime or to redefine the offender as someone who is not really a child (Zimring 1998).

For most of the twentieth century, American society has most often chosen the first approach—redefining the offense—and has treated most juvenile infractions as matters to be adjudicated as delinquent acts within a separate juvenile justice system designed, at least in theory, to recognize the special needs and immature status of young people and to therefore emphasize rehabilitation over punishment. Indeed, for much of the past century, states believed that the juvenile justice system was a vehicle to protect the public by providing a system that responds to children who are maturing into adulthood. States recognized that conduct alone—that is, the alleged criminal act—should not be dispositive in deciding when to invoke the heavy hand of the adult criminal justice system. They recognized that by providing for accountability, treatment, and supervision in the juvenile justice system—and in the community whenever possible—they promoted short-term and long-term public safety.

During the last two decades of the twentieth century, there was a dramatic shift in the way juvenile crime was viewed by policy makers and the public. Rather than choosing to define offenses committed by youth as delinquent, society increasingly opted to deal with young offenders more punitively in the juvenile justice system or to redefine them as adults and try them in adult criminal court. This trend was reflected in the growing number of juvenile offenses adjudicated in adult criminal court, where adolescents are exposed to a far more adversarial proceeding than in juvenile court; in the increasingly punitive response of the criminal justice system to juvenile offenders who are found guilty; and in what some observers have referred to as the "criminalization" of the juvenile justice system itself through increased use of punishment, rather than rehabilitation, as a legitimate juvenile justice goal (Feld 1993).

This transformation of juvenile justice policy and practice raises difficult, but important, questions for psychologists interested in the development and well-being of young people.

These questions are variations of the more general question of whether adolescents are fundamentally different from adults in ways that warrant the differential treatment of juveniles who break the law. In particular:

- Do adolescents have the psychological capabilities necessary to function as competent defendants in adult court?
- Should juveniles accused of crimes be held to the same standards of blameworthiness as adults and punished in the same ways as adult criminals who have committed similar crimes?
- How does exposing juveniles to especially punitive sanctions affect their behavior, development, and mental health?

These questions provide this review's focus. More broadly, the purpose of this review is to integrate developmental psychological considerations into moral, legal, political, and practical analyses of juvenile crime. Because addressing this issue necessitates at least a rudimentary understanding of the rationale and workings of the juvenile justice system, I begin not with a discussion of the science of adolescent development, but rather with a short history of juvenile justice in America and a brief overview of the process through which individuals are adjudicated within the system.

Following this brief introduction to American juvenile justice, I then summarize findings from recent studies of adolescent development that bear on whether adolescents differ from adults in ways that have implications for justice system policy and practice. Because not all aspects of adolescent development are pertinent to how young people are, or should be, treated in the justice system, I limit my discussion to studies that are especially relevant to these issues. Readers interested in a broader and more comprehensive treatment of adolescent development are encouraged to consult several recent reviews of this literature (Collins & Steinberg 2006, Smetana et al. 2006) as well as a recently updated handbook on adolescent psychology (Lerner & Steinberg 2009). I then look specifically at what we know about adolescents'

competence to stand trial, criminal culpability, and response to various types of sanctions and interventions.

## JUVENILE JUSTICE IN AMERICA: AN OVERVIEW

### The Origins of the Juvenile Justice System

Economic recessions in the early nineteenth century pushed children out of work in America's new factory system during the industrial revolution. Concerns about poor children on the street led to the creation of institutional care for children. In New York City, the Society for Prevention of Pauperism in 1824 became the Society for the Reformation of Juvenile Delinquents, and in 1825 opened the nation's first House of Refuge. Boston followed a year later and Philadelphia in 1828. These Houses of Refuge were designed to maintain class status and prevent unrest (Krisberg & Austin 1993, Platt 1977).

In 1899, Jane Addams and her Hull House colleagues established what is generally accepted as the nation's first juvenile court. Juvenile court judges, in the early part of the twentieth century, were authorized to investigate the character and social background of both predelinquent and delinquent children. They examined personal motivation as well as criminal intent, seeking to identify the moral reputation of problematic children (Platt 1977). Ben Lindsey, of Denver, was the juvenile court judge whose practice most closely matched the rhetoric of the emerging juvenile court:

> We should make it our business to study and know each particular case, because it will generally demand treatment in some little respect different from any other case.... (a) Is the child simply mischievous or criminal in its tendencies? (b) Is the case simply an exceptional or isolated instance in which a really good boy or girl has gone wrong for the first time because too weak to resist a strong temptation? (c) Is the child a victim of incompetent

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

**Competence to stand trial:** the ability of a defendant to understand the court proceeding, reason with relevant facts, and assist counsel

**Criminal culpability:** the extent to which an individual is judged to be responsible for a crime

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

**Transfer:** one mechanism through which juveniles' cases are referred to criminal (adult) court

**Disposition:** in the juvenile justice system, the outcome of an adjudication; comparable to a sentence in criminal court

parents? Does the home or parent need correction or assistance? (d) What of environment and association, which, of course, may embrace substantively all of the points of study? How can the environment be improved? Certainly by keeping the child out of the saloon and away from evil examples. (e) Is the child afflicted with what we call "the moving about fever" – that is, is he given to playing "hookey" from school, or "bumming" and running away, showing an entire lack of ambition or desire to work and settle down to regular habits? [Ben B. Lindsey, "The Boy and the Court," *Charities* 13 (January 1905):352; cited in Platt (1977)]

Julian Mack, Chicago's second juvenile court judge, similarly described the ideal juvenile court proceeding:

> The problem for determination by the judge is not Has this boy or girl committed a specific wrong but What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career. It is apparent at once that the ordinary legal evidence in a criminal court is not the sort of evidence to be heard in such a proceeding. (Mack 1909)

It is beyond the scope of this article to discuss the likely causes of the transformation of the juvenile justice system away from the rehabilitative ideal espoused by its founders and toward the more punitive regime that exists today (but see Scott & Steinberg 2008 for a discussion). However, it is worth noting that the early rhetoric on the rationale and purpose of the juvenile court is significant in two ways that bear on contemporary debates about justice system policy and practice. First, it is clear that the founders of the juvenile justice system began from the premise that adolescents are developmentally different from adults in ways that should affect our interpretation and assessment of their criminal acts. The questions raised by Judges Lindsey and Mack are relevant to the most vexing challenges that practition-

ers face today in determining (a) whether an adolescent's antisocial behavior is due to transient immaturity or contextual disadvantage, as opposed to deep-seated criminal character and (b) how best to construct a response to a juvenile's delinquent or criminal acts that will decrease the likelihood of recidivism. The difference between now and then, however, is that at the time of the court's founding, there was no science available to inform consideration of either issue. Owing to the dramatic increase in empirical research on normative and nonnormative adolescent development that began in the late 1970s, there has been a remarkable expansion of the scientific knowledge relevant to each of these matters.

## Critical Decision Points Along the Juvenile Justice Pipeline

Juvenile justice is regulated mainly by state law, which makes it difficult to generalize about the system in ways that apply universally. Despite whatever differences exist across jurisdictions in policies and practices, however, the points of decision are essentially similar: referral, intake, detention, transfer, adjudication, disposition, and release (see Steinberg & Schwartz 2000).

**Referral.** Entrance into the pipeline begins with a referral to the juvenile justice system or a police arrest. Depending upon the state, a child may be too young or too old for the juvenile justice system. Children who are too young are most often diverted from the system or sent to the branch of juvenile court that has jurisdiction over neglected and abused children. Children who are too old are tried as adults. A juvenile may also be charged with an offense that results automatically in adult prosecution. If the juvenile is charged as an adult, most states allow for judges, after a hearing, to decide that the case should be transferred to juvenile court if the public interest requires it, or if the juvenile can prove that he or she is amenable to treatment in the juvenile justice system.

**Intake.** If the child enters the juvenile justice system after being arrested, referred by a private petitioner (such as a school or next-door neighbor), or transferred from criminal court, there will be an intake decision. Should the case proceed, or should the juvenile be diverted? If the latter, should it be an informal diversion, without further involvement by the juvenile court, or should the child be sent to a program, such as a community panel or teen court (and returned to juvenile court if he or she fails to obey a community-ordered disposition)? Some cases are diverted to other systems, such as the mental health system. Some cases are dropped entirely because intake officers decide that this particular combination of youth and offense does not belong in the juvenile justice system. Many factors thus enter into the decision to divert a case: The youth's age, prior history, the seriousness of the offense, and the youth's explanation or attitude will affect the intake decision.

**Detention.** If the intake officer decides that the case should proceed to a hearing, the officer must decide whether the child should be sent home (with or without supervision) or should be detained, either in a maximum-security detention center or in a detention alternative. Juveniles and their parents will need to explain to an intake officer how pretrial supervision will occur, and they will have to convince the officer that the juvenile will appear for trial. If the child is detained, there will be a court appearance within 24–72 hours. Most states call this first court appearance a detention hearing. Here a judge or referee will decide whether to continue the detention status. This is usually the first time that the child meets his or her attorney. Here the child must be able to discuss with counsel the circumstances of the arrest and out-of-court issues related to the detention decision (such as school attendance or the presence of an interested adult in the juvenile's life).

**Transfer.** Most persons under the age of 18 who are tried as adults are done so because of statutory exclusion of their case from the juvenile justice system. State law may exclude them because of their age—in New York, for example, a 16-year-old will be tried as an adult for any offense. Every state excludes some offenses from juvenile court jurisdiction if a child is of a certain age (for example, a state can decide that 15-year-olds who are charged with armed robbery will have their cases begin in adult criminal court). Some states permit prosecutors to file the juvenile's case directly in the adult system, where the juvenile may or may not have an opportunity to have the case transferred to juvenile court. Every state also allows judges to transfer children of a certain age—usually 14, but in some instances, even younger—to criminal court if they are charged with an offense as serious as a felony. States usually must prove that the juvenile is "not amenable to treatment" in the juvenile justice system. At transfer hearings, it is important that the juvenile is able, for example, to discuss with counsel his or her recent placement history and its reason for failure. He or she should be able to understand options, such as proposed placements, counseling programs, or plea agreements.

**Adjudication.** If the child continues to be detained within the juvenile justice system, an adjudicatory hearing (comparable to the trial in criminal court) must be held within 10–30 days. (Although this is the general rule, in some states juveniles charged with high-profile crimes such as murder will have a longer time to wait until their trials.) Demands on juveniles at adjudicatory hearings are many. They will include the need to understand the nature of the charges against them and to consult with counsel. They will have to weigh the costs and benefits of entering an admission (guilty plea). They should be able to help counsel identify potential witnesses, know whether an alibi or other defenses are available, and consult with counsel during cross-examination of state witnesses.

**Disposition.** If the juvenile admits to the offense, or if the juvenile court finds by proof beyond a reasonable doubt that the child has committed the offense, the court will proceed to disposition (sentence). Juveniles are

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

expected to assist counsel in presenting disposition options to the juvenile court. Assistance might include suggesting dispositions or helping the attorney and experts develop client-specific dispositions. Juvenile dispositions historically have been aimed at providing treatment, rehabilitation, or supervision in a way that best serves the needs of the juvenile, although in recent years some legislatures also have included incapacitation for public safety as a valid rationale. Under any of the models, the juvenile court will have a range of discretion. In some states, the juvenile court has wide latitude, from ordering that a child return home under supervision (probation) to placing a child in maximum-security institutions, known as training schools, reform schools, or youth development centers. In other states, which use a "youth authority" model, the court will either order probation or, if placement is warranted, transfer custody of the child to the youth authority, which will then determine the appropriate level of care.

**Release.** Most juvenile court dispositions are for indeterminate periods of time. However, dispositions cannot be for a longer period than an adult would serve for a similar crime in the criminal justice system. The court will usually review the juvenile's case every six to nine months. Sometimes the reviews are formal hearings, whereas in other instances they are informal reviews of reports provided by probation officers or institutional staff. Many juveniles in placement, particularly those with mental health needs or who have been placed in inappropriate placements, end up being returned to juvenile court for a new disposition. Most often, those juveniles are placed in detention pending a new placement plan. When juveniles are released from institutions, they are placed on aftercare probation, which is analogous to parole. A juvenile who is on probation or on aftercare probation status can have that status revoked, or "violated," for new offenses or for violating the terms of probation, such as associating with gang members, truancy, or missing curfew. A violation of probation may

lead to rearrest, detention, and another hearing, the outcome of which may be a new disposition.

## The Relevance of Developmental Science to Decision Making in the Justice System

Although there are few decision points in the pipeline where the developmental status of the juvenile is taken into account explicitly, at each decision juncture, information about the juvenile's stage of development should play an important role in the outcome of the decision. A juvenile's developmental status is relevant with respect to the adjudication process because a just and fair hearing requires the competent participation of the individual in his or her defense. As noted earlier, at both the adjudication and transfer hearings, certain competencies are expected to be in place, including those that potentially affect the juvenile's ability to understand the charges, assist counsel, and enter pleas (Scott & Grisso 2005). To the extent that these competencies are based on capabilities that develop over the course of childhood and adolescence, an accurate understanding of how and along what timetable these capabilities develop is crucial to deciding whether an individual possesses the skills necessary to participate in the process.

Under the law, characteristics of the offender and the circumstances of the offense can mitigate criminal responsibility and lessen the punishment that is ordered by the court. A crime that is committed impulsively is punished less severely than one that is premeditated, as is a crime that is committed under coercive pressure from others. Familiarity with the expected developmental timetables of phenomena such as self-control, foresight, and susceptibility to peer pressure is therefore important for making determinations of culpability. In theory at least, an offender who, by virtue of developmental immaturity, is impulsive, shortsighted, and easily influenced by peers should be punished less harshly than one who is better able to control himself, anticipate the future consequences of his behavior, and resist the

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

antisocial urgings of his friends (Steinberg & Scott 2003).

Finally, decision makers in the system often must assess the youngster's potential for change and risk for future offending when making transfer or disposition decisions (Mulvey & Leistico 2008). Such determinations of developmental plasticity are especially important at transfer hearings, because a youngster who is or seems hardened and unlikely to profit from rehabilitation is more likely to be charged as an adult than is one who is or is seen as malleable and amenable to intervention. Similarly, a juvenile who is deemed to be at high risk of recidivism, either because of a long prior record of offending or other characteristics associated with continued and/or dangerous criminal behavior (e.g., failure to respond to prior attempts at rehabilitation, a history of uncontrollable violence, or likelihood of inadequate adult supervision in the community), will be more likely to be sent to institutional placement.

