UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

G. F., et al.,

            Plaintiffs,

     v.

CONTRA COSTA COUNTY, et al.,

          Defendants.

Case No.  13-cv-03667-MEJ

**ORDER GRANTING PRELIMINARY APPROVAL**

Re: Dkt. No. 279

## INTRODUCTION

The parties in this case have reached a settlement.  Through an unopposed Motion for Preliminary Approval of Settlement, they now seek an order (1) certifying the proposed class for settlement purposes, (2) granting preliminary approval of the Settlement Agreement, (3) directing notice to the Settlement Class, and (4) setting a Fairness Hearing and related dates.  Dkt. No. 279. Having carefully considered the Motion and relevant legal authority, as well as the proposed Settlement Agreements and all supporting documents, the Court **PRELIMINARILY APPROVES** the Settlement Agreements for the reasons set forth below.  This Order additionally sets the schedule for related deadlines, amending Dkt. Nos. 284 and 285.

## BACKGROUND

**A.**    **Case History**

Plaintiffs G.F. (by and through her guardian ad litem, Gail F.), W.B., and Q.G. filed this action on behalf of themselves and all others similarly situated, alleging discrimination against a proposed class of youth with disabilities who are detained, or will be detained, at the Juvenile Hall located in Martinez, California ("Juvenile Hall").  *See* First Am. Compl. ("FAC"), Dkt. No. 87.

United States District Court
Northern District of California

United States District Court
Northern District of California

1.     Background

The following background is taken from allegations in Plaintiffs' FAC:

Defendant Contra Costa County (the "County"), through its Probation Department, operates Juvenile Hall and is responsible for the care of youth detained there. *Id.* ¶¶ 35, 61. Juvenile Hall is a 290-bed, maximum-security detention facility, for youth up to age 18. *Id.* ¶ 61. Generally, Juvenile Hall provides temporary detention for pre-adjudicated youth awaiting hearings or sentencing, and adjudicated youth who are sentenced to a treatment or rehabilitation program that has a waiting list. *Id.* ¶ 62. It is generally not the final sentencing disposition for youth, except for those young people in the Youthful Offender Treatment Program ("YOTP") and for the Girls in Motion Program. *Id.* YOTP is a 30-bed boys' program designed for youth generally between 16 and 19 years of age. *Id.* ¶ 64. On average, YOTP can be completed in approximately fourteen months. *Id.* Juvenile Hall's one girls' housing unit includes the Girls in Motion Program, which can be completed in approximately four months. *Id.* ¶ 65. Additionally, youth found to be incompetent under the law also remain at Juvenile Hall and are supposed to receive competency training until they either become competent or are released. *Id.* ¶ 63. Such detentions can last for years. *Id.*

Juvenile Hall's solitary confinement policies are structured much like an adult detention facility, with varying levels of confinement, including Maximum Security, Security Risk, and Special Program. *Id.* ¶¶ 68-70. Maximum Security is the most restrictive, confining youth to their cells and prohibiting them from participating in any unit activity and from attending school and participating in educational services, including special education. *Id.* ¶¶ 71, 74. They are allowed out of their cell for only one hour per 24-hour period: 30 minutes in the morning and 30 minutes in the afternoon/evening. *Id.* ¶ 71. Security Risk is less restrictive, but still prohibits the youth from attending school and participating in educational services, including special education. *Id.* ¶¶ 76, 79. Security Risk youth are not permitted to participate in rehabilitative programs such as anger management classes or group counseling sessions. *Id.* ¶ 80. Youth on Security Risk are allowed out of their cell for one hour during a 24-hour period, 30 minutes on the morning shift and 30 minutes on the afternoon/evening shift. *Id.* ¶ 76. Finally, "Special Program" is used when a

resident is habitually committing minor rule infractions.  *Id. ¶* 81.  While on Special Program, supervisors have authority to impose restrictions on a youth's school attendance.  *Id. ¶* 82. Additionally, Special Program youth are not permitted to participate in rehabilitative programs, including anger management classes or group counseling sessions.  *Id. ¶* 84.  Generally, youth on Special Program are let outside their cells twice per day for 45 minutes.  *Id. ¶* 81.

There are other security restrictions that subject youth to more time in their cells than usual such as "Security Suspect" or "Suspect," where it is believed that a youth could be a serious threat to the community, or when he or she exhibits bizarre or suspicious behaviors indicating they may be a danger to themselves or others.  *Id. ¶* 85.  On Suspect, a youth is not allowed to attend any off-unit activity in the assessment center, overflow classroom, or other location where the youth may come into contact with youth from other housing units.  *Id.*  Whenever the unit is engaged in one of these off-unit activities in which the youth on Suspect is prohibited from participating, the youth may be confined to his/her cell.  *Id.*

Defendant Contra Costa Office of Education ("CCCOE"), in conjunction with the County Probation Department, operates the public onsite school, Mt. McKinley, which provides educational services for youth held at Juvenile Hall.  *Id. ¶* 122.  While on all school sites, students are under direct supervision of Probation personnel.  *Id. ¶* 124.  Each classroom has students of varying ages and grade levels, and all students are taught the same lessons regardless of whether they learned the material already or not.  *Id. ¶* 125.

While in school, if a teacher believes a student does not complete a sufficient amount of work or has committed some other infraction, the teacher may request that the student be placed on "room time" and confined to their cell.  *Id. ¶* 86.  Specifically, when a student engages in misconduct while in the classroom, CCCOE defers disciplinary measures to the Probation Department, thus leaving the decision as to the appropriate disciplinary measures for that student to Probation.  *Id. ¶* 87.  Plaintiffs assert that CCCOE is fully aware that the punishment that Probation imposes may be solitary confinement without special education and related services.  *Id.*

Plaintiffs contend youth can be locked in solitary confinement for anything, including disability-related behavior, and that youth are never given any guidance, written or verbal, as to

United States District Court
Northern District of California

what infractions will result in their being locked in solitary confinement or put on "room time." *Id.* ¶ 88. When youth are placed in solitary confinement, they are given a "due process" form that indicates which level of confinement they are in, but the form does not explain the reason why the youth was confined, and the youth is given no choice but to sign it. *Id.* ¶ 89. While there is a place on the due process form to write down the youth's side of the story, and a staff member is supposed to meet with the youth to discuss the confinement, this rarely occurs. *Id.* ¶ 90. Plaintiffs further contend that the due process form is not always provided to the youth and, thus, they do not have an opportunity to tell their side of the story. *Id.* Juvenile Hall does not contact the parents or guardians of students who are removed from class. *Id.* ¶ 188.

Plaintiffs assert that Defendants' solitary confinement policies and practices deny youth educational and rehabilitative services, which disproportionately burdens youth with disabilities who require additional assistance to access the general education curriculum and rehabilitative programs. *Id.* ¶¶ 2, 9. Without such assistance, youth with disabilities fall even further behind in education and rehabilitation than their non-disabled peers. *Id.* ¶ 9. Further, Plaintiffs contend that denial of access to these services in combination with solitary confinement causes their mental health to worsen, and they are not effectively deterred from future misconduct. *Id.* ¶ 2. Plaintiffs thus assert that it is more likely they will commit further infractions upon their release from solitary confinement and will once again be placed in solitary confinement and subject to further exclusions from and denials of education and rehabilitation, perpetuating the cycle of discrimination. *Id.* Consequently, Plaintiffs bring this action asserting Defendants have adopted and implemented policies and practices with regard to solitary confinement that have a disparate impact on youth with disabilities. *Id.* ¶ 297.