In order to make well-informed decisions about the treatment of juveniles who have entered the juvenile justice pipeline, therefore, policy makers, practitioners, and mental health professionals need to be familiar with the developmental changes that occur during childhood and adolescence in the capabilities and characteristics that are relevant to competence, culpability, and likely response to treatment. Legislators need this information in order to create age-related laws and statutes that are developmentally appropriate and scientifically reasonable; if, for example, we know that the ability to understand charges or enter pleas does not generally develop until a certain age, it makes little sense to draw age boundaries that would subject developmentally incompetent individuals to court proceedings that necessitate their participation in order to satisfy ordinary due process requirements. Judges need this information in order to make wise and fair decisions in the courtroom; if we know that the capacity to regulate one's own behavior is unlikely to be present before a certain age, it is important that this information be taken into account at the time of sentencing or disposition. Mental health professionals need this information in order to perform accurate assessments and make appropriate treatment recommendations; individuals at different stages of development may need very different sorts of interventions. And attorneys need this information in order to practice law more effectively; prosecutors may consider a juvenile's developmental status in deciding when it is appropriate to charge an individual as an adult, and defense attorneys need to know how best to interact with clients who may not fully understand their situation. Understanding the nature of psychological development during adolescence, therefore, will likely improve policymaking, judicial decision making, forensic evaluation, and legal practice.

## BRAIN, COGNITIVE, AND PSYCHOSOCIAL DEVELOPMENT IN ADOLESCENCE

When lawmakers focus on juvenile justice policy, the distinction between adolescence and adulthood, rather than that between childhood and adolescence, is of primary interest. However, most studies of adolescent development have compared adolescents with children, and only in recent years has scientific interest focused intensely on the psychological transition between adolescence and adulthood, largely in response to new research showing continued brain maturation through the end of the adolescent period. This work has provided support for the uniqueness of adolescence as a stage of life that is also distinct from adulthood with respect to several aspects of brain and psychosocial development.

### Adolescent Brain Development

Although most of the developmental research on cognitive and psychosocial functioning during adolescence involves psychological studies, recent work in developmental neuroscience is beginning to shed light on the neural underpinnings of psychological development across adolescence and adulthood. In the past several years, a new perspective on risk taking

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

**Socioemotional system:** the brain system governing the processing of social and emotional information and the experience of reward and punishment

**Cognitive control system:** the brain system governing executive function, including deliberative thinking, impulse control, foresight, and the evaluation of risk and reward

(including antisocial risk taking) during adolescence has emerged, one that is informed by advances in developmental neuroscience (Casey et al. 2008, Steinberg 2008). According to this view, risky behavior in adolescence is the product of the interaction between changes in two distinct neurobiological systems: a socioemotional system, which is localized in limbic and paralimbic areas of the brain, including the amygdala, ventral striatum, orbitofrontal cortex, medial prefrontal cortex, and superior temporal sulcus; and a cognitive control system, which is mainly composed of the lateral prefrontal and parietal cortices and those parts of the anterior cingulate cortex to which they are interconnected (Steinberg 2007).

According to this dual-systems model, adolescent risk taking is hypothesized to be stimulated by a rapid and dramatic increase in dopaminergic activity within the socioemotional system around the time of puberty, which is presumed to lead to increases in reward seeking. However, this increase in reward seeking precedes the structural maturation of the cognitive control system and its connections to areas of the socioemotional system, a maturational process that is gradual, unfolds over the course of adolescence, and permits more advanced self-regulation and impulse control. The temporal gap between the arousal of the socioemotional system, which is an early adolescent development, and the full maturation of the cognitive control system, which occurs later, creates a period of heightened vulnerability to risk taking during middle adolescence (Steinberg 2008). As one writer has characterized it, the process may be akin to "starting the engines without a skilled driver behind the wheel" (Dahl 2001).

Neurobiological evidence in support of this dual-systems model is rapidly accumulating. A growing literature, derived primarily from rodent studies but with implications for human development, indicates that the remodeling of the dopaminergic system within the socioemotional network involves an initial postnatal rise and then, starting in preadolescence, a subsequent reduction of dopamine receptor density in the striatum and prefrontal cortex; this pattern is more pronounced among males than females (Sisk & Foster 2004, Sisk & Zehr 2005, Teicher et al. 1995). As a result of this remodeling, dopaminergic activity in the prefrontal cortex increases significantly in early adolescence and is higher during this period than before or after. Because dopamine plays a critical role in the brain's reward circuitry, the increase, reduction, and redistribution of dopamine receptor concentration around puberty, especially in projections from the limbic system to the prefrontal area, is likely to increase reward-seeking behavior and, accordingly, sensation seeking.

There is equally compelling neurobiological evidence for changes in brain structure and function during adolescence and early adulthood that facilitate improvements in self-regulation that permit individuals to modulate their inclinations to seek rewards, although this development is presumed to unfold along a different timetable and to be independent of puberty (see Paus 2005 for a summary). Because of synaptic pruning and the continued myelination of prefrontal brain regions, resulting in improved connectivity among cortical areas and between cortical and subcortical areas, there are improvements over the course of adolescence in many aspects of executive function, such as response inhibition, planning, weighing risks and rewards, and the simultaneous consideration of multiple sources of information. There is also improved coordination of affect and cognition, reflected in improved emotion regulation, which is facilitated by the increased connectivity between regions associated with the socioemotional and cognitive control systems.

The development of the cognitive control system, which is manifested chiefly in improved connectivity across brain regions, must be distinguished from the well-publicized maturation of the frontal lobes because of synaptic pruning. Although both processes result in improved thinking abilities, they occur at different times in adolescence and have different implications for cognitive development. Whereas increases in connectivity take place throughout adolescence and well into adulthood, the decline in gray matter density that reflects synaptic

C

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

pruning takes place in preadolescence and early adolescence and is more or less complete by age 16. Consequently, performance on tasks that activate the frontal lobes continues to improve through middle adolescence but not beyond age 16 on tasks of moderate difficulty (Conklin et al. 2007, Crone & van der Molen 2004, Hooper et al. 2004, Luna et al. 2001). In contrast, adult-like performance on more demanding cognitive tasks, especially those that require coordination between and among multiple cortical and subcortical brain regions, is not attained until later in development.

The upshot of this developmental neuroscience is that changes in the socioemotional system at puberty may promote reckless, sensation-seeking behavior in early and middle adolescence, while the regions of the prefrontal cortex that govern cognitive control continue to mature over the course of adolescence and into young adulthood. This temporal gap between the increase in sensation seeking around puberty and the later development of mature self-regulatory competence may combine to make adolescence a time of inherently immature judgment. Thus, despite the fact that in many ways adolescents may appear to be as intelligent as adults (at least as indexed by performance on tests of information processing and logical reasoning), their ability to regulate their behavior in accord with these advanced intellectual abilities is more limited. As the next section makes clear, research on adolescent cognitive and psychosocial development is consistent with this neurobiological profile.

## Adolescent Cognitive Development

The application of information about normative adolescent development to policy and practice in the justice system necessitates differentiating between cognitive and psychosocial development, which appear to follow different developmental trajectories (Steinberg 2008). Briefly, on relatively less-demanding tasks that are mainly or exclusively cognitive in nature, and where improvement in adolescence is likely due to synaptic pruning of the frontal lobes,

adolescents evince adult levels of competence by age 16. In contrast, on more challenging tasks that involve the coordination of affect and cognition, and on many measures of psychosocial maturity, performance continues to improve well into young adulthood, most likely because this improvement is mediated by improved connectivity across brain regions, a relatively later development. As I discuss below, this temporal disjunction has created a great deal of confusion with regard to where we should draw the legal boundary between adolescence and adulthood, because different developmental literatures suggest different chronological ages.

The most important cognitive capacities involved in decision making are understanding (i.e., the ability to comprehend information relevant to the decision) and reasoning (i.e., the ability to use this information logically to make a choice). These capacities increase through childhood into adolescence. Between late childhood and middle adolescence (roughly between the ages of 11 and 16), individuals show marked improvements in reasoning (especially deductive reasoning) and in both the efficiency and capacity of information processing (Hale 1990, Kail 1997, Keating 2004, Overton 1990). Research has demonstrated conclusively that, as a result of gains in these areas, individuals become more capable of abstract, multidimensional, deliberative, and hypothetical thinking as they develop from late childhood into middle adolescence (Kuhn 2009). These abilities reach an asymptote sometime around 16, and by this age, teens' capacities for understanding and reasoning in making decisions, at least in controlled experiments, roughly approximate those of adults. This comparability between middle adolescents and adults is not limited to basic cognitive abilities such as memory or verbal fluency or to performance on tasks of logical reasoning. Studies of capacity to grant informed consent to receive medical treatment or participate as a research subject, for example, show little improvement beyond age 16 (Belter & Grisso 1984, Grisso & Vierling 1978, Gustafson & McNamara 1987, Weithorn & Campbell 1982).

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

The notion that adolescents and adults demonstrate comparable capacities for understanding and reasoning should not be taken to mean that they also demonstrate comparable levels of maturity of judgment, however. As my colleagues and I have argued elsewhere, maturity of judgment is affected both by cognitive capabilities as well as psychosocial ones, and although the former show adult levels of maturity by 16, the latter do not (Steinberg et al. 2009). As a result, adolescents may be less able to deploy their cognitive capacities as effectively as adults in exercising judgment in their everyday lives when decisions are influenced by emotional and social variables. The development of these psychosocial factors is described in the next section.

## Adolescent Psychosocial Development

New perspectives on adolescent "cognition-in-context" emphasize that adolescent thinking in everyday settings is a function of social and emotional, as well as cognitive, processes, and that a full account of youthful judgment must examine the interaction of all of these influences (Scott et al. 1995, Steinberg & Cauffman 1996). Even when adolescent cognitive capacities approximate those of adults, youthful decision making may still differ from that of adults due to psychosocial immaturity. Indeed, research indicates that psychosocial maturation proceeds more slowly than cognitive development and that age differences in judgment may reflect social and emotional differences between adolescents and adults that continue well beyond mid-adolescence. Of particular relevance to the present discussion are age differences in susceptibility to peer influence, future orientation, reward sensitivity, and the capacity for self-regulation. Available research indicates that adolescents and adults differ significantly with respect to each of these attributes.

**Peer influence.** Substantial research evidence supports the conventional wisdom that teens are more oriented toward peers and responsive to peer influence than are adults (Steinberg & Monahan 2007). Resistance to peer influence increases between adolescence and adulthood as individuals begin to form an independent sense of self and develop greater capacity for autonomous decision making. Studies of age differences and age changes in resistance to peer influence suggest somewhat different patterns vis-à-vis antisocial versus neutral or prosocial peer pressure prior to middle adolescence (with resistance to antisocial influence decreasing during this time, especially among boys, but resistance to other forms of peer influence increasing), but similar patterns after age 14 (with resistance to all forms of peer influence increasing). Because the main justice policy and practice questions concern differences between adolescents and adults, especially during the latter part of the adolescent period, it is this increase in resistance to peer influence from age 14 on that is of particular interest.

Recent studies of the neural underpinnings of resistance to peer influence in adolescence indicate that improvements in this capacity may be linked to the development of greater connectivity between cortical and subcortical regions, which likely facilitates the better coordination of affect and cognition (Grosbras et al. 2007, Paus et al. 2008), although it should be noted that this conclusion is based on studies of individual differences in brain morphology and function among same-aged adolescents who differ in their self-reported resistance to peer pressure and not to cross-sectional or longitudinal studies that link age differences in resistance to peer influence to age differences in brain structure or function. Nevertheless, it is reasonable to speculate that the social and arousal processes that may undermine logical decision making during adolescence, when connectivity is still maturing, do not have the same impact during adulthood. One recent behavioral study found, for instance, that adolescents, college undergraduates, and adults performed similarly on a risk-taking task when performing the task alone, but that the presence of same-aged friends doubled risk taking among the adolescents and increased it 50% among the undergraduates, but had no

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

impact on the adults (Gardner & Steinberg 2005).

Peer influence affects adolescent judgment both directly and indirectly. In some contexts, adolescents might make choices in response to direct peer pressure, as when they are coerced to take risks that they might otherwise avoid. More indirectly, adolescents' desire for peer approval and consequent fear of rejection affects their choices even without direct coercion. The increased salience of peers in adolescence likely makes approval seeking especially important in group situations. Thus, it is not surprising, perhaps, that adolescents are far more likely than are adults to commit crimes in groups (Zimring 1998). Peers also may provide models for behavior that adolescents believe will assist them to accomplish their own ends. For example, there is some evidence that during early and middle adolescence, teens who engage in certain types of antisocial behavior, such as fighting or drinking, may enjoy higher status among their peers as a consequence. Accordingly, some adolescents may engage in antisocial conduct to impress their friends or to conform to peer expectations; indeed, in one of the most influential accounts of so-called adolescence-limited offenders (that is, individuals who commit crimes during adolescence but not before or after), imitation of higher-status peers is hypothesized to be a prime motivation for antisocial behavior (Moffitt 1993).

**Future orientation.** Future orientation, the capacity and inclination to project events into the future, may also influence judgment because it affects the extent to which individuals consider the long-term consequences of their actions in making choices. Over the course of adolescence and into young adulthood, individuals become more future oriented, with increases in their consideration of future consequences, in their concern about the future, and in their ability to plan ahead (Greene 1986, Nurmi 1991, Steinberg et al. 2008b).

There are several plausible explanations for this age gap in future orientation. In part, adolescents' weaker future orientation may reflect

their more limited life experience (Gardner 1993). To a young person, a short-term consequence may have far greater salience than one five years in the future. The latter may seem very remote simply because five years represents a substantial portion of her life. There is also evidence linking the differences between adolescents and adults in future orientation to age differences in brain structure and function, especially in the prefrontal cortex (Cauffman et al. 2005).

**Reward sensitivity.** Research evidence also suggests that, relative to adults, adolescents are more sensitive to rewards and, especially, to immediate rewards, a difference that may explain age differences in sensation seeking and risk taking (Galvan et al. 2007, Steinberg et al. 2008a). Although it had once been believed that adolescents and adults differ in risk perception, it now appears that age differences in risk taking are more likely mediated by age differences in reward sensitivity than by age differences in sensitivity to the potential adverse consequences of a risky decision (Cauffman et al. 2008, Millstein & Halpern-Felsher 2002). Thus, adolescents and adults may perceive risks similarly (both in the lab and in the real world) but evaluate rewards differently, especially when the benefits of the risky decision are weighed against the costs. So, for example, in deciding whether to speed while driving a car, adolescents and adults may estimate the risks of this behavior (e.g., being ticketed, getting into an accident) similarly, but adolescents may weigh the potential rewards (e.g., the thrill of driving fast, peer approval, getting to one's destination sooner) more heavily than adults, leading to lower risk ratios for teens—and a higher likelihood of engaging in the (rewarding) activity. Thus, what distinguishes adolescents from adults in this regard is not the fact that teens are less knowledgeable about risks, but rather that they attach greater value to the rewards that risk taking provides (Steinberg 2004).