According to Plaintiffs, Defendants have no policies specific to Juvenile Hall to identify students who may have a disability (i.e., "Child Find" policies) as mandated by law, but rather only have a policy to offer special education to students "*already identified* as having a disability." *Id.* ¶ 143 (emphasis in original); *see also id.* ¶ 128. Plaintiffs contend Defendants fail to identify students with disabilities who enter Mt. McKinley but may not yet have been identified as having a disability. *Id.* ¶ 142. Plaintiffs allege there is only one placement option for students with

United States District Court
Northern District of California

disabilities in Juvenile Hall: the general education classroom setting (i.e., the regular classroom), and further allege there is no special day class that would provide full-time (or even part-time) special education instruction. *Id.* ¶¶ 146-47.  Plaintiffs also contend that Individualized Education Plans ("IEPs") are legally required for youth with disabilities, but assert Defendants have an established policy of simply disregarding those requirements, noting that the IEPs in Juvenile Hall are strikingly similar regardless of the students' varying disabilities, needs, and previous IEPs. *Id.* ¶ 150.  Plaintiffs contend Defendants have no records to establish they are complying with their legal obligations and do not track whether the required minutes are provided to each student who is entitled to specialized academic instruction. *Id.* ¶ 157.  Finally, Plaintiffs allege Juvenile Hall's IEPs do not consider disability-related behavior that may impact education, and Defendants do not rely on positive behavioral interventions and supports to counter behavior that impedes learning. *Id.* ¶¶ 166, 169.

      2.    The Litigation

Plaintiffs originally filed this suit on August 8, 2013 and subsequently filed their FAC on December 24, 2013, bringing six causes of action against Defendants: (1) violation of Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 et seq.; (2) violation of Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101; (3) violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, et seq.; (4) violation of California Government Code section 11135; (5) violation of California Education Code for Special Education Requirements, Cal. Educ. Code §§ 56000, et seq.; and (6) violation of California Education Code for General Education Requirements.  Plaintiffs filed their Motion for Class Certification contemporaneously with their original complaint, and subsequently re-filed their motion for class certification following the filing of the FAC.  Dkt. Nos. 9, 93.

On January 24, 2014, Defendants filed Motions to Dismiss the FAC, Dkt. Nos. 113, 118, and on February 7, 2014, they filed their Oppositions to Plaintiffs' Motion for Class Certification, Dkt. Nos. 133, 136.  All motions have been fully briefed, but upon notification about the parties' ongoing efforts to reach a mutually agreeable settlement, the Court deferred ruling on these motions.  The parties filed their Motion for Preliminary Approval of their Settlement Agreements

on June 30, 2014.  Dkt. No. 279.

       3.      <u>Settlement Negotiations</u>

     The Parties have been engaged in ongoing settlement discussions for the majority of this case.  Prior to filing the Complaint, Plaintiffs sent Defendants a pre-litigation demand letter in July of 2013.  Smith Decl. ¶ 12, Dkt. No. 279-1.  After filing this case, Plaintiffs met with the County and CCCOE on August 22, 2013 to discuss the possibility of engaging in settlement negotiations.  *Id.* ¶ 13.  On September 4, 2013, Plaintiffs made their first written settlement proposal to the County and CCCOE.  *Id.* ¶ 14.  Plaintiffs' counsel also met with County Counsel and Defendant Philip Kader, the County's Chief Probation Officer, on October 29, 2013 to discuss possible settlement options.  *Id.* ¶ 15.  Plaintiffs made their second written settlement proposal to both Defendants that same day.  *Id.* ¶ 16.  All parties met for a two-day in-person settlement conference before the Honorable James Warren (Ret.) on November 4 and November 7, 2013.  *Id.*  Although the parties were unable to reach agreement at that conference, they continued to discuss settlement options and exchanged written settlement proposals in February of 2014.  *Id.* ¶ 17.

     Additional in-person settlement conferences were held before Magistrate Judge Joseph C. Spero on August 26, 2014 with CCCOE, and on August 27, 2014 with the County.  *Id.* ¶ 18.  On September 17, 2014, all parties participated in a telephonic conference with Judge Spero.  *Id.* ¶ 18.  Plaintiffs then met in person with CCCOE on September 29, 2014 and with the County on September 30, 2014 to further discuss settlement proposals.  *Id.* ¶ 20.  Plaintiffs met with the County for further in-person settlement conferences before Judge Spero on November 13, 2014, January 22, 2015, and March 31, 2015.  *Id.* ¶ 21.  Plaintiffs met with CCCOE for a further in-person settlement conference before Judge Spero on November 20, 2014.  *Id.* ¶ 22.  Plaintiffs also met with CCCOE before a mediator, Robert D. Links, appointed through the Court's Alternative Dispute Resolution Program, on February 24, 2015, to address Plaintiffs' attorneys' fees and costs.  *Id.* ¶ 23.  Throughout this final settlement effort, the parties exchanged extensive written proposals.  *Id.* ¶ 11.  The final agreement with CCCOE (the "CCCOE Agreement") was fully executed on May 18, 2015, and the final agreement with the County (the "County Agreeement")

United States District Court
Northern District of California

6

was fully executed on May 19, 2015 (collectively, the "Settlement Agreements").  *Id.* ¶ 24; *see* Dkt. No. 279-2 ("CCCOE Agmt."); Dkt. No. 279-3 ("Cty. Agmt.").

        4.     <u>Preliminary Approval Hearing & Subsequent Stipulations</u>

On July 23, 2015, the Court held a hearing on the Motion for Preliminary Approval of the Settlement Agreements.  Dkt. No. 286.  The Court discussed a number of issues with the parties, including minor discrepancies between the proposed notice and the Settlement Agreements, as well as the potential deadlines for the proposed Fairness Hearing and related scheduling matters. The same day, Plaintiffs and CCCOE submitted a stipulation modifying one portion of their agreement concerning the timing for when CCCOE was to pay Plaintiffs' Counsels' first attorneys' fee installment payment.  Dkt. No. 283.  The next day, the parties submitted a joint stipulation modifying their Agreements to reflect the following:

      (1)     The parties agree that any award of attorneys' fees to the Plaintiffs is subject to Court Approval;

      (2)     Revisions to the proposed class notice, addressing the Court's concerns at the Preliminary Approval Hearing; and

      (3)     Proposing a schedule for Final Approval, including the Fairness Hearing and related deadlines.

Dkt. No. 284.