The heightened salience of rewards to adolescents, relative to adults, is seen in age

**Adolescence-limited offenders:** antisocial individuals whose offending begins and ends during adolescence

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

differences in performance on the Iowa Gambling Task, in which subjects are given four decks of cards, face down, and are instructed to turn over cards, one at a time, from any deck. Each card has information about how much money the subject has won or lost by selecting that card. Two of the decks are "good," in that drawing from them will lead to gains over time, and two of the decks are "bad"; drawing from them will produce net losses. Because a few cards in the "bad" decks offer very high rewards, though, a person who is especially sensitive to rewards will be drawn to the "bad" decks, even if he or she keeps losing money as a result. At the beginning of the task, people tend to draw randomly from all four decks, but as the task progresses, normal adults pick more frequently from the good decks. Children and younger adolescents (as well as adults with damage to the ventromedial prefrontal cortex) do poorly on this task (Crone et al. 2005, Crone & van der Molen 2004, Hooper et al. 2004). Performance improves with age, with the most dramatic improvement taking place during middle adolescence. This likely reflects a decrease in susceptibility to choosing based on the prospect of an immediate, attractive reward. Further evidence that adolescents tend to value immediate rewards more than adults do is seen in age differences in performance on tests of delay discounting, in which individuals are asked to chose between a smaller immediate reward (e.g., receiving $600 tomorrow) and a larger delayed one (e.g., receiving $1000 in one year) (Steinberg et al. 2008b). Heightened reward sensitivity, indexed by self-report or task performance, is especially pronounced during early and middle adolescence, when reward circuitry in the brain is undergoing extensive remodeling. There is some evidence from both human and animal studies that this may be linked to pubertal maturation (Dahl 2004).

**Self-regulation.** In addition to age differences in susceptibility to peer influence, future orientation, and reward sensitivity, adolescents and adults also differ with respect to their ability to control impulsive behavior and choices. Thus,

the widely held stereotype that adolescents are more reckless than adults is supported by research on developmental changes in impulsivity and self-management over the course of adolescence (Galvan et al. 2007, Leshem & Glicksohn 2007). In general, studies show gradual but steady increases in the capacity for self-direction through adolescence, with gains continuing through the high school years and into young adulthood. Similarly, impulsivity, as a general trait, declines linearly between adolescence and adulthood (Steinberg et al. 2008a).

An illustration of behavioral research that sheds light on age differences in impulse control is the study of performance on a task known as the Tower of London. In this test, the subject is presented with an arrangement of colored balls, stacked in a certain order, and several empty vertical rods onto which the balls can be moved. The subject is then presented with a picture of a different configuration of balls and asked to turn the original configuration into the new one by moving one ball at a time, using the fewest number of moves (Berg & Byrd 2002). This task requires thinking ahead, because extra moves must be used to undo a mistake. In several studies, our research group found that early and middle adolescents performed similarly to adults when the problem presented was an easy one (i.e., one that could be solved in two or three moves), but that they did not plan ahead as much as late adolescents and young adults on the harder problems; unlike the older subjects, the younger individuals spent no more time before making their first move on the complex problems than they did on the simple ones (Steinberg et al. 2008a). These findings are consistent with casual observations of teenagers in the real world, which also suggest that they are less likely than adults to think ahead before acting.

Taken together, these findings from self-report and behavioral studies of psychosocial development indicate that individuals become more resistant to peer influence and oriented to the future, and less drawn to immediate rewards and impulsive, as they mature from adolescence to adulthood. Although the science of

adolescent brain development is still in its infancy, findings indicate that much of this maturation continues well beyond the age by which individuals evince adult levels of performance on tests of cognitive capacity. As I discuss in the next section, the continued maturation of cognitive competence through age 16 and the continued maturation of psychosocial competence into young adulthood have important implications for how we view and respond to the criminal behavior of juveniles.

## JUVENILE JUSTICE ISSUES INFORMED BY DEVELOPMENTAL SCIENCE

### Criminal Culpability of Youth

The adult justice system presumes that defendants who are found guilty are responsible for their own actions, should be held accountable, and should be punished accordingly. Because of the relative immaturity of minors, however, it may not be justified to hold them as accountable as one might hold adults. If, for example, adolescents below a certain age cannot grasp the long-term consequences of their actions or cannot control their impulses, one cannot hold them fully accountable for their actions. In other words, we cannot claim that adolescents "ought to know better" if, in fact, the evidence indicates that they do not know better, or more accurately, cannot know better, because they lack the abilities needed to exercise mature judgment. It is important to note that culpability cannot really be researched directly. Because an individual's culpability is something that is judged by someone else, it is largely in the eye of the beholder. What can be studied, however, are the capabilities and characteristics of individuals that make them potentially blameworthy, such as their ability to behave intentionally or to know right from wrong.

I use the term "culpability" in this review as a shorthand for several interrelated phenomena, including responsibility, accountability, blameworthiness, and punishability. These notions are relevant to the adjudication of an individual's guilt or innocence, because an individual who is not responsible for his or her actions by definition cannot be guilty, and to the determination of a disposition (in juvenile court) or sentence (in criminal court), in that individuals who are found guilty but less than completely blameworthy, owing to any number of mitigating circumstances, merit proportionately less punishment than do guilty individuals who are fully blameworthy.

The starting point in a discussion of criminal culpability is a principle known as penal proportionality. Simply put, penal proportionality holds that criminal punishment should be determined by two criteria: the harm a person causes and his blameworthiness in causing that harm. The law recognizes that different wrongful acts cause different levels of harm through a complex system of offense grading under which more serious crimes (rape, for example) are punished presumptively more severely than less serious crimes (shoplifting, for example). Beyond this, though, two people who engage in the same wrongful conduct may differ in their blameworthiness. A person may be less culpable than other criminals—or not culpable at all—because he inadvertently (rather than purposely) causes the harm, because he is subject to some endogenous deficiency or incapacity that impairs his decision making (such as mental illness), or because he acts in response to an extraordinary external pressure—a gun to the head is the classic example. Less-blameworthy offenders deserve less punishment, and some persons who cause criminal harm deserve no punishment at all (Scott & Steinberg 2008).

The concept of mitigation plays an important role in the law's calculation of blame and punishment, although it gets little attention in the debate about youth crime. Mitigation applies to persons engaging in harmful conduct who are blameworthy enough to meet the minimum threshold of criminal responsibility but who deserve less punishment than a typical offender would receive. Through mitigation, the criminal law calculates culpability and punishment along a continuum and is not limited to the options of full responsibility or complete

**Penal proportionality:** the principle in American criminal law linking the severity of punishment for a crime to the criminal's culpability

**Mitigation:** in criminal law, the lessening of criminal responsibility

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

excuse. Indeed, criminal law incorporates calibrated measures of culpability. For example, the law of homicide operates through a grading scheme under which punishment for killing another person varies dramatically depending on the actor's blameworthiness. Thus, the actor who kills intentionally is deemed less culpable if he does so without premeditation because his choice reveals less consideration of the harmful consequences of his act, and the actor who negligently causes another's death is guilty of a less serious crime than one who intends to kill. A person who kills in response to provocation or under extreme emotional disturbance may be guilty only of manslaughter and not of murder. Under standard homicide doctrine, mitigating circumstances and mental states are translated into lower-grade offenses that warrant less punishment.

What makes the conduct of one person less blameworthy than that of another person who causes the same harm? Generally, a person who causes criminal harm is a fully responsible moral agent (and deserves full punishment) if, in choosing to engage in the wrongful conduct, he has the capacity to make a rational decision and a "fair opportunity" to choose not to engage in the harmful conduct. Under this view, the actor whose thinking is substantially impaired or whose freedom is significantly constrained is less culpable than is the typical offender and deserves less punishment—how much less depends on the extent of the impairment or coercion. Under American criminal law, two very different kinds of persons can show that their criminal conduct was less culpable than that of the offender who deserves full punishment—those who are very different from ordinary persons due to impairments that contributed to their criminal choices and those who are ordinary persons whose offenses are responses to extraordinary circumstances or are otherwise aberrant conduct (Scott & Steinberg 2008).

Although it seems paradoxical, adolescents, in a real sense, belong to both groups. In the first group are individuals with endogenous traits or conditions that undermine their decision-making capacity, impairing their ability to understand the nature and consequences of their wrongful acts or to control their conduct. In modern times, this category has been reserved mostly for offenders who suffer from mental illness, mental disability, and other neurological impairments. The criminal law defenses of insanity, diminished capacity, extreme emotional disturbance, and involuntary act recognize that psychological and biological incapacities can undermine decision making in ways that reduce or negate the culpability of criminal choices.

Individuals in the second group are ordinary persons whose criminal conduct is less culpable because it is a response to extraordinary external circumstances: These cases arise when the actor faces a difficult choice, and his response of engaging in the criminal conduct is reasonable under the circumstances, as measured by the likely response of an ordinary law-abiding person in that situation. Thus, under standard self-defense doctrine, a person who kills a threatening assailant is excused from liability if a reasonable person in his place would have felt that his life was in danger. Similarly, the defenses of duress, necessity, and provocation are available to actors who can explain their criminal conduct in terms of unusual external pressures that constrained their ability to choose.

In the preceding section, I described aspects of psychological development in adolescence that are relevant to youthful choices to get involved in criminal activity and that may distinguish young offenders from their adult counterparts. Although youths in mid-adolescence have cognitive capacities for reasoning and understanding that approximate those of adults, even at age 18 adolescents are immature in their psychosocial and emotional development, and this likely affects their decisions about involvement in crime in ways that distinguish them from adults. Teenagers are more susceptible to peer influence than are adults and tend to focus more on rewards and less on risks in making choices. They also tend to focus on short-term rather than long-term consequences and are less capable of anticipating future consequences, and they are more impulsive and volatile in their emotional responses. When we consider these

developmental factors within the conventional criminal law framework for assessing blameworthiness, the unsurprising conclusion is that adolescent offenders are less culpable than are adults. The mitigating conditions generally recognized in the criminal law—diminished capacity and coercive circumstances—are relevant to criminal acts of adolescents and often characterize the actions of juvenile offenders. This does not excuse adolescents from criminal responsibility, but it renders them less blameworthy and less deserving of adult punishment.

Although in general lawmakers have paid minimal attention to the mitigating character of adolescents' diminished decision-making capacities, some legislatures and courts have recognized that immature judgment reduces culpability. Most notably, in its consideration of the constitutionality of the juvenile death penalty, the Supreme Court has focused on this rationale for mitigation. In *Roper v. Simmons*, the 2005 case that abolished the juvenile death penalty, the Court adopted the developmental argument for mitigation that follows from the research reviewed above. Justice Kennedy, writing for the majority, described three features of adolescence that distinguish young offenders from their adult counterparts in ways that mitigate culpability—features that are familiar to the reader at this point. The first is the diminished decision-making capacity of youths, which may contribute to a criminal choice that is "not as morally reprehensible as that of adults" because of its developmental nature. The Court pointed to the tendency of adolescents to engage in risky behavior and noted that immaturity and an "underdeveloped sense of responsibility" often result in "impetuous and ill-considered decisions" by youths. Second, the Court pointed to the increased vulnerability of youths to external coercion, including peer pressure. Finally, the Court emphasized that the unformed nature of adolescent identity made it "less supportable to conclude that even a heinous crime was evidence of irretrievably depraved character." Adolescents are less blameworthy than are adults, the Court suggested, because the traits that contribute to criminal conduct are transient, and because most adolescents will outgrow their tendency to get involved in crime as they mature. Although the Court did not elaborate, we have seen that each of these attributes of adolescence corresponds to a conventional source of mitigation in criminal law (*Roper v. Simmons* 2005).

Does this argument apply to the conduct of immature adults? Although most impulsive young risk takers mature into adults with different values, some adult criminals are impulsive, sensation-seeking risk takers who discount future consequences and focus on the here and now. Are these adolescent-like adults also less culpable than other adult offenders and deserving of reduced punishment? I think not. Unlike the typical adolescent, the predispositions, values, and preferences that motivate the adult offenders are not developmental but characterological, and they are unlikely to change merely with the passage of time. Adolescent traits that contribute to criminal conduct are normative of adolescence, but they are not typical in adulthood. In an adult, these traits are often part of the personal identity of an individual who does not respect the values of the criminal law and who deserves punishment when he or she violates its prohibitions (Scott & Steinberg 2008).

## Competence of Adolescents to Stand Trial

Before discussing adolescents' competence to stand trial, it is worth underscoring the distinction between competence and culpability—two very different constructs that are often confused, even by those with expertise in criminal law. Competence to stand trial refers to the ability of an individual to function effectively as a defendant in a criminal or delinquency proceeding. In contrast, determinations of culpability focus on the defendant's blameworthiness in engaging in the criminal conduct and on whether and to what extent he will be held responsible. Although many of the same incapacities that excuse or mitigate criminal responsibility may also render a defendant incompetent, the two issues are analytically distinct and

*Roper v. Simmons*: the U.S. Supreme Court case that abolished the juvenile death penalty

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

*Dusky v. United States*: the U.S. Supreme Court case that established criteria for competence to stand trial

*In re Gault*: the U.S. Supreme Court case that determined that juveniles adjudicated in juvenile court were entitled to many of the same procedural protections as adults adjudicated in criminal court

**Developmental incompetence**: a lack of competence to stand trial due to normal cognitive or psychosocial immaturity, as opposed to mental illness or disability

separate legal inquiries, and they focus on the defendant's mental state at two different points in time (the time of the crime and the time of the court proceeding).

The reason that competence is required of defendants in criminal proceedings is simple: When the state asserts its power against an individual with the goal of taking away his liberty, the accused must be capable of participating in a meaningful way in the proceeding against him. If a defendant is so mentally ill or disabled that he cannot participate adequately, then the trial lacks fundamental fairness that is required as a part of due process under the Fourteenth Amendment to the U.S. Constitution (Scott & Grisso 2005).

In 1960, the Supreme Court announced a legal standard for trial competence in *Dusky v. United States* that has since been adopted uniformly by American courts. According to *Dusky*, when the issue of a defendant's competence is raised in a criminal trial, the court's determination should focus on "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational, as well as factual, understanding of the proceedings against him." Thus, there are two parts to the competence requirement: The defendant must be able to consult with her attorney about planning and making decisions in her defense, and she must understand the charges, the meaning, and purpose of the proceedings and the consequences of conviction (Scott & Grisso 2005).

The requirement that criminal defendants be competent to stand trial had no place in delinquency proceedings in the traditional juvenile court. In a system in which the government's announced purpose was to rehabilitate and not to punish errant youths, the procedural protections accorded adult defendants—including the requirement of adjudicative competence—were thought to be unnecessary. This all changed with *In re Gault*, which led to an extensive restructuring of delinquency proceedings to conform to the requirements of constitutional due process. Today, it is generally

accepted that requirements of due process and fundamental fairness are satisfied only if youths facing charges in juvenile court are competent to stand trial.