**B.**    **Settlement Terms**

As summarized by Plaintiffs (*see* Mot. 6-13), the terms of the settlements are as follows:

        1.     <u>The County Agreement</u>

          a.     *Room Confinement*

Under the County Agreement, Probation Staff will no longer use room confinement for discipline, punishment, administrative convenience, retaliation, staffing shortages or reasons other than a temporary response to behavior that threatens immediate harm to the youth or others.  Cty. Agmt. at 5, § IV(D)(2).  Additionally, Probation staff are prohibited from placing youth in continuous room confinement for longer than four hours.  *Id.*, § IV(D)(3).  After four continuous hours, staff must return the youth to the general population, develop "specialized individualized

United States District Court
Northern District of California

programming" for the youth, or consult with a qualified mental health professional about whether a youth's behavior requires that he or she be transported to a mental health facility. *Id.* As part of the expert review, discussed below, the experts will consider whether and under what conditions it would be appropriate for the youth to remain in room confinement after the initial four hour period as part of special individualized programming. *Id.* at 6, § IV(D)(5).

Further, Probation staff must develop special individualized programming for youth with persistent behavior problems that threaten the safety of youth or staff or the security of the facility and may not use room confinement as a substitute for special individualized programming. *Id.* at 5, § IV(D)(4). Special individualized programming includes the development of any individualized plan designed to improve the youth's behavior, which is created in consultation with the youth, Contra Costa County Mental Health ("County Mental Health") staff, and the youth's family members, when available. *Id.* at 5-6, § IV(D)(4)(a). The plan must identify the causes and purposes of the negative behavior, as well as concrete goals that the youth understands that he or she can work toward to be removed from special programming. *Id.* at 6, § IV(D)(4)(b). The special individualized programming calls for increased collaboration between staff members and the youth by requiring in-person supervision and educational service. *Id.*, §§ IV(D)(4)(c)-(f). Further, there must be daily review with the youth of his or her progress toward the goals outlined in his or her plan. *Id.*, § IV(D)(4)(g).

### b. Expert Review of Disability-Related Policies

The County will also retain Professor Barry Krisberg as an expert in this matter, and Professor Krisberg will work with Professor Edward Latessa to conduct a review of the County's policies and practices at the Juvenile Hall. *Id.*, § IV(A). Specifically, Professors Krisberg and Latessa will review policies and practices relating to: (a) room confinement; (b) use of behavior incentives; (c) coordination between CCCOE and the Probation Department, including but not limited to, the County's coordination with CCCOE on CCCOE's implementation of IEPs, Section 504 Plans[1], and behavior intervention plans; (d) identification, assessment and tracking of youth

---

[1] Section 504 Plans refer to plans established in accordance with the Rehabilitation Act.

United States District Court
Northern District of California

with disabilities who are detained at Juvenile Hall and referral systems to identify these youth for CCCOE and County Mental Health; (e) the implementation of Juvenile Detention Alternatives Initiative standard V.D.4., which specifies that disability must be considered in determining an appropriate response when assigning consequences. *Id.*, §§ IV(A)(1)(a)-(e). Following review by the experts of the above policies and practices, the joint recommendations of Professors Krisberg and Latessa will be submitted to the County and Plaintiffs' counsel, and the County will implement those joint recommendations. *Id.*, § IV(A)(2). The Agreement also sets forth a dispute resolution process if the experts do not agree on recommendations. *Id.* at 3-4, §§ IV(A)(2)(a)-(e).

### c.   *Multi-Disciplinary Team Meetings*

The County Agreement calls for increased coordination between Probation, CCCOE, and County Mental Health through the use of multi-disciplinary team meetings, to be held at least once per month with additional meetings held as needed. *Id.* at 4, § IV(B). Such meetings will address the following subjects:

(a)      Coordination of responses and interventions for individual youth who are having consistent and/or chronic issues conforming their behavior to expectations, regardless of where or when the behavior occurs;

(b)      Coordination of the provision of special education and counseling services to all eligible youth on all units;

(c)      Discussion of provision of a continuum of placements based on the special education needs of youth in Juvenile Hall, including a process for approving and placing children in non-public schools and residential placements outside of the Juvenile Hall.

*Id.*, §§ IV(B)(1)-(3)

### d.   *Attendance at Individualized Education Plan Meetings*

The County Agreement requires more involvement from Probation staff. Specifically, Probation staff will attend IEP meetings when requested to do so, and when the Probation Department has received prior written or oral consent from the education rights holder to attend, when certain conditions are met. *See id.* at 4-5, §§ IV(C)(1)-(2). These conditions include: (a)

United States District Court
Northern District of California

9

where the youth has been removed from the classroom or prevented from attending Mt. McKinley School for more than 9 school days in one school year for disciplinary reasons by the Probation Department and/or CCCOE in response to conduct by the youth; (b) where a youth has been detained in the Juvenile Hall for 30 consecutive days or more and a special day class, residential treatment, or a non-public school placement is being recommended or requested as a placement option by CCCOE or the education rights holder for the youth; or (c) where a behavior support/intervention plan is being put in place for youth assigned to the Youthful Offender Treatment Program or the Girls in Motion program or youth who have been detained in the Juvenile Hall for 60 consecutive days or more.  *Id.*

      e.  *Duration of the Agreement, Monitoring, and Reporting*

   The County Agreement consists of two primary phases: the Implementation Period and the Monitoring Period.  The Implementation Period lasts 18 months, allowing for the experts to conduct their review, issue their expert report detailing their findings and recommendations, and for the County to train staff and revise policies to implement those recommendations.  *Id.* at 6, § IV(E).  Following that Period, there will be a Monitoring Period that lasts for 24 months, during which the experts will provide the parties with monitoring reports every 6 months.  *Id.*

   The parties will rely on benchmarks to show the County's compliance with the County Agreement during the initial phase of the Monitoring Period.  *Id.*, § IV(E).  The benchmark for compliance with the Agreement at the time of the first and second Monitoring Report will be 70% compliance.  *Id.*  The benchmark for the next year, during which the experts will provide their third and fourth Monitoring Reports, will be 80% compliance.  *Id.*  Thereafter and through the conclusion of the Monitoring Period, including the issuance of the fifth and final monitoring report, all units will be in substantial compliance with the provisions of this Agreement.  *Id.*

      f.  *Dispute Resolution*

   To the extent disputes arise regarding the experts' recommendations and/or compliance with the County Agreement during the Monitoring Period, the parties will first meet and confer in a good faith attempt to resolve the dispute.  *Id.* at 3, § IV(A)(2)(a).  If they are unable to resolve the dispute through the meet and confer process, either Plaintiffs or the County may submit the

matter to Judge Spero for purposes of mediation.  *Id.* at 4, § IV(A)(2)(b).  If the mediation is

unsuccessful, the parties will submit the matter to the Court, and the decision of the Court will be

appealable to the Ninth Circuit.  *Id.* at 4, §§ IV(A)(2)(c)-(d).  Attorneys' fees and costs for work

performed in conjunction with dispute resolution may be awarded to the prevailing party in

accordance with the standard set forth in *Christanberg Garment Company v. E.E.O.C.*, 434 U.S.

412 (1978).  *Id.* § (IV)(A)(2)(e).  If Plaintiffs are the prevailing party, the Court may, in its

discretion, reduce the amount of attorneys' fees and costs awarded if it determines that the

County's position(s) were reasonable, in whole or in part.  *Id.*

        **g.**     *Attorneys' Fees and Costs*

The County Agreement provides for the payment of $1,340,000 as full and final settlement

of all attorneys' fees and costs related to this case and the named Plaintiffs' individual due process

claims, as set forth in *Contra Costa County v. Barbara C.*, Civil Case No. C-14-00268 MEJ,

*Contra Costa County v. CiCi C.*, Civil Case No. C-14-00269 MEJ, and *Contra Costa County v.