Until the 1990s, the issue of juveniles' trial competence involved a straightforward incorporation into delinquency proceedings of a procedural protection that was relevant to a relatively small number of mentally impaired adult defendants, where it was assumed to apply similarly to a small number of mentally incapacitated youths. The regulatory reforms that began in the late 1980s changed the situation by increasing the punishment stakes facing many young offenders and by eroding the boundary between the adult and juvenile systems. The importance of this issue was not recognized immediately, however. As legislatures across the country began to enact laws that dramatically altered the landscape of juvenile crime policy, the procedural issue of whether developmentally immature youngsters charged with crimes might be less able to participate in criminal proceedings than are adult defendants—what is referred to in this article as developmental incompetence—was not central to the policy debates.

Given that developmental incompetence largely escaped the attention of courts and policy makers until recently, it is worth asking directly whether the constitutional prohibition against criminal adjudication of incompetent defendants must be applied to this form of incapacity. The answer is surely "yes." The competence requirement is functional at its core, speaking to questions about the impact of cognitive deficiencies on trial participation. Functionally it makes no difference if the defendant cannot understand the proceeding she faces or assist her attorney, whether due to mental illness or to immaturity (Scott & Grisso 2005). In either case, the fairness of the proceeding is undermined. In short, the same concerns that support the prohibition against trying criminal defendants who are incompetent due to mental impairment apply with equal force when immature youths are subject to criminal proceedings. In the context of the recent changes in juvenile

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

justice policy, it has become important to have a better understanding of how the capacities of children and adolescents to participate in criminal proceedings compare with those of adults. In pursuit of this end, I first examine the specific abilities that are required for adjudicative competence under the legal standard. I then turn to the research directly comparing the abilities of juveniles and adults.

Three broad types of abilities are implicated under the *Dusky* standard for competence to stand trial: (*a*) a factual understanding of the proceedings, (*b*) a rational understanding of the proceedings, and (*c*) the ability to assist counsel (Scott & Grisso 2005). Courts applying the standard are directed to weigh each factor, but otherwise they exercise substantial discretion in deciding how much competence is enough. Examining each component of competence under the *Dusky* standard and considering how the capacities of juvenile defendants are likely to compare with those of adults is instructive.

Factual understanding focuses on the defendant's knowledge and awareness of the charges and his understanding of available pleas, possible penalties, the general steps in the adjudication process, the roles of various participants in the pretrial and trial process, and his rights as a defendant. Intellectual immaturity in juveniles may undermine factual understanding, especially given that youths generally have less experience and more limited ability to grasp concepts such as rights. Juveniles also may be more likely than are adults to have extensive deficits in their basic knowledge of the trial process, such that more than brief instruction is needed to attain competence.

The rational understanding requirement of *Dusky* has been interpreted to mean that defendants must comprehend the implications, relevance, or significance of what they understand factually regarding the trial process. Deficits in rational understanding typically involve distorted or erroneous beliefs that nullify factual understanding. For example, an immature defendant may know that he has a right to remain silent, yet believe that the judge can take this "right" away at any time by demanding a

response to questions. (When asked what he thought the "right to remain silent" meant, my 12-year-old son said, "It means that you don't have to say anything until the police ask you a question.") Intellectual, emotional, and psychosocial immaturity may undermine the ability of some adolescents to grasp accurately the meaning and significance of matters that they seem to understand factually.

Finally, the requirement that the defendant in a criminal proceeding must have the capacity to assist counsel encompasses three types of abilities. The first is the ability to receive and communicate information adequately to allow counsel to prepare a defense. This ability may be compromised by impairments in attention, memory, and concentration, deficits that might undermine the defendant's ability to respond to instructions or to provide important information to his attorney, such as a coherent account of the events surrounding the offense. As I noted above, these capacities continue to improve through age 16, according to studies of cognitive development. Second, the ability to assist counsel requires a rational perspective regarding the attorney and her role, free of notions or attitudes that could impair the collaborative relationship. For example, a young defendant may develop a belief that all adults involved in the proceeding are allied against him, perhaps after seeing defense attorneys and prosecutors chatting together outside the courtroom. Third, defendants must have the capacity to make decisions about pleading and the waiver or assertion of other constitutional rights. These decisions involve not only adequate factual and rational understanding, but also the ability to consider alternatives and make a choice in a decision-making process. Immature youths may lack capacities to process information and exercise reason adequately in making trial decisions, especially when the options are complex and their consequences far reaching.

As juveniles' competence to stand trial began to emerge as an important issue in the mid-1990s, the need for a comprehensive study comparing the abilities of adolescents

Ann. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

and adults in this realm became apparent. Before this time, a few small studies had looked at particular capacities in juveniles that were important at different stages in the justice process. However, no comprehensive research had compared the specific capacities of juveniles and adults that are directly implicated in assessments of adjudicative competence. In response to that need, the MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice sponsored a large-scale study of individuals between the ages of 11 and 24—half of whom were in the custody of the justice system and half of whom had never been detained—designed to examine empirically the relationship between developmental immaturity and the abilities of young defendants to participate in their trials (Grisso et al. 2003). The study also probed age differences in psychosocial influences on decision making in the criminal process.

Based on participants' responses to a structured interview that had been used in previous studies of competence to stand trial among mentally ill adults, and for which norms had been established to define clinically significant "impairment," the researchers found that competence-related abilities improve significantly between the ages of 11 and 16. On average, youths aged 11 to 13 demonstrated significantly poorer understanding of trial matters, as well as poorer reasoning and recognition of the relevance of information for a legal defense, than did 14- and 15-year-olds, who in turn performed significantly more poorly than individuals aged 16 and older. There were no differences between the 16- and 17-year-olds and the young adults. The study produced similar results when adolescents and adults were categorized according to their scores above and below the cut-off scores indicating impairment. Nearly one-third of 11- to 13-year-olds and about one-fifth of 14- and 15-year-olds, but only 12% of individuals 16 and older, evidenced impairment at a level comparable to mentally ill adults who had been found incompetent to stand trial with respect to either their ability to reason with facts or understand the trial process.

Individual performance did not differ significantly by gender, ethnicity, or, in the detained groups, as a function of the extent of individuals' prior justice system experience. This last finding is important because it indicates that there are components of immaturity independent of a lack of relevant experience that may contribute to elevated rates of incompetence among juveniles.

A different structured interview was used to probe how psychosocial influences affect decision making by assessing participants' choices in three hypothetical legal situations involving a police interrogation, consultation with a defense attorney, and the evaluation of a proffered plea agreement. Significant age differences were found in responses to police interrogation and to the plea agreement. First, youths, including 16- to 17-year-olds, were much more likely to recommend waiving constitutional rights during an interrogation than were adults, with 55% of 11- to 13-year-olds, 40% of 14- to 15-year-olds, and 30% of 16- to 17-year-olds choosing to "talk and admit" involvement in an alleged offense (rather than "remaining silent"), but only 15% of the young adults making this choice. There were also significant age differences in response to the plea agreement. This vignette was styled so as not to clearly favor accepting or rejecting the state's offer, which probably accounted for the fact that young adults were evenly divided in their responses. In contrast, 75% of the 11- to 13-year-olds, 65% of the 14- to 15-year-olds, and 60% of the 16- to 17-year-olds recommended accepting the plea offer. Together, these results suggest a much stronger tendency for adolescents than for young adults to make choices in compliance with the perceived desires of authority figures (Grisso et al. 2003).

Analysis of participants' responses to the vignettes also indicated differences between the youngest age group and older subjects in risk perception and future orientation. Participants were asked to explain their choices, including their perceptions about positive and negative consequences of various options; questions probed the subjects' assessment of the

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

seriousness of risks (the perceived negative consequences) and the likelihood of risks materializing. Analyses indicated age differences for all of these dimensions of "risk perception," with the 11- to 13-year-olds less able to see risks than 16- to 17-year-olds and young adults. Similarly, in comparison with older adolescents, fewer 11- to 13-year-olds mentioned the long-range consequences of their decisions, which suggests that future orientation differences exist that are consistent with those described above.

The study's findings are consistent with those of earlier studies that examined various dimensions of youths' functioning in the justice system. For example, an important study of youths' and adults' capacities to understand Miranda rights in the early 1980s found that, compared with adults in the criminal justice system, 14-year-olds in juvenile detention were less able to understand the meaning and importance of *Miranda* warnings (Grisso 1981). Other studies using smaller samples also have found age differences across the adolescent years with regard to knowledge of legal terms and the legal process in delinquency and criminal proceedings (e.g., Cooper 1997). Finally, a series of studies found significant age differences across the adolescent years in "strategic thinking" about pleas; older adolescents were more likely than younger subjects to make choices that reflected calculations of probabilities and costs based on information provided (e.g., Peterson-Badali & Abramovitch 1993).

In light of what is known about psychological maturation in early and mid-adolescence, these findings are not surprising. Indeed, given the abilities required of defendants in criminal proceedings, it would be puzzling if youths and adults performed similarly on competence-related measures. This research provides powerful and tangible evidence that some youths facing criminal charges may function less capably as criminal defendants than do their adult counterparts. This does not mean, of course, that all youths should be automatically deemed incompetent to stand trial any more than would a psychiatric diagnosis or low IQ score. It does mean, however, that the risk of incompetence is substantially elevated in early and mid-adolescence; it also means that policy makers and practitioners must address developmental incompetence as it affects the treatment of juveniles in court (Scott & Grisso 2005).

It is important to emphasize that the pattern of age differences in studies of legal decision making more closely resembles that seen in studies of cognitive development (where few age differences are apparent after 16) than in studies of psychosocial development (where age differences are observed in late adolescence and sometimes in young adulthood). This suggests that determinations of where to draw a legal boundary between adolescence and adulthood must be domain specific. In matters in which cognitive abilities predominate, and where psychosocial factors are of minimal importance (that is, in situations where the influence of adolescents' impulsivity, susceptibility to peer pressure, reward sensitivity, and relatively weaker future orientation is mitigated), adolescents older than 15 should probably be treated like adults. In situations in which psychosocial factors are substantially more important, drawing the boundary at an older age is more appropriate. This is why my colleagues and I have argued that it is perfectly reasonable to have a lower boundary for adolescents' autonomous access to abortion (a situation in which mandatory waiting periods limit the impact of impulsivity and shortsightedness and where consultation with adults likely counters immaturity of judgment) than for judgments of criminal responsibility (because adolescents' crimes are often impulsive and influenced by peers) (Steinberg et al. 2009).

## Impact of Punitive Sanctions on Adolescent Development and Behavior

As noted above, the increasingly punitive orientation of the justice system toward juvenile offenders has resulted in an increase in the number of juveniles tried and sanctioned as adults and in the use of harsher sanctions in responding to the delinquent behavior of juveniles who have been retained in the juvenile justice

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

**Life-course-persistent offenders:** antisocial individuals whose offending begins before adolescence and persists into adulthood

**Age-crime curve:** in criminology, the relation between age and crime, showing that the prevalence of criminal activity increases between preadolescence and late adolescence, peaks around age 17, and declines thereafter

system. Research on the impact of adult prosecution and punishment and on the use of punitive sanctions more generally suggests, however, that these policies and practices may actually increase recidivism and jeopardize the development and mental health of juveniles (Fagan 2008). Consequently, there is a growing consensus among social scientists that policies and practices, such as setting the minimum age of criminal court jurisdiction below 18 (as about one-third of all states currently do), transferring juveniles to the adult system for a wide range of crimes, including nonviolent crimes, relying on incarceration as a primary means of crime control, and exposing juvenile offenders to punitive programs such as boot camps, likely do more harm than good, cost taxpayers much more than they need spend on crime prevention, and ultimately pose a threat to public safety (Greenwood 2006).

In order to understand why this is the case, it is important to begin with a distinction between adolescence-limited and life-course-persistent offenders (Moffitt 1993). Dozens of longitudinal studies have shown that the vast majority of adolescents who commit antisocial acts desist from such activity as they mature into adulthood and that only a small percentage—between five and ten percent, according to most studies—become chronic offenders. Thus, nearly all juvenile offenders are adolescent limited. This observation is borne out in inspection of what criminologists refer to as the age-crime curve, which shows that the incidence of criminal activity increases between preadolescence and late adolescence, peaks at about age 17 (slightly younger for nonviolent crimes and slightly older for violent ones), and declines thereafter. These findings, at both the individual and aggregate level, have emerged from many studies that have been conducted in different historical epochs and around the world (Piquero et al. 2003).

In view of the fact that most juvenile offenders mature out of crime (and that most will desist whether or not they are caught, arrested, prosecuted, or sanctioned), one must therefore ask how to best hold delinquent youth responsible for their actions and deter future crime (both their own and that of others) without adversely affecting their mental health, psychological development, and successful transition into adult roles. If the sanctions to which juvenile offenders are exposed create psychological disturbance, stunt the development of cognitive growth and psychosocial maturity, and interfere with the completion of schooling and entrance into the labor force, these policies are likely to exacerbate rather than ameliorate many of the very factors that lead juveniles to commit crimes in the first place (mental illness, difficulties in school or work, and, as reviewed above, psychological immaturity).

It is clear that sanctioning adolescents as adults is counterproductive. One group of researchers examining this question compared a group of 2700 Florida youths transferred to criminal court, mostly based on prosecutors' discretionary authority under Florida's direct-file statute, with a matched group of youths retained in the juvenile system (Bishop & Frazier 2000). In another study, the researchers compared 15- and 16-year-olds charged with robbery and burglary in several counties in metropolitan New York and in demographically similar counties in New Jersey. The legal settings differed in that New York juveniles age 15 and older who are charged with robbery and burglary are automatically dealt with in the adult system under that state's legislative waiver statute, whereas in New Jersey, transfer is rarely used, and the juvenile court retains jurisdiction over almost all youths charged with these crimes (Fagan 1996).

The New York-New Jersey study found that youths convicted of robbery in criminal court were rearrested and incarcerated at a higher rate than those who were dealt with in the juvenile system, but that rates were comparable for burglary, a less serious crime. The study also examined the number of days until rearrest and found a similar pattern; the youths sentenced for robbery in criminal court reoffended sooner than did their juvenile court counterparts. Recidivism was not affected by sentence length; longer sentences were not more

effective at reducing recidivism than were shorter sentences. Results of the Florida study also support the conclusion that juvenile sanctions may reduce recidivism more effectively than criminal punishment. This study measured only rearrest rates and found lower rates for youths who were retained in juvenile court than for youths who were transferred. The follow-up period in this study was relatively brief—less than two years. During this period, transferred youth were more likely to be rearrested, committed more offenses per year, and reoffended sooner than did juveniles in the juvenile system. As in the New York–New Jersey study, longer sentences did not have a deterrent effect.

Within the juvenile system, of course, there is wide variation in the types and severity of sanctions to which offenders are exposed. Some youths are incarcerated in prison-like training schools, whereas others receive loosely supervised community probation—neither of which is effective at changing antisocial behavior. An important question therefore is, what can the juvenile system offer young offenders that will be effective at reducing recidivism? A detailed discussion of the enormous literature evaluating the effects of various sanctions and interventions is beyond the scope of this review, and this literature has been summarized many times (Greenwood 2006, Lipsey 1999). Here I highlight a few main points.