Gail F.*, Civil Case No. C-14-00270 MEJ.  *Id.* at 11-12, § IX.

        **2.**     <u>The CCCOE Agreement</u>

        **a.**     *Expert Review of Educational Policies*

The CCCOE Agreement provides for CCCOE to retain an expert with expertise in: (1) the

IDEA; (2) the Rehabilitation Act and the ADA; (3) California state law requirements pertaining to

special education; and (4) the operation of juvenile court schools.  CCCOE Agmt. at 2, § 4.1.1.

This expert will conduct a review of CCCOE's policies, procedures and practices in the following

areas: (a) Child Find obligations in accordance with the IDEA and related California law and the

Rehabilitation Act for youth with suspected disabilities who are detained at Juvenile Hall; (b)

development and implementation of IEPs and Section 504 Plans in accordance with the IDEA and

related California law and the Rehabilitation Act for all eligible disabled youth detained in

Juvenile Hall; (c) discipline in accordance with applicable law for all eligible disabled youth

detained in the Juvenile Hall; and (d) the obligations of CCCOE to coordinate with Probation

regarding all matters in which CCCOE and Probation have joint or overlapping responsibilities, in

accordance with relevant California law.  *Id.* at 3-4, § 4.1.7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    To conduct this review, the expert will be given full and reasonable access to any and all

2  information he or she deems necessary, including the following: (1) full access to the areas in

3  which CCCOE operates; (2) the ability to talk with, consult with, and interview staff from

4  CCCOE; (3) the ability to observe youth in the classroom setting, attend IEP meetings with the

5  consent of the educational rights holder, observe youth during other special education related

6  services, except for individual counseling services, and review recordings of IEP team meetings;

7  (4) access to CCCOE records with the exception of private personnel files; and (5) the ability to

8  conduct written surveys of youth detained in Juvenile Hall and to speak with small groups of

9  students as needed.  *Id.* at 4-5, § 4.1.8.

10    Based on this review, the expert will develop a report ("Expert Report") which will include

11  all proposed revisions to policies, procedures, and practices that he or she recommends.  *Id.* at 5, §

12  4.1.10.  This report will be completed within six months of the commencement of the expert's

13  review.  *Id.*  Following the issuance of the Expert Report, both Plaintiffs and CCCOE will have an

14  opportunity to challenge any recommendation contained in the report on the basis that it is not

15  required by and/or does not comply with federal and/or state law.  *Id.*, § 4.1.11.  Once all

16  challenges have been resolved, CCCOE will adopt and implement the report.  *Id.*, § 4.1.12.

17         *b.*      *ADA Coordinator*

18    CCCOE will designate at least one employee at the Juvenile Hall as responsible for

19  coordinating ADA compliance ("ADA Coordinator").  This person will be responsible for

20  ensuring compliance with the ADA generally and for investigating and responding to any ADA

21  complaints.  *Id.* at 6, § 4.2.1.

22         *c.*      *Coordination with the County Probation Department*

23    CCCOE shall use best efforts when implementing the Expert Report to coordinate and

24  cooperate with other authorities operating in and providing services at Juvenile Hall, including,

25  but not limited to, the County's Probation Department.  *Id.* at 6, § 4.3.1.

26         *d.*      *Duration of Agreement, Monitoring, and Reporting*

27    Following selection of the Expert and drafting and approval of the Expert Report, there

28  will be a 24-month monitoring term.  *Id.* at 5, § 4.1.12.  During this time, the Expert will provide

the parties with monitoring reports on a quarterly basis for the first 12 months and on a semi-annual basis for the following 12 months.  *Id.* at 6, § 5.2.

               *e.*     *Dispute Resolution*

        To the extent disputes arise regarding the Expert Report and/or compliance with the CCCOE Agreement during its term, the parties will first notify each other in writing and meet and confer in a good faith attempt to resolve the dispute.  *Id.* at 7, § 6.2.  If they are unable to resolve the dispute through the meet and confer process, Plaintiffs or CCCOE may submit the matter for mediation.  *Id.*  If the mediation is unsuccessful, the parties will submit the matter to the Court and the decision of the Court will be appealable in accordance with applicable law.  *Id.*

               *f.*     *Attorneys' Fees and Costs*

        The CCCOE Agreement provides for the payment of $1,165,000 for reasonable attorneys' fees and costs incurred during the course of the lawsuit, with $70,000 of this amount put aside to compensate for fees, expenses and costs incurred in monitoring CCCOE's implementation of the Settlement Agreement.  *Id.* at 11, §§ 12.2, 12.3.

        3.     <u>General Provisions in Both Agreements</u>

               *a.*     *Release of Claims*

        The proposed Settlement Agreements resolve all claims for injunctive relief brought by Plaintiffs.  Except as discussed below, the settlements do not: (1) provide for any monetary relief to be paid to class members; (2) release any individual claims for damages, or otherwise affect the rights of class members to pursue individual claims for compensatory education or other individual relief under the IDEA and/or Section 504 of the Rehabilitation Act; and (3) do not affect any claims for reasonable accommodations related to physical access, communication access, and/or accommodations otherwise relating to hearing, vision and/or mobility disabilities arising under the ADA or the Rehabilitation Act.  Cty. Agmt. at 10, § VI; CCCOE Agmt. at 10-11, § 11.

        Under the County Agreement, however, the three named Plaintiffs have released their individual claims for compensatory education as a resolution of their related individual cases, *Contra Costa County v. Barbara C.*, Civil Case No. C-14-00268 MEJ, *Contra Costa County v.*

United States District Court
Northern District of California

1    *CiCi C.*, Civil Case No. C-14-00269 MEJ, and *Contra Costa County v. Gail F.*, Civil Case No. C-

2    14-00270 MEJ. Cty. Agmt. at 11, § VII. Specifically, the County will pay the named Plaintiffs a

3    total of $1,140, representing the amount awarded to them for compensatory education by an

4    administrative judge from the Office of Administrative Hearings ("OAH") following their filing of

5    three separate individual due process administrative proceedings. *See* Mot. at 4-5 & 10 n.6. The

6    County will provide these funds in exchange for Plaintiffs dismissing their cross appeals of the

7    OAH's decisions. *Id.* at 10 n.6.

8              b.      *Notice*

9         If the Court preliminarily approves the Settlement Agreements and certifies the proposed

10   class, the parties will initiate notice to the settlement class in the manner approved by this Court

11   within 30 days of the Court's order preliminarily approving the agreements. Cty. Agmt. at 9, §

12   V(F); CCCOE Agmt. at 9, § 8.4.12. The parties will distribute the parties' proposed joint notice

13   of class action settlement, which includes: a brief statement of the claims released by the Class;

14   the date of the hearing on the Final Approval of the Agreements; the deadline for submitting

15   objections to the Agreements; and the web page, address, and phone and fax numbers that may be

16   used to obtain a copy of the Notice in the format and language requested. Cty. Agmt. at 9-10, §

17   V(F); CCCOE Agmt. at 8-9, § 8.4. Notice will be posted in prominent places on each of the

18   parties' websites as well as in Juvenile Hall's lobby and classrooms. Cty. Agmt. at 9-10, §§

19   V(F)(b), (c); CCCOE Agmt. at 9-10, §§ 8.4.1.3, 8.4.1.4. CCCOE will mail notice to the last

20   known address of the educational rights holder of all youth currently receiving special education

21   services at Mt. McKinley. CCCOE Agmt. at 9, § 8.4.1.2.