Until the 1990s, most researchers who study juvenile delinquency programs might well have answered that the system had little to offer in the way of effective therapeutic interventions; the dominant view held by social scientists in the 1970s and 1980s was that "nothing works" to reduce recidivism with young offenders. Today the picture is considerably brighter, in large part due to a substantial body of research produced over the past 15 years showing that many juvenile programs, in both community and institutional settings, have a substantial crime-reduction effect; for the most promising programs, that effect is in the range of 20% to 30%. An increased focus on research-based programs and on careful outcome evaluation allows policy makers to assess accurately the impact on recidivism rates of particular programs to determine whether the economic costs are justified. In a real sense, these developments have revived rehabilitation as a realistic goal of juvenile justice interventions.

In general, successful programs are those that attend to the lessons of developmental psychology, seeking to provide young offenders with supportive social contexts and to assist them in acquiring the skills necessary to change problem behavior and to attain psychosocial maturity. In his comprehensive meta-analysis of 400 juvenile programs, Lipsey (1995) found that among the most effective programs in both community and institutional settings were those that focused on improving social development skills in the areas of interpersonal relations, self-control, academic performance, and job skills. Some effective programs focus directly on developing skills to avoid antisocial behavior, often through cognitive behavioral therapy. Other interventions that have been shown to have a positive effect on crime reduction focus on strengthening family support, including Multisystemic Therapy, Functional Family Therapy, and Multidimensional Treatment Foster Care, all of which are both effective and cost effective (Greenwood 2006). It is also clear from these reviews that punitive sanctions administered within the juvenile system have iatrogenic effects similar to those seen in studies of juveniles tried as adults. Punishment-oriented approaches, such as "Scared Straight" or military-style boot camps, do not deter future crime and may even inadvertently promote reoffending. Nor do these programs appear to deter other adolescents from offending (Greenwood 2006).

The dearth of evidence supporting the effectiveness of tough sanctions in deterring youthful criminal activity becomes less puzzling when we consider the response of young offenders to harsh punishment in light of developmental knowledge about adolescence discussed earlier. Teenagers on the street deciding whether to hold up a convenience store may simply be less capable than adults, due to their

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

psychosocial immaturity, of considering the sanctions they will face. Thus, the developmental influences on decision making that mitigate culpability also may make adolescents less responsive to the threat of criminal sanctions (Scott & Steinberg 2008).

In addition, adolescence is a formative period of development. In mid and late adolescence, individuals normally make substantial progress in acquiring and coordinating skills that are essential to filling the conventional roles of adulthood. First, they begin to develop basic educational and vocational skills to enable them to function in the workplace as productive members of society. Second, they also acquire the social skills necessary to establish stable intimate relationships and to cooperate in groups. Finally, they must begin to learn to behave responsibly without external supervision and to set meaningful personal goals for themselves. For most individuals, the process of completing these developmental tasks extends into early adulthood, but making substantial progress during the formative stage of adolescence is important. This process of development toward psychosocial maturity is one of reciprocal interaction between the individual and her social context. Several environmental conditions are particularly important, such as the presence of an authoritative parent or guardian, association with prosocial peers, and participation in educational, extracurricular, or employment activities that facilitate the development of autonomous decision making and critical thinking. For the youth in the justice system, the correctional setting becomes the environment for social development and may affect whether he acquires the skills necessary to function successfully in conventional adult roles (Steinberg et al. 2004).

Normative teenagers who get involved in crime do so, in part, because their choices are driven by developmental influences typical of adolescence. In theory, they should desist from criminal behavior and mature into reasonably responsible adults as they attain psychosocial maturity—and most do, especially as they enter into adult work and family responsibilities.

Whether youths successfully make the transition to adulthood, however, depends in part on whether their social context provides opportunity structures for the completion of the developmental tasks described above. The correctional environment may influence the trajectories of normative adolescents in the justice system in important ways. Factors such as the availability (or lack) of good educational, skill building, and rehabilitative programs; the attitudes and roles of adult supervisors; and the identity and behavior of other offenders shape the social context of youths in both the adult and the juvenile systems. These factors may affect the inclination of young offenders to desist or persist in their criminal activities and may facilitate or impede their development into adults who can function adequately in society—in the workplace, in marriage or other intimate unions, and as citizens.

## SUMMARY AND CONCLUDING COMMENTS

The overarching question I pose in this article is whether research on adolescent development indicates that adolescents and adults differ in ways that warrant their differential treatment when they violate the law. More specifically, I ask how this research informs debate about three fundamental questions that continue to challenge the justice system: (*a*) Should adolescents be held to adult standards of criminal culpability and, accordingly, exposed to the same punishment as adults; (*b*) Do adolescents possess the necessary capabilities to function as competent defendants in an adversarial court proceeding; and (*c*) How are juvenile offenders affected by the sorts of punitive sanctions that became increasingly popular during the past several decades?

It is now incontrovertible that psychological development continues throughout adolescence and into young adulthood in ways that are relevant to all three questions. Although basic cognitive competence matures by the time individuals reach age 16, many of the social and emotional capacities that influence adolescents'

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

judgment and decision making, especially outside the psychologist's laboratory, continue to mature into late adolescence and beyond. Compared to individuals in their mid to late twenties, adolescents even as old as 18 are more impulsive, less oriented to the future, and more susceptible to the influence of their peers. In addition, because adolescence is also period during which individuals are still acquiring the psychological capacities they will need to successfully transition into adult work and family roles, it is important that the sanctions to which juvenile offenders are exposed not adversely affect their development. Recent research on the neural underpinnings of these developments does not change the portrait of adolescent immaturity painted by behavioral research, but it does add detail and support to the argument that makes the story more compelling. It is one thing to say that adolescents don't control their impulses, stand up to peer pressure, or think through the consequences of their actions as well as adults; it is quite another to say that don't because they can't.

Because American criminal law clearly provides that diminished judgment mitigates criminal responsibility, it is reasonable to argue that adolescents are inherently less blameworthy than their elders in ways should affect decisions about criminal punishment; as a class, adolescents are inherently less blameworthy than adults. The picture that emerges from an analysis of the capacities necessary for competence to stand trial is not the same, however. Here the relevant research indicates that some adolescents (generally, those 16 and older) have adult-like capabilities but that others (generally those 15 and younger) may not. Research on the impact of punitive sanctions on adolescent development and behavior, although not explicitly developmental in nature, indicates that trying adolescents as adults or exposing them to especially harsh sanctions does little to deter offending and may indeed have iatrogenic effects.

Although justice system policy and practice cannot, and should not, be dictated solely by studies of adolescent development, the ways in which we respond to juvenile offending should at the very least be informed by the lessons of developmental science. Taken together, the lessons of developmental science offer strong support for the maintenance of a separate juvenile justice system in which adolescents are judged, tried, and sanctioned in developmentally appropriate ways. Using developmental science to inform juvenile justice policy is not a panacea that will solve the problem of youth crime. Adolescents will always get in trouble, sometimes very serious trouble, and some will continue to offend, despite the state's best efforts to respond to their crimes in ways that will deter future offending. At the same time, the future prospects of some youths will be harmed by a system that holds them to adult levels of accountability for their crimes under our transfer rules. No one policy regime will yield good outcomes for all young offenders, but looking to developmental research to guide our decision making provides a solid framework for policies and practices that will enhance public safety in the long run by promoting healthy adolescent development.

## SUMMARY POINTS

1. During the past two decades, policies and practices concerning the treatment of juvenile offenders in the United States became increasingly punitive, as evidenced by the increase in the number of juveniles tried as adults and the expanded use of harsh sanctions within both the juvenile and criminal justice systems. This was a break from the traditional model of juvenile justice, which emphasized rehabilitation rather than punishment as its core purpose, that had prevailed for most of the twentieth century.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

2. In order to make well-informed decisions about the treatment of juveniles who have entered the juvenile justice pipeline, therefore, policymakers, practitioners, and mental health professionals need to be familiar with the developmental changes that occur during childhood and adolescence in the capabilities and characteristics that are relevant to their competence to stand trial, their criminal culpability, and their likely response to treatment.

3. Brain maturation continues well into young adulthood, and although individuals, on average, perform at adult levels on tests of basic cognitive ability by the time they are 16, most do not attain adult-like levels of social and emotional maturity until very late in adolescence or early in adulthood. Compared to adults, adolescents are more susceptible to peer influence, less oriented to the future, more sensitive to short-term rewards, and more impulsive.

4. This research on adolescent brain, cognitive, and psychosocial development supports the view that adolescents are fundamentally different from adults in ways that warrant their differential treatment in the justice system. An analysis of factors that mitigate criminal responsibility under the law indicates that adolescents are inherently less culpable than are adults and should therefore be punished less severely. In addition, studies of competence to stand trial indicate that those who are under 16 are more likely to be incompetent than are adults, raising questions about the appropriateness of trying younger adolescents in criminal court.

5. Studies of the impact of punitive sanctions on adolescent development and behavior, including prosecuting and sanctioning adolescents as adults, indicate that they do not deter adolescents from breaking the law and may in fact increase recidivism. In contrast, family-based interventions have been shown to be both effective and cost effective.

## DISCLOSURE STATEMENT

The author is not aware of any biases that might be perceived as affecting the objectivity of this review.

## ACKNOWLEDGMENTS

Work on this review was supported by the John D. and Catherine T. MacArthur Foundation. I am grateful to Elizabeth Cauffman, Thomas Grisso, Elizabeth Scott, and Robert Schwartz for their permission to draw on our collaborative work in the preparation of this review.

## LITERATURE CITED

Belter R, Grisso T. 1984. Children's recognition of rights violations in counseling. *Prof. Psychol. Res. Pract.* 15:899–910

Berg W, Byrd D. 2002. The Tower of London spatial problem solving task: enhancing clinical and research implementation. *J. Exp. Clin. Neuropsychol.* 25:586–604

Bishop D, Frazier C. 2000. Consequences of transfer. In *The Changing Borders of Juvenile Justice*, ed. J Fagan, F Zimring, pp. 227–77. Chicago: Univ. Chicago Press

Casey BJ, Getz S, Galvan A. 2008. The adolescent brain. *Dev. Rev.* 28:62–77

Ann. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

Cauffman E, Shulman E, Clans E, Banich M, Steinberg L, et al. 2008. Responding to reward versus punishment: how adolescents differ from adults in performance on the Iowa Gambling Task. Dept. Psychol. Social Behav., Univ. Calif., Irvine. Manuscr. under review

Cauffman E, Steinberg L, Piquero A. 2005. Psychological, neuropsychological, and psychophysiological correlates of serious antisocial behavior in adolescence: the role of self-control. *Criminology* 43:133–76

Collins WA, Steinberg L. 2006. Adolescent development in interpersonal context. In *Social, Emotional, and Personality Development. Handbook of Child Psychology*, ed. W Damon, R Lerner, N Eisenberg, pp. 1003–67. New York: Wiley

Conklin H, Luciana M, Hooper C, Yarger R. 2007. Working memory performance in typically developing children and adolescents: behavioral evidence of protracted frontal lobe development. *Dev. Neuropsychol.* 31:103–28

Cooper D. 1997. Juveniles' understanding of trial-related information: Are they competent defendants? *Behav. Sci. Law* 15:167–80

Crone EA, Bunge SA, Latenstein H, Van Der Molen MW. 2005. Characterization of children's decision making: sensitivity to punishment frequency, not task complexity. *Child Neuropsychol.* 11:245–63

Crone EA, Van Der Molen MW. 2004. Developmental changes in real life decision making: performance on a gambling task previously shown to depend on the ventromedial prefrontal cortex. *Dev. Neuropsychol.* 25:251–79

Dahl R. 2001. Affect regulation, brain development, and behavioral/emotional health in adolescence. *CNS Spectr.* 6:1–12

Dahl R. 2004. Adolescent brain development: a period of vulnerabilities and opportunities. *Ann. N. Y. Acad. Sci.* 1021:1–22

Fagan J. 1996. The comparative impacts of juvenile and criminal court sanctions on adolescent felony offenders. *Law Policy Rev.* 18:77–119

Fagan J. 2008. Juvenile crime and criminal justice: resolving border disputes. *Fut. Child.* 18(2):81–118

Feld BC. 1993. Criminalizing the American juvenile court. *Crime Just.* 17:197–280

Galvan A, Hare T, Voss H, Glover G, Casey BJ. 2007. Risk-taking and the adolescent brain: Who is at risk? *Dev. Sci.* 10:F8–14

Gardner M, Steinberg L. 2005. Peer influence on risk-taking, risk preference, and risky decision-making in adolescence and adulthood: an experimental study. *Dev. Psychol.* 41:625–35

Gardner W. 1993. A life-span rational choice theory of risk taking. In *Adolescent Risk Taking*, ed. N Bell, R Bell, pp. 66–83. Newbury Park, CA: Sage

Greene A. 1986. Future time perspective in adolescence: the present of things future revisited. *J. Youth Adolesc.* 15:99–113

Greenwood P. 2006. *Changing Lives: Delinquency Prevention as Crime Control Policy.* Chicago: Univ. Chicago Press

Grisso T. 1981. *Juveniles' Waiver of Rights: Legal and Psychological Competence.* New York: Plenum

Grisso T, Vierling L. 1978. Minors' consent to treatment: a developmental perspective. *Prof. Psychol.* 9:412–26

Grisso T, Steinberg L, Woolard J, Cauffman E, Scott E, et al. 2003. Juveniles' competence to stand trial: a comparison of adolescents' and adults' capacities as trial defendants. *Law Hum. Behav.* 27:333–63

Grosbras M, Jansen M, Leonard G, McIntosh A, Osswald K, et al. 2007. Neural mechanisms of resistance to peer influence in early adolescence. *J. Neurosci.* 27:8040–45

Gustafson K, McNamara J. 1987. Confidentiality with minor clients: issues and guidelines for therapists. *Prof. Psychol. Res. Pract.* 18:503–8

Hale S. 1990. A global developmental trend in cognitive processing speed. *Child Dev.* 61:653–63

Hooper C, Luciana M, Conklin H, Yarger R. 2004. Adolescents' performance on the Iowa Gambling Task: implications for the development of decision making and ventromedial prefrontal cortex. *Dev. Psychol.* 40:1148–58

Kail R. 1997. Processing time, imagery, and spatial memory. *J. Exp. Child Psychol.* 64:67–78

Keating D. 2004. Cognitive and brain development. In *Handbook of Adolescent Psychology*, ed. R Lerner, L Steinberg, pp. 45–84. New York: Wiley. 2nd ed.

Provides an excellent summary of research on the impact of trying juveniles as adults on adolescents' behavior, mental health, and recidivism.

Furnishes a comprehensive analysis of the effectiveness of various approaches to preventing and treating juvenile delinquency.