22             c.      *Class Action Fairness Compliance*

23        Defendants will provide notice of the proposed Agreements as required by the Class

24   Action Fairness Act (28 U.S.C. § 1715(b)), including to the U.S. Attorney General, the California

25   Attorney General's Office, and/or any other necessary parties. Cty. Agmt. at 8, § V(D); CCCOE

26   Agmt. at 8, § 8.3.1.

27             d.      *Continuing Jurisdiction*

28        The Agreements provide for the Court to retain jurisdiction for purposes of approval and

United States District Court
Northern District of California

14

1    enforcement of any award of attorneys' fees and costs, as well for purposes of dispute resolution.

2    Cty. Amgt. at 11, § VIII; CCCOE Agmt. at 10, § 10.1; *see also* Stipulation, Dkt. No. 284.

3                                   **LEGAL STANDARD**

4         The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class

5    actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Nonetheless, a

6    class action may not be settled without court approval. Fed. R. Civ. P. 23(e). When the parties to

7    a putative class action reach a settlement agreement prior to class certification, "courts must

8    peruse the proposed compromise to ratify both the propriety of the certification and the fairness of

9    the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

10        Courts generally employ a two-step process in evaluating a class action settlement. At the

11   preliminary stage, the court must first assess whether a class exists. *Staton*, 327 F.3d at 952 (citing

12   *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the court must determine

13   whether the proposed settlement "is fundamentally fair, adequate, and reasonable." *Hanlon v.*

14   *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). Where the parties reach a settlement prior to

15   class certification, courts apply "a higher standard of fairness and a more probing inquiry than may

16   normally be required under Rule 23(e)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)

17   (internal quotations and citation omitted). The Court's task at the preliminary approval stage is to

18   determine whether the settlement falls "within the range of possible approval." *In re Tableware*

19   *Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (internal quotations and citation

20   omitted). "The initial decision to approve or reject a settlement proposal is committed to the

21   sound discretion of the trial judge." *Class Plaintiffs*, 955 F.2d at 1276.

22        Preliminary approval of a settlement is appropriate if "the proposed settlement appears to

23   be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does

24   not improperly grant preferential treatment to class representatives or segments of the class, and

25   falls within the range of possible approval." *In re Tableware*, 484 F. Supp. 2d at 1079 (internal

26   quotations and citation omitted). The proposed settlement need not be ideal, but it must be fair

27   and free of collusion, consistent with a plaintiff's fiduciary obligations to the class. *Hanlon*, 150

28   F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether

1    the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free

2    from collusion.").  To assess a settlement proposal, courts must balance a number of factors:

3              the strength of the plaintiffs' case; the risk, expense, complexity, and
              likely duration of further litigation; the risk of maintaining class
4              action status throughout the trial; the amount offered in settlement;
              the extent of discovery completed and the state of the proceedings;
5              the experience and views of counsel; the presence of a governmental
              participant; and the reaction of the class members to the proposed
6              settlement.

7    *Hanlon*, 150 F.3d at 1026 (citations omitted).  The proposed settlement must be "taken as a whole,

8    rather than the individual component parts" in the examination for overall fairness.  *Id.*  Courts do

9    not have the ability to "delete, modify, or substitute certain provisions" because the settlement

10   "must stand or fall in its entirety."  *Id.*

11        If the court preliminarily certifies the class and finds the proposed settlement fair to its

12   members, the court schedules a fairness hearing pursuant to Federal Rule of Civil Procedure

13   23(e)(2) to make a final determination of whether the settlement is "fair, reasonable, and

14   adequate."  Fed. R. Civ. P. 23(e)(2); *see also In re Google Referrer Header Privacy Litig.*, 2014

15   WL 1266091, at *2 (N.D. Cal. Mar. 26, 2014).

16                                    **DISCUSSION**

17   **A.       Class Certification**

18        The Court first considers whether this action is appropriate for class treatment.  The

19   Federal Rules of Civil Procedure describe four preliminary requirements for class certification: (1)

20   numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *See* Fed. R. Civ.

21   P. 23(a)(1)-(4).  If these requirements are satisfied, the Court then examines whether Plaintiffs

22   have satisfied the requirements of Rule 23(b)(2).  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541,

23   2548-49 (2011).

24        The parties have stipulated to the certification of a Settlement Class, defined as:

25              [A]ll youth with disabilities as defined under the ADA and the
              Rehabilitation Act who are currently detained at or who will be
26              detained at the Contra Costa County Juvenile Hall.

27   Mot. at 14 (citing Cty. Agmt. at 2, §§ V.B.; CCCOE Agmt. at 2, §§ 3.2.1).  The proposed class is

28   identical to the proposed class definition set out in the FAC and the Class Certification Motions.

United States District Court
Northern District of California

1.     Rule 23(a)

      a.     *Numerosity*

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all parties is impracticable." Fed. R. Civ. P. 23(a)(1). No specific number is required, although there is a presumption that a class with more than 40 members is impracticable to require joinder. *Ries v. Ariz. Bevs. U.S. LLC, Hornell Brewing Co.*, 287 F.R.D. 523, 536 (N.D. Cal. 2012); *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 616 (N.D. Cal. 2014) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." (citation omitted)).

The numerosity requirement is satisfied here as the class contains at least 40 youth with disabilities currently in Juvenile Hall, with several hundred who will pass through it in the next year, and thousands who will enter it in the future. Smith Class Cert Decl. ¶¶ 5-6, Dkt. No. 105-1. Between September 2012 and May 2013 alone, Mt. McKinley served 282 students who were identified as having a disability that required an IEP or Section 504 Plan. Mot. at 15 n.8 (citing Smith Class Cert Decl. ¶ 6).

      b.     *Commonality*

Rule 23(a)(1) requires some "questions of fact and law which are common to the class." To satisfy this requirement, the claims must "depend upon a common contention" such "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. But this does not necessitate that "every question in the case, or even a preponderance of questions, is capable of class wide resolution." *Wang v. Chinese Daily News*, 737 F.3d 538, 544 (9th Cir. 2013). "So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Id.* (citing *Dukes*, 131 S. Ct. at 2556). "[C]ommonality cannot be determined without a precise understanding of the nature of the underlying claims." *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, ___ U.S. ___, 133 S. Ct. 1184, 1194-95 (2013); additional citation omitted)). "In a civil rights suit, commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of its

17

1   putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on*

2   *other grounds as recognized by Harris v. Alvarado*, 402 F. App'x 180, 181 (9th Cir. 2010).