Landmark empirical study that demonstrates that in comparison to adults, individuals under 16 are more likely to be incompetent to stand trial.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org
By National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

Krisberg B, Austin J. 1993. *Reinventing Juvenile Justice*. Newbury Park, CA: Sage

Kuhn D. 2009. Adolescent thinking. See Lerner & Steinberg 2009. In press

Lerner R, Steinberg L, eds. 2009. *Handbook of Adolescent Psychology*. New York: Wiley. 3rd ed. In press

Leshem R, Glicksohn J. 2007. The construct of impulsivity revisited. *Personal. Individ. Differ.* 43:681–91

Lipsey M. 1995. What do we learn from 400 research studies on the effectiveness of treatment with juvenile delinquents? In *What Works? Reducing Reoffending*, ed. J McGuire, pp. 63–78. New York: Wiley

Lipsey M. 1999. Can rehabilitative programs reduce the recidivism of young offenders? An inquiry into the effectiveness of practical programs. *Va. J. Soc. Policy Law* 6:611–41

Luna B, Thulborn K, Munoz D, Merriam E, Garver K, et al. 2001. Maturation of widely distributed brain function subserves cognitive development. *Neuroimage* 13:786–93

Mack J. 1909. The juvenile court. *Harv. Law Rev.* 23:104–22

Millstein S, Halpern-Felsher B. 2002. Perceptions of risk and vulnerability. *J. Adolesc. Health* 31S:10–27

Moffitt T. 1993. Adolescence-limited and life-course persistent antisocial behavior: a developmental taxonomy. *Psychol. Rev.* 100:674–701

Mulvey E, Leistico A. 2008. Improving professional judgments of risk and amenability in juvenile justice. *Fut. Child.* 18(2):35–58

Nurmi J. 1991. How do adolescents see their future? A review of the development of future orientation and planning. *Dev. Rev.* 11:1–59

Overton W. 1990. Competence and procedures: constraints on the development of logical reasoning. In *Reasoning, Necessity, and Logic: Developmental Perspectives*, ed. W Overton, pp. 1–32. Hillsdale, NJ: Erlbaum

Paus T. 2005. Mapping brain maturation and cognitive development during adolescence. *Trends Cogn. Sci.* 9:60–68

Paus T, Toro R, Leonard G, Lerner J, Lerner R, et al. 2008. Morphological properties of the action-observation cortical network in adolescents with low and high resistance to peer influence. *Soc. Neurosci.* In press

Peterson-Badali M, Abramovitch R. 1993. Grade related changes in young people's reasoning about plea decisions. *Law Hum. Behav.* 17:537–52

Piquero A, Farrington D, Blumstein A. 2003. The criminal career paradigm: background and recent developments. *Crime Just.* 30:359–506

Platt A. 1977. *The Child Savers: The Invention of Delinquency*. Chicago: Univ. Chicago Press. 2nd ed.

*Roper v. Simmons*, 541 U.S. 1040 2005

**Scott E, Grisso T. 2005. Developmental incompetence, due process, and juvenile justice policy. *N. C. Law Rev.* 83:793–846**

Scott E, Reppucci N, Woolard J. 1995. Evaluating adolescent decision making in legal contexts. *Law Hum. Behav.* 19:221–44

**Scott E, Steinberg L. 2008. *Rethinking Juvenile Justice*. Cambridge, MA: Harvard Univ. Press**

Sisk C, Foster D. 2004. The neural basis of puberty and adolescence. *Nat. Neurosci.* 7:1040–47

Sisk C, Zehr J. 2005. Pubertal hormones organize the adolescent brain and behavior. *Front. Neuroendocrinol.* 26:163–74

Smetana J, Campione-Barr N, Metzger A. 2006. Adolescent development in interpersonal and societal contexts. *Annu. Rev. Psychol.* 57:255–84

Steinberg L. 2004. Risk-taking in adolescence: What changes, and why? *Ann. N. Y. Acad. Sci.* 1021:51–58

Steinberg L. 2007. Risk-taking in adolescence: new perspectives from brain and behavioral science. *Curr. Dir. Psychol. Sci.* 16:55–59

**Steinberg L. 2008. A social neuroscience perspective on adolescent risk-taking. *Dev. Rev.* 28:78–106**

Steinberg L, Albert D, Cauffman E, Banich M, Graham S, Woolard J. 2008a. Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: evidence for a dual systems model. *Dev. Psychol.* In press

Steinberg L, Cauffman E. 1996. Maturity of judgment in adolescence: psychosocial factors in adolescent decisionmaking. *Law Hum. Behav.* 20:249–72

Steinberg L, Cauffman E, Woolard J, Graham S, Banich M. 2009. Are adolescents less mature than adults? Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop." *Am. Psychol.* In press

Provides a legal analysis of how the justice system might best take the developmental incompetence of juveniles into account. Argues that a lower standard of competence should be used in juvenile than in criminal court.

Calls for juvenile justice reform based on the scientific study of adolescent development. Supplies useful summaries of literatures on adolescents' criminal culpability, competence to stand trial, and response to intervention.

Discusses how brain development in adolescence affects risk taking and reckless behavior, in which the heightened vulnerability of middle adolescence is highlighted.

Steinberg L, Chung H, Little M. 2004. Reentry of young offenders from the justice system: a developmental perspective. *Youth Violence Juv. Just.* 1:21–38

Steinberg L, Graham S, O'Brien L, Woolard J, Cauffman E, Banich M. 2008b. Age differences in future orientation and delay discounting. *Child Dev.* In press

Steinberg L, Monahan K. 2007. Age differences in resistance to peer influence. *Dev. Psychol.* 43:1531–43

Steinberg L, Schwartz R. 2000. Developmental psychology goes to court. In *Youth on Trial: A Developmental Perspective on Juvenile Justice*, ed. T Grisso, R Schwartz, pp. 9–31. Chicago: Univ. Chicago Press

**Steinberg L, Scott E. 2003. Less guilty by reason of adolescence: developmental immaturity, diminished responsibility, and the juvenile death penalty. *Am. Psychol.* 58:1009–18**

Teicher M, Andersen S, Hostetter J. 1995. Evidence for dopamine receptor pruning between adolescence and adulthood in striatum but not nucleus accumbens. *Dev. Brain Res.* 89:167–72

Weithorn L, Campbell S. 1982. The competency of children and adolescents to make informed treatment decisions. *Child Dev.* 53:1589–98

Zimring F. 1998. *American Youth Violence.* New York: Oxford Univ. Press

Discusses why adolescents, by virtue of developmental immaturity, are inherently less culpable than adults. Cited multiple times by U.S. Supreme Court in its decision to abolish juvenile death penalty.

Annu. Rev. Clin. Psychol. 2009.5:459-485. Downloaded from www.annualreviews.org by National Institutes of Health Library (NIH) on 07/26/13. For personal use only.

# EXHIBIT H



Joseph A. Ovick, Ed.D., Superintendent of Schools

77 Santa Barbara Road • Pleasant Hill, CA 94523 • (925) 942-3388

To:      Lynn Mackey
From:    Jennifer Wall
Subject: DRA Request for documents
Date:    May 3, 2013
CC:      Rebecca Corrigan

**Items #1 & 3** – Percentage of youth with an IEP or 504 Plan

| Site | Total Students (Year to date unduplicated) | Students with an IEP or 504 Plan | Percentage of Students with an IEP or 504 Plan |
|---|---|---|---|
| Mt. McKinley School | 861 | 282 | 32.7% |
| Delta Vista High School | 245 | 48 | 19.5% |
| Total | 1106 | 330 | |

Comments:

**Items #2 & 4** – Percentage of youth that had IEP assessment

| Site | Initial Evaluations | Triennial Evaluations | Total |
|---|---|---|---|
| Mt. McKinley School | 1 | 16 | 17 |
| Delta Vista High School | 0 | 12 | 12 |
| Total | 1 | 28 | 29 |

Comments:
Data is only available dating back to September 2012, due to DIS provider changes.

**Item #5** – IEP team meetings scheduled

| Month | IEP Meetings | 3 Year Evaluation Meetings | SST Meetings | Initial IEP Meetings |
|---|---|---|---|---|
| July | 12 | 5 | | |
| August | 14 | 2 | | |
| September | 16 | 4 | 1 | |
| October | 21 | 1 | | 2 |
| November | 12 | 6 | 1 | |


| Month | IEP Meetings | 3 Year Evaluation Meetings | SST Meetings | Initial IEP Meetings |
|---|---|---|---|---|
| December | 14 | 1 | 2 | |
| January | 6 | 2 | | |
| February | 9 | 4 | | |
| March | 20 | | | 1 |
| April | 8 | | 1 | |
| **Total** | **132** | **25** | **5** | **3** |

Comments:

Numbers do not include students who had a meeting scheduled and left prior to meeting date. IEP meeting information was taken from Special Education Department calendar.

**Item #6**

No data available. Delta Vista High School does not keep an ongoing site or department calendar. The scheduling records are disposed of at the end of each month.

**Item #7**

Please refer to the attached 'COE Intake Procedures' document.

**Items #8 & 9**

There were no Behavioral Intervention Plans developed at either Mt. McKinley School or Delta Vista High School from July 2012 to present.

**Items #10 & 11**

There were no Manifestation Determinations held at either Mt. McKinley School or Delta Vista High School from July 2012 to present.

**Items #12 & 13**

| Site | Psychological Evaluations | Speech Evaluations |
|---|---|---|
| Mt. McKinley School | 18 | 10 |
| Delta Vista High School | 12 | 0 |
| Total | 30 | 10 |

**Items # 14 & 15**

**Delta Vista/Mt. McKinley**

| | | |
|---|---|---|
| 3028 SILVEIRA, REBECCA | Multiple Subject | General Subjects (Exam) |
| 3028 SILVEIRA, REBECCA | EDUCATION SPECIALIST INSTRUCT | Mild/Moderate Disabilities |
| 1040 AUSTIN, JOLYNN S | Clinical or Rehabilitative Ser | Language Speech and Hearing |
| 2140 STEIN-WIRTH, JILL | Clinical or Rehabilitative Ser | Language Speech and Hearing |
| 1492 HEIM, SUZANNE M | Pupil Personnel Services | Basic Pupil Personnel Services |
| 1492 HEIM, SUZANNE M | Pupil Personnel Services | School Psychology |
| 1492 HEIM, SUZANNE M | Multiple Subject | General Subjects (Exam) |
| 1492 HEIM, SUZANNE M | SPECIALIST INSTRUCTION | LEARNING/SEVERELY HANDICAPPED |
| 1943 PIGANELLI, CHRIS A | Resource Specialist COC | RESOURCE |
| 1943 PIGANELLI, CHRIS A | Single Subject | Physical Education |
| 1943 PIGANELLI, CHRIS A | SPECIALIST INSTRUCTION | Learning Handicapped |
| 2035 ROSIG, JACQUELINE | Single Subject | FL: Spanish |
| 2035 ROSIG, JACQUELINE | Education Specialist | Mild/Moderate Disabilities |

The teachers listed above are fully credentialed for their assignment

Kandi Gravenmier, Credentials Analyst

**Items # 17, 18, 19**

Contra Costa SELPA Procedures Guide www.ccselpa.org

*Items 17, 18, 19*

**Table of Contents**

Acknowledgments

Purpose of the
Procedures Guide

Abbreviations &
Terms Glossary

Accommodations and
Modifications

Adaptive Physical
Education (APE)

Administrative
Placements

Annual Performance
Report Measures

Assessment

Assistive Technology
& Augmentative and
Alternative
Communication Panel

Child Find &
Identification

Confidentiality of
Student Records

Discipline

Dispute Resolution

Early Intervention
Program (Part C:
Infant Services)

Educational Rights

Eligibility

# Contra Costa SELPA

# Procedures Guide

## Purpose of the Procedures Guide

*The Procedures Guide-Online is a work in progress. Information and
sections will be added and/or updated as necessary.*

The purpose of this guide is to provide specific information regarding
processes and procedures in special education. The procedures guide
provides answers as to why and how special education functions. The
guide acts as a reference tool for both nuts and bolts information and
best practices in special education. The Procedures Guide is an
official policy document of the Contra Costa SELPA and each
member Local Education Agency (LEA).

This procedures guide is to be used as a resource tool by all special
education personnel. It is the intent of the committee for this guide to
be used as a working document to assist teachers, parents,
administrators, and staff involved in helping students with special
needs. The Procedures Guide contains a variety of useful tools to
assist you in using it as a resource.

Look for this  icon at the end of each section for a pdf version of
the section and accompanying documents for easy printing.

The "To Do List" boxes can be used as a checklist in completing
different tasks such as low incidence reimbursements or preparing an
assessment report.

The "Training Tag" boxes list training module information related to
page topic, such as IEP process.

The "Resource Link" boxes provide links to information either on the
web or in SELPA publications.

There are several different publications that can be stand alone

# COE Intake Procedures

## COE Court Schools

### COE MIS (Management Information System):

1. Student is enrolled, added to Aeries.
2. Contact the previous district to notify them that their student is at your site. Check if the student is SpEd.
3. Check in SEIS to see if the student has a record.
   a. If yes, request the file be transferred and mark "Do not change the district of residence".
   b. If no, create an account once you have the most recent IEP in hand. Be careful to use correct spelling, etc.
   c. *"Keep district provider listed in SEIS so they can view file."*
      **Ed. Code indicates that district must provide records to court schools within 72 hours.
4. Add student to teacher's caseload.

### COE Case Manager:

After COE MIS staff completes the ins and outs and assigns case manager, case manager will:

1. Review student file and verify services.
2. Complete an Interim Placement form identifying comparable service(s).* *If Student Record is not yet in SEIS, you can print out a hard copy from the Document Library.*
3. Call parent to schedule a time to review Interim and schedule an Interim IEP within **30 calendar days.**
4. Meet with the parent to review the Interim Placement form, provide parents' rights, and obtain parent's signature.
   *You do NOT wait for signature on Interim Form to provide services. Begin services immediately.*
5. Obtain special education administrator authorization by signature
6. Send home Notice of IEP meeting and Member Excusal form, if applicable.
7. Evaluate placement, complete assessment as needed
8. Hold an IEP meeting within **30 calendar days.**

*Comparable Services: COE must provide services that are comparable to the services noted on the last IEP. RS and SDC are not IEP services, 330 Specialized Academic Instruction is the service.*

### For students entering from another court school *Mt. McKinley to/from Delta Vista:*

If an Interim Placement Form was already created at first court school, the timeline continues (it does not start over).

1. Case Manager from previous site will notify case manager at the new site and provide all necessary documentation, draft IEP paperwork, etc.
2. New case manager will contact the parents and either keep the IEP scheduled or schedule another IEP date within the 30 day timeline or as soon as possible.
3. Draft Interim IEP with services required for the student.