3        Commonality is satisfied here as the putative class members have in common their

4   exposure to the systemic policies and practices applied in Juvenile Hall, and their claims share

5   common questions of fact and law concerning (1) the educational services, including special

6   education, provided (or not) by Defendants; (2) the facility's disciplinary policies surrounding

7   room confinement, including whether youth's disabilities were taken into account in the

8   disciplinary process. *See Parsons*, 754 F.3d at 678 (finding commonality satisfied and noting the

9   "policies and practices" at issue were "the 'glue' that holds together the putative class . . . either

10  each of the policies and practices is unlawful as to every inmate or it is not.")  The putative class

11  members' claims share common questions of law concerning whether these policies and practices

12  violate the IDEA, ADA, Section 504, California Government Code sections 11135 et seq., and

13  California Education Code sections 56000 et seq.  Accordingly, for settlement purposes, the Court

14  finds commonality satisfied.

15          *c.*    *Typicality*

16       Rule 23(a)(3) requires that the representative party's claim be "typical of the claim . . . of

17  the class."  Fed. R. Civ. P. 23(a)(3).  "'Under this rule's permissive standards, representative

18  claims are typical if they are reasonably co-extensive with those absent class members; they need

19  not be substantially identical.'"  *Parsons*, 754 F.3d at 685 (quoting *Hanlon*, 150 F.3d at 1020).

20  "The test of typicality is 'whether other members have the same or similar injury, whether the

21  action is based on conduct which is not unique to the named plaintiffs, and whether other class

22  members have been injured by the same course of conduct.'"  *Id.* (quoting *Hanon v. Dataproducts*

23  *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

24       Typicality is met here: each named Plaintiff is or was (1) a youth with a disability; (2)

25  detained at Juvenile Hall; and (3) subject to the systematic policies and practices at issue in this

26  case.  *See* Mot. at 17 (citing G.F. Decl., Dkt. No. 97; Q.G. Decl., Dkt. No. 98; Cici C. Decl., Dkt.

27  No. 99).  Specifically, each named Plaintiff was offered one educational placement (in the general

28  classroom regardless of disability or prior IEP), denied access to special education and related

services when in room confinement, and placed in room confinement without any disability-related inquiry.  *Id.* (citing G.F. Decl.; Q.G. Decl.; Cici C. Decl.).  Like the proposed class representatives, all members of the proposed Settlement Class are being or will be subjected to the systematic policies and practices at Juvenile Hall and have or will likely suffer injuries as a result.  *See Parsons*, 754 F.3d at 685 (typicality satisfied where named plaintiffs: (1) allege the same or similar injury as the rest of putative class; (2) allege that injury is a result of a course of conduct that is not unique; and (3) allege that the injury follows from the course of conduct at the center of the class claims.).  Accordingly, the Court finds the named Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement.

> ### d.      Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Due process concerns are central to this determination: "[A]bsent class members must be afforded adequate representation before entry of judgment which binds them."  *Hanlon*, 150 F.3d at 1020 (citation omitted).  Two questions must be considered in this determination: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Id.*

First, there is no evidence the named Plaintiffs or their counsel have any conflicts of interest with other class members.  *See Hernandez*, 305 F.R.D. at 160 ("Class representatives have less risk of conflict with unnamed class members when they seek only declaratory and injunctive relief.").  Plaintiffs contend that "[t]heir individual pursuit of compensatory services for their alleged injuries has not affected and will not affect their pursuit of class-wide declaratory and injunctive relief as this relief resolved the claims raised in the related but separate individual cases[.]"  Mot. at 18.  They further assert that the Settlement Agreements specifically carve out and reserve the class members' claims for compensatory education.  *Id.*[2]

---

[2] The County Agreement also states: "The Named Plaintiffs agree not to retain Disability Rights Advocates and Public Counsel to pursue any individual claims against the County, or any of its employees or departments through the Term of the Agreement."  Cty. Agmt. at 11, § VI.

United States District Court
Northern District of California

1    Second, based on the information available, the Court is satisfied the named Plaintiffs and

2    their counsel have and will continue to vigorously prosecute this action on behalf of the class.  The

3    named Plaintiffs share the same interests in declaratory and injunctive relief as the absent class

4    members, including a common interest in improving the education and disciplinary programs at

5    Juvenile Hall and Mt. McKinley.[3]  According to Plaintiffs, "[b]ecause of their experiences with

6    education and discipline at the Juvenile Hall and the profound, continuing impact that those

7    experiences have had on their lives, they are each passionate about improving access to education

8    at the Juvenile Hall, and they are ready and able to act as effective advocates on behalf of the

9    class."  Mot. at 18 (citing Smith Decl. ¶ 29).

10    The named Plaintiffs are represented by Disability Rights Advocates and Public Counsel.[4]

11    These attorneys have substantial experience handling class actions and complex litigation and

12    have done extensive work investigating the claims in this action.  Faer Decl. ¶¶ 2-8, 10, Dkt. No.

13    Dkt. No. 279-5; Smith Decl. ¶¶ 5-10, 32.  They are also well-versed in disability and education

14    law and have sufficient resources to continue to vigorously prosecute this case.  Accordingly, the

15    Court finds both the named Plaintiffs and their counsel as adequate representatives and appoints

16    Disability Rights Advocates and Public Counsel as Class Counsel for settlement purposes.

17         *e.*    *Summary*

18    In light of the foregoing, the Court finds that Plaintiffs have satisfied Rule 23(a)'s four

19    prerequisites to maintaining a class action.  Accordingly, the Court turns to Rule 23(b) concerning

20    the type of class action that may be maintained.

21        2.    <u>Rule 23(b)(2)</u>

22    Plaintiffs seek to certify their proposed class under Rule 23(b)(2), which is satisfied if "the

23    party opposing the class has acted or refused to act on grounds that apply generally to the class, so

24    that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as

25    _____

26    [3] Although the named Plaintiffs are not currently detained at Juvenile Hall, they were each detained there at the time this suit was filed, and at the time of this Motion, Plaintiff G.F. was still

27    under eighteen years old.  Mot. at 18 n.9.

28    [4] Plaintiffs were also represented by Zelle Hofmann Voelbel & Mason LLP and Paul Hastings LLP but these firms do not seek to be appointed as class counsel.

1    a whole[.]"  Fed. R. Civ. P. 23(b)(2).  In *Wal-Mart*, the Supreme Court explained:

2
> the key to the (b)(2) class is "the indivisible nature of the injunctive
3    > or declaratory remedy warranted—the notion that the conduct is
> such that it can be enjoined or declared unlawful only as to all of the
4    > class members or as to none of them." [citation omitted].  In other
> words, Rule 23(b)(2) applies only when a single injunction or
5    > declaratory judgment would provide relief to each member of the
> class. It does not authorize class certification when each individual
6    > class member would be entitled to a *different* injunction or
> declaratory judgment against the defendant.

7    *Wal-Mart*, 131 S. Ct. at 2557 (emphasis in original).  Civil rights class actions are primary

8    candidates for Rule 23(b)(2) certification.  *See Amchem*, 521 U.S. at 614 ("[c]ivil rights cases

9    against parties charged with unlawful, class-based discrimination are prime examples" of Rule

10   23(b)(2) class actions); *see also Parsons*, 754 F.3d at 686 ("Although we have certified many

11   different kinds of Rule 23(b)(2) classes, the primary role of this provision has always been the

12   certification of civil rights class actions." (citing *Amchem*, 521 U.S. at 614)).