If an Interim IEP was held at the first court school and no annual IEP is upcoming:

Amendment

1. IEP is accepted and continued.

**Member Excusal:**

The public agency must ensure that the IEP Team for each child with a disability includes:

• The parents of the child;

• Not less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment);

• Not less than one special education teacher of the child, or where appropriate, not less than one special education provider of the child;

• A representative of the public agency (who has certain specific knowledge and qualifications);

  <u>One member can have a dual role (SpEd and LEA designee), but it is poor practice</u>

In accordance with 34 CFR 300.321(a)(7), the public agency must invite a child with a disability to attend the child's IEP Team meeting if a purpose of the meeting will be the consideration of the postsecondary goals for the child and the transition services needed to assist the child in reaching those goals under 34 CFR 300.320(b).

[34 CFR 300.321(a) and (b)(1)] [20 U.S.C. 1414(d)(1)(B)]

# EXHIBIT I

CONTRA COSTA COUNTY
PROBATION DEPARTMENT
JUVENILE HALL

BULLETIN NO: 502
RESIDENTS
Page 1
Revised: 7-25-11

POLICY AND PROCEDURE

SUBJECT:    Security Programs

REFERENCE: Title 15, Sections 1350, 1352, 1354, 1371, 1390 and 1391

POLICY:

It is the policy of the Contra Costa County Juvenile Hall to have established procedures for implementing Security Programs as a disciplinary measure for those residents who have violated Major Rules, demonstrate a pattern of repetitious Minor Rule violations, or who present an immediate physical threat to another person. When necessary, staff will monitor and control inappropriate behavior by removing residents from the group and placing them on a Security Program for the safety of themselves and others in Juvenile Hall and/or the community.

A Security Program is a temporary disciplinary action taken which affects residents' confinement status. It is assigned to residents who display negative behavior that warrants significant change to their standard unit program; *refer to Bulletin No. 404, Discipline.* If a minor is segregated for 24 hours or more, they are entitled to Due Process, *refer to Bulletin No. 406, Due Process.* A daily review of all residents on Security Programs will determine if continued room confinement is necessary. All residents confined to their rooms due to their Security Program status, will continue to have access to medical, dental and mental health services. Residents on a security program will, at minimum, be permitted the opportunity of one-hour of large muscle activity daily. Staff shall continue to perform safety checks as outlined in *Bulletin No. 305, Safety Checks* anytime a resident is confined to their room.

PROCEDURE:

I. Security Programs include:

    A. Maximum Security
    B. Security Risk
    C. Special Program
    D. Security Suspect
    E. No Playfield
    F. Escort (also used as a non-disciplinary security status)
    G. Ranch Removals

    A. Maximum Security

        Maximum Security is the most restrictive program at Juvenile Hall and is meant for the resident who is displaying dangerous or severe behaviors such as, but not limited to,

committing serious bodily injury to others, unprovoked attacks/acts of violence, assault/battery on staff, deliberate and unsafe destruction of property, possession of, or use of any weapon while in-custody, attempting escape, or actual escape from a locked facility. A resident on Maximum Security shall be confined to his/her room, and shall not participate in any unit activity with the group including cleanup details.

1. Assignment and Supervision

    a. Approval of the Building Supervisor is needed to place a resident on Maximum Security. The Building Supervisor will confer with staff and review the incident reports before making the final decision on the resident's program.
    b. Residents on Maximum Security status will be housed alone. In cases that staff believe that a roommate is prudent to deter self-destructive behavior, the Building Supervisor shall be notified of the circumstances which indicate a roommate is warranted. The Building Supervisor will evaluate the situation and authorize a roommate if deemed appropriate.
    c. The Lead Counselor shall ensure that the resident's behavior is documented during each shift in his/her Adjustment Record.
    d. An Institutional Supervisor shall review the resident's Maximum Security status daily. Program changes or reductions shall be made by an Institutional Supervisor-I and approved by the Building Supervisor.
    e. Staff shall document the resident's new security status in their Adjustment Record, the unit's log book, the face sheet and discipline sheet. The Admission Unit shall also be notified of the resident's change in status. This will include when the resident is placed on, reduced from, and/or taken off the security program(s).

2. Access Out of Room/Opening Room Door/Escorting

    a. A resident on Maximum Security shall be confined to his/her room when any other residents are in the common living area of the housing unit including residents assigned to work crews.
    b. Only one Maximum Security status resident shall be in the common living area at one time.
    c. Whenever the room door is opened for a resident on Maximum Security, or when the resident is out of their room, a minimum of three Probation Counselors must be on the housing unit.
    d. Prior to opening the room door, staff are to notify Central Control via radio to place a camera on the room. A minimum of two Probation Counselors shall be present and in the direct vicinity of the door. A third Probation Counselor is required to remain at the console, or in the immediate area, in case assistance is needed.
    e. A minimum of two Probation Counselor-staff shall escort the resident when he/she is required to be off the unit for the purpose of visiting, court, medical

clinic, etc. If two Probation Counselors are not available to escort, an Institutional Supervisor may count toward the required number of staff; however, Probation Officers and staff in other personnel classifications may not act in lieu of Probation Counselors when escorting maximum security residents.

f. Use of handcuffs during escort is at the discretion of an Institutional Supervisor.

g. Whenever a resident on Maximum Security status is returning to a housing unit, all other residents shall be secured until the Maximum Security resident is back in his/her room.

3. Room Searches

a. Room searches shall be conducted each time the resident leaves his/her room.

b. At the discretion of an Institutional Supervisor, the resident may have a paperback book or magazine if such material does not pose a security threat. Staff shall note in the unit's log book any items issued/allotted.

4. Visits

a. Visits with the Juvenile Hall Chaplain, Mental Health Therapists or Probation Officers are permitted with supervisory approval. The visit shall be conducted in the resident's room or in the unit's interview room.

b. During the visit, the room door must remain open, and a minimum of three Probation Counselors must be on the unit.

c. See **Bulletin No. 291, Visiting for Residents on Security Programs** for information addressing parent/guardian security visits.

5. Medical Care

a. Whenever possible, Maximum Security status residents should be treated on the housing unit. If determined necessary by medical staff, the resident may receive medical treatment in the Nursing Office.

b. Residents are to be supervised and escorted to the examination room by two Probation Counselors. At least one same sex Probation Counselor shall accompany the resident into the examination room.

c. A minimum of two Probation Counselors shall accompany the nurse to the resident's room when his/her medications are administered.

6. Meals

a. Residents on Maximum Security status shall eat all meals in their room. Two Probation Counselors will deliver each meal to the resident's room; the third Probation Counselor shall observe.

b. Meals shall be served on paper service and eaten with a spork. Paper service, spork, and uneaten food are to be removed after each meal in a timely manner.

c. No meal shall be denied for disciplinary purposes. If staff have probable cause to believe that a resident will use his/her spork as a weapon, as a tool for self-destructive behavior, is actively displaying threatening behavior towards staff,

has used his spork inappropriately during the preceding meal, has recently thrown or threatened to throw his meal, the Building Supervisor shall be notified of the situation and staff shall document the behavior in an incident report. The Building Supervisor may indicate that the resident shall be provided with food that does not require a utensil, such as sandwiches or other food that is harmless if thrown (commonly referred to as "finger food").

d. Other residents shall not assist with meal service to a resident on Maximum Security.

7. Showers

a. Residents shall be permitted to shower and receive clean clothing and bedding as defined in *Bulletin No.'s 402, 417, and 820.*

b. Residents on Maximum Security are to shower alone under supervision on the AM shift. Only one resident on Maximum Security may shower at a time per housing unit.

c. The time the resident showers shall be recorded in the unit log.

8. Exercise

a. Residents shall be allowed the opportunity of a minimum of two 30-minute large muscle exercise periods per day, one on the AM and one on PM shift, under the supervision of three Probation Counselors. The residents' showers are not to be included in their exercise time.

b. Maximum Security status residents shall exercise alone.

c. If a resident refuses an exercise period, staff should attempt to encourage the resident to use their exercise time. If the minor continues to refuse their exercise time, the refusal shall be documented in a Special Incident Report. It is also encouraged, but not required, that an exercise period be rescheduled.

d. The time the resident exercised, or refused to exercise, shall be recorded in the unit log. Staff shall document daily the resident's overall behavior in his/her Adjustment Record.

e. If a resident's behavior has been volatile and/or aggressive during the course of the shift, to the extent that there is no safe opportunity to exercise the resident, the Building Supervisor will be notified; Staff will document the details in the resident's adjustment record and in an incident report.

B. Security Risk

Security Risk status is less restrictive program than Maximum Security and is meant for residents who present a safety or security risk to staff, other residents and/or the facility. It can also be a used as a reduction from the Maximum Security Program. Residents on Security Risk are confined to their rooms and shall not participate in any unit activity with the group or the unit's resident workers.

1. Assignment and Supervision

    a. Approval of an Institutional Supervisor is needed to place a resident on Security Risk status. The Building Supervisor will confer with staff and review the incident reports before making the final decision on the resident's program.

    b. Residents on Security Risk status will be housed alone. In cases where staff believe that a roommate is prudent to deter self-destructive behavior, the Building Supervisor shall be notified of the circumstances that indicate a roommate is warranted. The Building Supervisor will evaluate the situation and authorize a roommate if appropriate.

    c. The Lead Counselor shall ensure on each shift that the resident's behavior is documented in the resident's Adjustment Record.

    d. An Institutional Supervisor will review the resident's Security Risk status daily. Program changes or reductions shall be made by an Institutional Supervisor-I with approval of the Building Supervisor.

2. Access Out of Room/Opening Room Door/Escorting

    a. A resident on Security Risk status shall be confined to his/her room when other residents including work crews are in the housing area.

    b. A minimum of two Probation Counselors must be on the housing unit whenever the resident's room door is opened, or when the resident is out of their room.

    c. If three Probation Counselors are present, two Security Risk status residents that were in unrelated incidents may be exercised on the housing unit at the same time.

    d. A minimum of one Probation Counselor or an Institutional Supervisor shall escort a resident on Security Risk status to any area outside of the housing unit. Staff in other personnel classifications, including Probation Officers, may not act as substitutes in escorting residents.

    e. Whenever a resident on Security Risk status is returning to the housing unit, all other residents shall be secured until the Security Risk resident is back in his/her room.

    f. Staff does not need to notify Central Control when opening the door for a resident on Security Risk, but shall notify Central Control via radio when escorting the resident off the housing unit.

3. Room Searches

Same procedures as specified in *Section A. Maximum Security, 3.Room Searches*, but utilizing two Probation Counselors.

4. Visits

Same procedures as specified in *Section A. Maximum Security, 4. Visits*, but utilizing two Probation Counselors.

5. Medical Care

    a. Whenever possible, Security Risk status residents should be treated on the housing unit. If medical staff determines necessary, the resident may be treated in the Nursing Office.

    b. Residents are to be supervised and escorted into the treatment room by one same sex Probation Counselor.

    c. A minimum of one Probation Counselor shall accompany the nurse to the resident's room when medications are administered. The other Probation Counselor must be immediately available to assist as necessary.

6. Meals

Same guidelines as specified in *Section A. Maximum Security, 6. Meals* except that only one Probation Counselor is required to deliver the meal, while a second counselor observes.

7. Showers

Same guidelines as specified in *Section A. Maximum Security, 7. Showers*, but utilizing two Probation Counselors. If three counselors are available, two residents on Security Risk status in unrelated incidents may shower at the same time.

8. Exercise

Same guidelines as specified in *Section A. Maximum Security, 8. Exercise*, but utilizing two Probation Counselors. If three Probation Counselors are available, two residents on Security Risk status in unrelated incidents may exercise at the same time.

C. Special Program

Special Program is generally assigned as a program reduction from Security Risk status. Special Program is also a behavior modification program used when a resident is habitually violating minor rule infractions and/or their behavior is not congruent with the

safety and/or stability of the housing unit. The program is used to slowly integrate a resident back into general population when their behavior is consistent with the expectations articulated in the Resident Handbook.

1. Assignment and Supervision

    a. An incident report must be submitted by unit staff to the Institutional Supervisor detailing the incident or ongoing behavioral issues the resident is exhibiting.

    b. A Special Program form must completed and approved by an Institutional Supervisor. The form shall include the amount of exercise time the resident will be allotted, number of meal trays, restrictions on school attendance, contact with the group, and other limitations.

    c. Every program will be created on a case-by-case basis.

    d. The resident may be allowed a roommate depending upon the circumstance and staff recommendations.

    e. The resident's behavior will be documented and reviewed as the guideline specified in *Section A. Maximum Security, 1. Assignment and Supervision*.

2. Access Out of Room/Opening Room Door/Escorting

    a. The resident will be permitted out of his/her room, as indicated on their program sheet.

    b. If two Probation Counselors are present, two residents on Special Program can be exercised at the same time if they were not involved in a related incident, they are not from opposite gangs and/or rival territories, they do not have a prior history of having problems with one another and their program does not indicated they are to have no contact with the group.

    c. When the resident is placed on a Special Program, he/she will be placed on "Escort" (*Refer to Section F, Escort*).

3. Room Searches

    a. Room searches shall be conducted on the AM and PM shift when the resident is being exercised and/or showered.

    b. At the discretion of unit staff, the resident may have a paperback book or magazines.

4. Visits

    a. The Juvenile Hall Chaplin, Mental Health Therapists and Probation Officers are permitted to visit the resident in his/her room, the unit's interview room or a common area of the unit, as consistent with the resident's contact with the group limitations.

      b. The resident's room door can be opened with two Probation Counselors on the unit.

      c. Parent/guardian visiting remains consistent with standard visiting protocol and with residents on Escort status.

## 5. Medical Care

Resident may be seen on the unit or escorted to the Nursing Department, as needed.

## 6. Meals

As specified on the resident's Special Program form.

## 7. Showers

As specified on the resident's Special Program form. Two residents on Special Program can shower at the same time if their program statuses are due to unrelated incidents.

## 8. Exercise

As specified on the resident's Special Program form. Two residents on Special Program can exercise at the same time if their program statuses are due to unrelated incidents and consistent with their Program parameters.

## D. Security Suspect

Residents may be placed on Security Suspect status when it is believed that they could be a serious threat to the community, such as a 707(b) offender, or exhibit bizarre or suspicious behaviors which would lead one to believe that he/she may be a danger to themselves or others. Staff may also place a resident on Security Suspect as a measure of behavior control when it has been determined that the resident is unable or unwilling to comply with behavioral expectations, and their behavior is such that it disrupts building or unit operations, and/or is a threat to others.

1. Any youth admitted into Juvenile Hall and is being charged with homicide, attempted homicide, rape/violent sex crime, or assault with great bodily injury offense shall be placed on Security Suspect.

2. Admission Staff will document why the resident was placed on Suspect status on the resident's Adjustment Record.

3. Any resident committed to DJJ or state prison, on adult status, and/or a DJJ parolee will also be placed on Suspect status.

4. Residents on Security Suspect status shall be allowed to participate in regular housing unit programs on his/her assigned housing unit. Residents on Suspect will also be allowed to go to the library or gym, unless their behavior or other security concerns deem it inappropriate.