13           Plaintiffs meet Rule 23(b)(2)'s requirements as they seek declaratory and injunctive relief

14   from Defendants' systematic policies and practices, which Plaintiffs allege violate their civil rights

15   by depriving them of access to education, including special education and related services, as well

16   as subjecting them to room confinement without regard for their disabilities and without

17   appropriate education services.  Plaintiffs' claims apply to all class members, and an injunction

18   addressing the Defendants' allegedly unconstitutional policies and practices resolves those claims

19   for all Plaintiffs.  *See id.* at 688 (Rule 23(b)(2)'s "requirements are unquestionably satisfied when

20   members of a putative class seek uniform injunctive or declaratory relief from policies or practices

21   that are generally applicable to the class as a whole.").  Furthermore, while the Defendants'

22   policies and practices concerning educational services and room confinement may impact

23   individual class members in various ways and degrees, these policies and practices nonetheless

24   "constitute shared grounds" for all of the individuals in the proposed class, demonstrating that

25   Defendants have acted or refused to act on grounds that apply generally to the class.  *Id.*  As such,

26   the Court finds that Rule 23(b)(2)'s requirements are satisfied for purposed of this Motion.

27           3.    <u>Class Certification Summary</u>

28           In view of the analysis above, the Court finds that Plaintiffs have satisfied the requirements

United States District Court
Northern District of California

of Rule 23(a)(1-4) and (b)(2).  Accordingly, for purposes of this motion, the Court certifies the stipulated and proposed class listed above and appoints Disability Rights Advocates and Public Counsel as class counsel to effectuate the settlement.

**B.      Preliminary Fairness Determination**

The Court now examines the Settlement Agreements to ensure they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C).  As noted, when settlement occurs before formal class certification, settlement approval requires a higher standard of fairness in order to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the class. *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).  Nonetheless, "class action settlements do not need to embody the best result for preliminary approval." *In re Google*, 2014 WL 1266091, at *6.  "At this point, the court's role is to determine whether the settlement terms fall within a reasonable range of possible settlements, with 'proper deference to the private consensual decision of the parties' to reach an agreement rather than to continue litigating." *Id.* (quoting *Hanlon*, 150 F.3d at 1027).

"The Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval." *Angell v. City of Oakland*, 2015 WL 65501, at *7 (N.D. Cal. Jan. 5, 2015) (quoting *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011) and *In re Tableware*, 484 F. Supp. 2d at 1079)).  "Closer scrutiny is reserved for the final approval hearing." *Harris*, 2011 WL 1627973, at *7.

1.      Settlement Negotiations

The settlements in this case appear to be the product of serious, informed, non-collusive negotiations.  Plaintiffs sent the Defendants a pre-litigation demand letter in July 2013, Smith Decl. ¶ 12, and after Plaintiffs filed this action, Defendants met with them on August 22, 2013 to discuss the possibility of engaging in settlement negotiations, *id.* ¶ 13.  After Plaintiffs submitted two different settlement proposals and the parties maintained ongoing discussions, all parties met

for a two-day, in-person settlement conference before the Judge Warren in November 2013.  *Id.* ¶¶

14-16.  Although they were unable to reach an agreement, they continued to discuss settlement

options and exchanged written proposals in February 2014.  *Id.* ¶ 17.

In the meantime, "[t]he action was vigorously litigated and involved significant discovery,

including depositions of each of the named Plaintiffs and voluminous written discovery including

the production of extensive educational records for individual youth held at the Juvenile Hall."

Mot. at 22.  There were also two separate Motions to Dismiss, which were briefed concurrently

with Plaintiffs' latest Class Certification Motion.  *Id.*  The action also involved filing

administrative proceedings on behalf of each of the named Plaintiffs, all of which proceeded to

hearing.  *Id.*  Accordingly, the Court accepts Plaintiffs' representation that when they and

Defendants "agreed to explore settlement, both sides came to the negotiating table with extensive

knowledge of the relevant facts, evidence, and law."  *Id.*

Judge Spero held in-person settlement conferences with Plaintiffs and CCCOE on August

26, 2014, and with Plaintiffs and the County on August 27, 2014.  Smith Decl. ¶ 18.  The parties

continued to periodically meet with Judge Spero and held ongoing settlement negotiations for the

next several months.  *Id.* ¶¶ 18-23.  According to Plaintiffs, "[m]any issues were heavily contested

and the resulting compromises were based on a series of protracted negotiations involving careful

deliberation by counsel for the Parties."  Mot. at 22-23.  They state that the "settlement process

was extensive, involved, and conducted at an arm's length."  *Id.* at 22.  Plaintiffs executed the final

Agreement with CCCOE on May 18, 2015 and the final Agreement with the County on May 19,

2015.  Smith Decl. ¶ 24.

Given the foregoing, it appears the parties' Settlement Agreements are based on an

extensive and serious set of negotiations lasting virtually the duration of the litigation but while at

the same time both parties continued to vigorously litigate the action, which in turn permitted

them to become more informed about the facts of this case.  Additionally, as Plaintiffs assert,

"[t]he lack of collusion between the Parties is further evidences by the fact that the Parties did not

negotiate Plaintiffs' attorney's fees or costs until after agreement was reached on the key merits

issues."  Mot. at 23.  Likewise, "[t]he assistance of an experienced mediator in the settlement

United States District Court
Northern District of California

process confirms that the settlement is non-collusive." *Satchell v. Fed. Exp. Corp.*, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).  Accordingly, the process by which the parties reached their settlement weighs in favor of preliminary approval.

   2.   The Presence of Obvious Deficiencies

   The Court must next analyze whether there are obvious deficiencies in the Settlement Agreements.  The Court raised a handful of issues with the parties at the hearing, and having heard the parties' responses and in light of their recent stipulations, the Court is satisfied there are no obvious deficiencies in the parties' agreements.

   First, the parties' recent stipulation addresses relatively minor discrepancies between the Settlement Agreements and the Class Notice, as well as clarifies that any award of attorneys' fees to Plaintiffs' counsel is subject to Court approval.[5]  *See* Dkt. No. 284.  Second, Plaintiffs and CCCOE also recently submitted a stipulation at the hearing indicating they agreed that CCCOE's first installment payment to Plaintiffs' counsel is payable within 60 days of the Court's issuance of final approval, whereas previously the CCCOE Agreement reflected that Plaintiffs' counsel would be paid on July 1, 2015, before the Court's approval.  Dkt. No. 283.  Finally, the Court asked counsel for all parties about their intent in structuring the settlement agreements in various ways, including their Alternative Dispute Resolution procedures in the event that the parties have future disputes on the implementation of the Settlement Agreements' terms, and the parties confirmed their intent in setting the procedures in the way they were laid out in the Agreements.

   Accordingly, the lack of obvious deficiencies in the Settlement Agreements, with the submitted stipulations, weighs in favor of granting preliminary approval.

   3.   Preferential Treatment

   The third factor the Court considers is whether the Settlement Agreements provide preferential treatment to any class member.  Having reviewed the proposed Agreements, the Court finds there is no preferential treatment to any class member.  The proposed relief does not single

---

[5] While the Court is not approving the requested attorneys' fees and costs at this stage, the Court notes that before Final Approval, class counsel must support these requests with affidavits and documents that demonstrate such requests are reasonable, given the time spent on the litigation. *See McCabe v. Six Continents Hotels, Inc.*, 2015 WL 3990915, at *8 (N.D. Cal. June 30, 2015).

out any particular class member(s) but appears uniform.  Additionally, the named Plaintiffs will not receive any incentive awards or any other preferential treatment through the Agreements.