5. A resident is not allowed to go to the playfield, or attend any off-unit activity located in the assessment center, overflow classroom, or where the resident may come into contact with residents from other housing units.

6. Whenever the unit is engaged in an off-unit activity which the Security Suspect status resident is prohibited from participating, the resident may be confined to his/her room.

7. Given the terms of Suspect status, any resident on Suspect is inherently also on Escort status. A Probation Counselor shall escort the resident to any area outside the housing unit. (i.e. Visiting, Nursing Department or Admissions)

8. An Institutional Supervisor will evaluate the need to continue the program weekly and note their findings in the resident's Adjustment Record. Should the original charges be reduced/altered the supervisor will evaluate the situation and modify the security program accordingly. Also upon notification or discovery that a resident has had additional/more severe charges added after admission, which warrant placing the resident on Security Suspect, the status will be modified to reflect the current circumstances.

9. Residents may be permitted magazines, books, writing materials, school assignments and materials, cards, approved games, etc., if such materials are not abused or misused during periods of confinement, and are consistent with the unit's housing rules.

E. No Playfield

No Playfield status is designed for residents awaiting transfer to other counties, states or institutions. Those residents believed to be a serious threat to the community shall also be placed on No Playfield status. Staff can place a resident on No Playfield status until reviewed by the Institutional Supervisor.

1. All residents with 707(b) charges are to be placed on "No Playfield" and will be documented accordingly.

2. Given the terms of Suspect status, all residents on Suspect are also on No Playfield.

3. Residents shall not participate in activities on the playfield.

4. Residents on No Playfield status may participate in the regular school program and may attended PE and other activities in the gym.

5. A resident on No Playfield status may be confined to his/her room when other residents are on the playfield.

6. A weekly review of the No Playfield status shall be made by an Institutional Supervisor.

F. Escort

Escort status is the least restrictive security program, or may be used as a non-disciplinary security status. Escort status requires a resident be under the direct supervision of a Probation Counselor whenever the resident leaves or returns to the housing unit. Residents are assigned to this program for their safety, the safety of others, or anytime it is believed that the resident needs direct supervision when they are off the housing unit. First time non-English speaking residents, residents on no contact status, and residents with certain medical conditions (i.e. broken leg, cast, crutches, wheelchair, etc.) may by placed on Escort status.

1. Staff may recommend Escort status to an Institutional Supervisor who will then review the Escort program weekly.

2. One Probation Counselor shall escort the resident to any area outside of the housing unit.

3. Upon intake, staff will record the reason why a minor is being placed on Escort.

4. Any minor placed on Escort upon intake will have their Escort status reviewed by an IS- I no later than one week after being admitted. An IS I will review the resident's behavior, stability, and any changes in charge status/filing to determine if the resident should remain on Escort.

G. Ranch Removals

Any resident who is sentenced to the OAYRF, subsequently removed, and readmitted into Juvenile Hall due to a violation of the program parameters and/or new law offenses will be placed on a security program. All removals will be addressed on a case-by-case basis. The Building Supervisor will assign the type of program based on the incident and related facts such as level of violence, degree of injury, history of combative/assaultive behavior, and any other contributing factors. Residents on security programs will be evaluated daily to determine if the modification of or removal from the program is warranted.

APPROVED BY:

_____          _____
Bruce Pelle, Superintendent                                    Date

# EXHIBIT J

# Engaging Students Who Are At Risk Through Instruction To Address Gaps in Academic Skills and Accelerate Learning

Lindy Khan, Ed.D., Academic Administrator

Lynn Mackey, Director Student Programs



Contra Costa County Office of Education

# Collaboration To Serve Youth in Detention

## Contra Costa County Probation Department

- The Probation Department operates the Contra Costa County **Juvenile Detention Facility and the Orin Allen Youth Rehabilitation Center (OAYRC).**

## Contra Costa County Office of Education (CCCOE)

- The County Office of Education employs teachers and other support staff to serve students detained in both facilities. Both court schools, **Mt. McKinley** in **Juvenile Hall** and **Delta Vista at OAYRC** are Western Association of Schools and Colleges (WASC) accredited.



# Probation Department

**Mission Statement :** To join our justice partners in service and support of our communities, courts, and victims

The Contra Costa County Probation Department is committed to the support of public safety by providing evidence-based prevention, investigation, and supervision services, and **a safe environment for our staff and those placed in our custodial care.**



John A. Davis Juvenile Hall



# Mt. McKinley School

Hallway with student art



## Mission:

The mission of the court and the community school is **to ensure academic improvement and successful transition while promoting pro social skills.**

# Competing Philosophies?

**Probation**

Safety and Security

**CCCOE**

Education and Successful Transition

**Not really...**

CCC Probation Leadership

supports education and other partners

to help youth in detention

# Barriers To Overcome

- ## Safety and Security are Paramount
  - Some limitations regarding instructional materials
  - Difficulty providing appropriate educational access to students on special program

- ## Strategies To Overcome Barriers
  - Strict check-out and check-in procedures for materials
  - Floating teacher provides instruction to individual students on special program

*Note: For years, Probation would not allow Internet access. Now students have limited, and staff full, access to the Internet.*

# Mt. McKinley School Demographics



- About 1,300 students served annually

- 7th – 12th graders
  (a few younger and some graduates)

- 81% male /19% female

- Ethnicity: 40% Hispanic

- Race: 41% African-American, 23% White,
  30% unspecified, 6% other

- 23% special education/27% English learners

# Other School Challenges

- Short-term, itinerant population

- History of school failure, thus disconnected from school

- Other issues that impact learning, such as substance abuse, mental illness, trauma

- Poor social skills and disruptive/negative behaviors

Some of these risks/needs can be addressed by school programs whereas others are better addressed by different departments. Risks/needs can all be impacted through staff sensitivity and understanding.

# Strategies To Address Gaps and Accelerate Learning

## Access Accurate Student Data Quickly

- **Assessment Center**
  - Administer pretests in Reading and Math
  - Assess English-language ability
  - Write an essay

- **Contact District**
  - Most recent transcript (for high school students)
  - IEPs or 504 plans from Special Education department (schedule interim placement IEP meeting ASAP)

- **Inform Teacher**
  - Create student profile in DataWise
  - Incorporate State- mandated test data
  - Create an Individual Learning Plan (with student input)

# Strategies To Address Gaps and Accelerate Learning



## Adequate Instructional Time

- **Small Class Size**
  - Maximum of 15 - 20 students
  - One teacher and another adult (i.e., an instructional assistant or special education teacher or assistant)

- **Block Scheduling**
  - 45 – 90 minute blocks of instructional time
  - Minimize transitions

# Sample Student Profile From DataWise

## Student Profile

**Name**

**Student ID** 14234

**School** Mt. McKinley School (Court)

**Birthdate** 1/1/65

**Gender** M

**Enter Date** 01/07/11

**Parent Information**

Pittsburg, CA 94565

**Grade** 11

**ELL Desig/Class** L

**Instr. Set**

GATE

**Teacher** 113



### Test Information

| Date | ID Test Name | Subject | MI School | Teacher | Score/Possible Prof. Description |
|---|---|---|---|---|---|

#### School Information

#### Score Information

**Grade 07**

| Date | ID Test Name | | | |
|---|---|---|---|---|
| 04/22/09 | 410 CST Math Scaled | Math | X Delta Vista High | 191 / 600 1 Far Below Basic |
| 04/22/09 | 350 CST ELA Scaled | Reading | X Delta Vista High | 233 / 600 1 Far Below Basic |

Multiple Measures Proficiency

| | Math | Reading |
|---|---|---|
| | N | N |

CST Math Scaled
350   247   191

CST ELA Scaled
350   260   233

☐ Average for School
■ Proficient
☐ Student Score

**Grade 09**

| | | | |
|---|---|---|---|
| 10/01/09 | 1333 CELDT Annual Overall | Language | Delta Vista High | 494 / 761 2 Early Intermediate |
| 10/01/10 | 1270 CELDT Annual Overall | Language | Delta Vista High | 405 / 761 2 Early Intermediate |
| 04/22/10 | CST ELA Scaled | Reading | X. Mt. McKinley School | 241 / 600 1 Far Below Basic |

| | Math | Reading |
|---|---|---|

CST ELA Scaled
350   270   252

☐ Average for School
■ Proficient
☐ Student Score

**Grade 10**

| | | | |
|---|---|---|---|
| 10/01/11 | 2213 CELDT Annual Overall | Language | Mt. McKinley School | 432 / 761 1 Beginning |
| 02/02/11 | 1441 CAHSEE Math Scaled Score | Math | Golden Gate | 303 / 450 1 Not Passed |
| 02/26/11 | 1433 CAHSEE ELA Scaled Score | Reading | Golden Gate | 301 / 450 1 Not Passed |
| 12/13/11 | 2433 Keyst2me - Level E - Unit 2 Final (1 - Grade 09 | Reading | Mt. McKinley School | 34 / 75 2 Below Basic |
| 04/22/12 | 2925 CST ELA Scaled | Reading | X Mt. McKinley School | 252 / 600 1 Far Below Basic |
| 04/22/12 | 2938 CST Life Science Scaled | Science | Mt. McKinley School | 290 / 600 1 Far Below Basic |

Multiple Measures Proficiency

| | Math | Reading |
|---|---|---|
| | | N |

CST ELA Scaled
350   279   241

☐ Average for School
■ Proficient
☐ Student Score



# Strategies To Address Gaps and Accelerate Learning

## Appropriate Instructional Strategies

- Direct instruction with appropriate supports

- Tiered academic interventions (ILP, IEP, small group, individual assistance)

- Computer-based independent work (Catch Up Math to help close gaps and Odysseyware for credit recovery)

- Collaborative learning



# Strategies To Address Gaps and Accelerate Learning

## Relevant Instructional Materials

- Texts and support materials aligned with State standards

- Content similar to districts

## Frequent Monitoring and Reporting

- Post tests (every 90 days)

- Quarterly report cards

- Update progress on IEP and ILP

- Student certificates



Recognizing Student Achievement

# Juveniles Committed to County Facilities

## CA Division of Juvenile Justice (DJJ)
## (formerly know at CA Youth Authority)

In 2007, legislation (SB 81 and AB 191) required most youthful offenders to be committed to county facilities, reserving those convicted of the most serious offenses and having the most severe treatment needs for DJJ. Previously adopted financial incentives for counties and the legislative changes reduced DJJ's population from a peak of approximately 10,000 a decade earlier to approximately 1,700.

# Youthful Offender Treatment Program (YOTP)

**Participants:** Adjudicated males with both nonviolent and violent charges

**Mission:** To protect society by restructuring unacceptable behaviors of youth and young adults by instilling the life skills necessary to transition into the community

**Length of commitment:** Determined by successful completion of four phases, three in custody and one post release; each phase is typically 18 weeks

**Program staff:** Probation counselors, teachers, mental health specialists, and an assigned Deputy Probation Officer

# YOTP

In addition to school, youth participate in other programs offered by Probation:

- **Thinking for a Change** (evidence-based cognitive behavior training curriculum

- **Aggression Replacement Training** (anger control, moral reasoning, and life skills)

- **Victim Empathy Class**

- **Job Tech** (a job readiness program)

# School in YOTP

## Challenges

- Longer stay - required expanded curriculum options

- Some students with high school diplomas - required post-secondary curriculum options

- Higher percentage of special education students

## Opportunities

- Enhanced learning opportunities for credit recovery and accelerated learning

- Program focus on individualized needs

- More time and emphasis on transition planning

- Greater collaboration with Probation staff

# Strategies To Engage Students in Their Learning



## Personalized Environment

- Develop a relationship with students

- Ongoing individual meetings with students

- Collaboration with Probation case managers

- Frequent interaction with a variety of caring adults

- Positive behavior expectations



Chaplain

Library

JH Auxiliary

Juvenile Hall Auxiliary

The Community Cares!

Other
caring
involved
adults

# Strategies To Engage Students

## Opportunities To Demonstrate Success

- Point system to evaluate individual effort and achievement

- Student of the Week – weekly raffle

- Certificates of Achievement/Celebrate Success

- School effort and success affect program advancement





# Hands-On Learning

Keyboarding, computer literacy, computer-based projects Odysseyware, Career Zone

# Strategies To Engage



**Student Input Into Their Learning**

- Personal Learning Inventories

- Access to programs of interest and those geared toward their individual needs

- Frequent Quickwrites to get input

- Individualized class schedule (one block per day)

- Customized formative assessments (for class and for the individual students)

# Jose

- Background:
  - In program for 1½ months
  - Gets to choose which credits to work on during independent work time
  - Expects to get his high school diploma before he leaves

- Thoughts on academic activities:
  - Thinks class is fun and interesting
  - Enjoys writing about his feelings
  - Loves working on the computer
  - Appreciates how his teacher breaks things down for him
  - Learned from the "bubble talk"– when you have something on your mind, think first, but better to get it out

- Quote:
  - "You could go as far as you want– what matters is how far you allow yourself to go."

# Alex

- Background:
  - In program for 11 months
  - Working on credits he needs
  - Learning to type and write essays on the computer

- Thoughts on academic activities:
  - Enjoys this school because he is more focused and is learning more
  - Appreciates the class time and the opportunity to work independently
  - "Thinking for a Change" helped him control his anger
  - Knows that people care when they speak to him one-on-one when he has a problem

- Quote:
  - "The school program is wonderful because they help us get our high school diploma or GED, make-up credits while still going through a regular school schedule."

# Outcomes for Long-Term Students



**PRE-POST READING GROWTH RATE**

- Eng Profic Only
- ELL Only
- All Students

| | 2009-10 | 2010-11 | 2011-12 |
|---|---|---|---|
| | 50% | 55% | 58% |
| | 48% | 52% | 77% |
| | 33% | 25% | 62% |



**PRE-POST MATHEMATICS GROWTH RATE**

- Eng Profic Only
- ELL Only
- All Students

| | 2009-10 | 2010-11 | 2011-12 |
|---|---|---|---|
| | 59% | 46% | 51% |
| | 75% | 40% | 50% |
| | 60% | 45% | 52% |

# Mt. McKinley School Outcomes



### HIGH SCHOOL DIPLOMAS

| 2009-10 | 2010-11 | 2011-12 |
|---------|---------|---------|
| 8 | 16 | 11 |



### GED PASSING RATE

| 2009-10 | 2010-11 | 2011-12 |
|---------|---------|---------|
| 73% | 62% | 74% |



### GED SECTIONS PASSING RATE

| | 2009-10 | 2010-11 | 2011-12 |
|---|---------|---------|---------|
| Reading | 88% | 94% | 100% |
| Writing | 88% | 84% | 100% |
| Math | 92% | 76% | 89% |
| Science | 96% | 97% | 78% |
| Soc. Stu. | 92% | 94% | 93% |

| 23/26 | 22/25 | 23/25 | 25/26 | 24/26 |
|-------|-------|-------|-------|-------|



We take great pride in our graduates!