Under the County Agreement, the County will pay the named Plaintiffs a total of $1,140, which represents the amount awarded to them for the compensatory education by the OAH administrative judge following their filing of three individual due process administrative proceedings.  *See* Mot. at 4-5 & 10 n.6.  The County will provide these funds in exchange for Plaintiffs dismissing their cross appeals of the OAH's decisions.  *Id.* at 10 n.6.  In doing so, the named Plaintiffs release their individual claims for compensatory education against the County. *Id.*  There is no indication this impacts the relief to the class, and Plaintiffs contend the "payments do not affect other class members' rights to bring their own claims for compensatory education based on their individual experiences in Juvenile Hall," noting that "those claims are specifically carved out and not released in the County Agreement."  *Id.* (citing Cty. Agmt. at 10, § VI).

Accordingly, the Court finds that this factor weighs in favor of preliminary approval.

4.     Reasonable Range of Possible Approval

Finally, the Court must determine whether the proposed settlement falls within the range of possible approval.  To determine whether an agreement is fundamentally fair, adequate, and reasonable, the Court may preview the factors that ultimately inform final approval: (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.  *Hanlon*, 150 F.3d at 1026.

The Court is satisfied that the *Hanlon* factors support preliminary approval.  Although there is no "amount offered" in the Settlement Agreements, they provide for much of the relief originally sought by Plaintiffs, and it further appears the parties have conducted meaningful evaluations of the merits of this case to be able to reasonably evaluate their respective positions. As the Motion points out, each side contends it would have ultimately prevailed after continued and likely prolonged litigation, but both parties agree the risks presented by continued litigation

1    would have been great.  Mot. at 21.  This case involves a number of complex legal and factual

2    issues, and it appears that settlement at this time will avoid substantial additional costs to all

3    parties, as well as avoid the delay and the risks presented by further litigation regarding issues

4    addressed by settlements.  It further appears that the Settlement Agreements were reached as the

5    result of intensive, prolonged, serious, and non-collusive arms-length negotiations, through the

6    assistance of experienced mediators.  Finally, the Court has not received any reactions from class

7    members at this time; the Court awaits those responses in conjunction with the Fairness Hearing.

**ORDER**

8

9        In light of the foregoing analysis, the Motion for Preliminary Approval of Class Settlement

10   is **GRANTED** as follows:

11       1)    This Order incorporates by reference the definitions in the Settlement Agreements

12   and all terms defined therein shall have the same meaning in this Order as set forth in the

13   Settlement Agreements.

14       2)    The proposed Settlement Class is hereby conditionally certified pursuant to Federal

15   Rules of Civil Procedure 23(a) and (b)(2) for purposes of settlement.  The Settlement Class is

16   defined as:

17             All youth with disabilities as defined under the ADA and the
             Rehabilitation Act who are currently detained at or who will be
18             detained at the Contra Costa County Juvenile Hall.

19   Certification of the Settlement Class is solely for settlement purposes and without prejudice in the

20   event the Settlement Agreements are not finally approved or otherwise do not take effect.

21       3)    The Settlement Agreements are preliminarily approved as fair, adequate, and

22   reasonable pursuant to Federal Rule of Civil Procedure 23(e).

23       4)    The Court appoints and designates Plaintiffs G.F., by and through her guardian ad

24   litem, Gail F.; W.B.; and Q.G as class representatives for settlement purposes only.

25       5)    The Court appoints Disability Rights Advocates and Public Counsel as Class

26   Counsel for the Settlement Class.

27       6)    The Court approves the form and content of the proposed Notice of Proposed

28   Settlement of Class Action Lawsuit ("Notice"), Dkt. No. 284-1, with one exception: the Notice

United States District Court
Northern District of California

United States District Court
Northern District of California

1    must be modified to reflect the amended dates in this Order.  The Court also approves the Notice

2    Plan as set forth in the parties' Agreements in Dkt. Nos. 279-2 (CCCOE Agmt. at 8, § 8.4) and

3    279-3 (Cty. Agmt. at 9, § V(F)), as well as the parties' Stipulation in Dkt. No. 284.  The deadline

4    for distribution of the Notice to the class is **August 21, 2015.**

5    　　　　7)    In the event the Settlement Agreements are not finally approved by the Court, or

6    otherwise fail to become effective, neither Plaintiffs nor Plaintiffs' counsel shall have any

7    obligation to repay the amounts disbursed to accomplish such notice and administration.

8    　　　　8)    Any objections by members of the Settlement Class to the proposed Settlement

9    Agreement shall be heard, and any papers submitted in support of said objection shall be

10   considered by the Court at the Fairness Hearing only if, **by October 13, 2015**, such objector files

11   with the Class Action Clerk of the United States District Court for the Northern District of

12   California, 450 Golden Gate Avenue, San Francisco, CA 94102: (1) a notice of his/her objection

13   and a statement of the basis for such an objection; and/or (2) if applicable, a statement of his/her

14   intention to appear at the Fairness Hearing.  A member of the Settlement Class need not appear at

15   the Fairness Hearing in order for his/her objection to be considered.  Any Settlement Class

16   member who does not make his/her objection in the manner provided for in this Order shall be

17   deemed to have waived such objection.

18   　　　　9)    Plaintiffs shall file their motion for approval of attorneys' fees and costs **by**

19   **September 29, 2015**.

20   　　　　10)   No later than **October 29, 2015**, the Parties shall file all papers in support of the

21   Application for Final Approval of the Settlement Agreements and/or any papers in response to any

22   valid and timely objection submitted to the Court, and shall serve copies of such papers on each

23   other and upon any objector who has complied with the provisions of Paragraph 8 of this Order.

24   Counsel for the Parties will also file with the Court sworn statements evidencing compliance with

25   the notice provisions of this Order.

26   　　　　11)   A Fairness Hearing shall be held before this Court on **November 12, 2015**, at 10:00

27   a.m. in Courtroom B, 15th Floor, 450 Golden Gate Avenue, San Francisco, California to

28   determine all necessary matters concerning the Settlement Agreements, including: whether the

proposed Settlement Agreements' terms and conditions are fair, adequate, and reasonable; whether Plaintiffs' Counsel's attorneys' fees and reimbursement of expenses should be approved; and whether an order approving the Settlement Agreements and dismissing the Litigation on the merits and with prejudice against the Named Plaintiffs and the Settlement Class, subject to the Court retaining jurisdiction to administer and enforce the Settlement Agreements, should be entered.

12)     The Fairness Hearing may, without further notice to the Settlement Class (except those who have filed timely objections or entered appearances), be continued or adjourned by order of the Court.

13)     Counsel for the Parties are hereby authorized to utilize all reasonable procedures in connection with the administration of the Settlement Agreements which are not materially inconsistent with either this Order or the terms of the Settlement Agreements.

14)     All pending pretrial deadlines are hereby vacated.

**IT IS SO ORDERED.**

Dated: July 30, 2015

_____

MARIA-ELENA JAMES
United States Magistrate Judge